## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AMERICAN FEDERATION OF** | ) | |
| **GOVERNMENT EMPLOYEES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 1:08-cv-00692 (EGS)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SECRETARY OF THE AIR FORCE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Secretary of the Air Force, respectfully moves this Court pursuant to Rules

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the

Complaint for lack of subject matter jurisdiction and failure to state a claim.  Alternatively,

Defendant respectfully requests summary judgment in its favor, pursuant to Federal Rule of Civil

Procedure 56 and Local Rules 7(h) and 56.1, on the ground that no genuine issue of material fact

exists and Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant refers the Court to the attached Statement of

Material Facts Not in Genuine Dispute, the Memorandum of Points and Authorities, and

Defendant's Exhibits A-J.

June 23, 2008                          Respectfully  submitted,


      /s/ Jeffrey Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


      /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


      /s/ Cindy Owens
CINDY S. OWENS, D.C. BAR # 491465
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
202-616-2257/ FAX 202-514-8780

**OF COUNSEL:**
MAJOR TIMOTHY TUTTLE
CAPTAIN AMY BRYAN
United States Air Force
Arlington, Virginia

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:08-cv-00692 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**NOT IN GENUINE DISPUTE**

Pursuant to Local Rule 7(h) and in support of Defendant's Motion for Summary

Judgment, Defendant respectfully submits this statement of material facts as to which there

is no genuine dispute.

1. Plaintiff, American Federation of Government Employees (AFGE), is a labor

organization as defined by 5 U.S.C. § 7103(a)(4), and is affiliated with the AFL-CIO.

(Plaintiff's Complaint, filed April 23, 2008, hereinafter "Compl." ¶ 5). AFGE represents

federal government employees throughout numerous federal government departments and

agencies. <u>Id</u>. AFGE represents the interests of employees within its bargaining units by, *inter*

*alia*, enforcing the legal rights of its bargaining unit employees, negotiating collective

bargaining agreements, arbitrating grievances, filing unfair labor practices, lobbying, and

litigating employees' collective and individual rights in the federal courts and administrative

agencies. <u>Id</u>.

2.  Plaintiffs AFGE Local 997, AFGE Local 1364, AFGE Local 1367, AFGE Local 1709, AFGE Local 1778, AFGE Local 1869, AFGE Local 1952, AFGE Local 1997, AFGE Local 2077, AFGE Local 2316, AFGE Local 2361, AFGE Local 2568, AFGE Local 3707, AFGE Local 3854, are local labor unions chartered by Plaintiff AFGE.  (See generally Compl.).  These AFGE chapters represent, among others, U.S. Air Force Air Reserve Technicians (ARTs) at various Air Force bases.  (Compl. ¶ 5.)

3.  Plaintiff Mark Winstead ("Winstead") is an ART employed by the U.S. Air Force at Andrews Air Force Base, Maryland.  Id.  Plaintiff Winstead is a member of the AFGE Local 1401 at Andrews Air Force Base.[1]  Id.

4.  Defendant is the Secretary of the Air Force.  As such he is responsible for the assigning, detailing, and prescribing the duties of members of the Air Force as well as civilian personnel of the Department of the Air Force. (Compl. ¶ 6.)

5.  The reserve components ("RC") of the United States armed forces are part of the military departments (10 U.S.C. § 101(a)(6)) and include, among other elements, the Air Force Reserve.  (Compl. ¶ 7.)

6.  The Air Force Reserve employs a core group of full-time employees to administer RC units, train RC personnel, and maintain RC equipment.  These employees are known as Full-Time Support ("FTS") personnel. Military Technicians ("MTs") are one category of FTS personnel.  Those MTs who hold membership in the Selected Reserve are referred to as

---

[1]AFGE Local 1401, Andrews Air Force Base, Maryland is not listed as a party to this lawsuit. (See generally Compl.).

2

"dual status technicians" because of their status as both civilian employees and reservists. (Compl. ¶ 7-9).

7. An Air Reserve Technician is a "dual status technician." (<u>See</u> Compl. ¶ 10).

8. An Air Reserve Technician ("ART") is a federal civilian employee hired under 5 U.S.C. § 3101 and whose dual status employment is governed by 10 U.S.C. § 10216. (Compl. ¶ ¶ 5, 14).

9. As a condition of employment, ARTs are required to maintain active membership in the Air Force Selected Reserve unit in which the position they hold is authorized, and be assigned militarily to the designated ART Position. (10 U.S.C. § 10216(a)(1)(B) and (d); Compl. ¶ 15).

10. ARTs' responsibilities include "the organizing, administering, instructing, or training of the Selected Reserve or in the maintenance and repair of supplies or equipment issued to the Selected Reserve or the armed forces." (10 U.S.C. § 10216(a)(1)(C); <u>See</u> Compl. ¶ 5).

11. MTs such as ARTs are federal civilian employees who provide support primarily to wartime deployable reserve units. (Compl. ¶ 12).

12. The Air Force Reserve's technician program was established in 1957 under the statutory umbrella of the civil service. (Compl. ¶ 11).

13. MTs shall not perform their civilian duties during their inactive duty or annual military reserve training unless their civilian and military duties are identical. Department of Defense ("DOD") Instruction 1205.18 ¶ 6.10.4. (Compl. ¶ 13).

14. Unlike non-dual status MTs, ARTs can be ordered to deploy with their unit if it is mobilized. (Compl. ¶ 16). In his or her military capacity, an MT may be a commissioned officer, a warrant officer, or an enlisted member. (Compl. ¶ 17).

15. ARTs receive civilian employee pay for their civil service jobs, plus military pay for their weekend military duty and summer active military duty tours. (Compl. ¶ 18). Because they are members of the civil service, ARTs may qualify for a civil service pension. (Compl. ¶ 19). They may also qualify for military retired pay based upon their active and reserve military service. (Compl. ¶ 20). ARTs are subject to timekeeping requirements pursuant to federal regulations for civilian employees with respect to their civilian employment. (Compl. ¶ 21).

16. ARTs receive annual leave pursuant to federal regulations for civilian employees with respect to their civilian employment. (Compl. ¶ 22). In their civilian capacity, ARTs are subject to civil service laws and regulations. (Compl. ¶ 23).

17. Air Force Instructions ("AFIs") are publications which act as orders of the Secretary of the Air Force. ((See 10 U.S.C. § 8013(g)(3) (Secretary of the Air Force has the authority to promulgate regulations)). AFIs are certified and approved at the Secretariat or the Air Staff level. AFIs are used to enable the Secretary and those directed by him "to carry out his functions, powers, and duties under Title 10 of the U.S. Code." 10 U.S.C. § 8013(g)(3).

18. An Interim Change ("IC") is an authorized method of changing an official Air Force publication. (AFI 33-360, Paragraphs 2.24 and 2.25).

19.  On August 6, 2007, Defendant, through interim changes to three (3) AFIs, instituted a requirement that ARTs wear their military uniform while performing duties in a civilian status.  (See Compl. ¶ 24; the relevant portions of the AFIs are attached hereto as Defendant's Exhibits A-C).

20.  The Air Force has elected not to bargain the substance of the decision to require ARTs to wear their military uniforms while performing duties in a civilian status.  (Compl. ¶ 25; See 5 U.S.C. § 7106(b)(1)).

21.  National Guard technicians, an MT category distinct from ARTs, are statutorily required to wear their military uniform while performing duties in a civilian status pursuant to Section 709(b)(4) of Title 32 of the U.S. Code.[2]

22.  There is no similar statutory requirement regarding uniform wear for ARTs, though the Department of Defense asked Congress to amend Section 10216 of Title 10 of the U.S. Code by adding a requirement that dual-status technicians in the Army and Air Force Reserve be required to wear their military uniforms while performing duties in a civilian status.  (Compl. ¶ ¶ 26-27).

23.  There have been multiple cases pursued by bargaining units and individuals in the various Federal Labor Relations Authority ("FLRA") fora (pursuant to 5 U.S.C. §§ 7101 *et seq*.)  regarding the Defendant's decision to require ARTs to wear their military uniforms while performing duties in their civilian capacity.  For example, Plaintiff AFGE Local 1778 filed one grievance dated November 20, 2007, (attached hereto as Defendant's Exhibit D)

---

[2] In Plaintiffs' Complaint, 32 U.S.C. § 709(b)(4) is incorrectly cited as 10 U.S.C. § 709(b)(4). (Compl. ¶ 26).

and Plaintiff AFGE Local 2361 filed a grievance dated October 16, 2007. (attached hereto as Defendant's Exhibit E). These two (2) examples are not exhaustive.

24. Additionally, Unfair Labor Practice ("ULP") charges were brought before the FLRA pursuant to Section 7116 of Title 5 of the U.S. Code; two (2) by Plaintiff AFGE Local 3854 (attached hereto as Defendant's Exhibits F and G), one (1) by Plaintiff AFGE Local 1952 (attached hereto as Defendant's Exhibit H), and one by Plaintiff AFGE Local 2316 (attached hereto as Defendant's Exhibit I), but has been subsequently withdrawn by Plaintiff. These examples are not exhaustive. The remaining ULPs filed by Plaintiffs are awaiting decision by the FLRA Regional Directors.[3]

25. Finally, Plaintiff 1367 has petitioned the FLRA[4] to assist in negotiations related to the requirement that ARTs wear their military uniform while serving in a civilian capacity. (Attached hereto as Defendant's Exhibit J).

June 23, 2008                                  Respectfully submitted,

                                    _____/s/ Jeffrey A. Taylor_____
                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                    United States Attorney

---

[3] Currently, the position of FLRA General Counsel is vacant. The authority to issue ULP Complaints is held by the General Counsel. 5 U.S.C. § 7104(f). Thus, if the FLRA Regional Directors wish to have a ULP Complaint issued, they will have to wait until the position of FLRA General Counsel is filled. The position is appointed by the President and is subject to the advice and consent of the U.S. Senate. 5 U.S.C. § 7104(f).

[4] 5 C.F.R. 2424, titled "Negotiability Proceedings," details the FLRA's procedures for determining under Section 7106 of Title 5 of the U.S. Code whether a federal agency must negotiate a union's proposal.

6

_____/s/Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


_____/s/Cindy Owens_____
CINDY S. OWENS, D.C. BAR # 491465
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
202-616-2257/ FAX 202-514-8780


**OF COUNSEL:**
MAJOR TIMOTHY TUTTLE
CAPTAIN AMY BRYAN
United States Air Force
Arlington, Virginia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:08-cv-00692 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff, American Federation of Government Employees (AFGE), is a labor

organization as defined by Section 7103(a)(4) of Title 5 of the U.S. Code.  ( See Plaintiff's

Complaint, filed April 23, 2008, hereinafter  "Compl." ¶ 5).  AFGE is composed of various

chapters.[5]  Compl. ¶ 1.  The AFGE chapters represent, among others, U.S. Air Force Air Reserve

Technicians ("ARTs") at various Air Force bases.  Id.  An ART is a federal civilian employee

serving in a dual status position that requires an active assignment in an Air Force Selected

Reserve unit.  10 U.S.C. § 10216(a)(1)(B) and (d) (2008) and Compl. ¶ 15.  An ART's

responsibilities include "the organizing, administering, instructing, or training of the Selected

_____

[5]Plaintiffs' AFGE Local 997, AFGE Local 1364, AFGE Local 1367, AFGE Local 1709, AFGE
Local 1778, AFGE Local 1869, AFGE Local 1952, AFGE Local 1997, AFGE Local 2077, AFGE
Local 2316, AFGE Local 2361, AFGE Local 2568, AFGE Local 3707, AFGE Local 3854, are its
local chapters.

Reserve or in the maintenance and repair of supplies or equipment issued to the Selected Reserve

or the armed forces." 10 U.S.C. § 10216(a)(1)(C) and Compl. ¶ 15.

Plaintiff, Mark Winstead ("Winstead"), is an ART employed by the U.S. Air Force at

Andrews Air Force Base, Maryland. Compl. ¶ 5. Plaintiff Winstead is a member of the AFGE

Local 1401 at Andrews Air Force Base.[6] Id.

On August 6, 2007, Defendant, through "interim changes" to three (3) Air Force

Instructions (AFIs)[7], instituted a requirement that ARTs wear their military uniform while

performing duties in a civilian status. Defendant's Exhibits A-C; Compl. ¶ 24.

Specifically, AFI 36-703, states that "Air Reserve Technicians will adhere to the

requirements as those prescribed in AFI 26-2903, '*Dress and Personal Appearance of Air Force

Personnel*,' when wearing the military uniform in civilian status." (Defendant's Exhibit A).[8] AFI

36-801 states that "Air Force Reserve Command (AFRC) Air Reserve Technicians (ART) must

wear the military uniform while performing civilian duties as an ART." See AFI 36-801,

Chapter 1, paragraph 1.1.1.9. (Defendant's Exhibit B).[9] And, AFI 36-2903 includes Tables 1.3

and 6.1 that indicate members in the Air Reserve Technicians must wear the uniform.

(Defendant's Exhibit C).[10]

---

[6]AFGE Local 1401 at Andrews Air Force Base is not listed as a party in the Plaintiff's complaint.
See generally Compl.
[7]AFIs are publications that act as orders of the Secretary of the Air Force. AFIs are orders issued
pursuant to the authority granted the Secretary of the Air Force by statute 10 U.S.C. 8013(g)(2)
and (3). An "Interim Change" (IC) is an authorized method of changing an official Air Force
publication. (AFI 33-360, Paragraph 2.24).
[8] available at http://www.e-publishing.af.mil/shared/media/epubs/AFI36-703.pdf.
[9]available at http://www.e-publishing.af.mil/shared/media/epubs/AFI36-801.pdf.
[10]available at http://www.e-publishing.af.mil/shared/media/epubs/AFI36-2903.pdf.

The decision to change the AFIs was made pursuant to Section 8013(g)(3) of Title 10 of the U.S. Code, granting the Secretary authority to "prescribe regulations to carry out his functions, powers, and duties under this title. " The decision was also made pursuant to the agency's authority to determine the method and means of performing work without electing to bargain under Section 7106(b)(1) of Title 5 of the U.S. Code. Additionally, Section 301 of Title 5 of the U.S. Code, granting the Secretary, as head of a military department, the authority to "prescribe regulations for the governance of his department, the conduct of its employees, the distribution and performance of its business . . . .;" and Section 10202(a) of Title 5 of the U.S. Code, provides the Secretary authority to "prescribe such regulations . . . necessary to carry out provisions of law relating to the reserve components under the Secretary's jurisdiction."

On April 23, 2008, Plaintiffs filed a Complaint with this Court alleging the Defendant violated the Administrative Procedures Act ("APA") by requiring ARTs to wear their military uniform while in a civilian duty status. Compl. ¶¶ 1-2. Plaintiffs allege the decision was arbitrary and capricious in violation of Section 706(2)(A) of Title 5 of the U.S. Code, contrary to law in violation of Sections 771 and 10216 of Title 10 of the U.S. Code and Section 702 of Title 18 of the U.S. Code and within the jurisdiction of this Court per Section 706(2)(A) of Title 5 of the U.S. Code, and in excess of statutory authority in violation of Section 10216 of Title 10 of the U.S. Code. (Compl. ¶¶ 30-38).

## II.  ARGUMENT

### A.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims

#### 1.    Standard of Review

On a motion to dismiss pursuant to Rule 12(b)(1), a complaint is construed to afford all

possible inferences in favor of the plaintiff's allegations of fact.  Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1106 (D.C. Cir. 2005).  "In spite of the favorable inferences that a plaintiff receives, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence."  McManus v. District of Columbia, 2007 U.S. Dist. LEXIS 94797, *30-32 (D.D.C. 2007); See also Am. Farm Bureau v. United States EPA, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).  In considering a motion to dismiss for lack of subject matter jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25, n.3 (D.C. Cir. 1997). Jurisdiction is a threshold matter; without it, this court has no authority to decide potentially dispositive issues in this case.  Tuck v. Pan Am. Health Org., 668 F.2d 547, 549 (D.C. Cir. 1981) ("The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds."); Am. Farm Bureau, at 91 (D.D.C. 2000) ("The court must address the issue of jurisdiction as a threshold matter, because absent jurisdiction the court lacks the authority to decide the case on any other grounds." (citations omitted)).  Therefore, before considering any other potentially dispositive arguments, the court must first consider the jurisdictional issue defendant raises.

## 2. Plaintiffs' Claims Are Not Justiciable As They Raise a Political Question

The Defendant, the Secretary of the Air Force, is responsible for effectuating national policy by implementing military decisions calculated to further that policy in a manner consistent

4

with the decisions made by the National Command Authority (the President of the United States as Commander in Chief of the U.S. military forces).  Those military decisions are political in character and are committed by the U.S. Constitution to the President, at Art. II, § 2.  "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."  Marbury v. Madison, 5 U.S. 137, 170 (1803).

It is a longstanding principle that, due to respect for the Legislative and Executive branches of the U.S. government and by recognizing that courts are ill-equipped to resolve certain matters, political questions are "nonjusticiable."  "A declination of jurisdiction under the doctrine presupposes that another branch of government is both capable of and better suited for resolving the 'political' question.  Vieth v. Jubelirer, 541 U.S. 267, 277 (2004); Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 229-230 (1986).  The Court in Baker v. Carr, identified several factors which make an issue a political question, thus nonjudiciable.[11]  369 U.S. 186, 217 (1962).

In Gilligan v. Morgan, 413 U.S. 1 (1973), the Supreme Court reviewed "the appropriateness of the 'training, weaponry and orders' of the Ohio National Guard" during civil unrest at Kent State University and held that the military decisions were nonjusticiable as it was a political question reserved for Congress and the Executive Branch.  413 U.S. at 3, 5.  The

---

[11]"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  Id. at 217.

Supreme Court illuminated the judicial branch's role in reviewing such military decisions.

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible – as the Judicial Branch is not – to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject <u>always</u> to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlie our entire constitutional system . . . . <u>Id.</u> at 10 (Emphasis in original).

In the present case, the Secretary of the Air Force, through his delegated commander, has made a distinctly military decision to order that ARTs wear their uniforms while they are serving in their civilian capacity. (See Defendant's Exhibits A-C). This decision was made pursuant to the Secretary's authority to make regulations under Section 8013(g)(3) of Title 10 of the U.S. Code. The decision involves a uniquely military matter which has "<u>always</u>" been subject to the Legislative and Executive Branches. <u>Gilligan</u>, at 10. This Court should dismiss this case as it concerns a nonjusticiable political question.

**B.     Plaintiffs Have Another Adequate Remedy at Law and Did Not State Facts in Support of Their Claims, Therefore This Court Should Grant Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

**1.     Standard of Review for a 12(b)(6) Motion to Dismiss**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a claim if plaintiff's complaint fails to plead "enough facts to state a claim for relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from <u>Conley v. Gibson</u>, 355

U.S. 41, 47 (1957)); <u>Aktieselskabet v. Fame Jeans, Inc.</u>, 2008 WL 1932768 (D.C. Cir. Apr. 29, 2008); <u>In re Sealed Case</u>, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing <u>Twombly</u>).  Hence, the focus is on the language in the complaint, and whether that language sets forth sufficient factual allegations to support plaintiff's claims for relief.

The court must construe the factual allegations in the complaint in the light most favorable to plaintiff and must grant plaintiff the benefit of all inferences that can be derived from the facts as they are alleged in the complaint.  <u>Barr v. Clinton</u>, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, the Court need not accept any inferences or conclusory allegations that are unsupported by the facts pleaded in the complaint.  <u>Kowal</u>, at 1276.  Moreover, the Court need not "accept legal conclusions cast in the form of factual allegations."  <u>Id.</u>

> **2.     Plaintiffs Have Another Adequate Remedy at Law and Therefore Judicial Review in This Case is Unavailable under the Administrative Procedures Act**[12]

The decision for ARTs to wear the military uniform while in a civilian duty status is subject to review of the Federal Labor Relations Authority ("FLRA") and the decisions of the FLRA are subject to judicial review.  In this case, Plaintiffs are improperly bringing a suit against

---

[12]Although it appears that the D.C. Circuit has addressed the issue of whether another adequate remedy exits in an APA lawsuit under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction,  <u>See</u> <u>Godwin v. Secretary of House and Urban Development</u>, 356 F.3d (D.C. Cir. 2004), Defendant presents its argument under Federal Rule of Civil Procedure 12(b)(6) to be consistent with the D.C. Circuit's en banc decision in <u>Council of the Blind of Del. Cty. Valley v. Regan</u>, 709 F.2d 1521 (D.C. Cir. 1983), that has been followed by this Court. <u>Love v. Connor</u>, 525 F. Supp. 2d 155, 159 (D.D.C. Nov. 30, 2007) (J. Robertson) (analyzing the issue of whether another adequate remedy exists in an APA case on remand from the D.C. Circuit under Federal Rule of Civil Procedure 12(b)(6)).

the Secretary of the Air Force when the claims they present should first be brought to and decided by the FLRA.

The APA limits judicial review to "agency action made reviewable by statute and final agency action <u>for which there is no other adequate remedy in a court</u>." <u>Council of the Blind of Del. Cty. Valley v. Regan</u>, 709 F.2d 1521, 1531 (D.C. Cir. 1983) (quoting 5 U.S.C. § 704) (emphasis added); <u>See also</u> <u>Godwin v. Secretary of Housing and Urban Development</u>, 356 F.3d 310, 312 (D.C. Cir. 2004). "The definitive interpretation of this section comes from <u>Bowen v. Massachusetts</u>, 487 U.S. 879 (1998), where the Supreme Court cited Attorney General Clark's manual on the APA for the proposition that § 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." <u>Id</u>. at 903. <u>Love v. Connor</u>, 525 F. Supp. 2d 155, 158 (Nov. 30, 2007) (J. Robertson). In <u>Love</u>, Judge Robertson identified that an act of Congress to extend a period of limitations by two (2) years so that plaintiffs could raise claims under the Equal Credit Opportunity Act, was both "special" and "adequate." <u>Love</u>, 525 F. Supp. 2d at 157-158. In the instant case, the FLRA provides both a special and an adequate remedy for Plaintiffs' claims.

First, the FLRA is a special entity created to address unique labor relations issues. By enacting the Civil Service Reform Act of 1978, (October 13, 1978, Pub.L. 95-454, 92 Stat. 1111), ("CSRA"), Congress created a robust and comprehensive scheme for reviewing the employment practices of federal government agencies. <u>United States v. Fausto</u>, 484 U.S. 439 (1988). The Federal Service Labor Management Relations Statute ("FSLMRS") (at Title VII of the CSRA), provides for administrative review by the Federal Labor Relations Authority ("FLRA"). 5 U.S.C. §

7101 et. seq.  Additionally, the FSLMRS provides for judicial review of FLRA decisions.  5 U.S.C. § 7123(a).

The CSRA, including the FSLMRS, was specifically designed so that the FLRA, as an expert body in labor relations law, could effectively implement the law.  New York Council, Association of Civilian Technicians v. FLRA (New York Council) 757 F.2d 502, 507 (2d Cir. 1985), cert. denied, 474 U.S. 846 (1985) (stating that "[l]ike the National Labor Relations Board, the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act.  Consequently, the Authority is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the Act to the complexities' of federal labor relations.") (emphasis added).  Congress not only created a special law to address labor relations issues, it also created the FLRA, a special body to make decisions regarding the labor relations disputes.

Second, the FLRA provides an adequate remedy at law because the decisions of the FLRA are subject to judicial review.  In fact, FLRA decisions regarding mandatory uniform wear by civilian military technicians have been judicially reviewed pursuant to the APA and affirmed.  Specifically, in New York Council, Association of Civilian Technicians v. FLRA (New York Council) 757 F.2d 502 (2d Cir. 1985), cert. denied, 474 U.S. 846 (1985), a case almost identical to the one at hand,  the Second Circuit upheld FLRA's decision to dismiss a complaint brought against the New York National Guard for its refusal to include a collective bargaining provision permitting its civilian

9

technicians to wear civilian attire.  At issue was the FLRA's decision affirming management's right to require National Guard technicians wear their uniforms while in their civilian capacity.[13]

Furthermore, the FLRA has ruled on the matter in multiple decisions and held that it was within management's rights to mandate uniform wear by military technicians while performing duties in civilian status as a "methods and means" of performing work pursuant to 5 U.S.C. § 7106 (b)(1).[14]

---

[13]The Second Circuit held that  "[i]t was not arbitrary for the Authority to consider it self-evident and unworthy of discussion that standard civilian attire would not 'foster military discipline, promote uniformity, encourage *esprit de corps*, increase the readiness of the military forces for early deployment and enhance identification of the National Guard as a military organization.'" Id. at 511.  In concluding such, the court found the FLRA provided a "reasoned explanation for its decision that does not contravene Congressional purpose."  Thus, the petition for review was denied.  Id. at 505.  (Cited by ACT, Schenectady Chapter v. FLRA, 230 F.3d 377, at 378 (D.C. Cir. 2000), ACT Chapter 29 v. FLRA, 22 F.3d 1150, at 1154(D.C. Cir. 1995), and Rhode Island National Guard v. FLRA, 982 F.2d 577, 578 (D.C. Cir. 1993); followed by AFGE Local 2441 v. FLRA, 864 F.2d 178, at 186 (D.C. Cir 1988)).

[14]See Division of Military and Naval Affairs, State of New York, Albany, New York and New York Council, Association of Civilian Technicians, 15 FLRA 288 (1984), (order that civilian technicians wear military uniforms while performing technician duties constitutes management's choice of a "methods, and means of performing work" within the meaning of § 7106(b)(1)) Association of Civilian Technicians, Michigan State Council and Michigan Air National Guard, 32 FLRA No. 1207 (1988), (requirement that civilian technicians observe military customs when in uniform constituted a method and means of performing work within the meaning of section 7106(b)(1)), National Association of Government Employees, SEIU, AFL-CIO and National Guard Bureau, Adjutant General, 26 FLRA No. 515 (1987) (requirement that civilian technicians observe military uniform grooming standards is a method and means of performing work; wear of the uniform fosters military discipline, encourages esprit de corps, increases readiness for early deployment, and enhances identification as a military organization), The Adjutant General Massachusetts National Guard Boston, Massachusetts and National Association of Government Employees, 36 FLRA No. 312 (1990) (option not to wear military uniform caps and substitute name tags negotiable only at the election of the agency under 7106(b)(1) as a method and means of performing work), and Association of Civilian Technicians and U.S. Department of Defense National Guard Bureau Rhode Island National Guard Providence, Rhode Island, 38 FLRA No. 1005, (1990) (proposal allowing employees to deviate from specific components of the military  uniform interfered with Agency's right to determine the methods and means of performing work under 7106(b)(1)).

The matter at hand is nothing more than a labor relations dispute between employees and their employer. The CSRA provides the comprehensive scheme for these matters and the FSLMRS provides a specific remedy at law for resolving such disputes between employees and their employer. Because another adequate remedy at law exists for Plaintiff to bring their claims (i.e. the FLRA and judicial review of its decisions), this Court should dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

> **3.    Plaintiffs' Compliant Offers No Evidence Defendant's Decision Was Arbitrary and Capricious**

The Plaintiffs' first cause of action claims the decision to require that ARTs wear their military uniform while performing civilian duties is arbitrary and capricious. (Compl. ¶¶ 30-32). In this case, the Secretary's decision to require ARTs to wear their military uniform while in a civilian status is at the discretion of the Secretary and is subject to a "particularly deferential" standard of review. Cochrane v. Wynne, 2008 U.S. Dist. LEXIS 25876 at *5-6 (D.D.C. March 31, 2008). "To prevail, a plaintiff 'must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" Id. (quoting Frizelle v. Slater, 111 F. 3d 172 (D.C. Cir. 1997). Additionally, in any consideration regarding whether the Plaintiff has stated a claim, this Court's review should focus on whether the Secretary's decision making process was deficient, not whether the decision itself was correct. Kreis v. Sec'y of the Air Force, 866 F.2d 1508, 1511 (D.C. Cir. 1989). In review, this Court should not substitute its judgment for that of the military decision-making authority. Mudd v. Caldera, 134 F. Supp. 2d 138, 141 (D.D.C. 2001) (J. Friedman).

Here, the Plaintiffs provided no facts to support their allegation that the Defendant's decision to require that ARTs wear their military uniform while performing civilian duties is arbitrary and capricious.  (Compl. ¶¶ 30-32).  While the court must construe the facts in the light most favorable to the Plaintiff in a motion to dismiss, the Plaintiff must provide sufficient facts to support its allegation. See Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) .  The Plaintiffs in this case have not provided any facts leading to the conclusion that the Secretary's decision was arbitrary and capricious. They simply allege  "[o]n August 6, 2007, the Secretary amended the regulations to provide that ARTs must wear the military uniform while performing civilian duties."  (Compl. ¶ 24).

### 4.    Plaintiffs' Allegation That Defendant's Decision is Contrary to Law Has No Basis

The Plaintiffs allege that the Defendant's decision mandating that ARTs wear their uniform while performing their civilian duties is contrary to law.  They argue the decision violates Sections 771 and 10216 of Title 10 of the U.S. Code and Section 702 of Title 18 of the U.S. Code.

Section 771 of Title 10 of the U.S. Code states:

> "Except as otherwise provided by law, no person except a member of the Army, Navy, Air Force, or Marine Corps, as the case may be, may wear – (1) the uniform, or a distinctive part of the uniform, of the Army, Navy, Air Force, or Marine Corps; or (2) a uniform any part of which is similar to a distinctive part of the uniform of the Army, Navy, Air Force, or Marine Corps."

Section 702 of Title 18 of the U.S. Code states:

> "Whoever, in any place within the jurisdiction of the United States or in the Canal Zone, without authority, wears the uniform or a distinctive part thereof or anything similar to a distinctive part of the uniform of any of the armed forces of the United States, Public Health Service or any auxiliary of such, shall be fined under this title or imprisoned not more than six months, or both."

Section 10216 of Title 10 of the U.S. Code does not pertain to military uniforms.  This section of the Code explains the authority for creating dual status military technicians (including ARTs), sets out the responsibilities of those positions, and mandates that those technicians be a member of the Selected Reserve.  See 10 U.S.C. § 10216.

Air Reserve Technicians (ARTs) are members of the United States Air Force Selected Reserve.  10 U.S.C. § 10216(a)(1)(B) and (C), § 10216 (d) and (e).  Therefore, ARTs are members of the United States Air Force.  10 U.S.C. § 101(a)(6) (defining "department" to include reserve components); 10 U.S.C. § 101 (a)(8) (defining "military department" to include the Department of the Air Force).  Because ARTs are members of the United States Air Force, Section 771 of Title 10 of the U.S. Code does not apply to them ("no person except a member of the . . .  Air Force . . . .may wear – (1) the uniform..."). The penalties in this Section apply to those individuals not members of the Army, Navy, Air Force or Marine Corp.  10 U.S.C. § 771.  Their status as members of the Air Force also gives them the "authority" to wear the uniform as envisioned in Section 702 of Title 18 of the U.S. Code.  Thus, the penalties spelled out in these statutes do not apply to ARTs.

Even if the ARTs were not considered members of the Air Force when performing their civilian duties, under Section 772(j)(2) of Title 10 of the U.S. Code the Defendant may authorize members of a designated organization to wear the Air Force uniform.  See 10 U.S.C. § 772(j)(2).

Unlike Section 771 of Title 10 of the U.S. Code and Section 702 of Title 18 of the U.S. Code, Section 10216 of Title 10 of the U.S. Code neither pertains to military uniforms nor prescribes any sort of punitive measure.  Nonetheless, the Plaintiffs claim the Defendant acted contrary to Section 10216 in making the decision to require that ARTs wear their military uniform while performing their civilian duties.  (Compl. ¶ 35).  The Plaintiffs' Complaint does not, however, provide any specifics

13

regarding or explanation of how the Defendant's action violated this statute.[15]  As previously

discussed, the Court need not accept any inferences or conclusory allegations that are unsupported by

the facts pleaded in the Complaint.  Kowal, at 1276.

The Plaintiffs' allegations that the Defendant's decision to require ARTs to wear their military

uniform while performing duties in their civilian status violates Section 771 of Title 10 of the U.S.

Code and Section 702 of Title 18 of the U.S. Code are clearly erroneous, as the ARTs do have

authority to wear the uniform thus they are not at risk of penalty.  Additionally, Plaintiffs failed to

provide any explanation of how the Defendant's action violates 10 U.S.C. § 10216.  Thus, the

Plaintiffs' Second Cause of Action should be dismissed in its entirety.

### 5.    Plaintiffs' Allegation That Defendant Exceeded His Authority in Making His Decision Is Incorrect

The Plaintiffs argue that the Defendant exceeded his statutory authority by requiring that

ARTs wear their military uniform while performing duties in their civilian capacity.  (Compl. ¶ 38).

As previously stated, the Defendant has the authority to "prescribe regulations to carry out his

functions, powers, and duties under this title" (10 U.S.C. § 8013(g)(3)); to "prescribe regulations for

the governance of his department, the conduct of its employees, the distribution and performance of

its business . . . ." (5 U.S.C. § 301); and to "prescribe such regulations as the Secretary considers

necessary to carry out provisions of law relating to the reserve components under the Secretary's

jurisdiction."  10 U.S.C. § 10202(a).  The Defendant clearly had the authority to require ARTs to wear

their uniforms while performing their civilian duties.

---

[15] The Defendant's authority for his action is discussed in the next section of this memorandum.

The Plaintiffs' Complaint does not identify any authority, statutory or otherwise, which prohibits the Defendant from requiring ARTs to wear their military uniform while performing their civilian duties. The Complaint implies that, because National Guard Technicians are statutorily required to wear their military uniforms while in a civilian status (Compl. ¶ 26) and, because the Department of Defense requested Congress to create such a statutory requirement that would require ARTs to wear their military uniforms while in a civilian status (Compl. ¶ 27), then the absence of a current statute mandating ARTs to wear the military uniform means the Defendant does not have the authority to issue such an order.

However, over a decade prior to the statutory requirement[16] that National Guard Technicians wear their military uniform while performing duties in a civilian status, the FLRA issued several decisions upholding management's right to create such a requirement.[17] In New York Council, the Court of Appeals for the Second Circuit affirmed the FLRA's decision, effectively confirming that the leadership of the National Guard had the authority to require its military technicians to wear their military uniform while performing duties in their civilian capacity, even without a statutory mandate. Id. The current case is almost identical.

---

[16] In 1996, Section 709 of Title 32 of the U.S. Code was re-written. Included in those changes was a new requirement that National Guard Technicians must wear their military uniforms while performing duties in their civilian capacity. See Pub.L. 104-106, Div. A, Title X, § 1038(a), 110 Stat. 432 (Feb. 10, 1996).

[17] See Division of Military and Naval Affairs, State of New York, Albany, New York and New York Council, Association of Civilian Technicians, 15 FLRA 288 (1984); Association of Civilian Technicians, Michigan State Council and Michigan Air National Guard, 32 FLRA 1207 (1988); National Association of Government Employees, SEIU, AFL-CIO and National Guard Bureau, Adjutant General, 26 FLRA 515 (1987); The Adjutant General Massachusetts National Guard Boston, Massachusetts and National Association of Government Employees, 36 FLRA 312 (1990); and Association of Civilian Technicians and U.S. Department of Defense National Guard Bureau Rhode Island National Guard Providence, Rhode Island, 38 FLRA 1005 (1990).

Section 8013(g)(3) of Title 10 of the U.S. Code, Section 301 of Title 5 of the U.S. Code, and Section 10202(a) of Title 10 of the U.S. Code provide the Defendant the authority to order ARTs to wear their military uniform while working in a civilian status. For the foregoing reasons, the Plaintiffs' Third Cause of Action should be dismissed in its entirety.

> **B.      Plaintiffs Have Already Filed Grievances and Charges Regarding The Matter at Hand with the FLRA, Therefore This Court Should Grant Defendant's Motion for Summary Judgment**
>
> **1.      Standard of Review for Summary Judgment**

Where no genuine dispute exists as to any material fact, summary judgment is required. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. Id. at 247. "The burden on the moving party may be discharged by 'showing' – that is, point out to the [Court] – that there is an absence of evidence to support the non-moving party's case." Sweats Fashions, Inc., v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Thus, to avoid summary judgment here, the Plaintiffs (as the non-moving party) must present some objective evidence that would enable the Court to find it is entitled to relief. In Celotex Corp. v. Catrett, the Supreme court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute. 477 U.S. 317, 322-23 (1986). In Anderson the Supreme Court further explained that "the mere existence of a scintilla of evidence

16

in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff." Anderson, 477 U.S. at 252; see also Laningham v. Navy, 813 F. 2d 1236, 1242 (D.C. cir. 1987) (the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor).

In Celotex, the Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 447 U.S. at 327 (quoting Fed. R. Civ. P. 1).

> **2.    Plaintiffs Have Brought Grievances and Charges Before the FLRA and Therefore Judicial Review Under the APA is Premature**

Plaintiffs have already brought grievances and charges before the FLRA in regard to whether they should be required to wear military uniforms while serving in a civilian capacity. Because the FSLMRS was specifically designed to handle labor disputes such as the one at hand, this Court should grant Defendant's motion for summary judgment.

The Supreme Court has stated that in passing the CSRA, Congress created "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations . . . ." Bush v. Lucas, 462 U.S. 367, 388(1983).  In the consideration of allowing additional legal liability, "Congress is in a better position to decide whether or not the public interest would be served by creating it." Id. at 390.  In the present case, as in Bush, a section of the CSRA, the FSLMRS, provides the comprehensive scheme governing labor relations between federal agencies and employees and is the avenue that Plaintiffs should pursue.

As previously stated, judicial review of FLRA decisions is provided for in Section 7123(a) of Title 5 of the U.S. Code and, at a minimum, Plaintiffs' action under the APA is premature.

In this instance, there have been multiple cases pursued by AFGE bargaining units and individuals in the various Federal Labor Relations Authority (FLRA) fora regarding the Defendant's decision to require ARTs to wear their military uniforms while performing duties in their civilian capacity. For example, Plaintiff AFGE Local 1778 filed one grievance dated November 20, 2007 (Defendant's Exhibits D) and Plaintiff AFGE Local 2361 filed a grievance dated October 16, 2007. (Defendant's Exhibits E). These two (2) examples are by no means exhaustive.

Additionally, Unfair Labor Practice ("ULP") charges were brought before the FLRA pursuant to Section 7116 of Title 5 of the U.S. Code; two (2) by Plaintiff AFGE Local 3854 (Defendant's Exhibits F and G), one (1) by Plaintiff AFGE Local 1952 (Defendant's Exhibit H), and one by Plaintiff AFGE Local 2316 (Defendant's Exhibit I), but has been subsequently withdrawn by Plaintiff. These examples are also not exhaustive. The remaining ULPs filed by Plaintiffs are awaiting decision by the FLRA Regional Directors.[8][1]

Finally, Plaintiff AFGE Local 1367 has petitioned the FLRA[19] to assist in negotiations related to the requirement that ARTs wear their military uniform while serving in a civilian capacity. (Defendant's Exhibit J).

---

[18] Currently, the position of FLRA General Counsel is vacant. The authority to issue ULP Complaints is held by the General Counsel. 5 U.S.C. § 7104(f). Thus, if the FLRA Regional Directors wish to have a ULP Complaint issued, they will have to wait until the position of FLRA General Counsel is filled. The position is appointed by the President and is subject to the advice and consent of the U.S. Senate. 5 U.S.C. § 7104(f).

[19] 5 C.F.R. 2424, titled "Negotiability Proceedings," details the FLRA's procedures for determining under 5 U.S.C. 7106 whether a federal agency must negotiate a union's proposal.

After notification of the change in the AFIs requiring that ARTs wear their military uniform while performing duties in a civilian status, Plaintiffs had options to pursue (and did pursue through multiple cases) under the FSLMRS.  (Defendant's Exhibits D-I)  Only after the FLRA has made a final decision is it proper for Plaintiffs to challenge the matter under the APA and rather than bringing a lawsuit against the agency, Plaintiffs should bring a lawsuit against the FLRA if they are unsatisfied with the FLRA's decision.  5 U.S.C. § 7123(c).

Any attempt to seek judicial review at this point is an attempt to circumvent the processes Congress established in that statute.  See Steadman et al. v. Governor, United States Soldiers' and Airmen's Home, 918 F.2d 963, 967-68 (D.C. Cir. 1990) (holding that plaintiff was required to first seek relief from the FLRA prior to adjudicating any constitutional claims in court).   Based on these arguments, this Court should grant summary judgment for the Defendant.

## II.     CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant Defendant's Motion to Dismiss, or in the alternative, grant Defendant's Motion for Summary Judgment.

June 23, 2008                          Respectfully  submitted,

                                              /s/ Jeffrey A. Taylor
                                      JEFFREY A. TAYLOR, D.C. BAR # 498610
                                      United States Attorney

                                              /s/ Rudolph Contreras
                                      RUDOLPH CONTRERAS, D.C. BAR #  434122
                                      Assistant United States Attorney

                /s/ Cindy Owens
                CINDY S. OWENS, D.C. BAR # 491465
                Special Assistant United States Attorney
                United States Attorney's Office
                555 4th Street, N.W.
                Washington, D.C. 20530
                202-616-2257/ FAX 202-514-8780

**OF COUNSEL:**
MAJOR TIMOTHY TUTTLE
CAPTAIN AMY BRYAN
United States Air Force
Arlington, Virginia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AMERICAN FEDERATION OF** | ) | |
| **GOVERNMENT EMPLOYEES, <u>et al.</u>,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 1:08-cv-00692 (EGS)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SECRETARY OF THE AIR FORCE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**ORDER**

Upon consideration of Defendant's Motion to Dismiss and Motion for Summary Judgment, it is hereby

ORDERED, that Defendant's Motion to Dismiss is hereby GRANTED; it is further

ORDERED, that Defendant's Motion for Summary Judgment is hereby GRANTED.

_____
UNITED STATES DISTRICT JUDGE

*BY ORDER OF THE*
*SECRETARY OF THE AIR FORCE*



*AIR FORCE INSTRUCTION 36-703*

*1 AUGUST 1999*

Incorporating Change 1, 6 August 2007

*Personnel*

*CIVILIAN CONDUCT AND RESPONSIBILITY*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:** Publications and forms are available on the e-Publishing website at www.e-publishing.af.mil for downloading or ordering.

**RELEASABILITY:** There are no releasability restrictions on this publication.

OPR: HQ AFPC/DPIE

Certified by: HQ AFPC/DPI (Col James P. Sturch)
Pages: 8

This instruction implements AFPD 36-7, *Employee and Labor-Management Relations*. It contains information regarding civilian standards of conduct and individual responsibility applicable to civilian employees. Where appropriate this instruction references the civilian standards of conduct specified in *DoD 5500.7-R, Joint Ethics Regulation*, and *Executive Order 12674, Principles of Ethical Conduct for Government Officers and Employees*. In the event of a conflict between this instruction and the *Joint Ethics Regulation*, the guidance of the *Joint Ethics Regulation* is controlling. It applies to U.S. citizen employees of the Air Force who are paid from appropriated funds. It also applies to civilian employees of the Air National Guard and Air Force Reserve, except that it does not apply to Air National Guard Technicians administered by the National Guard Bureau under Title 32, U.S.C. Section 309. It also does not apply to employees of the Army and Air Force Exchange Service. Records Disposition: Maintain and dispose of records created as a result of processes prescribed in this publication in accordance with AFMAN 37-139, Records Disposition Schedule.

## SUMMARY OF CHANGES

Updates paragraph 7., Civilian Uniform Wear and transfers AFI 36-703 Office of Primary Responsibility (OPR) from HQ USAF/DPME to HQ AFPC/DPIEC. A margin bar ( | ) indicates newly revised material.

*Section A—Authorities and Responsibilities*

**1. HQ USAF.** The Civilian Force Management Division, Directorate of Personnel Force Management, develops policy for civilian standards of conduct for areas not covered in *DoD 5500.7-R, Joint Ethics Regulation*, and provides guidance on the provisions of this AFI.

**2. Civilian Personnel Flights.** Civilian Personnel Flights (CPFs) should provide copies of this AFI to all new employees during New Employee Orientation.

Defendant's Exhibit A

to conducting labor organization membership drives during lunch periods or after duty hours. For other restrictions that involve commercial solicitation and sales to subordinates, refer to the *Joint Ethics Regulation.*

5.6. **Gambling.** Gambling is prohibited on federally owned or leased property or while in a duty status regardless of location. Gambling includes participation in "office pools" and the joint purchase of lottery tickets by employees. Refer to the *Joint Ethics Regulation* for specific exemptions regarding law enforcement activities, private legal wagers conducted entirely within assigned government quarters, and case-by-case exemptions approved by the Secretary of the Air Force.

5.7. **Outside Employment.** Consistent with the requirements of the *Joint Ethics Regulation,* Air Force employees may be required to report any outside employment or business activity to their supervisor or other locally designated official prior to engaging in employment or business activity. Supervisors have the authority to prohibit any outside employment or business activity that might detract from readiness or pose a security risk. Approval to participate in outside employment or business activity will be documented by supervisors on AF Form 971, **Supervisor's Record of Employee.** Employees required to file financial disclosure reports, SF 450 or SF 278, and those serving as procurement officials are subject to additional restrictions regarding outside employment and business activities. Employees should address specific questions to their local ethics counselor at their servicing legal office.

5.8. **Misuse of Government Property.** Employees must refrain from the use of government equipment, personnel, or other resources for their personal benefit or benefit of friends or relatives unless otherwise authorized. This includes resources such as computers, copiers, facsimile machines, telephones, or vehicles. Misuse of Air Force resources is misconduct, which may result in corrective disciplinary action against the employee.

### Section C—Dress and Appearance

**6. Professional Public Image.** Employees are expected to comply with reasonable dress and grooming standards based on comfort, productivity, health, safety, and type of position occupied. Due to the diversity of work functions and locations, appropriate dress standards may vary significantly. Employee attire will be in good repair, and should not be considered offensive, disruptive, or unsafe.

6.1. When clothing such as coats and ties, which are normally considered proper attire, creates discomfort during hot weather and in places where cooling is minimized to conserve energy, the dress standard should be adjusted. This change should correspond to any locally determined military summer uniform period.

6.2. Any management prohibitions on specific civilian dress must be based on a clear showing that the prohibited dress contributes to an unsafe, unhealthy, nonproductive, or disruptive work environment. Management disagreement with styles, modes of dress, and grooming currently in fashion is not an adequate criterion for making such a determination.

**7. Civilian Uniform Wear.** Military grooming and appearance standards do not apply to civilian employees. However, employees standard uniforms, such as those prescribed in AFI 36-801, *Uniforms for Civilian Employees,* or medical or food service personnel furnished uniforms under Table of Allowances 016, may be expected to comply with grooming and appearance standards for employees in similar occupations employed by other Federal, state, or municipal governments. Air Reserve Technicians will

Defendant's Exhibit A

adhere to the requirements as those prescribed in AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, when wearing the military uniform in civilian status.

### Section D—Professional Relationships

**8. General.** Professional relationships are essential to the effective operation of all organizations and to the efficiency of the service. While personal relationships between Air Force employees or between Air Force employees and military members are normally matters of individual choice and judgment, they become matters of official concern when they violate existing law or impede the efficiency of the service.

8.1. **Definitions:**

8.1.1. Professional relationships are those that contribute to the effective operation of the Air Force, thus promoting the efficiency of the service. The Air Force encourages personnel to communicate freely with their superiors regarding their careers, performance, duties, and missions. Such communications enhance morale, further the Air Force mission, and preserve the proper respect between employees, supervisors and managers. Participation by employees of all grades in organizational activities and unit-sponsored events enhances morale and unit cohesion.

8.1.2. Unprofessional relationships are those relationships, whether pursued on or off-duty, which detract from the authority of supervisors and managers or result in, or reasonably create the appearance of, favoritism, misuse of office or position, or the abandonment of organizational goals, and adversely affect the efficiency of the service. Unprofessional relationships can exist between civilian employees, military officers and civilian employees, and military enlisted members and civilian employees.

8.2. **Guidelines for Avoiding Unprofessional Relationships.** Experience has shown that certain kinds of relationships present a high risk for being or developing into unprofessional relationships. While some personal relationships are not in and of themselves unprofessional, they may be or become unprofessional when other facts or circumstances are taken into consideration.

8.2.1. Relationships Within Organizations. Unduly familiar relationships between individuals in which one person exercises supervisory authority over the other can easily be or become unprofessional. The danger of abuse of authority and perception of favoritism is always present. The ability of a supervisor or manager to influence, directly or indirectly, assignments, promotions, training opportunities, awards, and other employment opportunities places both the supervisor or manager and the subordinate in a vulnerable position.

8.2.2. Dating and Close Friendships. Dating and courtship between a supervisor or manager and an employee under his or her supervision invariably raises the perception of favoritism. Such relationships can adversely affect morale and impede the efficiency of the service.

8.2.3. Other Relationships. Other relationships, not specifically addressed above, can, depending on the circumstances, lead to actual or perceived favoritism or preferential treatment and must be avoided. Examples of such activities, but by no means inclusive, are soliciting or making solicited sales to personnel who are junior in grade or position (with specific exceptions as set out in the *Joint Ethics Regulation*, paragraph 5-409), and joint business ventures between supervisors and employees under their supervision.

8.3. **Individual Responsibility to Maintain Professional Relationships.** All Air Force employees share the responsibility for maintaining professional relationships. However, supervisors and manag-

Defendant's Exhibit A

**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**



*AIR FORCE INSTRUCTION 36-801*

*29 APRIL 1994*

Incorporating Change 1, 6 August 2007

*Personnel*

*UNIFORMS FOR CIVILIAN EMPLOYEES*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:**  Publications and forms are available on the e-Publishing website at www.e-publishing.af.mil for downloading or ordering.

**RELEASABILITY:**  There are no releasability restrictions on this publication.

OPR:  HQ AFPC/DPIE

Supersedes AFM40-12, 11 July 2002

Certified by: HQ AFPC/DPI
(Col James P. Sturch)
Pages: 48

This instruction implements AFPD 36-8, *Employee Benefits and Entitlements*, and Department of Defense (DoD) Instruction 1418.2, *Standards for Furnishing Uniforms or Paying Uniform Allowances to DoD Civilian Employees*, 5 May 1969, by establishing standards and conditions for furnishing uniforms or paying uniform allowances to direct hire Air Force employees paid from appropriated funds, including United States Air Force Reserve (USAFR) and Title 5 United States Code (U.S.C.) employees of the Air National Guard.  It does not apply to employees furnished uniforms or paid uniform allowances under other laws or regulations, such as medical and food service personnel furnished uniforms under Table of Allowance (TA) 016, non-US citizen employees furnished uniforms or paid uniform allowances under labor agreements concluded with another government, and persons furnished special clothing under AFM 67-1 or its implementing instructions.

### SUMMARY OF CHANGES

Updates paragraph **1.1.**, When US Citizen Employees Wear Uniforms and transfers AFI 36-801 Office of Primary Responsibility (OPR) from HQ USAF/DPME to HQ AFPC/DPIEC. A margin bar ( | ) indicates newly revised material.

**Chapter 1— WEARING OF UNIFORMS AND ESTABLISHING UNIFORM**
    **ALLOWANCES**    6

 1.1. When US Citizen Employees Wear Uniforms:  ........................................................  6

 1.2. Responsibilities:  ...................................................................................................  6

 1.3. Furnishing Uniforms:  ...........................................................................................  8

 1.4. Establishing Uniform Allowances.  .......................................................................  8

 1.5. Uniform Allowances for Reemployed or Transferred Employees:  .........................  9

Defendant's Exhibit B

## Chapter 1

## WEARING OF UNIFORMS AND ESTABLISHING UNIFORM ALLOWANCES

**1.1. When US Citizen Employees Wear Uniforms:**

1.1.1. US citizen employees of the Air Force must wear uniforms when:

1.1.1.1. Hired directly as a guard or police officer. Employees who are classified under standards who have primary functions in the fields of investigation and identification are excluded from wearing a uniform. Employees having both guard and firefighter duties wear the uniform for their primary assignment.

1.1.1.2. Employed in the Fire Protection and Prevention series, GS-081.

1.1.1.3. Employed as a chauffeur of vehicles assigned to the Secretary, Under Secretary, and Assistant Secretaries of the Air Force; Chief of Staff, Vice Chief of Staff, United States Air Force; or additional key officials of the Air Force as periodically designated by HQ USAF.

1.1.1.4. Employed as a chauffeur or an operator of passenger vehicles. Commanders of major commands (MAJCOM) prescribe the uniform that the driver must wear.

1.1.1.5. Employed as a physical education instructor at the USAF Academy Athletic Department.

1.1.1.6. Assigned to 47th FTW Aircraft Maintenance, where their work makes ready-identification important.

1.1.1.7. Hired to operate and maintain the water craft fleet assigned to the 3613th CCTS, USAF Water Survival School.

1.1.1.8. Employed as an audio-visual equipment operator by Air University.

1.1.1.9. Air Force Reserve Command (AFRC) Air Reserve Technicians (ART) must wear the military uniform while performing civilian duties as an ART.

1.1.2. US citizen employees of the Air Force in oversea areas (or employees being deployed to oversea areas) may be required to wear uniforms if the theater or air component commanders determine there is an actual or threatened outbreak of hostilities, involving war, major civil disturbance (or other equally grave situations), or where the deployment necessitates the wearing of uniforms in specifically defined geographic areas.

1.1.3. Direct hire employees of the Air Force who aren't US citizens must wear uniforms when the oversea commander determines that the mission necessitates uniforms.

1.1.4. Employees are not required to wear uniforms when they are appointed for 3 months or less or for any period of appointment, unless their work makes ready-identification important and wearing uniforms will accomplish that objective.

**1.2. Responsibilities:**

1.2.1. The HQ USAF Director of Civilian Personnel Policy and Personnel Plans or his or her designee and the HQ USAF Office of Primary Responsibility for the occupations listed in this instruction:

1.2.1.1. Establish basic standards for furnishing uniforms or paying uniform allowances.

Defendant's Exhibit B

**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**



*AIR FORCE INSTRUCTION 36-2903*

*2 AUGUST 2006*

Incorporating Change 1, 6 August 2007

*Personnel*

*DRESS AND PERSONAL APPEARANCE*
*OF AIR FORCE PERSONNEL*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:**   Publications and forms are available on the e-Publishing website at
www.e-publishing.af.mil for downloading or ordering.

**RELEASABILITY:**   There are no releasability restrictions on this publication.

---

OPR:  HQ AFPC/DPSOOC

Supersedes  AFI 36-2903, 29 September 2002 and
AFI36-2923, 25 May 2004

Certified by: HQ AFPC/DPS
(Col William D. Foote)
Pages: 161

---

This instruction implements Department of Defense Instruction (DoDI) 1334.1, *Wearing of the Uniform*,
26 October 2005, Department of Defense Directive (DoDD) 1300.17, *Accommodation of Religious Prac-
tices Within the Military Services*, 3 February 1988; and Air Force Policy Directive 36-29, *Military Stan-
dards*. It applies to all active duty Air Force members, members of the United States Air Force Reserve
(USAFR), and members of the Air National Guard (ANG). It directs the wear of uniforms, insignias,
awards and decorations. Describes minimum standards of personal appearance of Air Force members.
Failure to observe the prohibitions and mandatory provisions of this instruction to include **Table 2.5.**
regarding tattoos/brands/body piercing by active duty Air Force members; USAFR members on active
duty or inactive for training; ANG members in Federal service, is a violation of Article 92, *Uniform Code
of Military Justice (UCMJ)*. Violations of these provisions can be prosecuted under Article 92 of the
UCMJ, as well as any other applicable articles of the UCMJ, when appropriate. The Commander, Mili-
tary Personnel Flight (MPF) assigns an office within the Customer Support Section to be the Office of Pri-
mary Responsibility (OPR) for this instruction. Refer to **Attachment 1** for a Glossary. Authorized
supplements to this instruction and requests for uniform changes will be processed in accordance with
**Chapter 7**, *Uniform Changes and Supplements*.

## SUMMARY OF CHANGES

Updates **Table 1.3.**, Wearing the Uniform and **Table 6.1.**, Conditions for Wear of Uniform. A margin
bar ( | ) indicates newly revised material.

**Chapter 1— COMMANDERS' AUTHORITY AND INDIVIDUALS' RESPONSIBILITIES**       6

   1.1.    Commanders' Authority. ..........................................................................................   6

   1.2.    Members Identified as not presenting a Professional Military Appearance. .............   6

Defendant's Exhibit C

Table 1.3. Wearing the Uniform (see notes).

| Members: | | | |
|---|---|---|---|
| Wear | Do not wear | Optional | When: |
| X | | | The member is an Air Reserve Technician (ART) performing duties while in an ART position. |
| | | X | departing from a military airfield on DoD aircraft or US Government Commercial Contract Flights (service uniform combination) (See notes 3 and 4). |
| | | X | departing from or arriving at commercial airports, or traveling on commercial contract flights (tie or tie tab optional) (See note 3 & 5). |
| | | X | traveling in a foreign country. Consult the DoD Foreign Clearance Guide. |
| | X | | uniform items do not meet Air Force specifications. |
| | X | | participating in public speeches, interviews, picket lines, marches or rallies, or in any public demonstration when the Air Force sanction of the cause for which the activity is conducted may be implied. |
| | X | | furthering political activities, private employment, or commercial interests. |
| | X | | working in an off-duty civilian capacity. |
| | X | | participating in civilian court proceedings when the conviction would bring discredit--at the discretion of installation commander. |
| | | X | attending off-duty education conducted off a military installation. |
| | X | | in civilian attire. For example:  grade insignia, cap devices, badges and other U.S. or Air Force insignia, distinctive buttons, etc. |

*NOTES:*

1. On other Services' installations, comply with order of dress for that Service, within Air Force standards.

2. TDY personnel will comply with local policies established at each TDY location, within Air Force standards.

3. Those choosing to wear civilian clothing will ensure it is neat, clean, and warm enough for in-flight operations and appropriate for the mode of travel and destination. Examples of inappropriate clothing include: ripped, torn, frayed, or patched clothing; tank tops, shorts,

Defendant's Exhibit C

short skirts, undergarments worn as outergarment, bathing suits, sandals, and any garments which are revealing or contain obscene, profane, or lewd words or drawings.

4. The Battle Dress Uniform is an acceptable uniform when traveling between military installations.

5. Air Force personnel may not wear their military uniforms when using frequent flyer miles to upgrade to business or first class. Thus, even when an upgrade to business or first class accommodations is legitimate, military personnel should avoid wearing the uniform to avoid the public perception of the misuse of government travel resources, which generates unnecessary complaints.

6. Officers and Enlisted: Do not wear or mix unique uniform items with civilian clothes. These items are those unique to the uniform. They include grade insignia, cap devices, badges and other U. S. or Air Force insignia, such as items with the "Wing and Star" design, and so forth. Exception: Tie tacs and lapel pins when wearing business attire authorized.

7. General Officer's are encouraged to wear a combination of blue uniform when traveling on commercial aircraft.

8. Air Force personnel may wear civilian attire on commercial aircraft or a combination of blue uniform if they prefer.

9. Utility uniforms (BDU and flight suits) are not authorized for travel on commercial aircraft.

10. Uniform of the Day (BDU and flight suits) is authorized for traveling MILAIR.

Defendant's Exhibit C

## Chapter 6

## WEAR OF UNIFORMS BY RESERVE, AIR NATIONAL GUARD, RETIRED OR SEPARATED PERSONNEL

**6.1. Conditions for Wear of Uniform.** Table 6.1. shows when and where to wear the uniform.

**Table 6.1.  When Reserve, ANG, Retired, Or Separated Personnel Are Required Or Authorized To Wear The Uniform (See note 1).**

| RULE | A<br><br>If the member is | B<br><br>may wear the uniform | C<br><br>and is authorized to wear the appropriate uniforms |
|---|---|---|---|
| 1 | in any of the categories | when traveling to and from any function listed in this table, when travel in uniform is within 24 hours of the scheduled function. | according to the rules below. |
| 2 | | at any time, when he or she has been awarded the Medal of Honor and **Chapter 1** does not prohibit wear of the uniform. | |
| 3 | a reservist (on active duty) | when participating in short periods of active duty (including active duty for training) | listed in this instruction. |
| 4 | a reservist not on EAD and residing in the US, its territories, or possessions | when participating in authorized inactive duty training, unit training assemblies, or equivalent training | |
| 5 | | when engaged in military flying activities, including traveling as a passenger on military aircraft | |
| 6 | | on occasions of military ceremony | |
| 7 | | social functions and informal gatherings of a military nature | |
| 8 | | when engaged in military instruction | |

Defendant's Exhibit C

| RULE | A | B | C |
|---|---|---|---|
|  | **If the member is** | **may wear the uniform** | **and is authorized to wear the appropriate uniforms** |
| 9 |  | when responsible for military discipline at an educational institution | listed in this instruction. |
| 10 | a reservist not on EAD and not residing in the US, its territories, or possessions | when authority is granted by the Secretary of the Air Force |  |
| 11 |  | at military ceremonies or other functions of a military nature, provided authority is granted; such authority may be obtained by reporting to the nearest military attaché |  |
| 12 | an airman with Air Force Reserve commission | of his or her Reserve grade when attending meetings or functions of associations formed for military purposes (membership will be mostly officers or former officers) |  |
| 13 | an ANG technician | according to ANG regulations while performing air technician duties, however, they do not receive a uniform allowance for voluntarily wearing the uniform (see notes 2 - 5) |  |
| 14 | an Air Reserve technician | must when performing duty in civil service status as an Air Reserve Technician |  |
| 15 | an Air Reserve technician | DELETED |  |
| 16 | retired | at occasions of military ceremonies | prescribed at date of retirement, or any of the uniforms authorized for active duty personnel, including the dress uniforms. Do not mix uniform items (see notes 6 and 7). |

Defendant's Exhibit C

AFI36–2903  2 AUGUST 2006                                                                    153

| R U L E | A | B | C |
|---|---|---|---|
| | If the member is | may wear the uniform | and is authorized to wear the appropriate uniforms |
| 17 | | military funerals, weddings, memorial services, and inaugurals | |
| 18 | | patriotic parades on national holidays, other military parades or ceremonies in which any active or Reserve US military unit is taking part | |
| 19 | | at educational institutions when engaged in giving military instructions or responsible for military discipline | |
| 20 | | at social or other functions when the invitation has been influenced by the member's active military service | |
| 21 | separated (other than retired ANG or Reserve) (war service) | at military funerals, memorial services, and inaugurals | authorized at time of separation or any of the uniforms authorized for active duty personnel if they served honorably in the Air Force (including service with an air component of the Army before the Air Force was established), during a declared or undeclared war (see notes 8 and 9). |
| 22 | | patriotic parades on national holidays; military parades or ceremonies in which any active or Reserve US military unit is taking part | |
| 23 | | on any other occasion when authorized by law | |

Defendant's Exhibit C

| R U L E | A | B | C |
|---|---|---|---|
|  | If the member is | may wear the uniform | and is authorized to wear the appropriate uniforms |
| 24 | separated (other than retired, ANG, or Reserve) (non war service) | from place of discharge to home, within 3 months after discharge | of the highest grade authorized at time of separation (see note 9). |

**NOTES:**

1. Members will conform to the same standards of appearance, military customs, practices, and conduct in uniform prescribed for active duty members. **Authorized To Wear the Uniform (see note 1).**

2. Title 10, U.S.C., Section 772 entitles members of the ANG to wear the uniform as prescribed for active duty members.

3. State-appointed ANG officers without federal recognition do not wear the uniform or any distinctive uniform item. Newly appointed ANG officers granted temporary federal recognition by a federal recognition board wear the uniform.

4. Enlisted ANG members wear the uniform on enlistment.

5. Upon written request of the governor and the consent of the Air Force Chief of Staff, the Chief of the National Guard Bureau authorizes a state adjutant general, who holds a federally commissioned status in the Air Force, to wear the grade insignia of his or her state-appointed grade while occupying the federally recognized position on the state headquarters unit manning documents, provided that grade does not exceed Major General.

6. Members receive the retired lapel button at retirement. Retirees wear the retired lapel button on the left lapel. Members whose assignments have included command at squadron, group or wing level are also authorized to wear the command insignia pin on the left lapel, below the retired lapel button.

7. Members whose last assignment prior to retirement was a First Sergeant and/or Command Chief may wear appropriate chevrons in all instances the uniform is worn.

8. Retirees may wear civilian clothing when flying in military aircraft. They will present a favorable appearance in good taste. Members of the reserve components who are eligible to retire but are not at mandatory retirement age (60 years) do not wear the uniform while traveling on military aircraft.

9. Honorably discharged members who served during World War II wear the Honorable Discharge Emblem on the left lapel.

10. Installation commanders authorize such separatees to use military clothing sales stores (MCSS) to purchase uniforms and accessories required for special occasions such as military funerals, parades, or other ceremonies. Separatees purchase only the service dress or mess dress uniforms and accessories. Separatees may not purchase items commonly available from commercial sources. MCSSs establish adequate controls over quantities of uniform items each separatee pur-

Defendant's Exhibit C

chases. Commanders ensure separatees present proof of honorable discharge under honorable conditions and know current uniform and grooming standards. other ceremonies. Separatees purchase only the service dress or mess dress uniforms and accessories. Separatees may not purchase items commonly available from commercial sources. MCSSs establish adequate controls over quantities of uniform items each separatee purchases. Commanders ensure separatees present proof of honorable discharge under honorable conditions and know current uniform and grooming standards.

Defendant's Exhibit C

# William G. Baillie, Jr. Local

# LOCAL 1778

# American Federation of Government Employees

### AFFILIATED WITH THE AFL-CIO

 

MAILING ADDRESS
BOX 278
WRIGHTSTOWN, N.J. 08562
(609) 723-5300
FAX (609) 723-7218

14 December 2007

Pat Schmidt
Labor Relation Specialist
305 MSS/DPCE
McGuire AFG, NJ 08641

AFGE Local 1778
PO Box 278
Wrightstown, NJ 08562

SUBJECT Union Initiated Grievance CASE # __GA 3049____

1. In accordance with Article 33, Section 6, we are proceeding to the next level, of the negotiated grievance procedure. The following information is provided:

Date and approximate time of grievance: 19 November 2007

Information discussed at the informal meeting: The items discussed during the informal meeting were the same as written on the informal complaint. Union reiterated that management violated contractual guidance by implementing the mandatory wear of the military uniform for all ART's assigned to McGuire Air Force Base, New Jersey.

Article and Section Violated: Article 5, Matters Appropriate for Negotiation Section 2, Artical 12 Standards of Conduct Section 3, and Article 36 Duration/Amendments/Reopeners Section 3 for Reopeners of Articles appropriate for Bargaining.

Union representative at informal meeting: Katrin Mason, Omar Mieles

Management representative at informal meeting: Pat Schmidt

Date of informal meeting: 6 December 2007

Informal decision: See Attachment

**RECEIVED**

1 of 3

Defendant's Exhibit D

12-19-07  Called Ella and scheduled  7 Jan 08 at 1400 in Bldg 2217.     Recd 12-14-07 Bldg 2217
tentative Israel Grievance for

Recommended Resolve: _Cease and desist, immediately.  We stand fast with our_
_original decision and request for the agency to rescind the directions_
_previously published.  Employer abide by the Labor Management Agreement_
_and recognize that the Interim Message Changes (IMC's) to Air Force_
_Instructions (AFI) (effective 7 Aug 07, AFI 36-703, AFI 36-801 and AFI_
_36-2903) are not changes in applicable laws or regulations of appropriate_
_authority and rescind any disciplinary action taken against any Bargaining_
_Unit ART, while in civilian status, during the grievance process._

2. In accordance with Article 33, Section 6 step 2, please notify this office within (7)
seven days of receipt of this complaint as to the name, date, time and place to meet with
the appropriate supervisor.

Thank you,

Katrin Mason
Executive Vice President
AFGE Local 1778

Attachment:
Informal Response Letter dated 13 December 2007

 **RECEIVED**
2 of 3

Defendant's Exhibit D

·12/13/2007  16:26    6097543574          DPCE                            PAGE  01/01



# DEPARTMENT OF THE AIR FORCE
### 305TH AIR MOBILITY WING (AMC)

13 December 2007

MEMORANDUM FOR AFGE Local 1778

FROM: 305 MSS/DPCE/S

SUBJECT: Response to Union Initiated Grievance #3049

1. On 6 Dec 07, I met with KC and Omar Mieles to discuss the above-mentioned Union Initiated Grievance that was submitted to my office on 20 Nov 07. During this meeting, KC requested that Col Kerr cease and desist with implementation of Brigadier General Bradley's order for ARTs to wear military uniforms immediately. I reiterated my previous position that I disagreed with the Union's assertion that wear of the military uniform is in direct violation of our Labor Management Agreement. This concluded our discussion regarding the grievance.

2. Therefore, the above-mentioned grievance is denied.

PAT E. SCHMIDT
Human Resources Specialist



RECEIVED
3 of 3

Defendant's Exhibit D      **AMC-GLOBAL REACH FOR AMERICA**

(11-26-07)

Rescheduled
12-6-07
@ 11:30

/USC/

# AFGE LOCAL 1778
## (609) 754-3358
### Email Address: LOCAL1778@aol.com

Date ___20 November 2007___   Case # __UI 3049__

Name  AFGE Local 1778

Squadron _____

Section Employed _____
Duty Phone _____
First Level Supervisor ___Col. Kerr___   Phone __X-5140___
Second Level Supervisor _____   Phone _____

Incident Date  19 November 2007

Brief Description of Complaint:
**Effective 19 Nov 07 it became mandatory for all Air Reserve Technicians to wear the Military uniform while in civilian status. Reasons given to support the implementation of this standard were vague, did not justify or support the need, and are in violation of our current Master Labor Agreement.**

Recommended Resolve: _Cease and desist, immediately. We stand fast with our original decision and request for the agency to rescind the directions previously published. Employer abide by the Labor Management Agreement and recognize that the Interim Message Changes (IMC's) to Air Force Instructions (AFI) (effective 7 Aug 07, AFI 36-703, AFI 30-801 and AFI 36-2903) are not changes in applicable laws or regulations of appropriate authority and rescind any disciplinary action taken against any Bargaining Unit ART, while in civilian status, during the grievance process._

Employee
Signature _____   Frank T. Spinelli, President Local 1778

Article and Section Violated: Article 5, Matters Appropriate for Negotiation Section 2, Artical 12 Standards of Conduct Section 3, and Article 36 Duration/Amendments/Reopeners Section 3 for Reopeners of Articles appropriate for Bargaining.

Defendant's Exhibit D


RECEIVED



# American Federation of Government Employees Local 2361

*P.O. Box 522, Whiteman AFB, MO. 65305 (660-563-5666)*

Col. Garrett Harencak                          16 October 2007
Commander 509th Bomb Wing
Whiteman AFB, MO  65305

CC: Robert G. Fuemmeler
     Labor Relations Officer
     Whiteman AFB, MO  65305

This Union grievance, in no way, relinquishes the Union's right or willingness to continue to negotiate the Agency's proposals to require civilian employees to wear a military uniform while in civilian status.

This is a Union initiated grievance under Section 11 of Article 33 of our Labor Management Agreement (LMA). The Agency has informed the Union that it has decided to enforce recent revisions of AFI 36-703, 36-801 & 36-2903 that, among other things, require employees to wear military uniforms while performing their civilian employment duties. This decision by the Agency violates the LMA and is an unfair labor practice under 5 U.S.C.§ 7116(a)(7) because the AFI revisions conflict with the LMA, as discussed further below, and the LMA was in effect before the date the AFI revisions were prescribed.

Employees' right to wear civilian clothing at work is a matter "covered by" the LMA. For this reason the matter should be negotiated only after the agreement expires and the AFI revisions should not be enforced in the meantime. Under Article 3, Section 2 of the LMA the subjects of "new or amended governing directives" are covered by the LMA if the directives "affect or contradict certain Articles" of the agreement. Where a new or amended directive affects an Article of the LMA, the parties, if both agree, may negotiate a "new amended article." Either party, however, may decline to negotiate a "new amended article."

The Agency has informed the Union that the Agency believes that Article 3, Section 3 of the LMA applies to the AFI revisions. This is incorrect. Under Article 3, Section 3 of the LMA, negotiation "to update the agreement" is mandatory only "when changes are made to governing directives above the installation level that establish[] new personnel policies, practices or procedures not currently contained in" the LMA. Where these mandatory negotiations produce agreement, the result is "a new article" of the LMA.

Defendant's Exhibit E

1

The essence of the difference between Section 2 and Section 3 is reflected by the two phrases "new amended article" and "new article." A "new amended article," the phrase used in Section 2, is an article that addresses the same subject as an existing article and changes the terms of that article. A "new article," the phrase used in Section 3, is an article that addresses a new subject, one not addressed in an existing article.

Similarly, "new or amended governing directives . . . affect . . . Articles" of the LMA within the meaning of Section 2 if they address the same subjects as those articles. In contrast, directives "establish[] new personnel policies, practices or procedures not currently contained in" the LMA, within the meaning of Section 3, if they address new subjects, ones that are not contained in the LMA.

Section 2 of the LMA, not Section 3, applies to the situation here because the AFI revisions requiring technicians to wear the military uniform while performing technician duties are directives that address the same subjects as "Articles" of the agreement, and thereby "affect," and even "contradict," those articles, within the meaning of Section 2.

The AFI revisions address the subjects of, and thereby "affect," two articles of the LMA. The first is Article 7, which states, in Section 7, that "An Employee is accountable only for . . . compliance with the standards of conduct for Federal Employees." The "standards of conduct for Federal Employees" include standards for dress and personal appearance. This is clear from AFI 36-703, which in its opening sentence states that it "contains information regarding civilian standards of conduct . . . applicable to civilian employees" and then states in the first sentence of paragraph 7, "Military grooming and appearance standards do not apply to civilian employees." By requiring technicians to wear military uniforms during technician employment, the AFI revisions impose "[m]ilitary grooming and appearance standards" on technicians, changing and thereby "affect[ing]" the "standards of conduct" established in Article 7, Section 7 of the LMA. Indeed, the amended directives not only "affect" Article 7, Section 7, they "contradict" this LMA provision, because Section 7 says that—with respect to standards of conduct, and therefore dress and personal appearance—employees are "accountable *only for* . . . compliance with the standards of conduct for Federal Employees." (Emphasis added.)

The AFI revisions also address the subject of, and thereby "affect," Article 28, which in Section 4b states, "Safety toe footwear shall be purchased through a distributor mutually acceptable to Organizational Commanders or designee and the Union. Employees may select from the distributors available shoes which meet ANSI Z 41 standards." This provision grants employees who are designated to wear safety toe shoes the right to wear civilian safety toe footwear of their own choice. By requiring wear of the military uniform, the AFI revisions require wear of military footwear. This not only affects, it contradicts, the right to wear civilian footwear established in Section 4b of Article 28 of the LMA.

Because the AFI revisions address the subjects of—and thereby "affect" and indeed "contradict"—Articles 7 and 28 of the LMA, enforcement of the AFI revisions is contrary to Articles 7 and 28 and also contrary to 5 U.S.C. § 7116(a)(7) ("unfair labor

Defendant's Exhibit E

18

practice for an Agency . . . to enforce any rule or regulation . . . which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed"). Under Article 3, Section 2 of the LMA, AFI revisions may be enforced only if the Union agrees to negotiate a "new amended article" that allows "implementation of the directives." Under Article 3, Section 2, the Agency cannot require the Union to negotiate such a "new amended article."

For these reasons, the Agency cannot enforce the AFI revisions. Negotiations concerning the AFI revisions should await the expiration of the LMA and, until those future negotiations are completed, the right of technicians to wear civilian clothing during technician employment should continue to be respected.

Sincerely,

Richard L. Roberts
Steward-at-Large

Received: _____
Date: _16__ October 2007

Defendant's Exhibit E

3

19

TIME SENSITIVE

Form Exempt Under 44 U.S.C. 3512

| | | FOR FLRA USE ONLY | |
|---|---|---|---|
|  **UNITED STATES OF AMERICA**<br>**FEDERAL LABOR RELATIONS AUTHORITY**<br><br>**CHARGE AGAINST AN AGENCY** | | Case No. | SF-CA-07-0660 |
| | | Date Filed | 08/27/2007 |

Complete instructions are on the back of this form.

| 1. Charged Activity or Agency | 2. Charging Party (Labor Organization or Individual) |
|---|---|
| Name: 4AF Commander | Name: AFGE 3854 |
| Address: 895 Baucom Ave SE<br>March ARB CA 92518<br>Tel.#: (951) 655-3432   Ext.<br>Fax#: (   ) | Address: P.O. Box 6207<br>March ARB, CA 92518<br>Tel.#: (951) 655-3902   Ext.<br>Fax#: (   ) |
| 3. Charged Activity or Agency Contact Information | 4. Charging Party Contact Information |
| Name: 452 AMW/CC | Name: Ursula Benitez |
| Title: Commander | Title: Union Steward |
| Address: Bldg 470, March ARB, CA 92518<br>Tel.#: (951) 655-4520   Ext.<br>Fax#: (   ) | Address: P.O. Box 6207, March ARB, CA 92518<br>Tel.#: ((909) 771-9775   Ext.<br>Fax#: (   ) |

5. Which subsection(s) of 5 U.S.C. 7116(a) do you believe have been violated? [See reverse] (1) and _____ Section 7

6. Tell exactly WHAT the activity (or agency) did. Start with the DATE and LOCATION, state WHO was involved, including titles.

1. On 23 August 2007, during a civilian commander's call, the 4AF Commander stated that he was giving us heads-up that on 2 September 2007, ALL Federal Civilian Workers, also known as Air Reserve Technicians (ARTs), will be required to wear the military uniform while performing duties in civilian status. The Union Steward replied that enforcing this requirement violates not only Title 5 and Title 10 of the U.S. Code, but also the Labor Management Agreement between March Field and the AFGE 3854. The 4AF Commander responded by saying that the Union refused to negotiate this issue, which the Union Steward refuted. Since then, AFRC has provided instructions to commanders on how to impose Disciplinary action against ARTs who do not comply with this new mandate.

2. Excerpt out of the Labor Management Agreement, Article 37, SECTION 4a. The wear of the military uniform is encouraged by ARTs during exercises, operational readiness inspections and ongoing contingency operations, HOWEVER, is not mandatory when performing duty in civilian status as an air reserve technician except when mandated by the employee's position description. 4b. Wear of the uniform while performing duty in civil service status is at the option of the individual  except when mandated by the employee's job description.

3. If the command wants to change the condition of employment for its approximately 10,000 employees, this has to be done via legislation, as stated in Title 10.

4. The AFGE 3854 received a memo from the labor relations officer requesting negotiations on the Military Uniform wear by ARTs. The AFGE 3854 responded by stating that this provision is already covered by the current labor management agreement, but that the Union was not giving up bargaining rights, because this issue would be included in December 2007, when the labor management agreement is scheduled for re-negotiations. (Please see attached responses to the Labor Relations Officer.)

5. The AFGE 3854 respectively requests that the FLRA issues an IMMEDIATE IMPLEMENTATION STAY on the mandatory requirement for civilian ARTs to having to wear the Military Uniform until all contract negotiations have been completed and signed or that Congress has issued a legislation to that affect.

7. Have you or anyone else raised this matter in any other procedure?   ✓ No   ☐ Yes   If yes, where? [see reverse] _____

8. I DECLARE THAT I HAVE READ THIS CHARGE AND THAT THE STATEMENTS IN IT ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT MAKING WILLFULLY FALSE STATEMENTS CAN BE PUNISHED BY FINE AND IMPRISONMENT, 18 U.S.C. 1001. THIS CHARGE WAS SERVED ON THE PERSON IDENTIFIED IN BOX #3 BY [check "x" box]   ☐ Fax   ☐ 1st Class Mail   ✓ In Person
☐ Commercial Delivery   ☐ Certified Mail

| URSULA BENITEZ | Ursula Benitez | 08/27/2007 |
|---|---|---|
| Type or Print Your Name | Your Signature | Date |

FLRA Form 22 (Rev. 1/99)

Defendant's Exhibit F



# American Federation of Government Employees

Affiliated with the AFL-CIO

P.O. Box 6207 March Field, CA 92518
(951) 655-3902 * FAX (951) 653-1186

**LOCAL 3854**

DATE:     16 August 2007

TO:       MaryAnne Tonello
          452 MSG/DPCE

FROM:     Michael LePenske
          President
          AFGE 3854

SUBJECT:  Response to Notification of Revision of AFIs 36-703, 36-801 and 36-2903

1. The wear of military uniform while performing duty in civilian status has been previously negotiated in Article 37 of the Labor-Management Agreement between March Field and the American Federation of Government Employees, Local 3854.

2. We want to be perfectly clear, that we are not waiving our bargaining rights on this issue however, the entire contract is scheduled for re-negotiation in December 2007 at which time all issues will be addressed.

MICHAEL LE PENSKE
President
AFGE 3854
March ARB, CA

Signature: _Brenda Reese_

Date Received: _16 aug. 2007_

Defendant's Exhibit F

**TO DO FOR ALL WHICH NONE CAN DO FOR ONESELF**



# American Federation of Government Employees

Affiliated with the AFL-CIO

P.O. Box 6207 March Field, CA 92518
(951) 655-3902 * FAX (951) 653-1186

**LOCAL 3854**

DATE:     23 August 2007

TO:       MaryAnne Tonello
          452 MSG/DPCE

FROM:     Michael LePenske
          President
          AFGE 3854

SUBJECT:  Response to Notification of Revision of AFIs 36-703, 36-801 and 36-2903

1. The wear of military uniform while performing duty in civilian status has been previously negotiated in Article 37 of the Labor-Management Agreement between March Field and the American Federation of Government Employees, Local 3854.

2. The Labor-Management Agreement is tentatively scheduled for re-negotiations in December 2007 and the subject matter will be addressed at that time.

3. Please see the attachment.

MICHAEL LE PENSKE
President
AFGE 3854
March ARB, CA

Signature: _Sylvia Marquez_

Date Received: _24 Aug 2007_

Defendant's Exhibit F

**TO DO FOR ALL WHICH NONE CAN DO FOR ONESELF**

Form Exempt Under 44 U.S.C. 3512

| | | FOR FLRA USE ONLY | |
|---|---|---|---|
| UNITED STATES OF AMERICA **FEDERAL LABOR RELATIONS AUTHORITY** **CHARGE AGAINST AN AGENCY** | | Case No. | SF-CA-07-0708 |
| | | Date Filed | 09/26/2007 |

Complete Instructions are on the back of this form.

| 1. Charged Activity or Agency | 2. Charging Party (Labor Organization or Individual) |
|---|---|
| Name: 452 AMW/CC | Name: AFGE Local 3854 |
| Address: Bldg 470, March ARB, CA 92518-1644 | Address: P.O. Box 6207, March ARB, CA 92518-1644 |
| Tel.#: (951)655-4520    Ext.<br>Fax#: ( ) | Tel.#: (951)655-3902    Ext.<br>Fax#: ( ) |
| **3. Charged Activity or Agency Contact Information** | **4. Charging Party Contact Information** |
| Name: MaryAnne Tonello | Name: Ursula Benitez |
| Title: Labor Relations Officer | Title: Steward |
| Address: March ARB, CA 92518-1644 | Address: March ARB, CA 92518-1644 |
| Tel.#: (951)655-3501    Ext.<br>Fax#: (951)655-4671 | Tel.#: ((909) 771-9775    Ext.<br>Fax#: ( ) |

5. Which subsection(s) of 5 U.S.C. 7116(a) do you believe have been violated? [See reverse] [1] and   (5)

6. Tell exactly WHAT the activity (or agency) did. Start with the DATE and LOCATION, state WHO was involved, including titles.

1. On 27 August 2007, the Commander, through his Agents, notified the Union by means of a Memorandum, that the Agency was no longer bound by Article 37, Section 4 (a) (b) and (c) and Article 7, Section 1 (a) of the Labor Management Agreement.

2. The Agency stated that the current contract expired on 4 May 04, yet, the Agency has never notified the Union, in writing, that the Agency no longer accepted the existing contract. On the contrary, during past and current grievances and arbitrations, the Agency has continuously referenced sections that are in our contract, therefore, acknowledged the validity of the existing agreement. Also, by mutual agreement, the life of the contract has been extended until contract re-negotiations have been completed. Both parties agreed on a contract re-negotiation date of 31 December 2007.

3. However, even if the contract had been expired, the issue, which generated the Memorandum, was a mandatory and not a permissive subject, therefore, the Agency was bound to bargain. Contrary to the Agency's contention, the Union has never given up their bargaining rights in reference to the issue stated in the Memorandum.

4. Based on the FLRA's "Covered By" Doctrine, permissive subjects are those which do not concern conditions of employment and those which are delineated in Section 7106(b)(1) of the Statute. Since the issue at hand is a condition of employment and Section 7106(b)(1) of the Statute does not apply, the Agency employed the permissive subject erroneously and was therefore still bound by the current Labor Management Agreement.

5. The Union respectfully asks that the Agency acknowledges the current contract as being valid and binding in its entirety and reverses any implementation of changes resulting from this action.

7. Have you or anyone else raised this matter in any other procedure?    No ___  Yes ✓    If yes, where? [see reverse]  h

8. I DECLARE THAT I HAVE READ THIS CHARGE AND THAT THE STATEMENTS IN IT ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT MAKING WILLFULLY FALSE STATEMENTS CAN BE PUNISHED BY FINE AND IMPRISONMENT. 18 U.S.C. 1001. THIS CHARGE WAS SERVED ON THE PERSON IDENTIFIED IN BOX #3 BY [check "x" box] ☐ Fax  ☐ 1st Class Mail  ☑ In Person
☐ Commercial Delivery    ☐ Certified Mail

| URSULA R. BENITEZ | *[signature]* | 09/27/2007 |
|---|---|---|
| Type or Print Your Name | Your Signature | Date |

FLRA Form 22 (Rev. 1/99)

Defendant's Exhibit G



**DEPARTMENT OF THE AIR FORCE**
**AIR FORCE RESERVE COMMAND**

2 7 AUG 2007

MEMORANDUM FOR AFGE LOCAL 3854

FROM: 452 MSG/DPCE

SUBJECT: Response to Notification of Revision of AFIs 36-703, 36-801 and 36-2903

1. This is in response to your letters dated 16 August 2007 and 23 August 2007, same subject.

2. In the memorandum Notification of Revision of AFIs 36-703, 36-801 and 36-2903 dated 10 August 2007 I notified you that the subject AFIs were changed to specify that Air Reserve Technicians (ARTs) must wear the military uniform while performing civilian duties as an ART. I also notified you to respond with 5 workdays after receipt of the notice if you wish to negotiate the change. Your response dated 16 August 2007 stated that the "wear of military uniform while performing duty in civilian status has been previously negotiated in Article 37 of the Labor-Management Agreement between March Field and the American Federation of Government Employees, Local 3854." You also stated that you are not waiving your bargaining rights.

3. In accordance with Article 7, Section 3 of the labor-management agreement and my 10 August 2007 notice, you had 5 workdays to provide this office with a written notice to negotiate and then we are to meet to exchange written proposals within 5 workdays of the negotiation notice. On 21 August 2007 I called your office to set up an appointment to exchange proposals. Gerry Merrill told me that the issue is covered in the current labor-management agreement and that you had no proposals. I reminded him that the current agreement is expired (it expired on 4 May 2004).

4. Consistent with Federal Labor Relations Authority case law, if the expired clauses are permissive subjects of bargaining, an agency need not be bound by those clauses. Upon the expiration of an agreement, either party may elect to no longer be bound by the provisions of the agreement concerning permissive subjects of bargaining. Thus, permissive subjects remain in effect unless or until one of the parties gives notice that it will no longer be bound by the expired article. Therefore, consider this memorandum as notice that we are no longer bound by Article 37, Section 4 a, b and c and Article 7, Section 1 a of the expired labor management agreement. The change which requires ARTs to wear the military uniform is a permissive subject of bargaining and we have the right to implement this change upon completion of our obligation to bargain the impact and implementation of the change.

5. Since you refuse to set an appointment to exchange proposals and you acknowledged that you have no proposals, we have concluded that we've met our bargaining obligation. This is official notification that the change which specifies that ARTs must wear the military uniform while performing civilian duties as an ART will be implemented for all bargaining unit personnel effective 2 September 2007.

6. The agency remains committed to ensuring successful transition of this change to the workforce. The agency will certainly consider any post-implementation concerns the union may have.

7. If you have any questions please contact me at extension 3501.

MARY ANNE TONELLO
Labor Relations Officer

Defendant's Exhibit G

Form Exempt Under 44 U.S.C. 3512



| UNITED STATES OF AMERICA<br>FEDERAL LABOR RELATIONS AUTHORITY<br>CHARGE AGAINST AN AGENCY | FOR FLRA USE ONLY |
|---|---|
| | Case No. OH-CA-08-0191 |
| | Date Filed 12-28-07 |

Complete instructions are on the back of this form.

| 1. Charged Activity or Agency | 2. Charging Party (Labor Organization or Individual) |
|---|---|
| Name: 910th Airlift Wing | Name: AFGE Local 1952 |
| Address: 3976 King Graves Rd. Vienna, OH 44473 | Address: 3976 King Graves Rd, Unit 54 Vienna, OH 44473 |
| Tel.#: (330)609-1382   Ext. | Tel.#: 330-856-4555   Ext. |
| Fax#: (330) 609-1097 | Fax#: 330-856-4555 |

| 3. Charged Activity or Agency Contact Information | 4. Charging Party Contact Information |
|---|---|
| Name: Udo K. McGregor, Col. USAFR | Name: Joseph M. DeMarco |
| Title: Commander, 910th Airlift Wing | Title: President, AFGE Local 1952 |
| Address: 3976 King Graves Rd. Unit 10 Vienna, OH 44473 | Address: Same as Above |
| Tel.#: (330)609-1243   Ext. | Tel.#: ((330) 856-4555   Ext. |
| Fax#: (330) 609-1097 | Fax#: (330) 856-4555 |

5 Which subsection(s) of 5 U.S.C. 7116(a) do you believe have been violated? [See reverse] (1) and (5)

6. Tell exactly WHAT the activity (or agency) did. Start with the DATE and LOCATION, state WHO was involved, including titles.

On or about 13 Aug 07, AFGE Local 1952 received an Impact and Implementation notice from management (910AW/DPC), instituting a mandatory requirement for Air Reserve Technicians (dual status civilian employees) to wear military uniform while in civilian status. This was being proposed as a "technology, method and means of accomplishing work". Our employees were quite upset by this significant change to their civilian working conditions, due to the added military requirements that go along with the wearing of the military uniform, such as saluting superiors, standing "at attention", and numerous other denials of the freedoms accorded to civilian employees. On 22 Aug 07, we submitted a "Demand to Bargain" letter which included our first information request. This request included compelling need, demonstrated need, authority of law etc. Management's only response was quotes from the new Air Force regulations.

We have had a fairly amiable relationship with management over the last few years and have always attempted to negotiate in a spirit of cooperation based on a level of trust that had been developed over this time. This trust built on the cooperative behavior of management on most issues including supplying us with virtually every piece of information that we requested. This relationship led us to bargain the many less significant issues proposed during this time period on a casual basis.

Despite their initial refusal to provide us with the information necessary to carry out our statutory obligations on this issue, we submitted several uniform proposals to them. This was done in the spirit of cooperation and as a gesture of good faith. While they were very interested in bargaining these items, this "gesture" was ignored and over the course of the next five weeks, we exchanged numerous letters regarding our information requests. During this time we filed a ULP in an attempt to force them to share information. (This was later dropped) Management continued to supply us with very little meaningful information and even refused to provide us with a list of affected employees and their work centers.

After weeks of information denials and threats of implementation, it was decided that since management could no longer be trusted, we would have to abandon our casual method of negotiation for a more structured process. On 2 Nov 07 we presented them with ground rule proposals. They replied that ground rules were unnecessary, and sited past practice. There have been several letters and conversations on the subject, but we have refused to move from our position on bargaining ground rules. Because of our position, management has accused us of stalling (bad faith bargaining) and has decided to implement this unilateral change without providing the union a chance to fully bargain the issue. The implementation date is 1 Jan 08. We would like to point out that they had the ground rule proposals in hand for seven weeks prior to announcing their intent to implement and as such clearly shows that this action is being done to preclude bargaining, not for reasons of timeliness.

As the premature implementation of this policy is a significant issue, as it essentially forces federal civilian employees into full time military servitude, we are requesting a grant of temporary relief or at least an expedited investigation of this ULP. We would also expect management to be directed to the table to fully bargain this issue, to include ground rules and that employees would be allowed the freedom to dress as "civilians" until negotiations are complete.

7. Have you or anyone else raised this matter in any other procedure?  ✓ No   ___ Yes   If yes, where? [see reverse] _____

8. I DECLARE THAT I HAVE READ THIS CHARGE AND THAT THE STATEMENTS IN IT ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT MAKING WILLFULLY FALSE STATEMENTS CAN BE PUNISHED BY FINE AND IMPRISONMENT, 18 U.S.C. 1001. THIS CHARGE WAS SERVED ON THE PERSON IDENTIFIED IN BOX #3 BY [check "x" box]   ☐ Fax   ☐ 1st Class Mail   ☑ In Person
☐ Commercial Delivery   ☐ Certified Mail

| Joseph M. DeMarco | | 28 Dec 07 |
|---|---|---|
| Type or Print Your Name | Your Signature | Date |

FLRA Form 22 (Rev 1/99)

Defendant's Exhibit H

UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**

## CHARGE AGAINST AN AGENCY

| FOR FLRA USE ONLY |
| --- |
| Case No. BN-CA-08-0015 |
| Date Filed 10-10-07 |

Complete instructions are on the back of this form.

| 1. Charged Activity or Agency | 2. Charging Party (Labor Organization or Individual) |
| --- | --- |
| Name: Department of the Air Force 911th Air Force Reserve Base | Name: American Federation of Government Employees Local 2316, 911th Air Force Reserve |
| Address: 2475 Hercules Court, Coraopolis, PA 15108 | Address: 1285 Rocky Lane, Coraopolis, PA 15108 |
| Tel.#: (412) 474-8505 | Tel.#: (412) 474-8500 |
| Fax#: (412) 474-8432 | Fax#: (412) 474 8365 |

| 3. Charged Activity or Agency Contact Information | 4. Charging Party Contact Information |
| --- | --- |
| Name: Colonel Gordon Elwell | Name: Joseph P. Corcoran |
| Title: Commander | Title: AFGE National Representative |
| Address: (see Item #1) | Address: 105 Rizzi Drive, Irwin, PA 15642 |
| Tel.# (see Item #1) | Tel.# (724) 744-2193 |
| Fax# (see Item #1) | Fax# (724) 744-0357 |

5. Which subsection(s) of 5 U.S.C. 7116(a) do you believe have been violated? (See reverse) (1) and (5)

6. Tell exactly WHAT the activity (or agency) did. Start with the DATE and LOCATION, state WHO was involved, including titles.

Since on or about October 2, 2007, the above named activity by its officers and agents has refused to negotiate in good faith with the AFGE Local 2316. Specifically, the Agency has refused to negotiate ground rules to govern the negotiation of Agency proposed changes in the Air Reserve Technicians (ART) civilian uniform policy. Further, the Agency has issued an ultimatum to the union that it must either enter into negotiations over the proposed changes without a ground rules agreement, or the Agency will implement the changes unilaterally. (See attached memorandum dated October 2, 2007)

** Request for temporary relief:  Considering that the Agency has indicated its intent to proceed with implementation of the proposed changes if the union continues to insist on negotiating ground rules, the union is requesting a grant of temporary relief or at least an expedited investigation of this unfair labor practice charge.

7. Have you or anyone else raised this matter in any other procedure?  X No    Yes    If yes, where? (see reverse)

8. I DECLARE THAT I HAVE READ THIS CHARGE AND THAT THE STATEMENTS IN IT ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT MAKING WILLFULLY FALSE STATEMENTS CAN BE PUNISHED BY FINE AND IMPRISONMENT, 18 U.S.C. 1001.

THIS PETITION WAS SERVED ON THE PERSON IDENTIFIED IN BOX #3 BY [CHECK "X" BOX] X Fax  ☐ 1st Class Mail  ☐ In Person
☐ Commercial Delivery  ☐ Certified Mail

| Joseph P. Corcoran | *(signature)* | October 10, 2007 |
| --- | --- | --- |
| Type or Print Your Name | Your Signature | Date |

FLRA Form 22 (Rev. 1/99)

Defendant's Exhibit I



UNITED STATES OF AMERICA
### FEDERAL LABOR RELATIONS AUTHORITY
10 Causeway Street, Suite 472
Thomas P. O'Neill, Jr., Federal Building
Boston, MA 02222
Office: (617) 565-5100  Fax: (617) 565-6262

January 30, 2008

Mr. Chris Mason
AFGE, Local 2316
911th Airlift Wing
2375 Hercules Court
Pittsburgh IAP-ARS
Coraopolis, PA 15108-4403

Re: Case No. BN-CA-08-0015

Dear Mr. Mason:

In a telephone conversation with Trial Attorney David Mithen on January 29, 2008, you requested that the charge in this matter be withdrawn. I have approved this request and the case is closed.

Sincerely,

Philip T. Roberts, Acting Regional Director
Boston Region

Cc:    Amy E. Bryan, Captain, USAF
       Litigation Attorney, Labor Relations
        Law Branch
       AFLOA/LLFSC
       1501 Wilson Boulevard, 7th Floor
       Arlington, VA 22209-2403

       Mr. Joseph P. Corcoran, National Representative
       AFGE, Local 2316
       105 Rizzi Drive
       Irwin, PA 15642

Defendant's Exhibit I



| UNITED STATES OF AMERICA<br>**FEDERAL LABOR RELATIONS AUTHORITY** | FOR FLRA USE ONLY |
|---|---|
| **Petition for Review of**<br>**Negotiability Issues**<br>**Proposals** | Case No.<br><br>Date Filed<br><br>Complete instructions are on the back of this form. |

## USE THIS FORM ONLY FOR NEGOTIABILITY DISPUTES WHERE THE UNION HAS SUBMITTED A BARGAINING PROPOSAL TO THE AGENCY AND THE PARTIES HAVE NOT REACHED AGREEMENT ON THE PROPOSAL AND ITS NEGOTIABILITY.

*Important Information*: This form is to be used to initiate a negotiability proceeding and provide the Agency with notice that the Union requests a decision from the Authority that specific contract language is negotiable. Section 2424.22 of the Authority's Regulations requires the Union in the petition for review to, among other things, set out the exact language of its proposal(s), explain the meaning of the language, explain how it is intended to operate, explain technical or unusual terms, and provide copies of materials that support the Union's position.

The information requested below may be provided on this form or in a separately created document. The form is available over the Internet, at www.flra.gov, in a format that can be completed using standard word processing software. If you have questions about completing this form, please contact the Authority's Case Control Office at (2022 )218-7700.

The regulations governing negotiability proceedings are in 5 C.F.R. part 2424, and are available on the Internet at www.flra.gov.

On receipt of the petition for review, a representative of the Authority will schedule a conference concerning this petition. Every effort will be made to conduct this conference by telephone or in perso **within ten (10) calendar days of the filing of the petition for review**.

| 1.   **Name and address of Petitioning Union:**<br><br>American Federation of Government Employees<br>Local 1367<br>1871 Kirtland St, Bldg 6149<br>Lackland AFB, TX 78236-5525 | 2.   **Union Representative Contact Information:**<br><br>**Name:**   Eloise R. Stripling<br><br>**Title:**   President<br><br>**Address (if different from Question 1):**<br><br>Phone: 210-671-2745   Fax: 210-670-8353 |
|---|---|
| 3.   **Name and address of Agency:**<br><br>Department of the Air Force<br>Lackland Air Force Base<br>Civilian Personnel Office<br>1720 Patrick St, Bldg 5311<br>Lackland AFB, TX 78236-5276 | 4.   **Agency Representative Contact Information:**<br><br>**Name:**   Alfred Carrillo<br><br>**Title:**   Labor Relations Officer<br><br>**Address (if different form Question 3):**<br><br>Phone: 210-671-1643   Fax: 210-671-3910 |

**FLRA Form 208**

Defendant's Exhibit J

**5.  How many proposals are in dispute?**

Ten (10) proposals are in dispute.

(Proposals  5, 6, 10, 13, 14, 16, 17, 18, 19, 20)

---

**6.  Did you receive a written allegation of nonnegotiability from the Agency claiming that each proposal was not negotiable?**

 Yes                    No

**6a.  If Yes, what was the date of the allegation?**

Although the correspondence is not addressed to AFGE Local 1367 (the Union), the Agency provided the Union with a copy of a memorandum dated 23 May 08 to Mr. Andy Pizzi of the Federal Service Impasses Panel (FSIP).  In that memorandum, the Agency alleges that several proposals that it had previously negotiated over with the Union are in fact non-negotiable matters.  In mid-March 2008, the Agency had submitted those proposals (proposals 5, 6, 10, and 14) to the FSIP for adjudication on the grounds of impasse in negotiations.

Earlier, prior to a negotiation session, the Agency presented the Union with an undated package of its counterproposals to each of the Union's 23 original proposals.  For four (4) of these proposals (16, 17, 18, and 20), under the heading of "Management Counter Proposal," the Agency stated that it was their opinion that the proposal did not meet the definition of an appropriate arrangement or of methods and means.  The labor relations officer indicated orally that he did not intend to negotiate over those matters.  In addition, although the allegation of non-negotiability is unclear, the "Management Counter Proposal" to proposals 13 and 19 were also intended to convey the Agency's assertion that the matters covered in those proposals were non-negotiable.  Nevertheless, there was further discussion of proposals 13 and 19, but no agreement.  At no time did the Union request an allegation of non-negotiability on any of its proposals, nor did the Union seek to limit or terminate discussion of the proposals which the Agency believed did not constitute appropriate arrangements.  In accordance with the Guide to the Federal Labor Relations Authority Negotiability Appeals Process, the Union chose to keep negotiation options open and endeavor to revisit these proposals.

**6b.  If No, did you request such a written statement from the Agency?  If you have, attach a copy of the request.**

Yes                    No

Defendant's Exhibit J

7.  **Are there or were there any related Court, FLRA, Federal Service Impasses Panel (FSIP), or other proceedings concerning the same contract language?**

( Yes )        No

7a.  **If Yes, which of the following proceedings?**

i.  **An unfair labor practice charge**                    Yes              ( No )

If Yes, explain in detail how the unfair labor practice charge is related to this negotiability proceeding and provide the following:

What date was it filed?        What is the status of the case?      What is the case number?

ii.  **A proceeding before the FSIP**                       ( Yes )           No

If Yes, explain in detail how the proceeding before FSIP is related to this negotiability proceeding and provide the following:

A request for assistance was filed with the FSIP by the Agency on or about 17 March 2008.

The status of that case is unknown to the Union.  The case number is 8 FSIP 49.

Please see item 6a above for details of how that case is related to this negotiability proceeding.

iii.  **A related petition for review of negotiability issues**   Yes   ( No )

If Yes, explain in detail how the petition for review of negotiability issues is related to this negotiability proceeding and provide the following:

What date was it filed?        What is the status of the case?      What is the case number?

iv.  **A related grievance**                               Yes              ( No )

If Yes, explain in detail how the grievance is related to this negotiability proceeding and provide the following:

What date was it filed?        What is the status of the case?      What is the case number?

Defendant's Exhibit J

**Alternative Dispute Resolution (ADR)**

The Authority offers ADR services to help parties resolve their negotiability disputes through its Collaborative and Alternative Dispute Resolution Office and Program (CADR). The CADR program provides an alternative to traditional case processing and is available on a voluntary basis. If you are interested in CADR assistance or information regarding any of its services, you may contact the CADR office at (202) 482-6503.

8.   Are you interested in attempting to resolve this matter with the assistance of CADR?

 Yes                        No

**The Proposals**

9.   Set out the exact language of all of the proposals sought to be negotiated.

FOR EACH PROPOSAL, ANSWER QUESTIONS 10 THROUGH 14. MAKE A SEPARATE COPY OF THIS PAGE FOR EACH PROPOSAL.

NOTE: The Agency responded to the Union's Proposals 1-4 by stating that each one was more of a question from the union to management. Under the heading of "Management Response" rather than "Management Counter Proposal," the Agency provided an answer to the question. The Union accepted the Agency's premise that these "proposals" were actually requests for information. As such, we accepted that these items would not be negotiated. In accepting that premise and acknowledging Management's response, the Union did not necessarily agree with the content of the Agency's explanation. For the record, had the Union not agreed to set "proposals" 1-4 aside as "non-proposals," we would have asked the Authority to review them in this proceeding as well. (Also for the record, the wording of Proposals 1-4 and the management response are attached to this petition.)

Defendant's Exhibit J

10. Set out the exact wording of the proposal sought to be negotiated.

**PROPOSAL 5**

**UNION PROPOSAL #5 (Union's Counter 1)**

a. The Agency will provide to civilian bargaining unit employees all of the elements required to be fully and properly uniformed, including but not limited to the following items:

Airman Battle Uniform

Ten (10) ABU pants (utility trousers)
Ten (10) ABU shirt (utility shirt/blouse)
Ten (10) pairs of foliage green boot socks
Ten (10) sand colored t-shirts
Two (2) sand colored riggers belts
Two (2) pairs of foliage green boots
Two (2) ABU patrol caps
Two (2) pairs of cold-weather foliage green colored gloves
One (1) ABU Field Jacket
One (1) Gortex Jacket
One (1) ABU duffel bag

Dress Uniforms

Ten (10) Service Blue pants/trousers
Ten (10) Service Blue skirts (for female employees)
Ten (10) Service Blue shirts
Ten (10) white T-shirts (for male employees)
Ten (10) pairs of black nylon trouser socks
Five (5) blue neckties (for male employees)
Five (5) blue neck tabs (for female employees)
Two (2) pairs of black leather shoes
Two (2) flight caps
Two (2) Service Blue coats
Two (2) trouser belts with chromium plate
Two (2) chromium plated buckles
One (1) all-weather coat with removable liner
One (1) Poly Jacket with removable liner

Protective Gear to Cover Uniform (for mechanics)

Two (2) green summer coveralls
Two (2) green winter coveralls
One (1) pair rubber overshoes to cover boots (provide ground & nonskid sole)

Defendant's Exhibit J

b. The items listed above will be provided at no charge to each bargaining unit employee required to wear uniforms in the performance of his/her duties in civilian status. This initial issue will be provided to all employees prior to the effective date for the requirement to wear uniforms.

c. Laundry facilities (washing machines and dryers) will be made available at the work site for use by dual status employees for the laundering of dirty uniforms.

d. A laundry service will be contracted to clean the coveralls used by mechanics to protect their uniforms. Clean coveralls will be made available at all times.

e. Employees who cannot wear combat boots will be allowed to wear black shoes/athletic shoes; provided that the employee brings medical documentation clearly stating he/she is unable to wear combat boots.

f. Maternity uniform items (both ABU and Dress Blues) will be issued to pregnant employees in the same quantities listed above.

g. These uniforms are provided in addition to any uniforms provided for use by the employee while serving in military status or under military orders.

Through further negotiation, the following language was agreed upon as a partial resolution of section 5.a. of the above proposal:

> The Parties agree that, at this time, there is no requirement for dual status employees to wear the dress blues while in civilian status. In the event that management requires the wearing of dress blues, dress blue uniforms will be provided in the same quantity as the utility uniforms.

11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.

- and -

12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.

The Agency asserts that a regulatory authorization for four (4) uniforms for reservists precludes the issuance of additional uniforms for use by these same individuals when they are working in their civilian jobs.

It is the Union's position that these negotiations are for the purpose of establishing agreements related to uniform usage while in *civilian status*, and that therefore, any facts, regulations, or policies related to uniform usage by these same individuals while in *military status* are irrelevant to these negotiations. Specific to Proposal 5, the fact that the dual status employees are authorized four uniforms for use while in military status has no bearing on the negotiation of appropriate arrangements to address the impact of the Agency's proposal regarding how these employees will dress 40 hours a week, while working as civilians.

Defendant's Exhibit J

By memorandum dated 26 April 2007, the Office of Personnel Management (OPM) announced an increase to the maximum annual uniform allowance rate *for civilian employees* from $400 to $800—the first increase in seventeen years.  In its argument, the Agency notes that the Department of Defense (DoD), nevertheless, continues to limit the uniform allowance *for civilian employees* to $400 a year. Using the price quotes provided by the Agency, the cost for the Airman Battle Uniform (ABU) blouse and pants set is $74.85.  An allowance of $800 would allow a civilian employee to buy ten (10) ABU sets.  An allowance of $400 would allow the employee to buy five uniforms (one per work day per week).  Those five uniforms would suffice if the Agency would recognize that these uniforms are authorized for civilian employees, and that therefore, they are authorized in addition to the four that the employees have long been entitled to for use while in military status one weekend a month.  The overwhelming majority of the dual status bargaining unit employees (BUEs) are aircraft mechanics.  They perform heavy labor in high temperatures in south Texas, and they work with fuels, grease, hydraulic fluid, etc.  These facts and conditions will require that they put on a clean uniform each day if their appearance is not to become a discredit to the Air Force.  That being the case, these BUEs should not have to go home on weeknights and do laundry.  They should have one uniform for each day that they work in civilian status so that they can do laundry only one day a week.  The Union would find the total of nine (9) ABU sets to be sufficient, as long as the initial issue included the required T-shirts, socks, belts, belt buckles, caps, and any other accessories the civilian employee would be required to wear to be considered properly uniformed.

We did not further modify our proposal to reflect a change from ten (10) ABUs to nine (9) because the Agency was insistent that no additional uniforms would be issued beyond the four (4) that each employee has been historically authorized.  We did, however, agree to a modification of part a which would drop the proposal for dress uniforms through the agreed-upon language cited above.

The Union's proposal that protective gear to cover the uniform be supplied is intended as a cost-saving and hassle-sparing measure to help mechanics avoid staining and tearing their uniforms, and keep them usable considerably longer than they otherwise would.  This was not a proposal for safety gear as the Agency has characterized it.

Because the majority of the dual status BUEs currently do not have the full complement of four uniforms authorized for their reserve duty, but rather have only two (2) or three (3) ABUs or battle dress uniforms (BDUs), which they need to keep in good condition for reserve duty and inspections, it is our position that the employees should be issued the full complement of uniforms that is ultimately decided upon prior to the implementation of this proposed change to their working conditions.  We disagree with the Agency's assertion that these employees already have a sufficient number of uniforms available to them to comply with a daily wear requirement.

The Agency currently provides laundry service for coveralls in at least some of the shops.  This service is provided because of the heavy soil to which these garments are subjected.  The Union's position is that the coveralls and the laundry service should be available to all BUEs who are required to wear the uniform while in civilian status.  In addition, we propose that washers and dryers be made available near the work area to allow employees to launder greasy, soiled uniform components on site.

The proposal for the exception to the requirement to wear combat boots is intended to protect the health of those employees who have a medical condition that will not allow them to wear boots or that would be aggravated by the daily use of the boots.  Management and the Union are close to an agreement on the language of this provision.  The Union has no objection to Management's proposal to add a requirement for medical documentation to support the exemption.  Similarly, Management has agreed to provide maternity uniforms as needed.  Only the quantity is not yet agreed upon.

Defendant's Exhibit J

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

    Yes                    No

The Union requests severance of this proposal so that only those parts that the Authority finds incompatible with law or regulation would be eliminated. This request is made because the proposal encompasses several distinct issues related to the uniform itself—quantity of uniforms to be issued, any costs to employees, laundry service and/or facilities, exemption from the footwear requirement, maternity uniforms, and provision of the full complement of uniforms prior to implementation of the proposed change.

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL 6**

**UNION PROPOSAL #6 (Union's Counter 1)**

a. The Employer will replace in kind any unserviceable uniforms and uniform items (stripes, name tags, military patches, etc.) submitted for exchange by the employee. Management agrees to provide a voucher for the sewing/placement/attachment of the required items on the uniform. The Employer will replace uniforms and uniform items submitted for exchange by the employee upon becoming unserviceable within fourteen (14) calendar days of the items' being turned in the by employee.

b. For the purposes of this agreement, "unserviceable" will be defined as referring to any uniform item which is no longer fit for use based on changes in the employee's size or fair wear and tear, including but not limited to fading, stains, tears, fraying, and stitch marks or discoloration where patches have been removed.

c. Any disagreement between Management and an employee or the Union regarding whether or not a uniform item is unserviceable will be resolved through the Lackland ADR program, with a union representative included in the process.

---

Through further negotiation, the following language was agreed upon by Management and the Union for section 6.a. of the above proposal:

If a member's uniform becomes unserviceable, the member must report to his/her supervisor as soon as possible to begin the process of replacing the uniform item. Due to any unforeseen event, if a member has fewer than two (2) serviceable uniforms on hand, a waiver may be granted by Management on wearing of the uniform. A member who turns in two or more unserviceable uniforms at one time will not be granted a waiver.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

For the record, it should be noted that the Union's original Proposal 6 included a provision that Management would bear the cost of dry cleaning for the ABUs, as the care instructions indicate that the uniform is to be dry cleaned if the fabric is to be protected. This uniform, when laundered with ordinary detergent, will "glow" in the dark. Management indicated that they do not expect the employees to dry clean the uniform or to prevent it from becoming phosphorescent due to exposure to laundry detergent. For that reason, the Union omitted the proposal that management pay for dry cleaning. However, the employees will not be able to use these uniforms when deployed in a combat zone.

Defendant's Exhibit J

Management indicated in the letter to Mr. Pizzi on 23 May 08 that the Agency can agree to 6.b. as it is worded above.

Although Management engaged in negotiation of part c of this proposal, their letter to Mr. Pizzi indicates that they now consider this item to be non-negotiable. The Union's intent in 6.c. is to ensure that civilian employees do not end up having to purchase their own uniforms if they want to look presentable. Past experience has indicated that Management has not kept up with the issuance of uniforms or the replacement of unserviceable uniforms in accordance with the regulation or as dictated by need. Dual status employees report being admonished by Management to stay away from main base Lackland during their lunch time on reserve duty weekends (remain on the former Kelly AFB property) because there had been complaints from the active duty training instructors that the reservists looked shabby and set a bad example for the young recruits. Management claims to know nothing about this. The dual status employees do not want to embarrass themselves or the Air Force by wearing faded, stained, or torn uniforms; however, if they are not able to get them replaced because Management says they are still serviceable or says they don't have any new uniforms, the employee has no option but to buy his own uniforms. This has been a problem and with the proposed requirement to wear the uniform 22 or 23 days per month instead of 2 days per month, this concern looms large. The Agency claims this will not happen, but it has been common in the past, and they do not want to put a requirement in place to enter into mediation as a way to address the situation should it occur.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

 Yes                    No

The Union requests severance of this proposal so that only those parts that the Authority finds incompatible with law or regulation would be eliminated. This request is made because parts a and b have been informally agreed upon, leaving only part c to be resolved.

---

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL 10**

<u>**UNION PROPOSAL #10 (Union's Counter 1)**</u>

a. All dual status employees who are required to wear the uniform while working in civilian status will wear the uniform in accordance with the standards in AFI 36-2903. These employees will not be required to wear the uniform while not on duty, including but not limited to, while en route to and from their job and while on an unpaid lunch period.

b. Employees may use existing facilities throughout the 433rd AW to change into and out of their uniforms. The Employer will provide suitable and adequate private locations for all dual status employees to change their clothes within the building where they work or within close proximity to their work station.

c. For each dual status employee, the Employer will provide and assign a secure locker large enough to store a complete uniform and protective gear for cold and/or wet weather, as well as coveralls for mechanics. These lockers will be made available to each employee prior to the effective date of the requirement to wear uniforms. No locker will be purchased, issued, changed, or moved without the Union's concurrence.

d. To change into and out of their uniform, dual status employees will be allowed 15 minutes at the beginning and at the end of their shift, as well as before and after any and all unpaid periods of time within the shift, such as lunch periods.

e. At the discretion of the individual wearer, dual status employees may wear the uniform when not in a duty status (i.e., not in a paid status as either reservist or civilian), including but not limited to, while en route to and from their job and while on an unpaid lunch period.

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

Although Management has already engaged in extensive negotiation of this proposal with the Union, in their memorandum to Mr. Pizzi, they assert that the Union's Proposal 10 is "not responsive to the requirement" and is, thus, non-negotiable.

In the Agency's counter proposal to the Union's original proposal, Management indicated that they would not allow any paid time for the employees to change into and/or out of their uniform before and/or after the start of their shift or their lunch period. They also indicated they would provide no additional space for this purpose and no lockers beyond those already in place in some of the work areas. Most of the buildings are without lockers and have only small restrooms that may be used for

Defendant's Exhibit J

changing clothes. The space is inadequate to accommodate more than a few people at one time, so it is impractical to propose and insincere to suggest that the existing facilities are sufficient. In addition, without lockers, the employees would have to store their civilian clothes in their vehicles.

In denying the dual status employees time and facilities to change clothes, Management implies that the reason for changing into or out of a required work uniform is only legitimate if it is *their* reason. For example, medical personnel must change into their work uniform upon arrival at the work site, and they must change out of the work uniform before departing. They are allowed time "on the clock" in which to change and locker facilities. This is done to decrease the spread of disease. The Agency respects the validity of that reason because it serves their purposes. In the case of civilian employees being mandated to wear a military uniform, the Agency's intransigence suggests that there is no good reason for employees to arrive at work in civilian clothes or to change into civilian clothes before leaving the work area at the end of their shift. For the employees, however, there are good reasons. These reasons are directly related to the fact that the military uniform *means something*. It has always signified something about the legal and social status of the person wearing it. The uniform *symbolizes*—in fact, *signals* to the public—that the wearer is an airman, a SSgt, a TSgt, a MSgt, etc. And beware—to the enemy, the uniform *signifies* that the wearer is a combatant. While wearing this uniform, a civilian employee may not participate in partisan political activities or visit certain business establishments. In addition, while wearing the uniform, the civilian cannot so much as have the freedom of retreating into his own thoughts or enjoy anonymity. He must remain ever alert so as not to miss the rendering of a required military courtesy, such as saluting an officer. There are many significant reasons to commute to and from work in civilian clothing. Notably, following the September 11 attacks, military personnel were ordered, for their personal safety, to wear civilian clothing while traveling, even in military status.

The Union disagrees with the Employer's contention that the purchase of lockers for civilian employees who are required to wear a uniform (military or otherwise) while on the job constitutes an expenditure of public funds for equipment that primarily benefits the employees as opposed to benefiting the government. It is at the government's mandate, and purportedly for the government's benefit, that these civilian employees are being directed to wear the military uniform.

The Union also disagrees that lockers fall into the category of "personal items," as identified in the case law cited (i.e., 30 FLRA 1025, 63 Comptroller General 278 (1984) and 61 Comptroller General 634 (1982).) The FLRA ruling cited refers to shoes and clothing, which the Union would agree are personal items. Lockers, on the other hand, are not personal. They are hardware and are generally fixed in one location. In addition, the use of a locker may be assigned/transferred from one employee to another, in a way that one would not do with shoes or other articles of clothing.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?



Yes                    No

The Union requests severance of this proposal so that only those parts that the Authority finds incompatible with law or regulation would be eliminated. This request is made because Management and the Union are already in agreement on parts of this proposal, including a, part of b, and e.

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

## PROPOSAL 13

### UNION PROPOSAL #13

Bargaining unit employees who wear the military uniform while performing their duties as civilian employees of the Agency will be held harmless with respect to normal military considerations governing wearing the uniform when in a military status.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

This wording of this proposal created confusion during negotiations, partly because it contained an error—the word *not* in the clause "...who wear the military uniform while [not] performing their duties as civilian employees...." It appears, however, that the Agency recognized that when they provided their counter proposal because their counter proposal addresses the heart of the Union's proposal, that is, whether civilians in military uniform are to render military customs and courtesies. Management states that they must. They also state that the Union's proposal interferes with a management right.

The Union contends that the Agency's position on this matter interferes with the civil rights of the civilian who is compelled to don clothing that belies his true status, deprives him of freedoms associated with his actual civilian status, and exposes him to many more opportunities to run afoul of some rule and be disciplined as a result. And that is only while he is on base. Masquerading as military while in civilian status in public places, while traveling, or deployed could prove to be life threatening.

It would appear that the law grants Management the license to require a specific work uniform of its civilian employees. However, the Union contends that this law does not grant the extension of that license to include prescribing specific behaviors that must be engaged in while wearing this particular clothing. We find this to be overstepping the bounds of the law. We view it as a presumptuous application of the practice of taking a mile when given an inch. (As any five-year-old can tell you, when you give a mouse a cookie, he's say it calls for a glass of milk and a straw.) Soon everybody is hopping and fetching.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

Yes                     No

---

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

## PROPOSAL 14

### UNION PROPOSAL #14

Dual status employees will not be required to wear the full military uniform during the summer months. Because of the heat in south Texas, outer BDU blouse will not be required for dual status employees during the months of April through October.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

The full uniform includes a T-shirt under the outer long-sleeved "blouse." Management has long recognized the absurdity and inhumanity of compelling employees to wear both shirts while working outdoors and/or in non-air conditioned areas during the hot weather. However, this has never before been a concern of the Union for its bargaining unit members since they were never before compelled to wear the military uniform while working in civilian status. For that reason, we wish to address this issue through negotiations and make this allowance a matter of written agreement. The Agency did not accept the Union's wording. Instead, they proposed that during the hot weather, Management will follow the provisions of Article 24, Section 7.02. That contractual provision states that Management will take precautionary measures to reduce the risks to employees who are exposed to extremes of temperature. However, this obligation only "kicks in" when the Agency's Bioenvironmental Office puts out a notice that the temperature in a particular work area exceeds recognized standards of safety. During negotiations, the managers at the table informed us that that has never happened. In other words, although there have been plenty of days when Management recognized the need for humane intervention in the form of allowing reservists to take off their outer long-sleeved shirt, they were not obligated to do so. The question becomes—how hot does it have to be before Management must make this allowance? And does that threshold disregard common standards of health and comfort?

Not insignificant to this discussion is the fact that only three summers ago, the Agency proposed a new option for these same employees—they could wear shorts while working outdoors and in non-air conditioned areas. The Union was notified of this proposal, some limited negotiations took place, and an agreement was born—to the relief of the employees working on the flightline.

In recognition of Management's concerns about loss of control of this situation, the Union revised its proposal as follows:

"A dual service employee working in uniform will be allowed to remove the outer blouse (shirt) of the uniform while inside the confines of a designated work area and work in his/her T-shirt. This option will be based on his/her own judgment, as related to personal comfort. Management reserves the right to direct all dual service employees to wear the outer shirt when a visitor is expected in the work area."

Defendant's Exhibit J

Although there was further discussion of this wording, no agreement was reached with the Agency.

13.  The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14.  Do you wish to "sever" any part of the proposal?

Yes                     No

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

## PROPOSAL 16

### UNION PROPOSAL #16

Civilian employees who are required to wear a uniform as a condition of their civilian employment will be allowed to exercise two hours each day during duty time in order to meet the obligation of being fit and respectfully wearing the uniform on a daily basis.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

The proposal to require employees who are in civilian status to wear a military uniform on a daily basis has been put forward ostensibly "to promote good order and discipline" and "to ensure an atmosphere of mutual integration, interest, and cooperation" between active duty Air Force and reservists. Unless these concerns are purely pretextual or superficial, and the uniform is for the sake of appearance only, one might expect the Agency to support an all-around stronger pursuit of a military bearing among these employees. Reaching the Air Force "Fit to Fight" goal requires regular physical exercise. Active duty Air Force members work out daily "on the clock." These newly conscripted "troops" deserve the same consideration to meet their fitness goals.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

      Yes  No

---

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL 17**

**UNION PROPOSAL #17**

Due to the large number of dual status employees in the bargaining unit and the vastly increased risk to them of disciplinary and/or adverse actions stemming from the obligation to observe all military customs, courtesies, and standards of grooming on an everyday basis, the Union anticipates a significant and immediate onslaught of grievances that will require research, processing, and representation. To address this added burden on the Union, the Agency will provide one dual status employee assigned to a block of 32 hours per week official time to investigate, resolve, and/or process these grievances.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

The Agency's plan to require civilians to wear a military uniform is much more than a wardrobe malfunction. Because dual status employees will be required to observe all military customs and courtesies, they will be open to many more "opportunities" to violate a rule and incur disciplinary action. These civilians will be treated disparately in terms of their exposure to potential liabilities to their career. The uniform requirement will put this group of 500 BUEs at a distinct disadvantage to other civilian employees, who do not need to concern themselves about a slew of new potential pitfalls. The number of grievances is likely to be quite high, demanding more manpower and expertise in military rules and regulations in the Union office.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

Yes                             No

---

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL 18**

**UNION PROPOSAL #18**

The parties will jointly develop an ad hoc committee, comprised of an even number of management and Union appointed members. This committee will address issues such as dress and grooming standards and the disposition of any issues that arise concerning the Employers dissatisfaction of an employee's dress or grooming. The committee will consist of no less than two members from each party and no more than a combined total eight members. Any issues not resolved to the satisfaction of the employee accused of the infraction will be grievable within 21 calendar days of the issue having been addressed by the committee. Any employee found to be in violation after exhausting the grievance and arbitration processes will be allowed administrative time to correct the dress or grooming deficiency.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

This proposal represents an attempt to put in place a system that would utilize alternative dispute resolution processes to address the grievances that will arise as a result of the requirement for civilians to wear a military uniform. This proposal would establish a committee of managers and dual status BUEs from the 433rd AW to resolve these problems rather than taking them to the base mediation program and having the discussion facilitated by a neutral party who is unfamiliar with military customs, courtesies, and standards of grooming.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

Yes                     No

---

Defendant's Exhibit J

**10. Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL 19**

<u>**UNION PROPOSAL #19**</u>

Employees will be allowed administrative time to obtain haircuts and shaves while in a duty status as required for the employees to comply with grooming standards associated with the wearing of the uniform.

---

**11. Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12. Describe how the proposal is intended to work and what impact it will have. Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

This proposal is fairly self-explanatory. The rationale is that these civilian employees are being placed under "special" requirements regarding hair cuts and shaving. That being the case, time expended pursuing such ends should be compensated by the Agency.

13. The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14. Do you wish to "sever" any part of the proposal?

Yes                               No

---

Defendant's Exhibit J

**10.  Set out the exact wording of the proposal sought to be negotiated.**

**PROPOSAL  20**

<u>**UNION PROPOSAL #20**</u>

Any bargaining unit employee who is required to dress up as an airman and observe military customs, courtesies, and standards of grooming while in fact working in civilian status will be afforded all of the benefits afforded to active duty military of the same rank.

---

**11.  Explain the meaning of the proposal including any special terms or phrases, technical language, or other words that are not in common usage.**

- and -

**12.  Describe how the proposal is intended to work and what impact it will have.  Where the proposal concerns a particular work situation, or other particular circumstances, describe the situation or circumstances that will enable the Authority to understand how each proposal is intended to apply.**

---

This proposal is fairly self-explanatory.  The Agency is proposing to use these civilians as "soldiers," as airmen, without comparable compensation.  We believe that is wrong.  If the law is going to allow such an outrageous step, certainly the conscripted individuals ought to be compensated.

13.  The Union's legal arguments concerning the negotiability of these proposals will be provided in response to the Agency's statement of position.

14.  Do you wish to "sever" any part of the proposal?

Yes                               No

---

Defendant's Exhibit J

**Hearing**

15. Do you believe that a hearing or other fact finding procedure is necessary to resolve any issues presented in this case?

Yes  No

15a. If Yes, explain what those issue are and why they require a hearing.

Defendant's Exhibit J

**Part V.  Responsibilities of the Union**

After filing the petition for review, the Union is responsible for participating in a conference and responding to any Authority Order.

Failure to participate in a conference under section 2424.23 of the Authority     's Regulations, a direction or proceeding under section 2424.31 or otherwise failure to provide timely or responsive information pursuant to an Authority Order may result in dismissal of the petition for review.  5  C.F.R. § 2424.32.

**Part VI.  Checklist with Statement of Service and Signature**

**All documents filed with the Authority must comply with the requirements set forth in part 2429 of the Authority's Regulations.**

A complete copy (including all attachments) of a petition for review must:

☒    Be served by certified mail, first-class mail, commercial delivery, or in person on:  (1) Principal Agency Bargaining Representative at the negotiations; and (2) the Head of the Agency (or designee) . ., . . . . . . . . . . . . . . . . . . . . . . . .........................(5 C.F.R. §§ 2424.2(g) & 2429.27(b))

☒    Contain a signed and dated statement of service with names and addresses of parties served, date of service, nature of document served, and whether by certified mail or personal delivery.  (See example on back page  ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  (5 C.F.R. § 2429.27(c))

☒    Contain an original and 4 complete and legible copies of all document  . s. (5 C.F.R. §2429.25)

☒    Be addressed to:    Case Control Office, Federal Labor Relations Authority
1400 K St., NW, Suite 201
Washington, D.C.  20424-0001

Defendant's Exhibit J

# Statement/Certificate of Service to be used by Union in filing a petition for review of negotiability issues.

## STATEMENT OF SERVICE

I certify that a complete copy of the petition for review, including all attachments, in the case of the <u>UNION and AGENCY</u> were filed with the Case Control Office, Federal Labor Relations Authority, Washington, D.C., and were sent this day to:

**Agency Principal Bargaining Representative:**

> ALFRED CARRILLO                FIRST CLASS MAIL
> LABOR RELATIONS OFFICER
> CIVILIAN PERSONNEL OFFICE
> 1720 PATRICK ST BLDG 5311
> LACKLAND AFB TX 78236-5276

**The Head of the Agency (or designee)**

> CAPT AMY E BRYAN                FIRST CLASS MAIL
> LABOR LAW FIELD SUPPORT CENTER
> AFLOA/JAC/LLFSC
> 1501 WILSON BLVD 7TH FLR
> ARLINGTON VA 22209-2403

_7 June 08_
**Date**

_Eloise R. Stripling_
**Name of filing party**

_Eloise R. Stripling_
**Signature of Union's Representative**

Defendant's Exhibit J



# DEPARTMENT OF THE AIR FORCE
## AIR FORCE LEGAL OPERATIONS AGENCY (AFLOA)

23 May 2008

MEMORANDUM FOR MR. ANDY PIZZI
FEDERAL SERVICE IMPASSES PANEL

FROM: AFLOA/JACL/LLFSC
7th Floor
1501 Wilson Boulevard
Arlington, VA 22209-2403

SUBJECT: Case No.8 FSIP 49, Lackland Air Force Base, Texas and AFGE Local 1367

1. In the above-referenced matter, the Activity submits the following supplemental information and positions regarding negotiations between Management and AFGE Local 1367 concerning wear of the uniform by Air Reserve Technicians (ARTs) while in a civilian duty status at Lackland Air Force Base, Texas.

2. An ART is a Federal civilian employee serving in a position that requires an active Reserve assignment in a Reserve unit. As a condition of employment, ARTs must be Ready Reservists assigned to and training with the unit in which they are employed and must occupy an equivalent Reserve military position with a comparable military rank or grade. They are full-time career civil service employees and accrue all the benefits and entitlements of Federal competitive service. They receive the pay of the civilian job and, in addition, receive military pay for all training periods performed in military status. The primary role of an ART is to train other reservists. They may be called upon to plan and/or conduct training of reservists during the normal workday, training assemblies, and when reservists are on active duty training. The statutory basis for the Air Reserve Technician (Dual Status Technician) program is vested in 10 U.S.C. §10216.

3. Employment as an ART is obtained in the same manner as any other competitive Federal service job. ARTs are afforded Federal civilian competitive status at the time of appointment and, therefore, are entitled to apply for positions in other Federal agencies in the same manner as any other Federal employee. By the same token, employees of other Federal agencies may apply for transfer into ART positions provided they meet all civilian and military/Reserve requirements of the position.

4. ARTs in their civilian capacity may be in the bargaining unit covered by the local labor agreement. If in the bargaining unit, they have the right to join or not join the recognized labor organization and may represent that organization. All ARTs in the bargaining unit are represented by the recognized labor organization regardless of union membership.

Defendant's Exhibit J

5. When a Reserve unit is mobilized, the unit becomes a part of the active duty gaining command. Since ARTs are Reserve members of the unit, they will be activated to perform duties in a military capacity the same as other members of the unit. Upon mobilization, their civilian pay ceases. They are subject to immediate call to active duty in the event of mobilization to meet a national emergency and may be assigned worldwide duty with their assigned unit or as an individual on active duty.

6. The role ARTs play as civilian employees in the full-time management of a Reserve unit is directly correlated to their obligations as members of the military establishment. Inherent in the job are certain military responsibilities, which are comparable to any Air Force member in an equivalent grade and position. The planning, scheduling, and conduct of training are among their most important functions. This pertains to all aspects of training, including skills training, aircrew training, and general military training. Maintaining a combat-ready posture depends directly on their ability to perform this aspect of the job.

7. On August 7, 2007, Air Force Instruction Interim Message Changes (IMC) were published, instituting the mandatory requirement for ARTs to wear the military uniform while in civilian status. Air Reserve Technicians encumber unique civil service positions which require them to maintain active military reserve status in the same unit of assignment as a condition of their civilian employment. An ART is not merely a civilian working for the military; rather an ART is a part of the military and operates in an inherently military environment. The Air Force Reserve (AFR) plays a vital role within our Air Force. As the Air Force mission transforms, so does the mission of the AFR. In the 60s, 70s and 80s, the AFR mission was much different than it is today. Our military and our Nation are facing significant challenges and increasingly rely on the AFR for the experience and capability we bring to the fight. ARTs often convert from civilian status to military status and back into civilian status during the civilian work week. ARTs occupy a significant percentage of the deployed force. There is little likelihood this increased involvement will decrease in the foreseeable future. The evolving mission of the AFR is reflected in its new vision, "One Air Force, Same Fight...An Unrivaled Wingman." Wear of the military uniform is reflective that Air Force Reserve Command is an integral part of the Air Force, and a vital part of the Total Force.

8. The mission of the United States Air Force Reserve is the same as that of the United States Air Force. Deliver sovereign options for the defense of the United States of America and its global interests – to fly and fight in Air, Space, and Cyberspace. Our purpose, as derived from Title 10 United States Code, is to provide combat-ready units and individuals for regular duty whenever there are not enough trained units and people in the Regular component of the Air Force to perform any national security mission.

9. The Agency changed the requirement for wear of the military uniform by ARTs while in civilian status pursuant to 5 U.S.C. §7106(b)(1) as a means of performing work. No other legal authority is necessary or required. Thus, the decision in this matter is a subject negotiable only at the election of the agency. In this instance, management did not elect to bargain over the decision to require ARTs to wear the military uniform. Consequently, the right to bargain was limited to procedures to be observed in the exercise of the right and appropriate arrangements for employees adversely affected by the exercise of the management right. ARTs wearing the

2

military uniform will continue to be subject to civilian rules and regulations while in civilian status, as are other civil service employees who are required to wear a uniform in performance of their duties, i.e., DoD police and firefighters, National Park Service rangers, USDA forest rangers.

10.  The 433d Airlift Wing (433 AW) and the 556th RED HORSE Squadron are located at Lackland Air Force Base, Texas.  Their combined strength totals approximately 3,100 personnel.  The workforce population is roughly divided among traditional reservists (77%), ARTs (19%), civilians (2%), active duty military (1%), and student aides (1%).  ART bargaining unit employees account for approximately 11% of the total force.  The specific mission of each is as follows:

   a.  433 AW:  Provides managerial, administrative, and operational requirements necessary to operate, maintain and support 14 PAA strategic airlift aircraft and ensures the wartime readiness of approximately 3,000 reservists assigned to 26 units.  Under wartime tasking, operates as a Main Operating Base with various units deploying as forward elements.  Has full capability to stand alone in any contingency tasking.  Also, the 433d is the only Wing in the world providing student administration, support and training on the C-5 weapon system for aircrews of all three Air Force components (Active Duty, AF Reserve and Air National Guard).  This mission is routinely carried out with a core of instructors that includes active duty personnel, which further underscores the need to ensure an atmosphere of mutual integration, interest and cooperation.

   b.  556th RED HORSE Squadron:  A highly mobile and self sustaining combat support force that performs wartime tasks of major bed down operations, bare base development, and large scale construction projects in a contingency environment.

11.  By letter dated 10 August 2007 (referencing the 433 AW) and by letter dated 17 August 2008 (amended to include 556th RED HORSE unit), management notified AFGE Local 1367 of the requirement for all ARTs to wear the military uniform while in civilian status and requested that AFGE Local 1367 submit I&I proposals in accordance with their negotiated agreement.  At the same time, management provided AFGE Local 1367 with copies of the Interim Changes to AFI 36-703, *Civilian Conduct and Responsibility*; AFI 36-801, *Uniforms for Civilian Employees*; and AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*.  See Attachment 1.

12.  After negotiating for several months and seeking mediation through the Federal Mediation and Conciliation Service, Management and the Union were unable to reach agreement on four proposals.  Management's position with respect to the Union's most recent proposals (see Attachment 2) is outlined below:

   a.  **Proposal #5**

      i.  5a, 5b, 5f, 5g:  The Union has requested 10 complete sets of the Airman Battle Uniform, 10 Dress Uniforms, and protective gear for mechanics.  As drafted, the union's original proposal and counterproposal are outside the scope of the duty to bargain because the proposals violate the statutory maximum uniform allowance permitted by law.  Under 5 U.S.C. §5901(a)

3

(2008), agencies of the Government of the United States may furnish to each employee a uniform at a cost not to exceed $400 a year (or such higher maximum amount as the OPM may establish under 5 U.S.C. §5902); or pay each of the employees an allowance for a uniform not to exceed $400 a year (or such higher maximum amount as the OPM may establish under 5 U.S.C. §5902). Effective 29 May 2007, OPM regulations allowed for agencies to pay up to $800.00 a year; however, the Department of Defense, pursuant to 10 U.S.C. §1593(b), has limited the amount of allowance to $400.00 a year. Therefore, if the agency elects to provide a uniform allowance or uniforms, the maximum amount permitted to be paid to (or purchased for) each employee by law is $400.00 a year.

The Air Force is in the process of transitioning from the Battle Dress Uniform to the Airman Battle Uniform. The Airman Battle Uniform is not mandatory until 2011. The estimated cost for the BDU blouse, pants, t-shirt, and socks set is $62.44 and the cost for the ABU blouse and pants set is $74.85. If management were to provide 10 sets to each ART employee, it would total approximately $624.40 for BDUs or $748.50 for ABUs, both amounts which clearly exceed the statutory maximum. The maximum is exceeded without even considering dress uniforms.

While nonnegotiable, in the interest of trying to reach a mutual agreement and ensuring ARTs have a more than adequate uniform inventory, management proposes an initial uniform allowance of $150.00. It is anticipated that each employee could purchase two additional BDU sets of uniforms. Combined with the uniforms an ART already received in his or her military capacity would give each employee an adequate number of BDU uniforms. After this initial allowance, management proposes that each employee may replace in-kind a uniform during any drill weekend. Likewise, maternity BDU components are subject to in-kind replacement.

Protective gear is not part of the standard military uniform. See also Attachment 3, AFI 36-801, *Uniforms for Civilian Employees*, 29 April 1994, paragraph 2.2, Items Not Considered Part of the Uniform (listing normal work clothing such as coveralls worn by painters and fatigue clothing worn by fire fighters as well as safety shoes and asbestos gloves). Management provides protective gear, as necessary, to employees for their safety while working with potential hazardous fuels (i.e., jet fuel, hydraulic fluid, etc.). The protective gear is not specific to a given individual. Management will continue to provide safety gear to those employees who need it, as it has done in the past.

Implementation would be effective upon completion of I&I bargaining requirements. The 433 AW and 566th RED HORSE bargaining unit employees already have military uniforms available for them to wear upon implementation.

ii. 5c: Laundry facilities: Civilian employees, including ART employees, are responsible for laundering their own clothes. See Attachment 3, AFI 36-801, paragraph 2.3.1 ("Employees normally pay for their own cleaning and laundering expenses.") Management does not currently have any laundry facilities available for employees to wash their personal clothes.

4

iii. 5d: As explained above, protective gear, which includes coveralls, is not a part of the standard military uniform. Management already provides clean coveralls to ART employees who need to use the coveralls in the performance of their assigned duties. Management will continue to provide clean coveralls to ART employees who need them during the course of their duties. Providing coveralls to ART employees is not affected by the change requiring ART employees to wear the military uniform while in a civilian duty status.

iv. 5e: The parties tentatively agreed to the following: Employees who cannot wear combat boots may be allowed to wear black shoes/athletic shoes provided that the employee brings proper medical documentation clearly stating he/she is unable to wear combat boots. The employer will not pay for these black shoes/athletic shoes. Caveat: Management will also follow the waiver procedures for proper wear of the uniform in accordance with AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, 2 Aug 06, Table 2.6, item 18 (regarding wear of athletic shoes). See Attachment 4 (Medical waiver will only be approved by unit commander when recommended by appropriate medical authorities.)

b.  **Proposal #6**

i. 6a: Management and the Union agreed to the proposal as rewritten: If a member's uniform becomes unserviceable, the member must report to his/her supervisor as soon as possible to begin the process of replacing the uniform item. Due to any unforeseen event, if a member has less than two (2) serviceable uniforms on hand, a waiver may be granted by Management on wearing of the uniform. A member who turns in two or more unserviceable uniforms at one time will not be granted a waiver. See Attachment 5.

ii. 6b: Management can agree that "Unserviceable" shall be defined as referring to any uniform item which is no longer fit for use based on changes in the employee's size or fair wear and tear, including but not limited to fading, stains, tears, fraying, stitch marks, or discoloration where patches have been removed.

iii. 6c: This proposal seeks to replace an existing process that governs when uniforms for civilian employees will be replaced. The standard for replacing uniforms for civilian employees is governed by AFI 36-801, *Uniforms for Civilian Employees*, 29 April 1994. Specifically, under AFI 36-801, paragraph 2.3.2., "local management decides when employees must replace uniform items." See Attachment 3. Disagreements between management and a bargaining unit employee regarding whether a uniform is serviceable also would be covered by the existing procedures already agreed upon in the parties' current collective bargaining agreement. See Attachment 6, Collective Bargaining Agreement, Article 22.

c.  **Proposal #10**

i. 10a, 10e: The requirement for ART employees to wear the military uniform while in a civilian duty status applies when the employees are on duty. The requirement to wear the military uniform is not applicable off-duty. The union's proposal, as drafted, is not responsive to the requirement. Thus, it is outside the scope of the duty to bargain.

5

Defendant's Exhibit J

ii. 10b: For ART employees who desire to change into their military uniform at their duty location, the Agency intends for employees to use the existing facilities (i.e. restrooms) to change as is currently done.

iii. 10c: The Union's request for each ART to receive his or her own secure personal locker is simply not feasible due to the size of the lockers and the cost to accomplish this request. There are approximately 475 bargaining unit ARTs in the 433 AW and 13 bargaining unit ARTs in the 556th RED HORSE Squadron. They are dispersed throughout approximately 40 different buildings on the installation. In some buildings lockers exist. In other buildings, lockers do not exist. Where lockers do exist, the primary purpose is to store any issued equipment (e.g., individual shop tools, etc.) and personal belongings of the employee (e.g., rings, watches, necklaces, etc.) that are not allowed in the performance of their assigned duties. The vast majority of current lockers are not individually assigned, but are available to all on an as needed basis related to the mission or on a personal basis as available. The cost for one set of lockers is approximately $107.25. The 433 AW recently purchased 125 sets of lockers at a total cost of $13,406.25 to supplement existing lockers. In order to provide lockers to every ART employee, buildings would likely have to be redesigned and renovated at significant cost. Because of the many locations where ART employees work, the lack of space, and significant cost, Management cannot agree to this proposal. Furthermore, to require that "no locker will be purchased, issued, changed, or moved with [or without] Union's concurrence" is not an appropriate arrangement as it excessively interferes with management's rights under the Statute.

iv. 10d: Allowing employees 1 hour of time during on average an 8-hour duty day to change from civilian clothes in and out of the military uniform (15 minutes of duty time at the beginning of the duty day, before the lunch hour, after the lunch hour, and at the end of the duty day) is outside the duty to bargain because it interferes with management's right to assign work under 5 U.S.C. §7106(a)(2)(B). As drafted, such proposal also cannot be considered an appropriate arrangement as it excessively interferes with management's right to assign work. Thus, this proposal is nonnegotiable. Management expects ART employees to be in uniform during the entire duty day.

### d. **Proposal # 14**

As drafted, the union's original proposal and counterproposal are outside the scope of the duty to bargain because both proposals interfere with management's right to determine the methods and means of performing work. The proper wear of the military uniform is inextricably intertwined with the requirement to wear the military uniform as a methods and means of performing work. See, e.g., Association of Civilian Technicians and National Guard Bureau, 38 F.L.R.A. 1005, 1012-13 (1990); The Adjutant General Massachusetts Nation Guard, Boston, Massachusetts and NAGE, 36 F.L.R.A. 312, 319-22 (1990). The Union's proposals address the substance of the decision to require ART employees to wear the military uniform while in a civilian duty status. Management elected not to bargain over the decision to require ARTs to wear the military uniform. Additionally, the proposals as drafted are not an appropriate arrangement as they excessively interfere with management's right under the Statute. Once implemented, all ART employees are expected to comply with the requirements of AFI 36-2903 regarding proper wear of the military uniform. To the extent external temperature conditions

6

Defendant's Exhibit J

create safety concerns for employees; management will comply with the provisions of Article 24, Section 7.02 of the collective bargaining agreement. See Attachment 6, Article 24, section 7.02; see also Attachment 7, AFI 36-2903, Tables 2.2 & 2.4., line 1 (". . .shirt may be removed in immediate work area. When removed, T-shirt (other than the athletic or sleeveless style) will be worn.")

AMY E. BRYAN, Capt, USAF
Litigation Attorney,
Labor Relations Law Branch
Labor Law Field Support Center

Attachments:
1. Changes to AFI 36-703, AFI 36-801, and 36-2903 (13 pgs)
2. Proposals at Issue, Attachment 8 and page 8 of original submission (4 pgs)
3. AFI 36-801, *Uniforms for Civilian Employees*, 29 April 1994, Chapter 2 (2 pgs)
4. AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, 2 Aug 06, Table 2.6 (3 pages)
5. Proposal #6a as agreed upon (1 pg)
6. Collective Bargaining Agreement, Articles 22 and 24 (10 pgs)
7. AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, Tables 2.2. & 2.4, 2 Aug 06, Table 2.2 (9 pgs)

7

Defendant's Exhibit J

**Union's Proposal #1:**
The agency will cite under what authority of law and what provision of the collective
bargaining agreement (CBA) the requirement is being established for dual status Air
Force employees to wear a military uniform while in a civilian status.

**Management Response:**  This proposal does not meet the definition of an appropriate
arrangement nor does it meet the definition of methods and means.  This is more of a
question from the union to management.  Therefore, the following answer is being
provided.  Management has the right to decide whether to take actions listed in 5 USC
7106(a).  As such, these rights were used when management decided to make to change
and the Air Force Instructions were revised accordingly.  When there is a decision made
by the agency to change conditions of employment of unit employees who are covered by
a CBA, there is a duty to notify the local union.  At the request of the union, there is a
duty to bargain on the procedures that management will follow in implementing its
decision to include appropriate arrangements for employees expected to be adversely
affected by the decision.

Since these changes are not covered by our labor agreement, management is following
the provision outlined in Article 4 of the agreement.  Article 4 states under Section 1:
Matters appropriate for consultation or negotiation between the Parties shall include
personnel policies, practices, and matters affecting working conditions of employees in
the Bargaining Unit that fall within the scope of the Employer's authority....

Section 2:  In prescribing regulations relating to personnel policies, practices, and
working conditions, the Employer shall have due regard for the obligations imposed by
the above paragraph.  However, the obligation to meet and confer does not include
matters with respect to the mission of the agency; its budget; its organization; the number
of employees; and the numbers, types, and grades of positions or employees assigned to
an organizational unit, work project or tour of duty; the technology of performing its
work; its internal security practices, or any other matter under retained management
rights as stated in Article two (2).  This does not preclude the Parties from negotiating
agreements providing appropriate arrangements for employees adversely affected by the
impact of realignment of work forces or technological change.

Section 3:  The Employer or the designated representative, and the Union, through
appropriate representatives, will meet at reasonable times and confer in good-faith with
respect to personnel policies, practices, and matters affecting working conditions, so far
as may be appropriate under applicable law and regulations, a national or other
controlling agreement at a higher level in the agency, such as Public Law
95-454.

Section 4:  The following procedures will apply for the implementation of changes in
personnel policies, practices, and working conditions, which are not otherwise covered by
this Agreement for the duration of the Agreement.  The Employer will give the Union
prior notice of proposed changes in personnel policies, practices, and working conditions,
which are not covered by this Agreement.  If the Union requests negotiation on the

subject, the Parties will make good-faith efforts to arrive at mutual agreement prior to implementation of the change.

<u>Section 5</u>:  The Employer will inform the Union on matters concerning changes that may affect employees in the Bargaining Unit that are not appropriate matters for consultation or negotiations when the Employer deems such action appropriate.

All the above procedures for notifying the union on changes to working conditions of the employees have been followed.

Defendant's Exhibit J

**Union's Proposal #2:**
The agency will explain the specifics of their plan for implementation of all provisions of the requirement for civilians to wear military uniforms.

**Management Response:** This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. This is more of a question from the union to management. Therefore, the following answer is being provided. Management intents to implement the requirement of wearing the uniform after all I&I bargaining is completed. Air Force Reserve Command has directed that, in order to facilitate cohesion between the Reserve and active-duty component during increasing partnerships on 'tip-of-the-spear' type missions, air reserve technicians will wear military uniforms at all times. AFRC/PA will prepare a news service story and coordinate with key Air Force Reserve Command leaders and staff members as appropriate. Also, this information will be added to Air Force Reserve Command's monthly Commanders Call topics and posted on the AFRC public Web site. Air Force leadership wants reservists to be associated with the uniform for seamless interaction between Regular and Reserve components. AFRC plays a vital role within our Air Force. Being combat ready deployable war fighters is critical to the defense of the nation. Wear of the military uniform is reflective that AFRC is an integral part of the Air Force, and a vital part of the Total Force. ARTs will continue to be subject to civilian rules and requirements while in a civilian status. While in a civil service status, they will be required to adhere to military standards.

Defendant's Exhibit J

**Union's Proposal #3:**
The agency will clearly explain why the need and the purpose for dual status civilians to be clothed so as to give the deceptive appearance of being military airmen.

**Management Response:** This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. This is more of a question from the union to management. Therefore, the following answer is being provided. The Air Force changed three of its instructions on 07 August 2007 to require all air reserve technicians to wear military uniforms rather than civilian clothes while working in civilian status. ARTs are full-time civilian employees who serve in the same job as Air Force reservists and wear the uniform when in military status. The primary purpose for the change is noted in the comments by Lt. Gen. John A. Bradley, AFRC commander, "We want our ARTs to be in uniform because we are integrating with the Regular Air Force and Air National Guard throughout the Air Force and Total Force Integration is changing how we interact with the rest of the Air Force. Even before 9/11, the regular component depended on us to get the job done. That dependency is growing because we cannot afford to do business as usual. We need to consolidate our forces and capitalize on each other's strengths."

As example of progress, General Bradley cited reservists preparing to fly F-22s with the Regular Air Force in Alaska, reservists flying their own C-17s in California and reservists standing up and managing a C-130 unit in North Carolina with an active associate unit. "We are able to take on new and challenging missions because of the skills and experience of our air reserve technicians," said Chief Master Sgt. Troy McIntosh, AFRC command chief master sergeant. "Some technicians have told me they feel this uniform change is calling their military dedication or patriotism into question," said the chief. "That is not at all the case. Our technicians have proved themselves in the past and, I'm confident, they will continue to do so in the future." General Bradley said the Air Force Reserve is entering a new era, which is vastly different than 1958, the year the air reserve technician program was created. "I believe wearing uniforms is an important step to being a full partner and an Unrivaled Wingman in today's Air Force," said General Bradley.

Defendant's Exhibit J

**Union's Proposal #4:**
The agency will clearly explain why they believe the planned change to civilian dress policy is not covered by the existing agreement negotiated with the union, specifically Article 3, section 3F

**Management Response:** This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. This is more of a question from the union to management. Therefore, the following answer is being provided. The primary reason is that Article 3 section 3F talks about the requirement of employees to comply with reasonable dress and grooming standards that currently apply to their work areas. This has nothing to do with the changes in the AFI's requiring the employees to start wearing the military uniform. The Labor contract is silent on military uniforms. Since the change to the AFI's cause a change in working conditions, under Article 4 of the Labor contract, management is following the language of the contract. With the change in AFI and the I&I process, it will become necessary to rescind the agreement on the wearing of short as it will not be a part of the uniform.

Defendant's Exhibit J

## UNION PROPOSAL #5  (Union's Counter 1)

a. The Agency will provide to civilian bargaining unit employees all of the elements required to be fully and properly uniformed, including but not limited to the following items:

Airman Battle Uniform

Ten (10) ABU pants (utility trousers)
Ten (10) ABU shirt (utility shirt/blouse)
Ten (10) pairs of foliage green boot socks
Ten (10) sand colored t-shirts
Two (2) sand colored riggers belts
Two (2) pairs of foliage green boots
Two (2) ABU patrol caps
Two (2) pairs of cold-weather foliage green colored gloves
One (1) ABU Field Jacket
One (1) Gortex Jacket
One (1) ABU duffel bag

Dress Uniforms

Ten (10) Service Blue pants/trousers
Ten (10) Service Blue skirts (for female employees)
Ten (10) Service Blue shirts
Ten (10) white T-shirts (for male employees)
Ten (10) pairs of black nylon trouser socks
Five (5) blue neckties (for male employees)
Five (5) blue neck tabs (for female employees)
Two (2) pairs of black leather shoes
Two (2) flight caps
Two (2) Service Blue coats
Two (2) trouser belts with chromium plate
Two (2) chromium plated buckles
One (1) all-weather coat with removable liner
One (1) Poly Jacket with removable liner

Protective Gear to Cover Uniform (for mechanics)

Two (2) green summer coveralls
Two (2) green winter coveralls
One (1) pair rubber overshoes to cover boots (provide ground & nonskid sole)

b. The items listed above will be provided at no charge to each bargaining unit employee required to wear uniforms in the performance of his/her duties in civilian status.  This initial issue will be provided to all employees prior to the effective date for the requirement to wear uniforms.

Defendant's Exhibit J

c. Laundry facilities (washing machines and dryers) will be made available at the work site for use by dual status employees for the laundering of dirty uniforms.

d. A laundry service will be contracted to clean the coveralls used by mechanics to protect their uniforms. Clean coveralls will be made available at all times.

e. Employees who cannot wear combat boots will be allowed to wear black shoes/athletic shoes; provided that the employee brings medical documentation clearly stating he/she is unable to wear combat boots.

f. Maternity uniform items (both ABU and Dress Blues) will be issued to pregnant employees in the same quantities listed above.

g. These uniforms are provided in addition to any uniforms provided for use by the employee while serving in military status or under military orders.

**UNION PROPOSAL #6  (Union's Counter 1)**

a. The Employer will replace in kind any unserviceable uniforms and uniform items (stripes, name tags, military patches, etc.) submitted for exchange by the employee. Management agrees to provide a voucher for the sewing/placement/attachment of the required items on the uniform. The Employer will replace uniforms and uniform items submitted for exchange by the employee upon becoming unserviceable within fourteen (14) calendar days of the items' being turned in the by employee.

b. For the purposes of this agreement, "unserviceable" will be defined as referring to any uniform item which is no longer fit for use based on changes in the employee's size or fair wear and tear, including but not limited to fading, stains, tears, fraying, and stitch marks or discoloration where patches have been removed.

c. Any disagreement between Management and an employee or the Union regarding whether or not a uniform item is unserviceable will be resolved through the Lackland ADR program, with a union representative included in the process.

Defendant's Exhibit J

**Union's Proposal #5:**

The agency will provide to civilian bargaining unit employees who are required to wear a uniform in the performance of their duties an initial uniform allowance of $800 per year or the maximum allowed by law or government wide rule, whichever is greater, and an annual lump sum of $400 for uniform maintenance. The agency will provide sufficient uniforms and uniform items (ie black socks, black t-shirts, belt, boots/shoes, etc) at no charge to each bargaining unit employee required to wear uniform in the performance of his/her duties. This initial issue will be provided to all employees prior to the effective date for the requirement to wear uniforms. The employer will replace uniforms and uniform items submitted for exchange by the employee upon becoming unserviceable within seven (7) calendar days of the items being turned in by the employee. Bargaining unit employees will not be required to wear hats. Employees who cannot wear combat boots will be allowed to wear black shoes/athletic shoes; the employer will pay for these black shoes/athletic shoes.

Sufficient is define for the purpose of this agreement as meaning one uniform for each scheduled work day for the time period commencing at 0001 hours Sunday and to 2400 hours Saturday.

These uniforms are provided in addition to any uniforms provided for use by the employee while serving in military status or under military orders.

**Management Counter Proposal:**

Management will comply with the provisions as noted in 5 USC 5901 (a)(1). In addition, the agency will provide a one time initial sum of $150.00 to each bargaining unit member for the purchase of any uniform and or uniform item(s).

The employer will replace in kind any unserviceable uniforms and uniform items (stripes, name tags, military patches, etc.) submitted for exchange by the employee.

Employees who cannot wear combat boots may be allowed to wear black shoes/athletic shoes provided that the employee brings medical documentation clearly stating he/she is unable to wear combat boots. The employer will not pay for these black shoes/athletic shoes.

Defendant's Exhibit J

22 Feb 04

AC

GRS

Proposal

The Parties agree that, at this time, there is no requirement for dual status employees to wear the dress blues while in civilian status. In the event that management requires the wearing of dress blues, ~~dress blue uniforms~~ will be provided in the same quantity as the utility uniforms.

Defendant's Exhibit J

**Union's Proposal #6**

All cost incurred to meet the requirements of wearing the uniform will be paid for by the Agency. This shall include the cost for additional haircuts, boot shines, and for items not covered in proposal #1, such as dry cleaning costs, patches and stripes required (purchased and affixed) on the uniforms. The employer agrees to pay 100% of the employee's bills for all uniform alterations and the attachments of any required patches. Employees will submit receipts for these reimbursements. All expenses will be reimbursed in a timely manner each month.

**Management Counter Proposal:**

The employer will replace in kind any unserviceable uniforms and uniform items (stripes, name tags, military patches, etc.) submitted for exchange by the employee. Management agrees to provide a voucher for the sewing/placement/attachment of the required items on the uniform. These services will be at no cost to the employee.

Defendant's Exhibit J

Given to union and federal mediator on 2/22/08

Proposal 6.A.

GPS

If a member's uniform becomes unserviceable, the member must report to ~~their~~ his/her supervisor ~~within two (2) workdays~~ to begin the process of replacing the uniform item. Due to any unforeseen event, if a member has ~~less~~ fewer than two (2) serviceable uniforms on hand, a waiver may be granted by Management on wearing of the uniform. ~~If a member does not report a uniform as being unserviceable with two (2) workdays, a waiver may not be given.~~ A member who turns in two or more unserviceable uniforms at one time will not be granted a waiver.

~~5 workdays~~

* as soon as possible

— Agreed by Union

Defendant's Exhibit J

## UNION PROPOSAL #10  (Union's Counter 1)

a. All dual status employees who are required to wear the uniform while working in civilian status will wear the uniform in accordance with the standards in AFI 36-2903.  These employees will not be required to wear the uniform while not on duty, including but not limited to, while en route to and from their job and while on an unpaid lunch period.

b. Employees may use existing facilities throughout the 433rd AW to change into and out of their uniforms.  The Employer will provide suitable and adequate private locations for all dual status employees to change their clothes within the building where they work or within close proximity to their work station.

c. For each dual status employee, the Employer will provide and assign a secure locker large enough to store a complete uniform and protective gear for cold and/or wet weather, as well as coveralls for mechanics.  These lockers will be made available to each employee prior to the effective date of the requirement to wear uniforms.  No locker will be purchased, issued, changed, or moved with the Union's concurrence.

d. To change into and out of their uniform, dual status employees will be allowed 15 minutes at the beginning and at the end of their shift, as well as before and after any and all unpaid periods of time within the shift, such as lunch periods.

e. At the discretion of the individual wearer, dual status employees may wear the uniform when not in a duty status (i.e., not in a paid status as either reservist or civilian), including but not limited to, while en route to and from their job and while on an unpaid lunch period.


**NOTE:**

- The Union disagrees with the Employer's contention that the purchase of lockers for civilian employees who are required to wear a uniform (military or otherwise) while on the job constitutes an expenditure of public funds for equipment that primarily benefits the employees as opposed to benefiting the government.  It is at the government's mandate, and purportedly for the government's benefit, that these civilian employees are being directed to wear the military uniform.

- The Union also disagrees that lockers fall into the category of "personal items," as identified in the case law cited (i.e., 30 FLRA 1025, 63 Comptroller General 278 (1984) and 61 Comptroller General 634 (1982).)  The FLRA ruling cited refers to shoes and clothing, which the Union would agree are personal items.  Lockers, on the other hand, are not personal.  They are hardware and are generally fixed in one location.  In addition, the use of a locker may be assigned/transferred from one employee to another, in a way that one would not do with shoes or other articles of clothing.

Defendant's Exhibit J

**Union's Proposal #10:**

The employer will provide facilities for employees to change clothing into the required uniform and secured means to store personal belongings. A personal locker large enough to store uniform items will be made available and assigned to each employee. These lockers will be made available to each employee prior to the effective date for the requirement to wear uniforms. No locker will be purchased, issued changed or moved without the Union's concurrence. Dual status employees will be given 15 minutes at the beginning and at the end of the shift to change into and out of their civilian clothing. Dual status employees will be given 15 minutes before and after lunch to change into and out of their civilian clothing. Bargaining unit employees will be allowed to wear the t-shirt, belt, shoes, socks, and BDU pants throughout the duty day, ie, while working, walking, commuting on off base, etc, at the discretion of the wearer.

**Management Counter Proposal:**

Employees may use existing facilities throughout the 433rd Wing to change into and out of their uniforms. All civilian employees who are required to wear the uniform must be in uniform at the start of the duty day and throughout their duty hours. Employees may change out of their uniform when not on duty (ie, before and after work, during their lunch time, or on third party proceedings). All employees are expected to be ready, willing and able to perform their duties.

All employees are expected to wear the uniform in accordance to AFI 36-2903 standards.

**NOTE: See 30 FLRA 1025 which states "The authority found that under the rules established by the Comptroller General, public funds may be spent for such items when it is determined that; 1) the government, rather than the employee, receives the primary benefit from the equipment, 2)the equipment is not a personal item which the employee should furnish. Also, see 63 Comptroller General 278 (1984) and 61 Comptroller General 634 (1982).**

Defendant's Exhibit J

**Union's Proposal #13**

Bargaining unit employees, who wear the military uniform while ~~not~~ performing their duties as civilian employees of the agency, will be held harmless with respect to normal military considerations governing wearing the uniform when in a military status.

**Management Counter Proposal:**

All employees while wearing the military uniform will be expected to follow all customs and courtesy (see 38 FLRA 1005). In addition, this proposal interferes with Managements right under 5 USC 7106 (a)(2)(A) and 7106 (b)(1).

Defendant's Exhibit J

## PROPOSAL #14

Original

Dual status employees will not be required to wear the full military uniform during the summer months. Because of the heat in South Texas, the outer BDU blouse will not be required for dual status employees during the months of April through October.

Revision

A dual service employee working in uniform will be allowed to remove the outer blouse (shirt) of the uniform while inside the confines of a designated work area and work in his/her T-shirt. This option will be based on his/her own judgment, as related to personal comfort. Management reserves the right to direct all dual service employees to wear the outer shirt when a visitor is expected in the work area.

Defendant's Exhibit J

**Union's Proposal #14:**
Dual status employees will not be required to wear the full military uniform during the summer months.  Because of the heat in South Texas, outer BDU blouse will not be required for dual status employees during the months of April through October.

**Management Counter Proposal:**
All ART employees will be expected to comply with the requirement of AFI 36-2903 on the wearing of the uniform.  During the months of hot weather, Management will follow the provisions of Article 24 section 7.02.

**NOTE: See 26 FLRA 682 regarding this proposal.  Technically, this proposal has been found by FLRA to be non-negotiable.  However, we will not have a problem with verbiage as written.**

Defendant's Exhibit J

**Union's Proposal #16**
Civilian employees who are required to wear a uniform as a condition of their civilian employment will be allowed to exercise two hours each day during duty time in order to meet the obligation of being fit and respectfully wearing the uniform on a daily basis.

**Management Counter Proposal:**
This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. In addition, by case law and statutory reference, the term "impact and implementation" includes only the procedures which management officials of a federal agency will observe in exercising management rights and appropriate arrangements for employees adversely affected by the exercise of such rights.

Also, proposals may not result in a benefit being derived. See United States Department of Treasury v. FLRA, 295 U.S. App DC 141, 960 F.2d 1068 (DC Cir 1992). The courts held that there was no appropriate arrangement for adversely affected employees where the proposal in question was one that would confer a benefit, and the only adverse effect was that flowing from management's denial of the proposal. However, ART employees will be allowed to continue participating in the Physical Fitness Activities up to three hours of duty time each week for full time employees and 1.5 hours for part time employees for physical fitness activities.

In addition, this proposal is not authorized under AFI 36-815 para 8.1.1 which reads in part; ....Installation Commanders or heads of service organizations may excuse civilian employees for physical fitness activities up to 3 hours based on mission and workload requirements. Participation is strictly voluntary.

Defendant's Exhibit J

**Union's Proposal #17**

Due to the large number of dual status employees in the bargaining unit and the vastly increased risk to them of disciplinary and or adverse actions stemming from the obligation to observe all military customs, courtesies, and standards of grooming on an everyday basis, the union anticipates a significant and immediate onslaught of grievances that will required research, processing, and representation. To address this added burden on the union, the agency will provide one dual status employee assigned to a block of 32 hours per week official time to investigate, resolve, and or process these grievances.

**Management Counter Proposal:**

This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. In addition, by case law and statutory reference, the term "impact and implementation" includes only the procedures which management officials of a federal agency will observe in exercising management rights and appropriate arrangements for employees adversely affected by the exercise of such rights.

This proposal is addressing a potential future action of workload for the union and not the employee's ability to perform their duties. Article 6 of our Labor Contract will be followed when the need for official time is required.

**NOTE: Pls see 295 U.S. App D.C. 141; 960 F.2d 1068 and Mgt right to assign work 7106 (a).**

Defendant's Exhibit J

**Union's Proposal #18**
The parties will jointly develop and ad hoc committee, comprised of an even number of management and union appointed members. This committee will address issues such as dress and grooming standards and the disposition of any issues concerning the employer's dissatisfaction of an employee's dress or grooming. The committee will consist of no less than two members from each party and no more than a combined total of eight members. Any issues not resolved to the satisfaction of the employee accused of the infraction will be grievable within 21 calendar days of the issue having been addressed by the committee. Any employee found to be in violation after exhausting the grievance and arbitration process will be allowed administrative time to correct the dress or grooming deficiency

**Management Counter Proposal:**
This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. In addition, by case law and statutory reference, the term "impact and implementation" includes only the procedures which management officials of a federal agency will observe in exercising management rights and appropriate arrangements for employees adversely affected by the exercise of such rights. This proposal interferes with Management rights under 5 USC Section 7106 (a)(2).

All ART employees have at their disposal the grievance procedure as outlined in the Labor Contract agreement to address any concerns they may have.

Defendant's Exhibit J

**Union's Proposal #19**

Employees will be allowed administrative time to obtain haircuts and shaves while in a duty status as required for the employees to comply with grooming standards associated with the wearing of the uniform.

**Management Counter Proposal:**

Management does not concur with this proposal as all ART personnel are expected to be ready, willing and able to perform their duty at the start of their shift.  In addition, this proposal is not authorized under AFI 36-815 para 8.1 which reads in part; ....Excused absence is not authorized for non-duty periods, nor, as in the case of ART's for the purposes of accomplishing military requirements or military training, e.g., haircuts.....

Defendant's Exhibit J

**Union's Proposal #20**

Any bargaining unit employee who is required to dress up as an Airman and observe military custom, courtesies, and standards of grooming while in fact working in civilian status will be afforded all of the benefits afforded to active duty military of the same rank.

**Management Counter Proposal:**

This proposal does not meet the definition of an appropriate arrangement nor does it meet the definition of methods and means. Proposals may not result in a benefit being derived. See United States Department of Treasury v. FLRA, 295 U.S. App DC 141, 960 F.2d 1068 (DC Cir 1992). The courts held that there was no appropriate arrangement for adversely affected employees where the proposal in question was one that would confer a benefit, and the only adverse effect was that flowing from management's denial of the proposal.

Defendant's Exhibit J

ARTICLE 24

HEALTH AND SAFETY

SECTION 1:  GENERAL

It is the responsibility of the agency to establish and maintain an effective and comprehensive occupational safety and health program which is consistent with the standards promulgated under Section 6 of the Occupational Safety and Health Act (OSHA), Executive Order 12196 as amended, Occupational Safety and Health Programs for federal employees, issued on 26 Feb 1980, and any other applicable laws, rules, and regulations.  In administrating the program, the agency agrees to recognize the Union as the exclusive representative of the bargaining unit employees.  The agency shall furnish places and conditions of employment that are free of recognized hazards and unhealthy working conditions.  The agency will post at worksite/center a copy of the Department of Labor Front CA-10, "What a Federal Employee Should Do When Injured at Work"

SECTION 2:  The Union agrees to support the safety program through encouragement to all employees to conscientiously abide by established safety rules, regulations, directives, etc., to report job connected injuries or illness to their supervisor immediately, and to complete all forms required by applicable regulations.

SECTION 3:  EMPLOYEES RIGHTS AND RESPONSIBILITIES

Employees are expected to comply with Employer health directives and to be alert to any practices, equipment and conditions that may present safety or health hazards.  Employees will report these hazards to their supervisors for the purpose of making such conditions or procedures safe, and will be responsible for reporting accidents in which they are involved or to which they are witness.  The agency shall assure the right of anonymity for those employees who report an unsafe or unhealthful working condition.  The agency will assure that no employee is subject to restraint, interferences, coercion, discrimination, or reprisal for filing a report of an unsafe or unhealthful working condition, or other participation in agency occupational and health program activities or because of the exercise by such employee on behalf of himself or herself or others of any right afforded by section 6 and 9 of the OSHA act and EO 12196. When employee, during the performance of official duties, believes he or she is exposed to a health or safety hazard which presents an imminent danger which may cause death, injury, occupational illness, loss of a facility, or major property' damage, said employee shall cease the activity and immediately contact the nearest available supervisor.

SECTION 4:  REPRESENTATION IN SAFETY AND HEALTH ISSUES

The Agency agrees that the Union may have designated safety representatives (3 primary and 3 alternates) to represent 59 MDW, 433 AW, and 37 TRW.  The Union will be authorized to have a representative to attend the bimonthly (every 2 months) ground safety meeting conducted by the Lackland Ground Safety Manager, and the semi-annual explosives safety meeting conducted by the Employer's Explosives Safety Manager.  The Union will also be authorized to have a representative at the quarterly occupational safety, fire, and health council meeting.  Union officials will be invited to attend all in-briefs and out-briefs provided by inspectors on staff assistance teams.

Defendant's Exhibit J

SECTION 5:  TRAINING

The agency will provide required safety and health training for employees including specialized job safety and health training appropriate to the work performed by the employee.  Such training also shall inform employees of the agency occupational safety and health program, with the emphasis on their rights and responsibilities.  Occupational safety and health training for employees of the agency who are representatives of employees shall include both introductory and specialized courses and materials that will enable such representatives to effectively identify unsafe healthful working conditions and practices in the workplace and enable them to effectively assist in conducting workplace safety and heath inspections.

SECTION 6:  PROTECTIVE CLOTHING, EQUIPMENT and TOOLS

The employer agrees to provide the required tools, safety or protective equipment that is reasonably fitted and cost effective, in accordance with required and authorized by Air Force directives, regulations, laws and standards.  Management will send employees who require safety equipment or clothing to the required vendor (base supply) first and if unable to satisfy requirements, a wavier will be furnished by the vendor authorizing other outside vendors be utilized.  Safety shoe will have a ceiling cost determined by the agency and the employee will pay any cost over the allowed ceiling.  Vendor purchase must meet the agency requirements in accordance with Air Force Standards.

SECTION 7:  ABATEMENT OF UNSAFE OR UNHEALTHFUL CONDITIONS

Employee reports of unsafe or unhealthful working conditions where imminent danger, toxic or flammable vapors, temperature conditions, or exposure to hazardous conditions is suspected will be given immediate attention by the supervisor.  When made aware, the Agency will comply with statutory requirements to abate unsafe and unhealthful conditions.

Section 7.01:  TOXIC OR FLAMMABLE VAPORS

When work to be performed is required in enclosed areas where flammable or toxic vapors may exist, the Agency agrees such areas will be maintained such that vapor levels remain within acceptable safety parameters as set forth by applicable safety standards.

Section 7.02:  EXTERNAL TEMPERATURE CONDITIONS

The parties recognize that temperature conditions in and around work areas can have a direct bearing on employee's comfort, morale, health and safety.  Where the Employer's Bioenvironmental Office determines that the effective temperature in a particular work area or site significantly exceeds recognized standards for the degree of work being performed, the Employer will take precautionary measures to reduce the risk to employees so exposed.  Such measures will include reduction of work being performed, increased frequency or duration of rest periods, etc.  This Section shall apply to both heat and cold exposure situations.

47

Defendant's Exhibit J

Section 7.03:  EXPOSURES TO HAZARDOUS CONDITIONS

The employer agrees that methods and operating procedures will be such that personnel will not be unnecessarily exposed to occupational safety/health hazards except where such exposure is necessary part of employee's official duties.  Employees performing such duties will be compensated in accordance with applicable regulations cited therein.

Section 7.04:  IMMINENT DANGER SITUATIONS

When employee(s), during the course of performance of official duties, believes he or she is exposed to a health or safety hazard which presents an imminent danger which may cause death, injury, occupational illness, loss of a facility, or major property damage employee(s) shall cease the activity and immediately contact the nearest available supervisor.  The supervisor shall then make an evaluation of the situation after discussion with appropriate safety personnel and decide as to whether work may proceed.  The union will be advised and specific information provided when requested.

Section 7.05:  ASBESTOS

Asbestos handling will be conducted in accordance with OSHA and EPA regulations.

Section 7.06:  VIDEO DISPLAY TERMINALS (VDT)

The Agency acknowledges that there are certain ergonomics and environmental factors that can contribute to the health and comfort of VDT users.  In areas where employees use a VDT or other keying device for at least one hour without any type of interruptions, the Agency may provide the employee with a 5-minute break for every continuous hour of utilization.  Such breaks will not be used in conjunction with the regularly scheduled rest periods. Management will conduct periodic test of terminals for emissions.  Any terminal that test above acceptable radiation standard will be repaired or removed from use.

Section 7.07:  STRESS

The parties agree that recognizing, minimizing, and coping with stress are essential parts of employee wellness.

SECTION 7.08:  WORK VIOLENCE

Incidents of Violence in the Workplace will he handled in accordance with base policy and appropriate law and regulations.  The Employer is committed to maintaining a work environment free from violence, threats of violence, harassment, intimidation, and other disruptive behavior.  While this kind of conduct is not pervasive at our agency, we recognize that no agency is immune and that disruptive behavior at one time or another will affect every agency.  Violence, threats, harassment, intimidation, and disruptive behavior in our workplaces will not be tolerated; all reports of incidents will he taken seriously and will be dealt with appropriately.  Such behavior can include oral or written statements, or gestures that communicate a direct or indirect threat of physical harm. Individuals who commit such act may be removed from the premises and may be subject to disciplinary action, criminal penalties, or both.

Defendant's Exhibit J

SECTION 7.09:  INDOOR AIR QUALITY

The Agency shall provide safe and healthful indoor air quality, by conforming to laws, guidelines, regulations, and or policies that are issued by federal regulatory agencies such as OSHA and EPA.  The Agency will make reasonable efforts to provide comfortable humidity and temperature control.

SECTION 8:  The union will be invited to attend all Federal Employee Compensation Act (FECA) meetings.  The union will have the right to request health and safety surveys.

SECTION 9:  In the course of performing their regularly assigned work, Union representatives are encouraged to identify unsafe practices, equipment, and conditions as well as environmental conditions in their immediate area, which constitute industrial health hazards.  If an unsafe or unhealthy condition is noted, the representative should report it to the immediate supervisor.  If the representative and the immediate supervisor do not settle the safety question, the matter may be referred promptly to the next level supervisor for resolution.  In the event resolution is not attained at this level, the Union may submit the problem to the Employer's Safety Officer.

SECTION 10:  USE OF RESPIRATORS

Situations requiring employees to wear respirators for safety shall include a process for respirator fit testing.

SECTION 11: SPECIAL HEALTH NEEDS

For employees who have obtained medical documentation for multiple-chemical sensitivity, the agency will attempt to reasonably accommodate them.  An employee who has sustained an injury or illness will be required to perform duties only to the extent and limits as prescribed by the treating physician or the Employee Health Physician, as appropriate.  No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness.  In the event that the employee's supervisor does not have limited duty that meets the physician's stated limitations for the employee, the supervisor will make a good faith effort to locate limited duty work where feasible.

SECTION 12 TESTING FOR LATENT DISEASES

When an employee has been exposed or has reason to believe he or she may have been exposed to radiation, hazardous or medical waste, or a hazardous chemical, the employee will notify the supervisor as soon as he or she becomes aware of the exposure or possible exposure.  The Employer will provide appropriate screening for detection of hazardous levels of radiation, elements, chemicals, or contagion factors, as appropriate to the particular exposure.  Testing will he repeated as often as necessary to detect any latent disease that could result from the exposure.

49

Defendant's Exhibit J