UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, *ET AL.*, )
                                )
                Plaintiffs,     )
                                )
        v.                      )      Civil Action No. 1:08cv692 (EGS)
                                )
SECRETARY OF THE AIR FORCE,     )
                                )
                Defendant.      )      Judge Sullivan


PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs hereby cross-move for summary judgment. A statement of points and authorities in support of this motion and in opposition to defendant's motion to dismiss or, in the alternative, for summary judgment, exhibits, statements of material facts and genuine issues, and proposed order are submitted herewith.

An opportunity to present oral argument is respectfully requested.

Respectfully submitted,

/s/ Mark D. Roth
MARK D. ROTH (235473)
General Counsel

/s/ Charles A. Hobbie
CHARLES A. HOBBIE (283499)
Deputy General Counsel
American Federation of Government
  Employees, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Tel     (202) 639-6434
Fax     (202) 639-6490

/s/ Eugene R. Fidell
EUGENE R. FIDELL (112003)
(*Lead Attorney*)
MATTHEW S. FREEDUS (475887)
FELDESMAN TUCKER LEIFER
  FIDELL LLP
2001 L Street, N.W., 2d Floor
Washington, D.C. 20036
Tel      (202) 466-8960
Fax      (202) 293-8103

*Attorneys for Plaintiffs*

August 15, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, *ET AL.*,     )
                                )
            *Plaintiffs,*          )
                                )
    v.                          )          Civil Action No. 1:08cv692 (EGS)
                                )
SECRETARY OF THE AIR FORCE,      )
                                )
            *Defendant.*          )

ORDER

On consideration of defendant's motion to dismiss or, in the alternative, for summary judgment, plaintiffs' cross-motion for summary judgment, and the parties' oppositions and replies, it is, by the Court, this _____ day of _____, 2008,

ORDERED that defendant's motion to dismiss or, in the alternative, for summary judgment be, and the same hereby is, DENIED, and plaintiffs' cross-motion for summary judgment be, and the same hereby is GRANTED. It is, in addition,

DECLARED that the August 6, 2007 amendments to Air Force Instructions 36-801, *Uniforms for Civilian Employees*, 36-2903, *Dress and Personnel Appearance of Air Force Personnel*, and 37-703, *Civilian Conduct and Responsibility* are invalid, and

ORDERED that the Secretary cease and desist all efforts to compel plaintiffs and their "dual status" Air Reserve Technician members to wear military uniforms when performing duty in their civilian capacity.

United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF        )
GOVERNMENT EMPLOYEES, *ET AL.*,    )
                              )
             *Plaintiffs,*     )
                              )
      v.                      )         Civil Action No. 1:08cv692 (EGS)
                              )
SECRETARY OF THE AIR FORCE,    )
                              )
             *Defendant.*      )         Judge Sullivan


PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Most of the material facts have already been set forth by the Secretary. The

following additional material facts are respectfully noted in accordance with LCvR 7(h):

1. According to AFI 36-108, the same concepts, rules, regulations and policies apply

to ART positions as to regular civil service positions. Pl. Ex. 2.

2. The Air Force has announced that the requirements imposed by the 2007 amend-

ments are not negotiable within the context of collective bargaining between it and AFGE's

locals. Def. Ex. J, at 6 (¶ d).

3. The Air Force has many other categories of *civilian* personnel who wear *civilian*

uniforms. These include guards and police, firefighters, chauffeurs, motor vehicle operators,

U.S. citizens in overseas areas, physical education instructors, water survival school person-

nel, aircraft maintenance employees, and motion picture projectionists. *See generally* AFI

36-801 *passim*, Pl. Ex. 4.

4. Wearing the military uniform when in civilian status is misleading. It implies

that an ART in civilian status but wearing the military uniform who happens to be a non-

commissioned officer in his or her military capacity, can give military orders, when in fact such an individual cannot do so. It imposes an obligation to render formal military courtesies to persons wearing the uniform of a higher military pay grade, when in fact the ART is not serving as a military member. It prevents the ART from engaging in perfectly normal and acceptable civilian behavior such as using a cell phone while walking. Sacco Decl. ¶ 6, Pl. Ex. 19.

5. There is no reason ARTs in civilian status should be required to wear the military uniform when non-ART reservists (so-called "weekend warriors") who also work for the Air Force as civilians (or for any other civilian employer, for that matter) need not do so. Sacco Decl. ¶ 6, Pl. Ex. 19.

6. Most ARTs have been associated with the Armed Forces one way or another for many years. ARTs are typically older than non-ARTs with the same military pay grade. Sacco Decl. ¶ 7, Pl. Ex. 19.

7. Wearing the military uniform adds nothing to any ART's awareness of his or her part in National Defense or the fact that they work in a military environment. Their workplaces are military bases; the Air Force is all around them. Sacco Decl. ¶ 7, Pl. Ex. 19.

8. ARTs shift from one status to the other in the normal course of events, becoming military only when their reservist-capacity obligations arise for drills one weekend a month or annual 15-day training. This is perfectly normal, and has been the case for decades. Sacco Decl. ¶ 8, Pl. Ex. 19.

9. Dual status ARTs are subject to deployment in either their military or civilian status. ARTs have gone on overseas missions, but this has been in their capacity as mili-

tary reservists during periods in which they have been activated to active duty status, like any other reservist, rather than in their civilian capacity. Sacco Decl. ¶ 8, Pl. Ex. 19.

10. The FLRA currently lacks both a quorum and a General Counsel. Pl. Exs. 11-12.

11. The 2007 amendments have already led to disciplinary action and a resignation. Pl. Ex. 9.

12. It is likely that the confusion of status inherent in the wearing of uniforms, with all that the power of military rank and the symbol of military service that uniforms represent, would breed not only uncertainty, but possibly friction and resentment that could undermine the efficiency and effectiveness of those organizations. Kohn Decl. ¶ 7, at 4, Pl. Ex. 18.

Respectfully submitted,

/s/ Mark D. Roth
MARK D. ROTH (235473)
General Counsel

/s/ Charles A. Hobbie
CHARLES A. HOBBIE (283499)
Deputy General Counsel
American Federation of Government
  Employees, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Tel     (202) 639-6434
Fax     (202) 639-6490

/s/ Eugene R. Fidell
EUGENE R. FIDELL (112003)
(*Lead Attorney*)
MATTHEW S. FREEDUS (475887)
FELDESMAN TUCKER LEIFER
  FIDELL LLP
2001 L Street, N.W., 2d Floor
Washington, D.C. 20036
Tel     (202) 466-8960

Fax     (202) 293-8103

*Attorneys for Plaintiffs*

August 15, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF        )
GOVERNMENT EMPLOYEES, *ET AL.*,  )
                              )
              *Plaintiffs,*    )
                              )
        v.                    )        Civil Action No. 1:08cv692 (EGS)
                              )
SECRETARY OF THE AIR FORCE,   )
                              )
              *Defendant.*     )        Judge Sullivan

# PLAINTIFFS' EXHIBIT 1

Department of Defense

# INSTRUCTION

**NUMBER** 1205.18
May 4, 2007

USD(P&R)

SUBJECT:  Full-Time Support (FTS) to the Reserve Components

References:  (a)  DoD Directive 1205.18, subject as above, May 25, 2000 (hereby canceled)
            (b)  Acting Deputy Secretary of Defense Memorandum, "DoD Directives Review – Phase II," July 13, 2005
            (c)  DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," October 17, 2006
            (d)  Sections 101, 115a, 10211, 10216-10218, 12301-12304, and 12310 of title 10, United States Code
            (e)  through (g), see Enclosure 1

## 1. REISSUANCE AND PURPOSE

This Instruction:

1.1.  Reissues Reference (a) as a DoD Instruction in accordance with the guidance in Reference (b) and the authority in Reference (c).

1.2.  Implements policy, assigns responsibilities, and establishes procedures for managing the FTS program in the Reserve components (RCs).

## 2. APPLICABILITY

This Instruction applies to the Office of the Secretary of Defense; the Military Departments (including the Coast Guard when it is not operating as a Service in the Navy, under agreement with the Department of Homeland Security), the Chairman of the Joint Chiefs of Staff; the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all organizational entities within the Department of Defense (hereafter collectively knows as the "DoD Components").

## 3. DEFINITIONS

Terms used in this Instruction are defined in Enclosure 2.

4. <u>POLICY</u>

It is DoD policy that:

    4.1. The RCs will maintain a cadre of FTS personnel who are responsible for assisting in the organization, administration, recruitment, instruction, training, maintenance, and supply support to the RCs, Armed forces on active duty, members of foreign military forces, DoD contractor personnel, and DoD civilian employees.

    4.2. The mix of FTS personnel, which consists of Active component (AC) personnel, Active Guard and Reserve (AGR) personnel, military technicians (dual-status) (MT), non-dual status technicians (NDST), and other Federal civilian (CIV) employees, shall be determined by the Secretary concerned to optimize consistency and stability for each RC to achieve its assigned missions.

5. <u>RESPONSIBILITIES</u>

    5.1. The <u>Assistant Secretary of Defense for Reserve Affairs</u>, under the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), shall:

        5.1.1. Provide overall policy guidance for the management of the RC FTS program.

        5.1.2. Monitor compliance with this Instruction, develop procedures, as necessary, to ensure an effective FTS program, and submit reports in accordance with title 10, United States Code (U.S.C.) sections 115a and 10216(c) (Reference (d)).

    5.2. The <u>Secretaries of the Military Departments</u> and the <u>Commandant of the Coast Guard</u> shall establish procedures to:

        5.2.1. Develop FTS programs and structures, to be managed by the chiefs of their respective RCs, which support mission requirements and provide the applicable allocation and mix of FTS categories to achieve readiness and deployability requirements of RC forces.

        5.2.2. Implement the policy and procedures in sections 4 and 6 for the management and employment of FTS personnel and define the data needed for effective FTS program oversight and require its periodic collection and monitoring.

        5.2.3. Ensure that FTS personnel are provided career opportunities, applicable to the category of employment for promotion, career progression, retention, education, and professional development consistent with this Instruction and strength limitations as described in paragraph 6.7., Reference (d), and title 32 U.S.C. (Reference (e)). The Secretary concerned shall establish

*DoDI 1205.18, May 4, 2007*

specific criteria for retention of AGR personnel on completion of any probationary period that has been established.

    5.2.4.  Ensure that the skill requirements of the civilian and military positions of MTs (when MTs are assigned or attached) are compatible, and that AGR members are assigned to validated Reserve positions that are compatible with their military grade and skill codes.

    5.2.5.  Conduct an annual review of the utilization of FTS members and accomplish the reporting requirements established in section 10216 of Reference (d).

    5.2.6.  Ensure that all FTS positions that do not require military FTS personnel are filled only by NDST or CIV personnel, as appropriate, consistent with the definitions in Enclosure 2 and References (d) and (e).

    5.2.7.  Establish Military Service policy for implementing MT military leave under section 6323(d) of title 5 U.S.C. (Reference (f)), ensuring that such policy applies equally to all MTs.

    5.2.8.  Implement the technician retirement and separation provisions of section 10218 of Reference (d) and section 709 of Reference (e).

    5.2.9.  Establish policies to limit the number of NDST in accordance with section 10217 of Reference (d).

6. <u>PROCEDURES</u>

    6.1.  An FTS force shall be established that is capable of ensuring the accomplishment of the following RC readiness goals:

    6.1.1.  Mobilizing and enhancing the deployability of RC units and personnel.

    6.1.2.  Achieving established unit readiness and deployability standards.

    6.1.3.  Training Selected Reserve personnel in their military occupations to ensure their skill qualification and readiness.

    6.1.4.  Recruiting and manning RC units.

    6.1.5.  Maintaining unit equipment, facilities, supplies, and records.

    6.1.6.  Providing RC advice, expertise, and liaison to AC activities, the Secretary of Defense, the Secretary of Homeland Security, the Secretaries of the Military Departments, the Joint Chiefs of Staff, and the commanders of the Combatant Commands, and assisting in the development of policy and procedures affecting the RCs.

6.1.7.  Providing AC experience, advice, doctrinal expertise, and liaison to RC units.

6.1.8.  Supporting Total Force integration initiatives and RC missions.

6.2.  Centralized administrative and operational headquarters and support functions shall use FTS personnel consistent with RC readiness requirements, DoD manpower determination requirements, applicable laws, and fiscal and manpower constraints to ensure that such organizations function at the most efficient and cost-effective manning level, thus maximizing the readiness of the units they support.

6.3.  Assign or attach AGR, MT, and AC personnel to designated FTS billets in RC units and organizations.  Personnel so assigned or attached shall meet mobilization and deployment standards, and shall mobilize and deploy according to the policy in this section.

6.4.  FTS positions requiring current military expertise, as determined by the Secretary concerned, shall be filled by AGR, MT, or AC personnel.  Other FTS positions not requiring current military expertise shall be filled by CIV personnel or NDST consistent with the definitions in Enclosure 2.

6.5.  AGR personnel shall be assigned duties as described in sections 101, 10211, and 12310 of Reference (d) and sections 502(f) and 709(a) of Reference (e).  These assignments may include providing instruction or training to members of the Armed Forces on active duty, members of foreign military forces, DoD contractor personnel, and DoD civilian employees.

6.6.  AGR programs in each Military Service shall be administered as career programs that may lead to a military retirement after attaining the required years of active Federal service.  Personnel may be placed in AGR status for occasional, one-time tours, or for a probationary period established by the Secretary concerned.  A probationary period shall not exceed 6 years.  Continuation beyond the initial probationary period, or service in AGR status for more than 6 years constitutes retention and shall require subsequent management under a career program.

6.7.  AGR personnel, except Coast Guard Reserve Program Administrators shall be counted against authorized Selected Reserve end strengths as authorized by the Congress each year for their respective RC; against the authorized end strengths for RC members on active duty or full-time National Guard duty in support of the RC; and, if applicable, against congressional authorizations for the grades of E-8, E-9, O-4, O-5, and O-6.

6.8.  Supervisory authority for FTS members shall correspond to military operational lines of authority.

6.9.  AC personnel who possess expertise and recent experience in AC training and doctrine are to provide advice, liaison, management, administration, training, and support to the RC.

6.10.  The military nature of the technician program is paramount over all other considerations, and the management of MT, NDST, and CIV personnel shall be as follows:

*DoDI 1205.18, May 4, 2007*

6.10.1.  MTs shall, as a condition of their civilian employment, maintain dual status as members of the Selected Reserve of the RC by which employed and shall remain qualified in both their civilian and military positions.  MTs shall maintain active status in the RC unit in which they are employed as a civilian, or one in which they are employed to support (Army Reserve non-unit MTs must maintain membership in the Selected Reserve of the RC by which employed).  The skill requirements of the military and civilian positions for MTs shall be compatible.

6.10.2.  Loss of Selected Reserve membership by an MT shall result in removal from the MT program in accordance with section 10216 of Reference (d) and section 709 of Reference (e).  Department of the Army MT removal may be deferred until the age of 60, pursuant to section 10216 of Reference (d).

6.10.3.  Applicable to the category of civilian personnel concerned, programs for civilian FTS personnel in each Service shall provide the opportunity for promotion, career progression, retention, education, and professional development, consistent with strength limitations, policy in this Instruction, and DoD civilian personnel policy.  Career programs should be structured to provide for both the civilian and military career needs of FTS personnel, as applicable.

6.10.4.  MTs shall be called or ordered to active duty with the unit to which they are assigned in a military capacity when such units are activated.  During inactive duty training and annual training, MTs shall perform training in their assigned military position.  MTs shall not perform their civilian duties during such training unless their civilian and military duties are identical.

6.10.5.  MTs participating in unit deployments, direct support of contingency operations, or operations/support in hostile fire or imminent danger areas outside the United States, its territories, and possessions shall perform those operations that provide support in a military status under sections 12301, 12302, and 12304 of Reference (d).  MTs performing other missions or support outside the United States and its territories and possessions shall be under section 12301 of Reference (d) according to policy established by the Secretary concerned.

6.10.6.  MTs shall be used to maximize readiness, and priority for unit/organization resourcing shall be given to high priority and early deploying units in accordance with section 10216 of Reference (d).

6.10.7.  In accordance with Reference (d), and except as otherwise required by law, MTs shall be managed as a separate category of dual-status civilian personnel; shall be exempt from any requirement for reductions in DoD civilian personnel; and shall be reduced only as a direct result of military force structure reductions.

6.10.8.  In accordance with Reference (d) and section 709 of Reference (e), NDSTs shall be managed and accounted for as a separate category of FTS; shall not encumber positions identified as MT positions, requiring dual-status incumbents; and shall encumber only positions identified by the Secretary concerned as NDST positions unless otherwise permitted in law.

*DoDI 1205.18, May 4, 2007*

7. <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

David S. C. Chu
Under Secretary of Defense
for Personnel and Readiness

Enclosures -- 2
   E1.  References, continued
   E2.  Definitions

6

*DoDI 1205.18, May 4, 2007*

E1. <u>ENCLOSURE 1</u>

<u>REFERENCES</u>, continued

(e)    Sections 328, 502(f) and 709 of title 32, United States Code, "National Guard"
(f)    Sections 3101 and 6323(d) of title 5, United States Code, "Government Organization and Employees"
(g)    Title 14, United States Code, "Coast Guard"

*DoDI 1205.18, May 4, 2007*

E2. ENCLOSURE 2

DEFINITIONS

E2.1.  Active Component (AC) FTS Personnel.  AC members paid from AC military personnel appropriations assigned or attached to Reserve component organizations or units by their respective Service to provide advice, liaison, management, administration, training, and support as a category of FTS.  Those personnel are not members of the Selected Reserve but may deploy with their assigned unit when mobilization occurs.  AC personnel who shall mobilize with the Reserve component unit to which assigned are counted as part of the Reserve component trained strength in units, but are not included in the Selected Reserve strengths.

E2.2.  Active Guard and Reserve (AGR).  For the purpose of this Instruction, Active Guard and Reserve are members of a Reserve component on active duty under section 12301(d) of Reference (d), 14 U.S.C. (Reference (g)), or full-time National Guard duty under sections 328 and 502(f) of Reference (e) for a period of 180 consecutive days or more to perform duties as described in sections 101, 10211, and 12310 of Reference (d).

E2.3.  Federal Civilian Employees (CIV) in FTS.  Personnel hired under section 3101 of Reference (f) to provide administration, training, maintenance, and recruiting support to the Reserve components.  Membership in the Selected Reserve is not a condition of CIV employment.

E2.4.  Full-Time Support (FTS).  Members of the Reserve components or AC, NDST, and CIV personnel, assigned to organize; administer; instruct; recruit and train; maintain supplies, equipment, and aircraft; and perform other functions required on a daily basis in the execution of operational missions and readiness preparation as authorized in title 5, title 10, and title 32 (References (f), (d), and (e), respectively).  Collectively, FTS personnel consist of five categories that are AGR, MTs, AC personnel, NDSTs, and CIV employees.

E2.5.  Military Technician (Dual Status) (MT).  For the purpose of this Instruction, Military Technician is a civilian employee of the Military Department concerned who is required, as a condition of employment, to maintain military membership in a Reserve component identified in Reference (d) or Reference (e) and who is assigned to a position as a technician in the organizing, administering, instructing and training of such Reserve component, or in the maintenance and repair of supplies or equipment issued to such Reserve component.  These assignments may include providing instruction or training to members of the Armed Forces on active duty, members of foreign military forces, DoD contractor personnel, and DoD civilian employees.  The military and civilian position skills of MTs must be compatible.  MTs in the Reserve components other than the Army National Guard and Air National Guard are appointed to positions in the competitive service under Reference (f).  National Guard MTs are appointed under section 709 of Reference (e) by the Adjutant General of the State or territory in whose National Guard they are employed.  All MTs hired on or after February 10, 1996, are required to maintain military membership in the Selected Reserve so that the position skills of their military and civilian positions are compatible.

E2.6.  <u>Non-Dual Status Technician</u> (NDST).  A civilian employee employed as a technician before November 18, 1997, under any of the authorities specified in section 10217 of Reference (d) and is not a member of the Selected Reserve or after that date has ceased to be a member of the Selected Reserve or is employed under section 709 of Reference (e) as specified in subsection (c) of that section and when hired was not required to maintain membership in the Selected Reserve.  NDST shall encumber only those technician positions identified by the Secretary concerned as NDST positions.

E2.7.  <u>Secretary Concerned</u>.  Refers to the Secretaries of the Military Departments and the Secretary of Homeland Defense with respect to the Coast Guard when it is not operating as a Service in the Navy.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 2

**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**

*AIR FORCE INSTRUCTION 36-108*

*26 JULY 1994*

*Personnel*

*AIR RESERVE TECHNICIAN (ART) PROGRAM*



## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**NOTICE:** This publication is available digitally on the SAF/AAD WWW site at: http://afpubs.hq.af.mil. If you lack access, contact your Publishing Distribution Office (PDO).

OPR:  HQ USAF/DPCX
    (Mr. Jack Flowers)

Certified by:  HQ USAF/DPC
(Mr. John R. Graham)
Pages: 5
Distribution: F

This instruction implements AFPD 36-1, *General Civilian Personnel Provisions and Authorities*. It gives instruction on providing civilian personnel service to Air Reserve Technicians (ART). The same concepts, rules, regulations, and policies apply to ART positions as to regular civil service positions, but this AFI addresses additional requirements that result from the nature of the ART.

## SUMMARY OF CHANGES

This is the first publication of AFI 36-108. It updates, clarifies, and streamlines guidance relative to the ART program formerly provided in Air Force Reserve regulations and supplements.

**1. General Provisions.** The ART workforce provides stable, continuous full-time management, administration, and training of the Ready Reserve and oversees the transition from a peacetime to a wartime or national emergency situation to ensure mobilization readiness is maintained. ARTs train reservists, provide continuity within the Reserve unit of assignment, and support the unit's gaining major command.

**2. Filling ART Positions:**

    **2.1. ART Officer Career Management Program.** HQ AFRES/DPC, Civilian Personnel and Personnel Plans, will manage the ART Officer Career Management Program. Refer to AFPD 36-6, Career Management, AFI 36-601, Civilian Career Program Management, and AFMAN 36-606, Air Force Civilian Career Program Management, Volume 1, Chapter 21, for specific information concerning servicing responsibilities for ART officer positions.

        2.1.1. HQ AFRES/DPCS (Career Management, Staffing, and Affirmative Employment) will:

            •  Fill all ART officer and ART enlisted intelligence positions.

- Rate each applicant for ART employment using the Office of Personnel Management (OPM) Qualifications Standards Handbook or the OPM/Air Force (AF) agreement on ART recruitment.
- Manage the Relocation Services (RS) Program for the Air Force Reserve. Employees eligible for the RS program authorized under Department of Defense (DOD) Joint Travel Regulations (JTR) Volume II, and who are selected through the ART Officer Career Management Program, will submit an application for relocation services. HQ AFRES/DPCS will verify eligibility and process the application.

**2.2. ART Special Examining Unit (SEU).** The SEU will conduct examinations for competitive appointments to ART positions located nationwide.

2.3. The military personnel flight will verify in writing (normally on DD Form 359, Referral for Consideration) the employee or applicant meets all military requirements for the ART position.

2.4. The servicing civilian personnel flight will:

- Ensure all selectees for ART officer or enlisted positions sign a mobility agreement. The mobility aspect of this agreement applies only to ART officers.
- Ensure all required or appropriate remarks on actions pertaining to ART employees are included on the Notification of Personnel Action, Standard Form (SF) 50.
- Fill all vacancies promptly to maintain high staffing levels of ART positions in each unit, as required.
- Submit a Request for Referral of Eligibles to the SEU for ART enlisted positions (except intelligence positions).
- Establish civilian employment plans for the unit, as needed.
- Notify status quo employees of conditions under which they are being retained in ART positions.
- Take appropriate action, (e.g., reassignment, change-to-lower grade, medical retirement, termination, etc.) when an ART fails to meet the medical requirements of the civilian position or loses active membership in the Reserve unit of assignment for reasons considered to be within the member's control.

**3. Reduction in Force (RIF).** The servicing civilian personnel flight will:

- Ensure an employee meets the military requirements (such as Air Force Specialty Code (AFSC), physical) prior to offering an ART position under RIF.
- Put similar ART and non-ART positions in separate competitive levels.

**4. Restoration Rights.** The servicing civilian personnel flight will:

- Extend restoration rights after a military tour of duty under 5 CFR Part 353, Restoration To Duty From Military Service or Compensable Injury, only to those members still eligible for Reserve assignment to the ART position vacated prior to entering on active duty or to an equivalent ART position for which qualified.

2

**5. Position Management and Classification.**

    5.1.  HQ AFRES/DPCC (Position Management and Classification) will:

- Administer a centralized classification program for ART positions in accordance with AFRES Instruction 36-501, Position Management and Classification Program.
- Classify ART positions according to OPM classification standards/guides.
- Maintain the master ART position description (PD) or core document (CD) files.
- Provide ART civilian position information for input in the Unit Manpower Document (UMD).
- Audit selected ART positions as needed when conducting occupational studies and applying new standards.

    5.2.  HQ AFRES/XPM, Manpower and Organization, will assign military designations and ranks to ART positions.  OPM does not review these designations.

    5.3.  The servicing civilian personnel flight will process minor changes or modifications to ART position descriptions which do not impact the title, series, grade, pay plan, nature, or purpose of the position.

**6. Labor-Management Relations (LMR).** HQ AFRES/DPCE (Labor & Employee Relations, Programs & Evaluations, & Personnel Plans Branch) will oversee the administration of the LMR program for ARTs using the same AF, DOD, and OPM policy guidance applicable to all civil service employees.  If ART positions are included in local bargaining units, the servicing civilian personnel flight will appoint at least one management official from the Reserve unit to the base negotiating team.

    6.1.  The host will provide the Reserve management official appropriate contract negotiator training and forward any agreement to HQ AFRES/DPCE for legal review.

    6.2.  HQ AFRES/DPCE will review those aspects of the agreement primarily affecting ART employees.

**7. Employee and Career Development (ECD).** HQ AFRES/DPT, Training, will oversee the employee and career development program for ARTs.

**8. Employee-Management Relations (EMR).** HQ AFRES/DPCE will oversee the administration of the EMR program for ARTs using the same AF, DOD, and OPM policy guidance applicable to all civil service employees.

    **8.1. Performance Management/Evaluation.**

        8.1.1.  The servicing civilian personnel flight will:

- Forward requests to appropriate Numbered Air Force (NAF) headquarters, wing, or group to conduct required performance appraisals on ART wing, group, or squadron commanders, and senior ARTs as appropriate.
- Forward recommendations to HQ AFRES/DPCE for honorary and non-federal awards for ART employees.  This requirement does not apply to monetary awards based on performance such as Quality Salary Increases (QSI) or Special Act or Service Awards (SASA).

8.1.2. HQ AFRES/DPCE will:

- Develop and provide guidance on performance management issues pertaining to ART employees.
- Review submissions for honorary and non-federal awards for ART employees, approve or forward awards to HQ USAF, as appropriate, and return completed action to the servicing civilian personnel flight.
- Prepare certificates for 30- and 40-year length of service recognition for ART employees, obtain signature of the AFRES Commander or Vice Commander, and forward certificates to the servicing civilian personnel flight.

**8.2. Conduct, Discipline, Appeals, Grievances and Discrimination Complaints.**

8.2.1. The servicing civilian personnel flight will:

- Provide HQ AFRES/DPCE with an advance copy of proposed notices of adverse action, replies, and decision letters on ART employees before taking action.
- Refer grievances under DOD CPM 1400.25M, Chapter 7, subchapter 13, Administrative Grievance System, (Superseded AFR 40-771), of ARTs involving ART rules, guidelines, and/or procedures through AFRES channels.
- Coordinate with HQ AFRES/DPCE on grievances filed under negotiated grievance procedures involving ART rules, guidelines, and procedures.
- Furnish HQ AFRES/DPCE one copy of each appeal or grievance from an ART employee to include the xaminer's report and arbitration or appeal decision.
- Furnish HQ AFRES/DPCE one copy of each formal discrimination complaint from an ART employee to include the counselor's report.

8.2.2. HQ AFRES/DPCE will:

- Develop and provide guidance on such matters pertaining to ART employees.
- Review disciplinary and adverse actions on ART employees for procedural correctness, legal sufficiency, and appropriateness on merit.
- Process grievances, appeals, and discrimination complaints affecting ART employees and requiring involvement of the AFRES Commander, Vice Commander, or Assistant Vice Commander, or as otherwise determined necessary by the headquarters.
- Provide representation as necessary in third party proceedings involving ART employees or issues.

**9. Defense Civilian Personnel Data System (DCPDS).** AFRES command (OM) authorizations have unique coding requirements for (DCPDS) input. See AFRES Supplement 1 to AFMAN 36-2622, Volume IV, Base Level Personnel Data System Civilian (PDS-C) Users Manual.


BILLY J. BOLES,  Lt General, USAF
DCS/Personnel

4

**Attachment 1**

**GLOSSARY OF TERMS**

*Terms*

**Air Reserve Technician (ART)**—Full-time civilian employees who are also members of the Air Force Reserve unit in which they are employed.  In addition to their civilian assignments, they are assigned to equivalent positions in the Reserve organization with a Reserve military rank or grade. ARTs must maintain active membership in their Reserve unit of assignment and satisfactory participation in order to keep their ART position.

**ART Centralized Classification Program**—A classification program for ART positions that is centralized at and administered by HQ AFRES/DPC.  The administration of this program includes developing and issuing standardized position descriptions (SPD) for the ART which are prescriptive in nature.  The issuance of prescriptive SPDs provides for consistency in grade allocation and organizational structure throughout AFRES, and ensures dual-status compatibility.

**ART Officer Career Management Program**—A career management program which provides standards and guidelines to enhance the intellectual and professional growth of ART officers in both their civilian and military careers to ensure highly qualified ART officers are available to assume positions of increased responsibility and scope throughout the Air Force Reserve.

**ART Special Examining Unit (SEU)**—A special unit operated by the Air Force Reserve to which the Office of Personnel Management (OPM) has delegated authority to conduct examinations and referrals for ART positions under OPM rules and regulations.

**Relocation Services Program**—A program designed to minimize the financial impact of permanent change of station (PCS) moves, make transition from the former duty station to the new duty station easier for the employee and the Air Force, and to provide an alternative to current direct reimbursement of PCS expenses.

**Status Quo Employees**—Those individuals occupying ART positions who lose active membership in their Reserve unit of assignment for reasons considered to be beyond their control.  Also included are those individuals who have declined membership or were not qualified Reserve members at the time their position was initially authorized as an ART position so long as they occupy the same position.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |


# PLAINTIFFS' EXHIBIT 3



**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**

*AIR FORCE INSTRUCTION 36-703*

*1 AUGUST 1999*

Incorporating Change 1, 6 August 2007

*Personnel*

*CIVILIAN CONDUCT AND RESPONSIBILITY*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:**    Publications and forms are available on the e-Publishing website at
**www.e-publishing.af.mil** for downloading or ordering.

**RELEASABILITY:**    There are no releasability restrictions on this publication.

---

OPR:  HQ AFPC/DPIE                          Certified by:  HQ AFPC/DPI (Col James P. Sturch)
                                                                                     Pages: 8

---

This instruction implements AFPD 36-7, *Employee and Labor-Management Relations.* It contains infor-
mation regarding civilian standards of conduct and individual responsibility applicable to civilian
employees. Where appropriate this instruction references the civilian standards of conduct specified in
*DoD 5500.7-R, Joint Ethics Regulation,* and *Executive Order 12674, Principles of Ethical Conduct for
Government Officers and Employees.* In the event of a conflict between this instruction and the *Joint
Ethics Regulation,* the guidance of the *Joint Ethics Regulation* is controlling. It applies to U.S. citizen
employees of the Air Force who are paid from appropriated funds. It also applies to civilian employees of
the Air National Guard and Air Force Reserve, except that it does not apply to Air National Guard Tech-
nicians administered by the National Guard Bureau under Title 32, U.S.C. Section 309. It also does not
apply to employees of the Army and Air Force Exchange Service. Records Disposition: Maintain and
dispose of records created as a result of processes prescribed in this publication in accordance with
AFMAN 37-139, Records Disposition Schedule.

## SUMMARY OF CHANGES

Updates paragraph **7.**, Civilian Uniform Wear and transfers AFI 36-703 Office of Primary Responsibility
(OPR) from HQ USAF/DPME to HQ AFPC/DPIEC. A margin bar ( | ) indicates newly revised material.

### *Section A—Authorities and Responsibilities*

**1. HQ USAF.** The Civilian Force Management Division, Directorate of Personnel Force Management,
develops policy for civilian standards of conduct for areas not covered in *DoD 5500.7-R, Joint Ethics
Regulation,* and provides guidance on the provisions of this AFI.

**2. Civilian Personnel Flights.** Civilian Personnel Flights (CPFs) should provide copies of this AFI to all
new employees during New Employee Orientation.

**3. Managers and Supervisors.** Managers and supervisors should ensure that employees are kept informed of these standards of conduct. They are responsible for taking timely and appropriate action in accordance with this instruction and related guidelines to ensure employee standards meet the spirit and intent of Air Force policy on proper conduct.

**4. Employees.** Air Force employees are required to comply with prescribed standards of conduct in all official matters. They are expected to maintain high standards of honesty, responsibility, and accountability as well as adhere to the Air Force Core Values of "Integrity first, Service before self, and Excellence in all we do."

## Section B—Personal Conduct

**5. Selected Standards of Conduct:**

5.1. **Furnishing Testimony.** Employees may be requested to provide testimony or information to the Air Force, Department of Defense, Merit Systems Protection Board, Equal Employment Opportunity Commission, Office of Personnel Management, and other government agencies on official matters.

5.1.1. If first warned that a failure to provide answers may subject the employee to discipline, including the possibility of removal in appropriate cases, and that any statements cannot be used against the employee in a criminal prosecution, a refusal to reply to questions during an investigation may be the basis for disciplinary action. Employees who lie or otherwise affirmatively mislead an investigation may be subject to discipline, including removal in appropriate cases.

5.1.2. Under no circumstances should an employee be questioned by management officials concerning a suspected criminal offense without the prior approval of the servicing legal office. Employees may be questioned by proper law enforcement officials, such as Office of Special Investigation (OSI) agents or Federal Bureau of Investigation (FBI) agents. The servicing legal office is responsible for ensuring that any information or allegation relating to a possible violation of Federal criminal laws is reported to the office of the United States Attorney for the district in which the crime allegedly occurred before the employee is questioned. The United States Attorney's Office must approve, in advance, all requests to compel the testimony of employees suspected of criminal offenses during administrative hearings or investigations.

5.1.3. Local Staff Judge Advocates and Civilian Personnel Flights should be contacted prior to questioning employees to ensure compliance with local contractual requirements, if any, regarding statutory rights to union representation.

5.2. **Taking Part in Public or Civic Activities.** An employee's participation in demonstrations, petitions, speeches, private organizations, and similar activities is permitted in his or her private capacity while not in a duty status as the exercise of the constitutional rights of speech, peaceable assembly, and petition to Congress. However, taking part in these activities may subject the employee to disciplinary action if it interferes with the mission of the armed forces; or interferes with the duty performance of the employee, other employees or military members. Employees may also be subject to disciplinary action, including removal, if convicted of inciting or taking part in a riot, civil disorder, or any group activity that results in damage to property or injury to people. (See AFI 36-704, *Discipline and Adverse Actions,* for guidance on actions to be taken when off duty misconduct is of such a nature that the employee is unable to fulfill his or her job responsibilities or there is an adverse effect upon the Air Force.)

5.3. **Indebtedness.** Consistent with the Standards of Ethical Conduct for Employees of the Executive Branch at Title 5, Code of Federal Regulations, Part 2635, employees shall satisfy, in good faith, their just financial obligations, especially those such as Federal, State, or local taxes that are imposed by law. A just financial obligation includes any financial obligation acknowledged by the employee or reduced to judgment by a court. In good faith means an honest intention to fulfill any just financial obligation in a timely manner In the event of a dispute between an employee and an alleged creditor, the Air Force does not determine the validity or amount of the disputed debt or collect debts on the alleged creditor's behalf. However, where the validity of a private debt is established by court order or admitted, a failure to satisfy an obligation can result in disciplinary action under AFI 36-704, *Discipline and Adverse Actions*.

5.3.1. CPFs should establish procedures for responding to indebtedness complaints from creditors. These procedures may require supervisors to forward all indebtedness complaints to the CPF for a proper determination and processing or for the CPF to provide the supervisor guidance on responding to the complaint. A creditor is a person or company to whom a debt is owed. These procedures should not apply to debt collectors, or persons or companies who regularly collect or attempt to collect debts owed to another. Requests from creditors should include information about previous direct attempts to collect the debt from the employee, and proof that the employee has been informed of his/her responsibility. The creditor is entitled to a courteous response from the CPF, but this response must clearly state that the Air Force does not collect or determine the validity of debts. It must neither admit or imply an admission of an employee's liability, nor report any action taken against an employee as a result of the complaint.

5.3.2. When an Air Force employee with a debt has been reassigned to another Air Force activity and a creditor seeks locator assistance, the losing CPF must either furnish the current duty address to the requester, or send the correspondence to the gaining CPF. If the individual is no longer an Air Force employee, the CPF may forward the correspondence to the former employee's last known mailing address. In cases where a government agency seeks an address for law enforcement purposes (i.e., a child support enforcement agency is attempting to enforce a child support order), the CPF may provide the last known mailing address of a current or former employee. However, in no instance will the CPF or the Air Force act as an intermediary in private matters that concern former employees.

5.4. **Work Performance.** All employees are expected to:

5.4.1. Discharge their assigned duties conscientiously and effectively.

5.4.2. Be present for duty unless authorized to be absent.

5.4.3. Follow Air Force Instructions and other directives and comply in a timely way with proper instructions or orders given by a competent authority.

5.4.4. Confer with line management (starting with immediate supervisor) to discuss matters/concerns, obtain information, or solve problems that relate to the job.

5.4.5. Comply with safety and health standards set for the job environment.

5.5. **Canvassing, Soliciting, and Peddling.** Canvassing, soliciting, or peddling among employees during working hours or in federal facilities is not allowed except for officially approved events, e.g. Combined Federal Campaign. However, this does not preclude office collections for fellow workers or passive activities such as "For Sale" notices on unit bulletin boards. This restriction does not apply

to conducting labor organization membership drives during lunch periods or after duty hours. For other restrictions that involve commercial solicitation and sales to subordinates, refer to the *Joint Ethics Regulation.*

5.6. **Gambling.** Gambling is prohibited on federally owned or leased property or while in a duty status regardless of location. Gambling includes participation in "office pools" and the joint purchase of lottery tickets by employees. Refer to the *Joint Ethics Regulation* for specific exemptions regarding law enforcement activities, private legal wagers conducted entirely within assigned government quarters, and case-by-case exemptions approved by the Secretary of the Air Force.

5.7. **Outside Employment.** Consistent with the requirements of the *Joint Ethics Regulation,* Air Force employees may be required to report any outside employment or business activity to their supervisor or other locally designated official prior to engaging in employment or business activity. Supervisors have the authority to prohibit any outside employment or business activity that might detract from readiness or pose a security risk. Approval to participate in outside employment or business activity will be documented by supervisors on AF Form 971, **Supervisor's Record of Employee.** Employees required to file financial disclosure reports, SF 450 or SF 278, and those serving as procurement officials are subject to additional restrictions regarding outside employment and business activities. Employees should address specific questions to their local ethics counselor at their servicing legal office.

5.8. **Misuse of Government Property.** Employees must refrain from the use of government equipment, personnel, or other resources for their personal benefit or benefit of friends or relatives unless otherwise authorized. This includes resources such as computers, copiers, facsimile machines, telephones, or vehicles. Misuse of Air Force resources is misconduct, which may result in corrective disciplinary action against the employee.

*Section C—Dress and Appearance*

6. **Professional Public Image.** Employees are expected to comply with reasonable dress and grooming standards based on comfort, productivity, health, safety, and type of position occupied. Due to the diversity of work functions and locations, appropriate dress standards may vary significantly. Employee attire will be in good repair, and should not be considered offensive, disruptive, or unsafe.

6.1. When clothing such as coats and ties, which are normally considered proper attire, creates discomfort during hot weather and in places where cooling is minimized to conserve energy, the dress standard should be adjusted. This change should correspond to any locally determined military summer uniform period.

6.2. Any management prohibitions on specific civilian dress must be based on a clear showing that the prohibited dress contributes to an unsafe, unhealthy, nonproductive, or disruptive work environment. Management disagreement with styles, modes of dress, and grooming currently in fashion is not an adequate criterion for making such a determination.

7. **Civilian Uniform Wear.** Military grooming and appearance standards do not apply to civilian employees. However, employees standard uniforms, such as those prescribed in AFI 36-801, *Uniforms for Civilian Employees,* or medical or food service personnel furnished uniforms under Table of Allowances 016, may be expected to comply with grooming and appearance standards for employees in similar occupations employed by other Federal, state, or municipal governments. Air Reserve Technicians will

adhere to the requirements as those prescribed in AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, when wearing the military uniform in civilian status.

### Section D—Professional Relationships

**8. General.** Professional relationships are essential to the effective operation of all organizations and to the efficiency of the service. While personal relationships between Air Force employees or between Air Force employees and military members are normally matters of individual choice and judgment, they become matters of official concern when they violate existing law or impede the efficiency of the service.

**8.1. Definitions:**

8.1.1. Professional relationships are those that contribute to the effective operation of the Air Force, thus promoting the efficiency of the service. The Air Force encourages personnel to communicate freely with their superiors regarding their careers, performance, duties, and missions. Such communications enhance morale, further the Air Force mission, and preserve the proper respect between employees, supervisors and managers. Participation by employees of all grades in organizational activities and unit-sponsored events enhances morale and unit cohesion.

8.1.2. Unprofessional relationships are those relationships, whether pursued on or off-duty, which detract from the authority of supervisors and managers or result in, or reasonably create the appearance of, favoritism, misuse of office or position, or the abandonment of organizational goals, and adversely affect the efficiency of the service. Unprofessional relationships can exist between civilian employees, military officers and civilian employees, and military enlisted members and civilian employees.

**8.2. Guidelines for Avoiding Unprofessional Relationships.** Experience has shown that certain kinds of relationships present a high risk for being or developing into unprofessional relationships. While some personal relationships are not in and of themselves unprofessional, they may be or become unprofessional when other facts or circumstances are taken into consideration.

8.2.1. Relationships Within Organizations. Unduly familiar relationships between individuals in which one person exercises supervisory authority over the other can easily be or become unprofessional. The danger of abuse of authority and perception of favoritism is always present. The ability of a supervisor or manager to influence, directly or indirectly, assignments, promotions, training opportunities, awards, and other employment opportunities places both the supervisor or manager and the subordinate in a vulnerable position.

8.2.2. Dating and Close Friendships. Dating and courtship between a supervisor or manager and an employee under his or her supervision invariably raises the perception of favoritism. Such relationships can adversely affect morale and impede the efficiency of the service.

8.2.3. Other Relationships. Other relationships, not specifically addressed above, can, depending on the circumstances, lead to actual or perceived favoritism or preferential treatment and must be avoided. Examples of such activities, but by no means inclusive, are soliciting or making solicited sales to personnel who are junior in grade or position (with specific exceptions as set out in the *Joint Ethics Regulation*, paragraph 5-409), and joint business ventures between supervisors and employees under their supervision.

**8.3. Individual Responsibility to Maintain Professional Relationships.** All Air Force employees share the responsibility for maintaining professional relationships. However, supervisors and manag-

ers in personal relationships bear primary responsibility for maintaining the professionalism of that relationship. Supervisors and managers are in leadership positions which require the maturity and judgment to avoid relationships which impede the efficiency of the service or adversely affect mission performance.

8.4. **Actions in Response to Unprofessional Relationships.** When unprofessional relationships impede the efficiency of the service or adversely affect mission performance, appropriate corrective action in accordance with AFI 36-704 should be taken.

## Section E—Related Directives

9. **Privacy Rules.** AFI 37-132, *Air Force Privacy Act Program*, implements the Privacy Act of 1974 and DoD Directive 5400.11, *Department of Defense Privacy Program*, DoD 5400.11-R, *Department of Defense Privacy Program*. Employees who have access to systems of records, or are involved in developing, operating, or maintaining a personnel record system must be informed of and comply with all requirements to protect individual privacy.

10. **Discipline.** AFI 36-704, *Discipline and Adverse Actions*, prescribes policies and procedures to use in considering corrective or disciplinary action for violations of this AFI or other prescribed standards of conduct.

11. **Drug and Alcohol Abuse.** AFI 36-810, *Substance Abuse Prevention and Control*, outlines the Civilian Substance Abuse Prevention and Control Program set up to help maintain standards of conduct and performance. Civilian employees of the Air Force must refrain from using illegal drugs whether on or off duty. Use of illegal drugs is inconsistent with the high standards of performance, military discipline, and military readiness necessary to accomplish the Air Force mission.

12. **Ethical Conduct.** DoD 5500.7-R, *Joint Ethics Regulation*, delineates standards of ethical conduct and ethics guidance including direction in the areas of financial and employment disclosure systems, post-employment rules, enforcement, training, gifts and gratuities, outside activities. Civilian employees shall become familiar with the provisions of the *Joint Ethics Regulation* and ensure their official activities and personal relationships with outside organizations and outside employment comply with its standards and guidance. Employees with questions concerning the *Joint Ethics Regulation* should seek guidance from an appropriate ethics counselor.

13. **Government-Issued Credit Card.** AFI 65-104, *Government Charge Card Program*, governs the use of credit cards issued for use in conjunction with official travel. This AFI directs each cardholder to pay all valid charges when billed. It also states the card is to be used only for cash advances prior to or during travel and/or for expenses incurred during official travel.

14. **Discrimination and Sexual Harassment.** AFPAM 36-2705, *Discrimination and Sexual Harassment,* states that the Air Force will conduct its affairs free from unlawful discrimination and harassment. No amount of discrimination or harassment will be tolerated.

**AFI36-703  1 AUGUST 1999**                                                                 7

*Section F—Other Requirements*

**15.  Other Provisions on Employee Conduct.** All restrictions on employee conduct cannot be specified in an AFI.  Therefore, supervisors, managers, and employees who have specific questions regarding standards of conduct which are not covered in this AFI or the publications referenced above, should consult their commander, servicing CPF, or the staff judge advocate for assistance.

**16.  Prescribed Forms:** No prescribed forms.

**17.  Adopted Forms:** AF Form 971, *Supervisor's Employee Brief* and SF 278, *Executive Branch Personnel Public Financial Disclosure Report.*

ROGER A. BRADY,  Lt General, USAF
DCS, Manpower and Personnel

**Attachment 1**

**GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION**

*References*

DoD Directive 5400.11, *Department of Defense Privacy Program*

DoD 5500-7-R, *Joint Ethics Regulation*

AFPD 36-7, *Employee and Labor-Management Relations*

AFPAM 36-2705, *Discrimination and Sexual Harassment*

AFI 36-704, *Discipline and Adverse Actions*

AFI 36-810, *Substance Abuse Prevention and Control*

AFI 37-132, *Air Force Privacy Act Program*

AFI 65-104, *Government Charge Card Program*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, *ET AL.*,   )
                                  )
           *Plaintiffs,*          )
                                  )
     v.                           )      Civil Action No. 1:08cv692 (EGS)
                                  )
SECRETARY OF THE AIR FORCE,       )
                                  )
           *Defendant.*           )      Judge Sullivan

# PLAINTIFFS' EXHIBIT 4



**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**

*AIR FORCE INSTRUCTION 36-801*

*29 APRIL 1994*

Incorporating Change 1, 6 August 2007

*Personnel*

*UNIFORMS FOR CIVILIAN EMPLOYEES*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:**   Publications and forms are available on the e-Publishing website at
**www.e-publishing.af.mil** for downloading or ordering.

**RELEASABILITY:**   There are no releasability restrictions on this publication.

OPR:  HQ AFPC/DPIE

Certified by:  HQ AFPC/DPI
(Col James P. Sturch)

Supersedes  AFM40-12, 11 July 2002

Pages:  48

This instruction implements AFPD 36-8, *Employee Benefits and Entitlements*, and Department of Defense (DoD) Instruction 1418.2, *Standards for Furnishing Uniforms or Paying Uniform Allowances to DoD Civilian Employees*, 5 May 1969, by establishing standards and conditions for furnishing uniforms or paying uniform allowances to direct hire Air Force employees paid from appropriated funds, including United States Air Force Reserve (USAFR) and Title 5 United States Code (U.S.C.) employees of the Air National Guard.  It does not apply to employees furnished uniforms or paid uniform allowances under other laws or regulations, such as medical and food service personnel furnished uniforms under Table of Allowance (TA) 016, non-US citizen employees furnished uniforms or paid uniform allowances under labor agreements concluded with another government, and persons furnished special clothing under AFM 67-1 or its implementing instructions.

## SUMMARY OF CHANGES

Updates paragraph **1.1.**, When US Citizen Employees Wear Uniforms and transfers AFI 36-801 Office of Primary Responsibility (OPR) from HQ USAF/DPME to HQ AFPC/DPIEC. A margin bar ( | ) indicates newly revised material.

**Chapter 1— WEARING OF UNIFORMS AND ESTABLISHING UNIFORM**
**ALLOWANCES**                                                                                        **6**

1.1.     When US Citizen Employees Wear Uniforms:  ........................................     6

1.2.     Responsibilities:  ...................................................................................     6

1.3.     Furnishing Uniforms:  ...........................................................................     8

1.4.     Establishing Uniform Allowances.  ......................................................     8

1.5.     Uniform Allowances for Reemployed or Transferred Employees:  ..........     9

**Chapter 2— UNIFORM COMPOSITION AND WEAR**                                   **10**

2.1.    Uniforms. ..........................................................................................    10

2.2.    Items Not Considered Part of a Uniform: ...................................    10

2.3.    Wearing Uniforms. ...........................................................................    10

2.4.    Changes in Uniform Items. ...........................................................    10

2.5.    Standards of Appearance. ..............................................................    10

**Chapter 3— UNIFORMS FOR GUARDS AND POLICE**                               **12**

3.1.    Covered  Employees. ......................................................................    12

3.2.    Purpose of the Uniform. ...............................................................    12

3.3.    When To Wear the Uniform. ........................................................    12

3.4.    Prescribed Uniforms. ....................................................................    12

3.5.    Protective Clothing and Equipment. ............................................    12

3.6.    Uniform Composition. ...................................................................    12

3.7.    Cap Insignia and Badge. ...............................................................    12

3.8.    Procuring Uniforms. ......................................................................    12

3.9.    Uniform Appearance. .....................................................................    12

3.10.   Uniform Items. ...............................................................................    12

3.11.   Insignia, Badges and Decorations. ...............................................    13

3.12.   Comfort Items. ...............................................................................    14

3.13.   Protective Clothing. .......................................................................    14

3.14.   Protective Equipment. ...................................................................    14

3.15.   Exceptions. .....................................................................................    14

Figure 3.1.    Car Jacket and Winter Coat. .....................................................    15

Figure 3.2.    Overcoat. ...................................................................................    16

Figure 3.3.    Summer Windbreaker and Summer Trousers. .............................    17

Figure 3.4.    Summer Shirt and Summer Trousers. ........................................    18

Figure 3.5.    Winter Shirt and Winter Trousers. ............................................    19

Figure 3.6.    Police Headgear. .......................................................................    19

Figure 3.7.    Guard Headgear. .......................................................................    20

Figure 3.8.    Insignia for Supervisors and How Worn (When appropriate, "Police" may be
              substituted for "Guard."). .......................................................    21

Table 3.1.      Authorized Uniforms For Civilian Guards And Police.  ............................................  23

**Chapter 4— UNIFORMS FOR FIRE PROTECTION PERSONNEL**                                      **25**

    4.1.      Covered Employees.  ...............................................................................................  25

    4.2.      Purpose of the Uniform.  ........................................................................................  25

    4.3.      Uniform Material Performance.  ............................................................................  25

    4.4.      When To Wear the Uniform.  .................................................................................  25

    4.5.      Parts of the Uniform:  ............................................................................................  25

    4.6.      Dress Mode.  ..........................................................................................................  27

    4.7.      Wearing of the Uniform:  .......................................................................................  27

    4.8.      Physical Fitness Clothing.  ....................................................................................  28

    4.9.      Exceptions.  ............................................................................................................  28

Figure 4.1.      Fire Chief Badge.  ..................................................................................................  29

Figure 4.2.      Senior Assistant Fire Chief Badge.  ......................................................................  30

Figure 4.3.      Assistant Fire Chief Badge.  .................................................................................  31

Figure 4.4.      Firefighter Badge.  .................................................................................................  32

**Chapter 5— UNIFORMS FOR CHAUFFEURS AND MOTOR VEHICLE OPERATORS**        **33**

    5.1.      Covered Employees.  ...............................................................................................  33

    5.2.      Purpose of the Uniform.  ........................................................................................  33

    5.3.      When To Wear the Uniform.  .................................................................................  33

    5.4.      Seasonal Uniform.  ................................................................................................  33

    5.5.      Uniform Standards:  ...............................................................................................  34

    5.6.      Exceptions.  ............................................................................................................  34

**Chapter 6— UNIFORMS FOR US CITIZENS IN OVERSEAS AREAS**                          **35**

    6.1.      Covered Employees.  ...............................................................................................  35

    6.2.      Purpose of the Uniform.  ........................................................................................  35

    6.3.      When To Wear the Uniform:  ................................................................................  35

    6.4.      Allowances For Uniforms.  ....................................................................................  35

    6.5.      Purchasing the Uniform.  .......................................................................................  35

    6.6.      Prescribed Uniforms.  ............................................................................................  35

    6.7.      Identification Insignia.  ..........................................................................................  36

    6.8.      Issue Items.  ...........................................................................................................  36

6.9.     Exceptions. ........................................................................................................ 36

**Chapter 7— UNIFORMS FOR PHYSICAL EDUCATION INSTRUCTORS**                            **37**

7.1.     Covered Employees. ......................................................................................... 37

7.2.     Purpose of the Uniform. .................................................................................. 37

7.3.     When To Wear the Uniform. ............................................................................ 37

7.4.     Parts of the Uniform. ....................................................................................... 37

7.5.     Wearing of the Uniform: .................................................................................. 38

7.6.     Exceptions. ........................................................................................................ 38

**Chapter 8— UNIFORMS FOR USAF WATER SURVIVAL SCHOOL**                                 **39**

8.1.     Covered Employees. ......................................................................................... 39

8.2.     Purpose of the Uniform. .................................................................................. 39

8.3.     When To Wear the Uniform. ............................................................................ 39

8.4.     Parts of the Uniform: ....................................................................................... 39

8.5.     Protective Clothing. ......................................................................................... 39

8.6.     Exceptions. ........................................................................................................ 39

**Chapter 9— UNIFORMS FOR AIRCRAFT MAINTENANCE EMPLOYEES**                           **40**

9.1.     Covered Employees. ......................................................................................... 40

9.2.     Purpose of Uniform. ......................................................................................... 40

9.3.     When To Wear the Uniform. ............................................................................ 40

9.4.     Parts of the Uniform. ....................................................................................... 40

9.5.     Government Furnished Items. .......................................................................... 42

9.6.     Exceptions. ........................................................................................................ 42

Figure 9.1.    Wear of Organization and Name Patches (Men). ................................... 43

Figure 9.2.    Wear of Organization and Name Patches (Female). ............................. 44

Figure 9.3.    Standard Buckle (Actual Size).  Configuation of Belts. ......................... 45

Figure 9.4.    Configuration of Name Patch. ............................................................. 45

Figure 9.5.    Configuration of Ball Cap. ................................................................... 46

Figure 9.6.    Organization Patch. ............................................................................. 46

**Chapter 10— UNIFORMS FOR MOTION PICTURE PROJECTIONIST**                            **47**

10.1.    Covered Employees. ......................................................................................... 47

10.2.    Purpose of the Uniform.  .................................................................................    47

10.3.    When To Wear the Uniform.  .............................................................................    47

10.4.    Parts of the Uniform.  .......................................................................................    47

10.5.    Exceptions.  .......................................................................................................    47

10.6.    Prescribed Forms:  ............................................................................................    47

10.7.    Adopted Forms:  ...............................................................................................    47

**Attachment 1— GLOSSARY OF ABBREVIATIONS AND ABBREVIATIONS**                             **48**

**Chapter 1**

**WEARING OF UNIFORMS AND ESTABLISHING UNIFORM ALLOWANCES**

**1.1. When US Citizen Employees Wear Uniforms:**

1.1.1. US citizen employees of the Air Force must wear uniforms when:

1.1.1.1. Hired directly as a guard or police officer. Employees who are classified under standards who have primary functions in the fields of investigation and identification are excluded from wearing a uniform. Employees having both guard and firefighter duties wear the uniform for their primary assignment.

1.1.1.2. Employed in the Fire Protection and Prevention series, GS-081.

1.1.1.3. Employed as a chauffeur of vehicles assigned to the Secretary, Under Secretary, and Assistant Secretaries of the Air Force; Chief of Staff, Vice Chief of Staff, United States Air Force; or additional key officials of the Air Force as periodically designated by HQ USAF.

1.1.1.4. Employed as a chauffeur or an operator of passenger vehicles. Commanders of major commands (MAJCOM) prescribe the uniform that the driver must wear.

1.1.1.5. Employed as a physical education instructor at the USAF Academy Athletic Department.

1.1.1.6. Assigned to 47th FTW Aircraft Maintenance, where their work makes ready-identification important.

1.1.1.7. Hired to operate and maintain the water craft fleet assigned to the 3613th CCTS, USAF Water Survival School.

1.1.1.8. Employed as an audio-visual equipment operator by Air University.

1.1.1.9. Air Force Reserve Command (AFRC) Air Reserve Technicians (ART) must wear the military uniform while performing civilian duties as an ART.

1.1.2. US citizen employees of the Air Force in oversea areas (or employees being deployed to oversea areas) may be required to wear uniforms if the theater or air component commanders determine there is an actual or threatened outbreak of hostilities, involving war, major civil disturbance (or other equally grave situations), or where the deployment necessitates the wearing of uniforms in specifically defined geographic areas.

1.1.3. Direct hire employees of the Air Force who aren't US citizens must wear uniforms when the oversea commander determines that the mission necessitates uniforms.

1.1.4. Employees are not required to wear uniforms when they are appointed for 3 months or less or for any period of appointment, unless their work makes ready-identification important and wearing uniforms will accomplish that objective.

**1.2. Responsibilities:**

1.2.1. The HQ USAF Director of Civilian Personnel Policy and Personnel Plans or his or her designee and the HQ USAF Office of Primary Responsibility for the occupations listed in this instruction:

1.2.1.1. Establish basic standards for furnishing uniforms or paying uniform allowances.

1.2.1.2.  Identify the employees who must wear uniforms.

1.2.1.3.  Identify the items of uniform required for each group of employees.

1.2.1.4.  Establish requirements for maintaining, repairing, and returning uniforms.

1.2.1.5.  Ensures that all uniform regulations comply with legal requirements and DoD policy

1.2.2.  **MAJCOMs:**

1.2.2.1.  Review requests for civilian uniform wear.

1.2.2.2.  Send requests, with comments, to HQ USAF/DPCE 1040 Air Force Pentagon, Washington DC 20330-1040 for approval.

1.2.3.  **Supervisors:**

1.2.3.1.  Identify the positions that require uniforms and initiate uniform authorization requests.

1.2.3.2.  Tell employees when and how to wear uniforms.

1.2.3.3.  Determine the amount and type of allowance (initial or replacement) and inform the accounting and finance officer.

1.2.3.4.  Inform employees about the Air Force uniform allowance.

1.2.3.5.  Obtain certifications from employees entering on duty in positions subject to uniform wear if they have been employed in DoD during the past year.

1.2.3.6.  Send a SF 1034, **Public Voucher for Purchases and Services Other Than Personal**, to the accounting and finance office to obtain allowances.

1.2.4.  **Accounting and Finance Officers:**

1.2.4.1.  Compute the amount of allowance the employee may receive.

1.2.4.2.  Record all uniform allowance payments

1.2.4.3.  Furnish information about established uniform allowances when the Air Force transfers employees within the DoD or rehires employees in the same type of position.

1.2.5.  **Civilian Personnel Officers:**

1.2.5.1.  Inform operating officials about this instruction's provisions.

1.2.5.2.  Check SF 66, **Official Personnel Folder**, for certifications from employees who, within 1 year of previous employment in DoD, entered positions that have uniform requirements.

1.2.5.3.  Note verification on the employee's certificate and send the certificate to the accounting and finance office with the request for payment.

1.2.5.4.  The civilian personnel flight (CPF) only requests further verification from the employee's former employing agency for a significant discrepancy between the information contained in the employee's certificate and the information on the SF 50, **Notification of Personnel Action**, in the official personnel folder.

1.2.6.  **Functional Experts:**

1.2.6.1.  Conduct annual reviews of uniform allowances for any necessary revisions.

1.2.6.2.  Determine when employees may obtain exceptions to this instruction's governing provisions.

1.2.6.3.  Estimate line-item costs when establishing the maximum amount of an initial or replacement allowance.

1.2.6.4.  Provide the initial and replacement allowance rate, with documentation, to HQ USAF/ DPC.

1.2.6.5.  Formulate and publish policy guidance on Air Force civilian uniform materials.

## 1.3. Furnishing Uniforms:

1.3.1.  The Air Force must either furnish a uniform or provide a uniform allowance to all civilian employees required to wear uniforms.  When giving an employee a rented or purchased uniform, be sure that the cost doesn't exceed the actual cost of the uniform or the maximum uniform allowance, whichever is less.

1.3.2.  Civilian employees normally must clean or launder their uniforms at their own expense.

1.3.3.  Procure uniforms locally in accordance with established AF supply procedures.

1.3.4.  When renting uniforms, account for and process the rental in the same way as other contractual services.

## 1.4. Establishing Uniform Allowances. A uniform allowance helps the employee pay for the uniform. It must not exceed the maximum authorized under 10 U.S.C. 1593.  The Air Force does not categorize uniform allowances paid under this instruction as pay, salary, or compensation.

1.4.1.  To establish an allowance, consider the quality of each uniform item that the employee needs to maintain a satisfactory standard of appearance.  Base the initial allowance on the costs of the items that make up the required uniform, but be sure you don't exceed the maximum allowance limitation.

1.4.1.1.  The initial allowance is effective as of the date an employee must first wear a uniform and covers a 1-year period from that date.  Don't give the initial allowance to any employee or former employee who leaves a position before getting an authorized uniform allowance.

1.4.2.  A replacement allowance reimburses employees for those uniform items that need replacement because of damage or wear.  Local activities establish wearout periods for replacing uniforms, but the minimum period is 1 year.

***EXCEPTION:***  Damage to clothing items beyond acceptable appearance standards qualifies for a replacement allowance.

1.4.2.1.  When establishing wearout periods, consider such factors as these: environment (heat and cold); the likelihood that some items wear out sooner (for example, coat, hat, trousers); seasons (winter, summer); flame retardancy, and so on.

1.4.2.2.  Set the replacement allowance to take into account locality, environment, amount of expense and frequency of replacement.

1.4.2.3.  Provide the replacement allowance on an annual or quarterly basis.  Be sure to pay it in full before the wearout period.

1.4.3.  Authorize an annual allowance only for an employee who has the same uniform requirements throughout the year.  If an activity has provided an annual allowance and the employee leaves a job requiring the wearing of the same uniform, the employee may keep one-fourth of the payment for each quarter or portion of a quarter the employee held the job.  The employee must return the balance of the annual payment.

1.4.3.1.  When employees are on extended leave, with or without pay, at the time a replacement allowance is due (quarterly or annual), and the supervisor has good reason to expect that the employee will not return to work for at least 30 calendar days into the period, withhold the replacement allowance.

1.4.3.2.  Employees who resume their position before the end of the quarter are entitled to the replacement allowance for the quarter.

1.4.3.3.  Employees who receive a replacement allowance on an annual basis don't receive payments until they return to work.  Their new annual payment cycle begins on that date.

1.4.3.4.  Employees given quarterly replacement allowances, who leave before the period of service involved expires, don't have to pay back the uniform allowance.

1.4.4.  Commanders determine the amounts of uniform allowances for eligible temporary employees. The commander's principle criteria are the employee's job requirements and the nature of the temporary employment.  Allowances for temporary employees to should be kept to a minimum.

**1.5.  Uniform Allowances for Reemployed or Transferred Employees:**

1.5.1.  Transferred or rehired employees don't receive a new allowance for identical uniform requirements if it overlaps a period for which the employee was paid an initial or replacement allowance.

1.5.2.  Employees transferred to or rehired in a position different from the one they left may receive an initial uniform allowance.

1.5.2.1.  Employees who leave a position and are later rehired in or transferred to a position with identical or similar uniform requirements may receive an initial uniform allowance if at least 1 full year has passed since the end of the period covered by the  last allowance payment.

## Chapter 2

## UNIFORM COMPOSITION AND WEAR

**2.1. Uniforms.** A uniform consists of the items of distinctive clothing or insignia that an employee must wear as a condition of employment, normally for identification purposes.  Uniforms will be as economical as possible for the purpose it serves.

**2.2. Items Not Considered Part of a Uniform:**

2.2.1.  Normal work clothing, such as coveralls worn by painters and fatigue clothing worn by fire-fighters.

2.2.2.  Safety clothing such as safety shoes and asbestos gloves.

2.2.3.  Shoes and socks that employees may wear as items of civilian dress during off-duty hours.

2.2.4.  Shirts of a distinctive uniform appearance that employees normally wear as an outside garment in place of a uniform coat or blouse are considered part of the uniform.

**2.3. Wearing Uniforms.** Employees must wear uniforms while on official duty.  They may wear them while traveling to and from official duty stations, if authorized by this instruction or permitted by local instructions.

2.3.1.  Employees must keep all uniform items clean and neat and must replace items that are no longer serviceable.  Employees normally pay their own cleaning and laundering expenses.

2.3.2.  Local management decides when employees must replace uniform items.

**2.4. Changes in Uniform Items.** Functional experts decide when to make changes to civilian uniforms.  They issue policy letters notifying installations of any changes to this instruction.  The policy letter includes the implementation dates for the new uniform, a detailed description of  the uniform's material and accessories, and other pertinent facts needed by the supervisor and employee to implement the policy.  The policy letter is an extension of this instruction and carries the same authority.

2.4.1.  When the Air Force revises civilian uniform items or specifications, employees subject to the new requirements may continue to wear their current uniform if it doesn't pose a safety risk or hazard to the employee.

2.4.2.  Supervisors must ensure that when employees purchase replacement items, the items meet the new requirements.

**2.5. Standards of Appearance.** Employees required to wear uniforms must:

2.5.1.  Maintain a high standard of personal and uniform appearance.

2.5.2.  Keep uniforms neat, clean, pressed, serviceable, and presentable at all times.

2.5.3.  Not wear faded, frayed, or torn uniforms.

2.5.4.  Commanders may prescribe standards of appearance to ensure that all employees meet job-related mission and safety requirements.

2.5.5.  Uniforms will be kept buttoned and zipped at all times.

2.5.5.1.  Male employees who work as guards or police must keep their hair evenly trimmed and tapered on the sides and rear of the head.  Hair must not:

2.5.5.1.1.  Cover any portion of the ear.

2.5.5.1.2.  Extend over the collar while the employee is in a normal standing posture.

2.5.5.1.3.  Fall below the eyebrows when the employee is wearing the uniform headgear.

2.5.5.2.  Sideburns must be:

2.5.5.2.1.  Neatly trimmed.

2.5.5.2.2.  Even in width.

2.5.5.2.3.  Not longer than the lowest part of the ear.

2.5.5.3.  Employees may have mustaches but otherwise must be clean-shaven.  The mustache must not extend 1/4 inch below or 1/4 inch beyond the line of an employee's upper lip or edge of the mouth.

2.5.5.4.  Female employees who work as guards or police must wear their hair no longer than the shoulder and have hair styles that allow them to wear headgear properly.  Wearing exaggerated hair styles with excessive fullness will not be allowed.  Wearing pins, combs, or barrettes of similar color to the hair is permitted.  Employees who wear hair pieces must conform to these same standards.  Cosmetics must be conservative.

2.5.5.5.  Firefighters must comply with more stringent appearance standards than non-uniformed employees.  Firefighters may wear mustaches but otherwise must remain clean-shaven.  The mustache must not extend more than 1 inch below or 1 inch beyond the line of an individual's upper lip or edge of mouth, and must not interfere with the seal of the self-contained breathing apparatus.  Sideburns must be neatly trimmed, even in width, and no longer than the lowest part of the ear.  Hair on the back of the head and neck must not extend below the bottom edge of the collar when the shirt is buttoned.  Hair styles must not interfere with wearing safety equipment or the uniform hat.

## Chapter 3

## UNIFORMS FOR GUARDS AND POLICE

**3.1.  Covered  Employees.** This chapter's requirements apply to all civilians hired directly by the Air Force as guards or police.

***EXCEPTION:*** Personnel classified under these standards who have primary functions in the fields of investigation and identification.

**3.2.  Purpose of the Uniform.** Employees must wear uniforms for purposes of identification and as evidence of authority.

**3.3.  When To Wear the Uniform.** Employees must wear the uniforms while on duty.  They may also wear uniforms when traveling between their places of residence and the place of official duty.

**3.4.  Prescribed Uniforms.** A duty uniform is a complete  uniform as authorized in this chapter.

**3.5.  Protective Clothing and Equipment.** Protective clothing and equipment such as  safety-goggles, safety shoes, safety hats will be obtained through supply channels according to applicable regulations or instructions.

**3.6.  Uniform Composition.** The uniforms for male and female guards and police are similar in material, design, and color.

**3.7.  Cap Insignia and Badge.** Employees wear the DoD police and guard insignia and badge  as a part of the uniform while on duty and when traveling to and from the place of official duty.  The insignia and badge are accountable as Government property.  Local authorities must establish necessary local safeguards to ensure that employees don't lose or damage DoD insignias and badges.

**3.8.  Procuring Uniforms.** Employees must procure the prescribed uniform as soon as possible after receiving their initial uniform allowance.

**3.9.  Uniform Appearance.** Miscellaneous paraphernalia, such as pencils, pens, watch chains, fobs, pins, jewelry, handkerchiefs, combs, cigars, cigarettes, or pipes will not be exposed on the uniform.

3.9.1.  Female employees normally wear skirts between the bottom of the knee and 2 inches above the top of the knee.

**3.10.  Uniform Items. Table 3.1.** prescribes the authorized combinations of uniform items (x indicates required items; o indicates optional items).  The articles listed in columns B, C, and D constitute a complete basic uniform.  Employees required to wear these uniforms:

3.10.1.  May not combine articles of uniform listed in different columns unless specifically authorized.

3.10.2.  May purchase and wear optional items when authorized by commanders.

3.10.3.  Must possess uniform articles in sufficient quantities to allow time for cleaning, laundering, and making emergency changes.

3.10.4.  **Car Jacket.** The car jacket must have a badge tab on the left breast and a leather identification tag with velcro fastener on the right breast.

3.10.5.  **Summer Windbreaker.** The summer windbreaker must have a badge tab on the left breast.

3.10.6.  **Winter Trousers.** Employees may wear suspenders with the trousers but they must be concealed from public view.

3.10.7.  **Winter Shirt.** The shirt must be French blue.

3.10.8.  **Summer Shirt.** The shirt must be French blue made of  permanent-press material, machine washable, and short-sleeved.

3.10.9.  **Headgear:**

> 3.10.9.1.  Police wear a navy-blue sheriff's-style hat in wool felt for winter and in straw for summer.  The headgear has a moisture-proof lining with a leather sweat band.  It must be worn with appropriate insignia.  The hat has braid with acorns; gold braid for supervisors and silver braid for other personnel.

> 3.10.9.2.  **Guards.** Headgear for guards will consist of a navy-blue garrison-type hat with Corfam or similar bill.  Patent leather is not authorized.  Wear an appropriate cap insignia as authorized in this instruction while on duty.  During inclement weather, guards may wear a rain cap cover (conventional black or police-type) with a detachable skirt.

> 3.10.9.3.  **Sun Helmet.** The sun helmet must be a gray military-type model, with a chin strap and a hole in the front center for the cap insignia.

3.10.10.  **Raincoat.** The raincoat must be a black rubberized police-type model.

3.10.11.  **Waist Belt.** The waist belt must be plain black (standard) leather with a conventional buckle.

3.10.12.  **Neckties.** Neckties must be plain and navy blue four-in-hand.  Leather ties are prohibited.

3.10.13.  **Shoes.** A black policeman leather or a black plain toe dress-type leather shoe model with standard heels must be worn.  Employees may wear good quality, lightweight black dress rubbers during inclement weather.

3.10.14.  **Socks.** Socks must be black and made of good quality material.

3.10.15.  **Winter Gloves.** Winter gloves must be black and made of good-quality, light-weight leather.  Gloves made of heavy material that interferes with the proper use of weapons is not authorized.

3.10.16.  **White Summer Gloves.** Commanders may authorize employees to wear white summer gloves.

**3.11.  Insignia, Badges and Decorations.** The insignia prescribed in this chapter are authorized only for civilian guard and police uniforms.  Commanders must ensure that employees don't purchase or wear unauthorized items of insignia.

> 3.11.1.  **Supervisory Personnel.** Supervisory personnel (Chief, Assistant Chief, Captain, Lieutenant, and Sergeant) may wear the appropriate insignia on uniforms.  Commanders prescribe how to wear the insignia.

3.11.2.  **Chief and Assistant Chief.** The shoulder insignia will be worn centered on the left sleeve of the overcoat, windbreaker, car jacket and shirts, 1 inch below the shoulder seam.  The supervisory insignia is blue serge with silver embroidery, worn immediately below the shoulder insignia on the left sleeve of the car jacket, overcoat, windbreaker, and shirts.  (See **Figure 3.8.**)

3.11.3.  **All Other Guards and Police.** The shoulder insignia will be worn centered on the left sleeve of the overcoat, windbreaker, car jacket and shirts, 1 inch below the shoulder seam.  (See **Figure 3.8.**)

3.11.4.  **Cap Insignia and Badge.** The words "Department of Defense" must appear at the bottom of the badge and the word "Police" must appear at the top.  Supervisors wear gold badges and nonsupervisory guards will wear silver badges.  The cap insignia and badge are identical in size and vary only in their attachment devices.

3.11.4.1.  **Engraving.** The scroll space on the insignia or badge may have an engraved title or rank of supervisors or badge serial numbers for nonsupervisors (such as Chief, Capt., -1, -2, -3).  The horizontal band may have an engraved activity identification, (for example, Bolling Air Force Base Washington DC).  Engraving is a local commander responsibility to be provided by the installation or activity concerned.

3.11.4.2.  **Display.** The badge must be worn on the left breast of the shirt and the outer garment.  The cap insignia must be secured to the cap through the front eyelet.

3.11.5.  **Procurement.** Badges and insignia will be requisitioned through supply channels.

3.11.6.  **Name Tag.** Name tags must be worn on the summer and winter uniform and must be placed on line with the flap of the right breast pocket.

**3.12.  Comfort Items.** Police and guard personnel may wear items of clothing essential to their health and comfort, and if the uniform conceals these items.

**3.13.  Protective Clothing.** Commanders may issue foul weather items to employees who need such clothing to carry out their assigned duties efficiently.  (See T/A 016.)

**3.14.  Protective Equipment.** Commanders may issue protective equipment to employees performing regular duties that are inherently hazardous or are made hazardous by adverse temperature, footing, lighting, ventilation, and so on.

**3.15.  Exceptions.** Personnel may deviate from these standards and specifications only in unusual circumstances and only after getting HQ USAF/DPC approval.  Send requests for exceptions to any conditions or requirements established in this chapter to the MAJCOM.  The MAJCOM sends requests it approves to HQ USAF/SP, 1340 Air Force Pentagon, Washington DC 20330-1340 for final endorsement.

**Figure 3.1.  Car Jacket and Winter Coat.**



**Figure 3.2.  Overcoat.**



**AFI36-801   29 APRIL 1994** 17

**Figure 3.3.  Summer Windbreaker and Summer Trousers.**



**Figure 3.4.  Summer Shirt and Summer Trousers.**



**Figure 3.5.  Winter Shirt and Winter Trousers.**



**Figure 3.6.  Police Headgear.**



**Figure 3.7.  Guard Headgear.**



**Figure 3.8.  Insignia for Supervisors and How Worn (When appropriate, "Police" may be substituted for "Guard.").**





**Figure 3.8.  Continued.**



Lieutenant
Silver Gray
Cloth Braid

Captain
Silver Gray
Cloth Braid

Chief and
Assistant Chief
Silver Braid

**AFI36-801   29 APRIL 1994**

**Table 3.1.  Authorized Uniforms For Civilian Guards And Police.**

| A | B | C | | |
|---|---|---|---|---|
| ARTICLE | Tropical and Semitropical Zones (See note 1) | Temperature Zones (See Note 1) | | |
| | | Warm | Mild | Cool-Cold |
| Overcoat | | | | O |
| Car Jacket | O | O | X | X |
| Windbreaker | | X | X | O |
| Trousers (winter) | | O | X | X |
| Trousers (summer) | X | X | O | |
| Shirt (winter) | | O | X | X |
| Shirt (summer) | X | X | O | |
| Cap | O | O | X | X |
| Cover, Cap | O | O | X | X |
| Cover, Rain Cap (see note 2) | O | O | O | O |
| Raincoat (see note 3) | O | O | O | O |
| Belt, Gun | X | X | X | X |
| Necktie | O | O | X | X |
| Insignia, Supervisory | X | X | X | X |
| Insignia, Shoulder | X | X | X | X |
| Shoes, Black | X | X | X | X |
| Rubber Shoe (see note 3) | O | O | O | O |
| Socks,  Black | X | X | X | X |
| Gloves, Black | | | O | X |
| Gloves, White | X | O | | |
| Sheriff Hat | X | X | X | X |
| Sun Helmet (see note 2) | O | O | O | |
| US Flag Replica (see note 3) | O | O | O | O |

**NOTES:**

1. See T/A 016.

2. Commanders may authorize guards whose tour of duty involves exposure to wet weather to purchase and wear this item.

3. Commanders may authorize employees to purchase and wear this item.

## Chapter 4

## UNIFORMS FOR FIRE PROTECTION PERSONNEL

**4.1. Covered Employees.** This chapter's requirements apply to all civilians employed by the Air Force at base-level fire protection organizations in the GS-081, *Fire Protection and Prevention Series*. These requirements also apply to Fire Alarm Communications Center (FACC) operators, regardless of series.

**4.2. Purpose of the Uniform.** Fire protection personnel must wear uniforms for proper identification.

**4.3. Uniform Material Performance.** The uniform clothing that fire protection personnel wear under their firefighter protective bunker clothing ensembles must comply with National Fire Protection Association (NFPA) 1975 (Station/Work Uniforms for Firefighters).

**4.4. When To Wear the Uniform.** Uniforms must be worn at all times while on official duty.

**4.5. Parts of the Uniform:**

4.5.1. **Chief's Uniform.** The fire chief's uniform is optional. It consists of these articles:

4.5.1.1. Jacket with optional stripes on both sleeves.

4.5.1.2. Protection badge, patches, and insignias.

4.5.2. **Standard Uniform.** The standard uniform for fire protection personnel consists of these articles:

4.5.2.1. Jacket (optional).

4.5.2.2. Name tag, prescribed patch and badge.

4.5.2.3. Work coat (optional).

4.5.2.4. Trousers.

4.5.2.5. Shirt with epaulets.

4.5.2.6. Sweater (optional)

4.5.2.7. Cap.

4.5.2.8. Tie.

4.5.2.9. Coveralls.

4.5.2.10. Fitness clothing.

4.5.2.11. Raincoat (optional).

4.5.3. **Station and Work Mode Uniform.** The station and work mode uniform consists of these articles:

4.5.3.1. Open collar uniform shirt.

4.5.3.2. Aircrew style name patch.

4.5.3.3. Trousers.

4.5.3.4. Jacket (depending on climatic).

4.5.3.5. Outer garments with a fire protection badge.

4.5.3.6. Belt.

4.5.3.7. Shoes.

4.5.3.8. Cap (when outdoors).

4.5.4. **Work Coat.** The work coat must be navy blue or black.

4.5.5. **Trousers.** The trousers must be of conventional type and style, without cuffs, matching the work coat and jacket in color (navy blue or black). The fire chief approves type and weight based on local weather conditions.

4.5.6. **Shirt.** The shirt must be uniform-type with two flap pockets, badge tab, shoulder flaps, and banded collar with collar stays. The fire chief approves the sleeve length, type, and weight of material based on local weather conditions. The fire chief, assistant chiefs, station chiefs and fire prevention specialists wear white shirts. The crew chief, lead firefighter, firefighters, and FACC operators wear light blue shirts.

4.5.7. **Sweater.** The sweater must be a navy blue or black V-neck, pullover in a ribbed knit wool blend.

4.5.8. **Cap.** The cap must be a round, conventional type with black visor. It must have eyelet holes in the front for personnel to attach a cap badge.

4.5.8.1. Caps worn by firefighters, crew chiefs, station chiefs and fire prevention specialists must be the same color (navy blue or black) as the uniform. Caps worn by the fire chief and assistant chiefs may be blue, white, or black, as determined by the fire chief. The riser of the cap may be solid or ventilated, as directed by the fire chief.

4.5.8.2. Crew chiefs and firefighters wear silver-faced cap straps without insignia. The fire chief and other fire officers wear gold-braided cap straps with or without insignia.

4.5.8.3. The fire chief may wear optional gold and red-flame insignias on the cap.

4.5.9. **Tie.** The tie must be plain black.

4.5.10. **Coveralls.** The coveralls must be of flame-resistant material that's labeled to meet the requirement of the latest edition of NFPA 1975.

4.5.11. **Raincoat.** Fire protection personnel may wear a raincoat as an optional uniform item. The raincoat must be a navy blue or black, three-quarters length, single-breasted type, made from a waterproofed blend or similar material that keeps acceptable appearance when wet.

4.5.12. **Optional Fire Chief Uniform.** The fire chief and other selected members of the department may wear the optional fire chief uniform, as determined by the fire chief. The uniform consists of a blazer-style jacket with matching or contrasting slacks. Personnel authorized to wear the optional uniform must also maintain the standard uniform requirement.

4.5.13. **Name Tag.** The name tag must be 1X3X1/16 inch, with a silver or gold background (matching the collar insignias) and black indented lettering, block type in 3/8 inch centered block type.

**4.6.  Dress Mode.** The dress mode consists of a shirt, trousers, skirts, tie, cap and optional jacket, Air Force fire protection badge, patches, insignias, belt, name tag and shoes.

4.6.1.  Female operations section fire protection personnel may not wear skirts.  Skirts, when authorized, will normally be worn between the bottom of the knee and two inches above the top of the knee.

4.6.2.  Fire protection personnel must appear in dress mode when they are on official business that brings them in direct contact with base or public officials or with the general public; on or off base.

**4.7.  Wearing of the Uniform:**

4.7.1.  **Collar Insignia or Epaulets.** Personnel wear collar insignias or epaulets to reflect rank and position within the fire department.  The department procures these items with operations and maintenance funds through normal supply channels.

4.7.2.  The type and method of identification are:

4.7.2.1.  Fire chief: five crossed gold bugles.

4.7.2.2.  Senior assistant fire chief: four crossed gold bugles.

4.7.2.3.  Assistant chief: three crossed gold bugles.

4.7.2.4.  Station chiefs: two crossed gold bugles.

4.7.2.5.  Lead firefighter and crew chief : two parallel silver bugles.

4.7.2.6.  Driver operator: one silver bugle.

4.7.3.  **Baseball Caps.** Personnel may wear a baseball-type during daily work conditions as prescribed by the fire chief.

4.7.4.  **Coveralls.** The department issues coveralls for firefighters to wear during situations such as vehicle maintenance, live-fire training, or other situations that are likely to cause damage to the normal uniform.  The coveralls contain an aircrew style name plate (ASNP).

4.7.5.  **Badge.** Personnel wear the appropriate (duty position) fire protection badge on all uniforms, as specified for identification.

4.7.6.  **Work Coat and Jacket Accouterments.** Coats and jackets must have the Air Force fire protection patch, or locally developed patch, on one sleeve.  An American flag will be worn on the opposite sleeve.  All personnel in the same installation must wear similar patches.  Patches must be centered 1 inch below the shoulder seams.  The fire chief may authorize personnel to wear  other patches identifying areas of accomplishment (such as EMT).

4.7.6.1.  A Maltese Cross designating service may be worn as an option on the left sleeve of the jacket.

4.7.6.2.  Personnel must wear the appropriate Air Force fire protection badge centered 1 inch above the top of the left jacket pocket.

4.7.7.  **Aircrew Style Name Plate.** Personnel must wear the ASNP on all station work clothing centered above the left breast pocket, touching the top of the pocket.  ASNP will be worn on the work coat.

4.7.7.1.  Personnel must wear the authorized badge on the ASNP.  The most current badge, placed vertical, must be embossed on the right side of the name tag.

4.7.8.  **Name Tag.** Personnel wear the name tag on all dress uniforms and on line with the flap on the right breast pocket.

4.7.9.  **Accessories.** Uniform accessories, are not a part of the official uniform but must be consistent at each installation, as specified by the fire chief.

4.7.10.  **Cap Insignia:**

4.7.10.1.  The fire chief, senior assistant chief, and assistant chief's and station chief's wear gold cap insignia, along with the nonlettered fire trumpet design of the appropriate number to designate rank.  The fire chief determines the insignia color for the fire prevention specialist.  The cap insignia must not exceed 1-1/2 inches in diameter.

**4.8.  Physical Fitness Clothing.** Physical fitness clothing identified in TA 016 for performing the Air Force Physical Fitness Program will be furnished to each fire fighter and worn for physical fitness activities.

**4.9.  Exceptions.** Send requests for exceptions through  MAJCOM for consideration to HQ Air Force Civil Engineering Support Agency (AFCESA) Fire Protection Directorate (DF), 139 Barnes Drive, Tyndall AFB FL 32403-5319.

**AFI36-801   29 APRIL 1994**

**Figure 4.1.  Fire Chief Badge.**



**Figure 4.2.  Senior Assistant Fire Chief Badge.**



**AFI36-801   29 APRIL 1994**                                                                            31

**Figure 4.3.  Assistant Fire Chief Badge.**



**Figure 4.4.  Firefighter Badge.**



**AFI36-801   29 APRIL 1994**                                                                                    **33**

## Chapter 5

## UNIFORMS FOR CHAUFFEURS AND MOTOR VEHICLE OPERATORS

**5.1. Covered Employees.** This chapter's requirements apply to:

5.1.1. Chauffeurs of vehicles assigned to Secretary of the Air Force and additional key officials of the Air Force as designated from time to time by HQ USAF.

5.1.2. Chauffeurs and operators of passenger vehicles designated by MAJCOM commanders or their designees.

**5.2. Purpose of the Uniform.** Employees wear uniforms for identification and proper appearance.

**5.3. When To Wear the Uniform.** The uniform must be worn on duty.  Employees may also wear their uniforms when traveling between the place of residence and place of official duty.

**5.4. Seasonal Uniform.** The uniform specifications for chauffeurs consists of a winter and a summer uniform.

5.4.1. **Winter Uniform:**

5.4.1.1. **Coat.** The coat must be dark blue, 13- to 15-ounce wool or worsted material, such as elastique, whipcord, serge, or  similar material. It must be double-breasted, three- or four-button style, with peaked lapels, seam back, no vent, and be semifitting of conventional length.

5.4.1.2. **Trousers.** The trousers must be of a conventional type and plain design, with cuffs.  The color and fabric must match the coat.

5.4.1.3. **Cap.** The cap must be made of dark blue material, such as elastique, whipcord, serge or similar material, with a standing front and flaring eight-point brim.

5.4.1.4. **Tie.** The tie must be conventional black four-in-hand of woven material, such as wool, silk, or rayon.

5.4.1.5. **Overcoat.** The overcoat must be of dark blue worsted fabric, such as wool gabardine, serge, whipcord, or similar clear-finish fabric.  It must be water-repellent and double-breasted.  It must be loose-fitting, full-skirted, and drawn in at the waist by an all-round belt of same material as the coat and fasten in the front with a buckle of nonmagnetic material.  The  coat must extend one-third of the distance from the kneecap to the ground.  A removable liner of blue wool flannel is optional.

5.4.2. **Summer Uniform:**

5.4.2.1. **Coat.** The coat must be the same style and color as the winter coat.  The material must be a tropical fabric, such as tropical worsted, wool  gabardine, rayon gabardine, or similar material.

5.4.2.2. **Trousers.** The trousers must be of conventional type and plain design, with cuffs.  The color and fabric must match the coat.

5.4.2.3. **Cap.** The cap must be the same material and style as the winter cap, except for having  a ventilated band.

5.4.2.4. **Tie.** The tie must be the same as the one worn with the winter uniform.

5.4.3. **Cap and Tie.** Uniform items for chauffeurs and operators of passenger vehicles are normally limited to a cap and a tie. Installation commanders may require these drivers to wear coats only when essential for the purposes of identification and appearance. Commanders may prescribe a jacket of the same color and material as the coat may be prescribed in lieu of the coat.

5.4.4. **Women's Wear** . Women employed as chauffeurs or operators of passenger-carrying vehicles substitute suitable articles of women's wear for the uniforms described in paragraph **5.4.** These articles must be similar in color and material to those for male employees.

**5.5. Uniform Standards:**

5.5.1. A white shirt and black shoes must be worn with both winter and summer uniforms.

5.5.2. A cap must be worn at all times when outside of a building and will be worn squarely on the head with the bottom edge horizontal.

5.5.3. The coat will be fully buttoned.

5.5.4. Trousers must be no higher than the top of the arch of the foot so that the socks won't show between the trouser bottom and the shoe top.

5.5.5. Overalls must be fully buttoned and belted.

5.5.6. Ties must be neatly tied with the conventional four-in-hand knot.

**5.6. Exceptions.** Send requests for exceptions through the MAJCOM to HQ USAF (LGTV) 5130 Air Force Pentagon, Washington DC 20330-5130.

## Chapter 6

## UNIFORMS FOR US CITIZENS IN OVERSEAS AREAS

**6.1. Covered Employees.** This chapter's requirements apply to all employees of US citizenship of the Air Force in oversea areas (including those employees being deployed to an overseas area) who are paid from appropriated funds. The requirements don't apply to civilian personnel covered by other chapters of this instruction.

**6.2. Purpose of the Uniform.** The purpose of the uniform is to protect Air Force employees by identifying them as members of the civilian component of the US Forces.

**6.3. When To Wear the Uniform:**

6.3.1. Employees wear uniforms in specially designated areas when prescribed by theater or air component commanders as a precautionary response to actual or potential hostilities or as a necessary part of a deployment.

6.3.2. Employees assigned to oversea areas normally don't have to wear a uniform before reporting to the oversea duty location.

6.3.3. Commanders of MAJCOMs or their designees may authorize uniforms for US citizen employees whose assigned duties require participation in exercises in supporting oversea deployments.

6.3.4. Unless otherwise approved, US citizen employees may not wear uniforms outside of oversea areas.

6.3.5. Theater or air component commander may authorize uniforms for employees of US citizenship in a specific overseas area to ensure that the personnel of all military departments in the area receive equitable treatment.

6.3.6. Employees must wear the uniform according to administrative instructions. Local instructions that direct Air Force military personnel on wearing apply equally to civilian employees, as appropriate.

**6.4. Allowances For Uniforms.** Commanders of MAJCOMs or their designees and theater or air component commanders may authorize the appropriate installation officials to furnish uniforms or pay a uniform allowance to civilian employees.

**6.5. Purchasing the Uniform.** Commanders who prescribe uniforms ensure that civilian employees can purchase the required uniform items. Employees may purchase the items through the Army and Air Force Exchange Service. Either new items or combat-serviceable items of uniform clothing are acceptable.

**6.6. Prescribed Uniforms.** The uniform's material is based on climate and other local conditions and must be consistent with the service uniform requirements established for military personnel in the same area. Commanders of MAJCOMs or their designees or theater or air component commanders determine the specific items of apparel listed in AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel* (formerly AFR 35-10) or its implementing instructions. Both male and female civilian employees must wear uniforms.

**6.7. Identification Insignia.** Civilian employees authorized to wear uniforms under this chapter must wear a subdued insignia consisting of a black equilateral triangle with the letters "US" in olive drab color printed on an olive green cloth background.  Wear the insignia centered 1 inch above the left breast pocket.

> 6.7.1.  MAJCOM commanders or their designees and theater or air component commanders may authorize employees to wear optional insignia on the battle dress uniform (BDU) cap.  The insignia must be placed directly in the front center of the cap.

> 6.7.2.  The patch will be obtained from the Army and Air Force Exchange Service to ensure that it conforms with all other DoD identification insignia issued to civilian employees overseas.

> 6.7.3.  **Nametape or Aircrew Style Name Patch.** Employees must wear a standard-size nametape or ASNP centered above the right breast pocket.  Where possible, the nametape or ASNP should be consistent with the requirements established for military personnel in the same area.

**6.8.  Issue Items.** Employees may use organizational and field clothing and equipment as a loan.

**6.9.  Exceptions.** Send requests for exceptions through the MAJCOM to HQ USAF/DPC, 1040 Air Force Pentagon, Washington DC 20330-1040.

## Chapter 7

## UNIFORMS FOR PHYSICAL EDUCATION INSTRUCTORS

**7.1. Covered Employees.** This chapter's requirements apply to all General Schedule employees employed by the US Air Force Academy Athletic Department who teach physical education classes.

**7.2. Purpose of the Uniform.** Employees wear the uniforms to identify themselves as civilian instructors at the USAF Academy.

**7.3. When To Wear the Uniform.** Instructors wear the uniform when performing departmental duties within the confines of the athletic department.

**7.4. Parts of the Uniform.** The standard uniform consists of these articles:

7.4.1. **Shirt.** White short-sleeve with the instructor's name printed in blue on the right side of the shirt and USAFA Athletics with logo printed on the left side of the shirt above the breast pocket.

7.4.2. **Shorts.** Shorts are blue.

7.4.3. **Sweat Pants and Jacket.** Sweat pants and the jacket are blue and inscribed with the Department of Athletics emblem.

7.4.4. **Utility Jacket.** The utility jacket is blue and inscribed with the Department of Athletics logo.

7.4.5. **Swim Suit.** The swimming suit is blue.

7.4.6. **Shoes.** The shoes are predominantly white.

7.4.7. **Initial Issue.** USAFA issues each instructor these uniform items in these quantities:

| *Item* | *Quantity* |
| --- | --- |
| White Instructor Shirt | 3 each |
| Utility Jacket | 1 each |
| Pants (warm up) | 1 each |
| Jacket (warm up) | 1 each |
| Socks | 3 pair |
| Shoes (gymnasium) | 1 pair |
| Shorts (trunks / general purpose) | 2 each |
| Swimming Suit | 2 each |
| Athletic Supporter (Males) | 2 each |
| Bath Towels | 2 each |
| White Tee Shirts | 2 each |
| Sweat Pants | 1 each |
| Sweat Shirt | 1 each |

**7.5.  Wearing of the Uniform:**

7.5.1.  **Shorts.** Shorts will be worn with the athletic shirt, white socks, and shoes.

7.5.2.  **Sweat Pants and Jacket.** Sweat pants and jacket must be worn when outside during cool weather.  Sweat pants may be inside at the discretion of the instructor.  The jacket may be worn indoors or outdoors with the pants or shorts.

7.5.3.  **Utility Jacket.** The jacket will be worn during inclement weather for intramurals or outside instruction classes.

7.5.4.  **Swim Suit.** The swim suit will be worn only in the pool area during swimming, scuba, or intramurals.

**7.6.  Exceptions.** Send requests for exceptions through HQ USAFA/AHP to HQ USAF/DPC, 1040 Air Force Pentagon, Washington DC 20330-1040.

## Chapter 8

## UNIFORMS FOR USAF WATER SURVIVAL SCHOOL

**8.1. Covered Employees.** This chapter's requirements apply to all civilian employees of the Air Force employed to operate and maintain the water craft fleet and assigned to the 3613th Combat Crew Training Squadron (CCTS), USAF Water Survival School.

**8.2. Purpose of the Uniform.** Employees wear the uniform to identify themselves as staff members at the USAF Water Survival School.

**8.3. When To Wear the Uniform.** Employees wear the uniform when on duty.  Employees may also wear their uniforms traveling between their place's of residence and place of official duty.

**8.4. Parts of the Uniform:**

   **8.4.1. Standard Uniform.** The standard uniform consists of:

      8.4.1.1. **Trousers.** The trousers must be navy blue, cotton or polyester, conventional type.

      8.4.1.2. **Shirt.** The shirt must be light blue, cotton, conventional type, matching the trousers, either long or short sleeve.  An embroidered name tag must be worn above the left pocket.

   **8.4.2. Standard Uniform (Hot Weather).** The standard uniform for hot weather consists of:

      8.4.2.1. **Shorts.** The shorts must be navy blue with pockets.

      8.4.2.2. **Short Sleeved Pullover.** The short sleeve pullover must be navy blue, collared, with a pocket.

      8.4.2.3. **Hat.** The hat must be navy blue, baseball style.

      8.4.2.4. **Belt.** The belt must be navy blue or black.

      8.4.2.5. **Insignia.** Employees may wear squadron insignias, name tags, patches along or other insignias when approved by the Commander.

   **8.4.3. Accessories.** Accessories are not a part of the official uniform, but prescribed by local commanders for uniform appearance.  These accessories consist of:

      8.4.3.1. **Deck Shoes.** The deck shoes must be either dark brown leather or dark blue upper canvas with non-skid soles.

      8.4.3.2. **Belt.** The belt must be navy blue or black.

**8.5. Protective Clothing.** Commanders may issue employees foul weather items when such clothing is operationally necessary.

**8.6. Exceptions.** Send requests for exceptions through  HQ AETC/DPC, 1851 1st Street East Ste 1, Randolph AFB TX 78150-5001 to HQ USAF/DPC, 1040 Air Force Pentagon, Washington DC 20330-1040.

## Chapter 9

## UNIFORMS FOR AIRCRAFT MAINTENANCE EMPLOYEES

**9.1. Covered Employees.** This chapter's requirements apply to all Laughlin AFB civil service aircraft maintenance employees of the 47th FTW Maintenance Complex.

**9.2. Purpose of Uniform.** Aircraft maintenance personnel wear uniforms for identification.

**9.3. When To Wear the Uniform.** Employees wear the uniform when on duty. Employees may also wear their uniforms when traveling between their places of residence and the place of official duty.

**9.4. Parts of the Uniform.** The basic uniform for all prevailing rate employees (WG, WL, WS) and General Schedule employees consist of :

9.4.1. **Trousers.** The trousers must be full-length, solid dark blue twill and made of cotton or a cotton and polyester blend that doesn't produce sparks.

9.4.2. **Skirt (optional for female employees).** The skirt or divided skirt must be solid dark blue made of cotton or a cotton and polyester blend. It must be no shorter than 2 inches above the knee.

9.4.3. **Shirts.** All shirts that prevailing rate employees wear must be long or half sleeve and made of cotton or a cotton and polyester blend material that doesn't produce sparks. Employees wear shirts in these colors:

9.4.3.1. Nonsupervisory: Solid medium blue.

9.4.3.2. Work Leader: Solid gray.

9.4.3.3. Supervisor: White

9.4.4. **Shirt or Blouse (Female Employees).** Female employees who primarily work outdoors or perform mechanical work wear the appropriate shirt listed in paragraphs **9.4.3.** Supervisory female employees wear the white shirt prescribed in paragraph **9.4.3.**

9.4.4.1. Employees who primarily work indoors wear shirts in these colors and styles:

9.4.4.1.1. **Non-supervisor:** Solid light blue long- or half- sleeve shirt or blouse made of cotton and polyester or cotton oxford cloth material.

9.4.4.1.2. **Supervisor:** White long- or short-sleeve shirt or blouse made of cotton and polyester or cotton oxford cloth.

9.4.5. **Work Jacket and Windbreaker.** Work jacket or windbreaker must be dark blue to match the trousers or skirt.

9.4.6. **Overcoat.** The overcoat must be dark blue, gray, or black. The coat may be lined or unlined.

9.4.7. **Tee Shirt.** Tee shirt must be a crew neck with quarter-length sleeves or longer, and made of cotton or a cotton and polyester blend. It must be the same color as the uniform shirt.

9.4.8. **Name Patch.** The name patch contains the individual's first and last name and the 47th FTW logo "XL."

9.4.9.  **Belt.** The color of the belt should complement the uniform. The buckle must be no longer than 1-1/2 inches by 2 inches unless the buckle is covered in leather to shield its metal parts. (See **Figure 9.3.**)

9.4.10.  **Footwear (non-protective).** When the Air Force doesn't provide safety-toe shoes, employees must wear footwear that complements the color of the basic uniform. Nonprotective footwear doesn't include shower clogs or beach thongs.

    9.4.10.1.  **Footwear (protective).** Protective footwear must be black and meet AFOSH and OSHA requirements (ANSI Z41 Class 75 for men and ANSI Z41 Class 30 or higher for women).

9.4.11.  **Alternative Managerial Items.** The Director of Maintenance may prescribe that senior managers, flight managers, and program managers wear these variations in lieu of the standardized uniform:

    9.4.11.1.  Blue or gray trousers or skirts.

    9.4.11.2.  White shirts or blouses with or without tie

    9.4.11.3.  Blue blazer or a blue or gray jacket.

9.4.12.  **Accessories.** All optional accessories must be made of material that doesn't produce sparks. Employees must observe all relevant instructions and regulations when wearing these items of the basic uniform.

9.4.13.  **Baseball Cap.** The baseball cap must be dark navy blue.

9.4.14.  **Sweater.** The sweater must be a cardigan that complements the uniform.

9.4.15.  **Jump Suit.** The jump suit must be dark blue, made of cotton or a cotton and polyester blend, long- or half-sleeve depending on the occupational safety needs of the work center.

9.4.16.  **Tee Shirt.** Employees must wear a tee shirt if the outer shirt is removed.

9.4.17.  **Exceptions to Wearing the Uniform.** Pregnant employees don't have to wear the standardized uniform. Employees with a medical exemption to specific uniform items don't have to wear those items until resolving their medical condition.

    9.4.17.1.  Temporary employees don't have to wear a uniform.

9.4.18.  **Organization Patch.** Each employee receives six organizational patches, at no cost to the employees, when they are initially hired. Patches are attached to the uniform as shown in **Figure 9.1.** and **Figure 9.2.**

    9.4.18.1.  The patch is mandatory on shirts, work jackets, windbreakers and blazers. *NOTE:* Flight managers will wear this patch on blazers only. If the shirt doesn't have pockets, center the patch between the front buttons and the sleeve seam (sideways) and between the base of the collar and chest line (up and down) for males and at the start of the bust line (up and down) for women.

    9.4.18.2.  On work jackets, windbreakers, and blazers wear the patch on the left side. Patches must be centered on the chest pocket. If these items don't have chest pockets, male employees place the patch between the center front and sleeve seam (sideways) and the chest line and waist line (up and down) and female employees place the patch above the bust line, between the center front and the sleeve seam with care so that the patch is not covered by the lapel.

9.4.18.3. The patch is worn on the right side of the uniform shirt (See **Figure 9.3.**). The base of the patch must rest and center on the top of the pocket. If the shirt doesn't have pockets, the patch must be centered between the front buttons and the sleeve seam (sideways).

9.4.19. **Name Patch.** The name patch must be worn on work jackets and windbreakers.

*EXCEPTION:* Flight managers may not wear name patches on any item.

9.4.19.1. Name patches will attached to the right side of the uniform as shown in **Figure 9.2.** The base of the patch must rest and center on the top of the pocket. If the shirt doesn't have pockets, center the patch between the front buttons and the sleeve seam (sideways). The base of the name patch must align with the base of the organization patch.

9.4.20. **Protective Footwear.** Protective footwear must be worn when provided by the Director of Maintenance to meet applicable safety standards.

9.4.21. **Sweater.** A sweater may be worn as an indoor garment to complement the uniform.

9.4.22. **Jump Suit.** The jump suit may be worn only in the work areas of hangars or shops.

9.4.23. **Overcoat (optional).** The overcoat will be worn at all times as an outdoor garment.

9.4.24. **Blazer.** The blazer will be worn as an indoor or outdoor garment.

**9.5. Government Furnished Items.** The Director of Maintenance may, issue employees foul weather items when such clothing is operationally necessary.

9.5.1. The Director of Maintenance issues protective clothing (for example, safety-toe shoes, ear muffs, ear plugs, gloves, so) at no cost to employees. These items must meet all AFOSH and OSHA standards. When an employee furnishes protective equipment, it must conform to the safety specifications and colors of the government-issued items.

**9.6. Exceptions.** Send requests for exceptions through  MAJCOM to HQ USAF/LGSS, 1030 Air Force Pentagon, Washington DC 20330-1030.

Figure 9.1.  Wear of Organization and Name Patches (Men).



**Figure 9.2.  Wear of Organization and Name Patches (Female).**



**AFI36-801   29 APRIL 1994**                                                                      **45**

**Figure 9.3.  Standard Buckle (Actual Size).  Configuation of Belts.**



Covered Buckle.

**Figure 9.4.  Configuration of Name Patch.**



**Figure 9.5.  Configuration of Ball Cap.**



**Figure 9.6.  Organization Patch.**



## Chapter 10

## UNIFORMS FOR MOTION PICTURE PROJECTIONIST

**10.1. Covered Employees.** This chapter's requirements apply to all civilian employees of Air University employed to operate audio-visual equipment. These employees are normally classified in the WG-3910 occupational series.

**10.2. Purpose of the Uniform.** This uniform identifies civilian employees assigned to operate audiovisual equipment.

**10.3. When To Wear the Uniform.** Employees wear the uniform when on duty and when traveling between their places of residence and the place of official duty.

**10.4. Parts of the Uniform.** The prescribed uniform consists of:

10.4.1. **Shirt or Blouse.** A solid light blue shirt or blouse made of cotton or a cotton and polyester blend.

10.4.2. **Trousers or Skirt.** Dress trousers or skirts must be of conventional design made of dark blue or black twill, and cotton or a cotton and polyester blend.

10.4.3. **Shoes.** Shoes must be black. Athletic footwear is not permitted.

10.4.4. **Accessories:**

10.4.4.1. **Belt.** The belt, if worn, must be black.

10.4.4.2. **Socks.** Socks must be dark blue or black. Hosiery must be coordinated with the rest of the uniform.

10.4.4.3. **Necktie or Scarf.** Neckties or scarfs must be dark blue, with no pattern. The supervisor may establish guidelines that require employees to wear a necktie or scarf.

10.4.4.4. **Name Tag.** An approved name tag must be worn on the left side of the shirt or blouse.

**10.5. Exceptions.** Send requests for exceptions through HQ AETC/DPC to HQ USAF/DPC, 1040 Air Force Pentagon, Washington DC 20330-1040.

**10.6. Prescribed Forms:** No prescribed forms.

**10.7. Adopted Forms:** SF 50, *Notification of Personnel Action,* SF 66, *Official Personnel Folder,* and SF 1034, *Public Voucher for Purchases and Services Other Than Personne*l.

ROGER A. BRADY,  Lt General, USAF
DCS, Manpower and Personnel

**Attachment 1**

**GLOSSARY OF ABBREVIATIONS AND ABBREVIATIONS**

*Abbreviations and Acronyms*

**HQ AETC/DPC**—Headquarters Air Education and Training Command, Directorate of Civilian Personnel

**HQ USAF/DPC**—Headquarters United States Air Force Director, Civilian Personnel Policy and Personnel Plans

**HQ USAF/DPCE**—Headquarters United States Air Force, Civilian Entitlements and Benefits Division, Directorate of Civilian Personnel

**HQ USAF/LGSS**—Headquarters United States Air Force, Supply and Fuels Policy Division

**HQ USAF/LGTV**—Headquarters United States Air Force, Vehicles Equipment and Facilities Division

**HQ USAF/SP**—Headquarters United States Air Force, Security Police

**HQ USAFA/AHP**—Headquarters United States Air Force Academy, Athletic Programs

**SF**—Standard Forms

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 5

**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**



*AIR FORCE INSTRUCTION 36-2903*

*2 AUGUST 2006*

Incorporating Change 1, 6 August 2007

*Personnel*

*DRESS AND PERSONAL APPEARANCE*
*OF AIR FORCE PERSONNEL*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**ACCESSIBILITY:**  Publications and forms are available on the e-Publishing website at **www.e-publishing.af.mil** for downloading or ordering.

**RELEASABILITY:**  There are no releasability restrictions on this publication.

OPR:  HQ AFPC/DPSOOC

Supersedes  AFI 36-2903, 29 September 2002 and
           AFI36-2923, 25 May 2004

Certified by:  HQ AFPC/DPS
(Col William D. Foote)
Pages:  161

This instruction implements Department of Defense Instruction (DoDI) 1334.1, *Wearing of the Uniform*, 26 October 2005, Department of Defense Directive (DoDD) 1300.17, *Accommodation of Religious Practices Within the Military Services*, 3 February 1988; and Air Force Policy Directive 36-29, *Military Standards*.  It applies to all active duty Air Force members, members of the United States Air Force Reserve (USAFR), and members of the Air National Guard (ANG).  It directs the wear of uniforms, insignias, awards and decorations.  Describes minimum standards of personal appearance of Air Force members. Failure to observe the prohibitions and mandatory provisions of this instruction to include **Table 2.5.** regarding tattoos/brands/body piercing by active duty Air Force members; USAFR members on active duty or inactive for training; ANG members in Federal service, is a violation of Article 92, *Uniform Code of Military Justice (UCMJ)*.  Violations of these provisions can be prosecuted under Article 92 of the UCMJ, as well as any other applicable articles of the UCMJ, when appropriate.  The Commander, Military Personnel Flight (MPF) assigns an office within the Customer Support Section to be the Office of Primary Responsibility (OPR) for this instruction.  Refer to **Attachment 1** for a Glossary.  Authorized supplements to this instruction and requests for uniform changes will be processed in accordance with **Chapter 7**, *Uniform Changes and Supplements.*

## SUMMARY OF CHANGES

Updates **Table 1.3.**, Wearing the Uniform and **Table 6.1.**, Conditions for Wear of Uniform. A margin bar ( | ) indicates newly revised material.

**Chapter 1— COMMANDERS' AUTHORITY AND INDIVIDUALS' RESPONSIBILITIES        6**

1.1.   Commanders' Authority.  ..................................................................................    6

1.2.   Members Identified as not presenting a Professional Military Appearance.  .............    6

## Chapter 1

## COMMANDERS' AUTHORITY AND INDIVIDUALS' RESPONSIBILITIES

**1.1. Commanders' Authority.** See **Table 1.1.** for commanders' responsibilities and **Table 1.2.** through **Table 1.4.** for how members acquire and wear uniform items and personal grooming standards.

**1.2. Members Identified as not presenting a Professional Military Appearance.**

1.2.1. The unit commander:

1.2.1.1. May require individuals who do not present a professional military appearance (regardless of overall fitness composite score) to enter the Fitness Improvement Program IAW AFI 10-248.

1.2.1.2. Schedules individuals for Fitness Education/Intervention.

**1.3. Individuals' Responsibilities.**

1.3.1. To present a professional military image individual will:

1.3.1.1. Procure and maintain all mandatory clothing items.

1.3.1.2. Review and follow local supplements and procedures.

1.3.1.3. Uniforms will be neat, clean, pressed, buttoned, and properly maintained.

1.3.2. Members will not:

1.3.2.1. Stand or walk with hands in pockets of any uniform combination, other than to insert or remove items.

1.3.2.2. Walk in uniform while using cell phones, radios, hands-free headsets unless required in the performance of official duties using a government issued device.

1.3.2.3. Smoke/use smokeless tobaccos, drink, or eat while walking in uniform.

| Table 1.3.  Wearing the Uniform (see notes). |

| Members: | | | |
|------|---------|----------|------|
| **Wear** | **Do not wear** | **Optional** | **When:** |
| X | | | The member is an Air Reserve Technician (ART) performing duties while in an ART position. |
| | | X | departing from a military airfield on DoD aircraft or US Government Commercial Contract Flights (service uniform combination) (See notes 3 and 4). |
| | | X | departing from or arriving at commercial airports, or traveling on commercial contract flights (tie or tie tab optional) (See note 3 & 5). |
| | | X | traveling in a foreign country. Consult the DoD Foreign Clearance Guide. |
| | X | | uniform items do not meet Air Force specifications. |
| | X | | participating in public speeches, interviews, picket lines, marches or rallies, or in any public demonstration when the Air Force sanction of the cause for which the activity is conducted may be implied. |
| | X | | furthering political activities, private employment, or commercial interests. |
| | X | | working in an off-duty civilian capacity. |
| | X | | participating in civilian court proceedings when the conviction would bring discredit--at the discretion of installation commander. |
| | | X | attending off-duty education conducted off a military installation. |
| | X | | in civilian attire. For example:  grade insignia, cap devices, badges and other U.S. or Air Force insignia, distinctive buttons, etc. |

*NOTES:*

1. On other Services' installations, comply with order of dress for that Service, within Air Force standards.

2. TDY personnel will comply with local policies established at each TDY location, within Air Force standards.

3. Those choosing to wear civilian clothing will ensure it is neat, clean, and warm enough for in-flight operations and appropriate for the mode of travel and destination. Examples of inappropriate clothing include: ripped, torn, frayed, or patched clothing; tank tops, shorts,

short skirts, undergarments worn as outergarment, bathing suits, sandals, and any garments which are revealing or contain obscene, profane, or lewd words or drawings.

4. The Battle Dress Uniform is an acceptable uniform when traveling between military installations.

5. Air Force personnel may not wear their military uniforms when using frequent flyer miles to upgrade to business or first class. Thus, even when an upgrade to business or first class accommodations is legitimate, military personnel should avoid wearing the uniform to avoid the public perception of the misuse of government travel resources, which generates unnecessary complaints.

6. Officers and Enlisted: Do not wear or mix unique uniform items with civilian clothes. These items are those unique to the uniform. They include grade insignia, cap devices, badges and other U. S. or Air Force insignia, such as items with the "Wing and Star" design, and so forth. Exception: Tie tacs and lapel pins when wearing business attire authorized.

7. General Officer's are encouraged to wear a combination of blue uniform when traveling on commercial aircraft.

8. Air Force personnel may wear civilian attire on commercial aircraft or a combination of blue uniform if they prefer.

9. Utility uniforms (BDU and flight suits) are not authorized for travel on commercial aircraft.

10. Uniform of the Day (BDU and flight suits) is authorized for traveling MILAIR.

**AFI36-2903  2 AUGUST 2006**                                                    151

## Chapter 6

### WEAR OF UNIFORMS BY RESERVE, AIR NATIONAL GUARD, RETIRED OR SEPARATED PERSONNEL

**6.1.  Conditions for Wear of Uniform.** Table 6.1. shows when and where to wear the uniform.

**Table 6.1.  When Reserve, ANG, Retired, Or Separated Personnel Are Required Or Authorized To Wear The Uniform (See note 1).**

| R U L E | A | B | C |
|---|---|---|---|
| | If the member is | may wear the uniform | and is authorized to wear the appropriate uniforms |
| 1 | in any of the categories | when traveling to and from any function listed in this table, when travel in uniform is within 24 hours of the scheduled function. | according to the rules below. |
| 2 | | at any time, when he or she has been awarded the Medal of Honor and **Chapter 1** does not prohibit wear of the uniform. | |
| 3 | a reservist (on active duty) | when participating in short periods of active duty (including active duty for training) | listed in this instruction. |
| 4 | a reservist not on EAD and residing in the US, its territories, or possessions | when participating in authorized inactive duty training, unit training assemblies, or equivalent training | |
| 5 | | when engaged in military flying activities, including traveling as a passenger on military aircraft | |
| 6 | | on occasions of military ceremony | |
| 7 | | social functions and informal gatherings of a military nature | |
| 8 | | when engaged in military instruction | |

| R U L E | A<br><br>If the member is | B<br><br>may wear the uniform | C<br><br>and is authorized to wear the appropriate uniforms |
|---|---|---|---|
| 9 | | when responsible for military discipline at an educational institution | listed in this instruction. |
| 10 | a reservist not on EAD and not residing in the US, its territories, or possessions | when authority is granted by the Secretary of the Air Force | |
| 11 | | at military ceremonies or other functions of a military nature, provided authority is granted; such authority may be obtained by reporting to the nearest military attaché | |
| 12 | an airman with Air Force Reserve commission | of his or her Reserve grade when attending meetings or functions of associations formed for military purposes (membership will be mostly officers or former officers) | |
| 13 | an ANG technician | according to ANG regulations while performing air technician duties, however, they do not receive a uniform allowance for voluntarily wearing the uniform (see notes 2 - 5) | |
| 14 | an Air Reserve technician | must when performing duty in civil service status as an Air Reserve Technician | |
| 15 | an Air Reserve technician | DELETED | |
| 16 | retired | at occasions of military ceremonies | prescribed at date of retirement, or any of the uniforms authorized for active duty personnel, including the dress uniforms.  Do not mix uniform items (see notes 6 and 7). |

**AFI36-2903  2 AUGUST 2006**                                                                153

| R U L E | A | B | C |
|---|---|---|---|
| | If the member is | may wear the uniform | and is authorized to wear the appropriate uniforms |
| 17 | | military funerals, weddings, memorial services, and inaugurals | |
| 18 | | patriotic parades on national holidays, other military parades or ceremonies in which any active or Reserve US military unit is taking part | |
| 19 | | at educational institutions when engaged in giving military instructions or responsible for military discipline | |
| 20 | | at social or other functions when the invitation has been influenced by the member's active military service | |
| 21 | separated (other than retired ANG or Reserve) (war service) | at military funerals, memorial services, and inaugurals | authorized at time of separation or any of the uniforms authorized for active duty personnel if they served honorably in the Air Force (including service with an air component of the Army before the Air Force was established), during a declared or undeclared war (see notes 8 and 9). |
| 22 | | patriotic parades on national holidays; military parades or ceremonies in which any active or Reserve US military unit is taking part | |
| 23 | | on any other occasion when authorized by law | |

| R U L E | A | B | C |
|---|---|---|---|
| | **If the member is** | **may wear the uniform** | **and is authorized to wear the appropriate uniforms** |
| 24 | separated (other than retired, ANG, or Reserve) (non war service) | from place of discharge to home, within 3 months after discharge | of the highest grade authorized at time of separation (see note 9). |

**NOTES:**

1. Members will conform to the same standards of appearance, military customs, practices, and conduct in uniform prescribed for active duty members. **Authorized To Wear the Uniform (see note 1).**

2. Title 10, U.S.C., Section 772 entitles members of the ANG to wear the uniform as prescribed for active duty members.

3. State-appointed ANG officers without federal recognition do not wear the uniform or any distinctive uniform item. Newly appointed ANG officers granted temporary federal recognition by a federal recognition board wear the uniform.

4. Enlisted ANG members wear the uniform on enlistment.

5. Upon written request of the governor and the consent of the Air Force Chief of Staff, the Chief of the National Guard Bureau authorizes a state adjutant general, who holds a federally commissioned status in the Air Force, to wear the grade insignia of his or her state-appointed grade while occupying the federally recognized position on the state headquarters unit manning documents, provided that grade does not exceed Major General.

6. Members receive the retired lapel button at retirement. Retirees wear the retired lapel button on the left lapel. Members whose assignments have included command at squadron, group or wing level are also authorized to wear the command insignia pin on the left lapel, below the retired lapel button.

7. Members whose last assignment prior to retirement was a First Sergeant and/or Command Chief may wear appropriate chevrons in all instances the uniform is worn.

8. Retirees may wear civilian clothing when flying in military aircraft. They will present a favorable appearance in good taste. Members of the reserve components who are eligible to retire but are not at mandatory retirement age (60 years) do not wear the uniform while traveling on military aircraft.

9. Honorably discharged members who served during World War II wear the Honorable Discharge Emblem on the left lapel.

10. Installation commanders authorize such separatees to use military clothing sales stores (MCSS) to purchase uniforms and accessories required for special occasions such as military funerals, parades, or other ceremonies. Separatees purchase only the service dress or mess dress uniforms and accessories. Separatees may not purchase items commonly available from commercial sources. MCSSs establish adequate controls over quantities of uniform items each separatee pur-

chases. Commanders ensure separatees present proof of honorable discharge under honorable conditions and know current uniform and grooming standards. other ceremonies. Separatees purchase only the service dress or mess dress uniforms and accessories. Separatees may not purchase items commonly available from commercial sources. MCSSs establish adequate controls over quantities of uniform items each separatee purchases. Commanders ensure separatees present proof of honorable discharge under honorable conditions and know current uniform and grooming standards.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF           )
GOVERNMENT EMPLOYEES, *ET AL.*,  )
                                 )
          *Plaintiffs,*          )
                                 )
     v.                          )     Civil Action No. 1:08cv692 (EGS)
                                 )
SECRETARY OF THE AIR FORCE,      )
                                 )
          *Defendant.*           )     Judge Sullivan

# PLAINTIFFS' EXHIBIT 6



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE RESERVE COMMAND

MEMORANDUM FOR  Mr. John Gage                    APR 1 8 2007
                National President
                American Federation of Government Employees
                80 F Street, NW
                Washington, DC  20001

FROM:  HQ AFRC/A1
       155 Richard Ray Blvd
       Robins AFB GA  31099-1079

SUBJECT:  Change to Air Force Instructions 36-703, 36-801 and 36-2903

1. In accordance with Title 5, U.S.C., Subpart F, Chapter 71, Section 7113, this memorandum serves as notification of the Air Force's intent to establish a requirement for all Air Reserve Technicians (ART) to wear the military uniform while in civilian status.

2. Air Reserve Technicians encumber unique civil service positions which require them to maintain active military reserve status as a condition of their civilian employment. An ART performs the same duties whether in civilian or military status, and typically reports to the same supervisor regardless of status. That chain of command is essential to the proper order and discipline associated with our mission and deployments. The ART operates in an inherently military environment. The ART is not merely a civilian working for the military. He is a part of the military. The ART is embedded in the structure of our Reserve units. The ART is not a "weekend warrior." He is the day-to-day continuity of the military organization to support the traditional reservists who too often report for military duty more than one weekend a month.

3. In the 60s, 70s and 80s, the mission of the Air Force Reserve Command (AFRC) was much different. Air Reserve Technicians now frequently convert from civilian status to military status and back during the week and have occupied a significant percentage of the deployed force. There is little likelihood that this increased involvement will shrink in the foreseeable future. AFRC has participated in major crises such as Just Cause (Panama), Urgent Fury (Granada), Desert Storm, Bosnia, Kosovo, Noble Eagle, Iraqi Freedom, Southern Watch, Afghanistan as well as hurricane relief in the US and tsunami relief in the Indian Ocean area.

4. The need for continuity and good order and discipline in both employment capacities (military and civilian) have become an essential part of their constant changing of statuses. By requiring the wear of the uniform, this obligation remains clear and visible. The need to ensure good order and military discipline in the maintenance function is even more apparent as we expand into a wider spectrum of total force initiatives requiring even greater integration of reserve forces with our active duty counterparts.

5. Many of AFRC's command policies are grounded in the military mission and are necessary to maintain military order, successful mission accomplishment, or preclude misuse of military/civilian (ART) time and attendance principles. Examples include a requirement for ARTs, who are in civilian status, but are working side-by-side with traditional reservists on a TDY to be billeted based on their military grade (keeps all in a group on a par with each other during the mission); or a requirement that certain TDYs be performed only in military status (to preserve Status of Forces Agreements or Geneva Convention rights). This is a continuing issue because of the high operations tempo and real-world events that require an elevated level of flying into theaters of operations that require the ART to be in active duty status. Air Reserve Technician aircrews performing real-world missions regularly transport personnel and cargo from the United States to staging areas in Europe and then fly the continuing mission into an Area of Responsibility (AOR). These missions may result in them converting between civilian and active duty status several times during the long distance missions.

6. The precedent for directing military technicians to wear the military uniform while in civilian duty status already exists. Military technicians of the National Guard are required to wear the military uniform at all times. Air Force Reserve Command policy already authorizes all ARTs to wear the military uniform while performing their duties in civilian status. The AFI changes will change the policy from an option to a requirement for ARTs. The changes will be consistent with, and reinforce, the provisions of paragraph 4.11 of DoDD 1205.18, *Full-Time Support (FTS) to the Reserve Components*, that states, "the military nature of the technician program is paramount over all other considerations."

7. If you have any views or recommendations concerning this change in policy, you may submit them for consideration. Please provide any comments by 22 May 2007. Local bargaining obligations will be fulfilled at the appropriate level prior to implementation of this change. The AFRC point of contact is Ms. Laurel Jacobs, HQ AFRC/A1CE, telephone number (478) 327-1300, FAX (478) 327-0358, EMAIL laurel.jacobs@afrc.af.mil.



STEVE L. MANN
Director of Manpower and Personnel

Attachment: AFI Changes

RECEIVED
APR 2 4 2007
AFGE-NPO

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 7

**Legislative Initiative**
(Unified Legislation and Budgeting)

<u>TITLE:</u>  Military Technicians Uniform Wear

<u>SHORT DESCRIPTION</u>:  Amend Title 10, USC 10216 to add (3) allowing the Service Secretary to require military technicians to wear the service uniform.

|  | Army | Navy | Marine Corps | AF |
|---|---|---|---|---|
| **Approximate Full-Year Cost** | Not Requested | N/A | N/A | $2M - 511K |

<u>SUBMITTER:</u>  Air Force Reserve          <u>OSD SPONSOR:</u>

<u>DISCUSSION:</u>

a.  Renew: Maintain a diverse, agile, workforce that leverages synergy between active duty, air reserve and civilian components, and private industry to meet requirements and sustain capabilities.

b.  Military Technicians (dual status)  perform the same job for the Department of Defense whether in civilian or military status.  This change is already in place for Army and Air National Guard technicians and it acts to reinforce and encourage a Total Force work environment.  The Army Reserve and Air Force Reserve Military Technician (dual status) workforce represents the last 15 percent of the force not performing duty in uniform.  It does not apply to Non-Dual status technicians.  Language is written in a manner that makes this a discretionary authority for the Secretaries of the Air Force and Army.

<u>**NUMBER OF PERSONNEL AFFECTED:**</u>

|  | Army | Navy | Marine Corps | Air Force |
|---|---|---|---|---|
| **Number** | 7,912 | N/A | N/A | 10,124 |

| <u>**COORDINATORS**</u> | <u>**ACTION OFFICERS**</u> | <u>**TELEPHONE**</u> | <u>**EMAIL**</u> |
|---|---|---|---|
| OSD |  |  |  |
| JOINT STAFF |  |  |  |
| ARMY |  |  |  |
| NAVY |  |  |  |
| MARINE CORPS |  |  |  |
| AIR FORCE | Lt Col Susan Lukas | 695-9441 |  |
| susan.lukas@pentagon.af.mil |  |  |  |

**COST METHODOLOGY:**
Based on an average cost of $200 per person allowance factoring in different wear and tear working environments and reduction in cost to maintain uniforms.

**BUSINESS CASE:** To increase the Total Force and provide one standard for work performance.

**PROS:**

- Allows the last two components not performing duty in uniform to option for the same military standard as the other components
- Total Force work environment.

**CONS:**

- Part of this cost is already included in the Reserve budget so there would only be a partial increase to implement this program.

### Legislative Language

Section 10216(a) is amended by inserting (3) Service Secretaries may require wear of the military uniform by Military Technicians (dual status) subject to standards, policies, and procedures for the uniform.

### Sectional Analysis

Military Technicians (dual status) perform the same job for the Department of Defense whether in civilian or military status. This change is already in place for Army and Air National Guard technicians and it acts to reinforce and encourage a Total Force work environment. The Army Reserve and Air Force Reserve Military Technician (dual status) workforce represents the last 15 percent of the force not performing duty in uniform. It does not apply to Non-Dual status technicians. Language is written in a manner that makes this a discretionary authority for the Secretaries of the Air Force and Army.

**Agency Subject Matter Expert:** Lt Col Susan Lukas, 703-695-9441

**Legislative Initiative**
(Unified Legislation and Budgeting)

**TITLE:** Clothing allowance: enlisted

**SHORT DESCRIPTION**: Amend Title 37, USC 418(b) to include Military Technicians (dual status) along with the National Guard technicians who are currently included.

|  | Army | Navy | Marine Corps | AF |
|---|---|---|---|---|
| **Approximate Full-Year Cost** | 0 | N/A | N/A | 0 |

**SUBMITTER:** Air Force Reserve          **OSD SPONSOR:**

**DISCUSSION:**

a.  Renew: Maintain a diverse, agile, workforce that leverages synergy between active duty, air reserve and civilian components, and private industry to meet requirements and sustain capabilities.

b.  This change is required to implement a program whereby Military Technicians (dual status) wear the military uniform when performing duty.  It partners with a change requested to 10 USC 10216.  In and of itself it does not incur a cost nor make a mandatory obligation of funds.  If the authority were to be invoked it would only apply to 15 percent the Air Force and Army Reserve Components.  It does not apply to Non-Dual status technicians.

**NUMBER OF PERSONNEL AFFECTED:**

|  | Army | Navy | Marine Corps | Air Force |
|---|---|---|---|---|
| **Number** | Unknown | N/A | N/A | 8936 |

| COORDINATORS | ACTION OFFICERS | TELEPHONE | EMAIL |
|---|---|---|---|
| OSD |  |  |  |
| JOINT STAFF |  |  |  |
| ARMY |  |  |  |
| NAVY |  |  |  |
| MARINE CORPS |  |  |  |
| AIR FORCE | Lt Col Susan Lukas | 695-9441 |  |
| susan.lukas@pentagon.af.mil |  |  |  |

**COST METHODOLOGY:**
No cost.

**BUSINESS CASE:** To increase the Total Force and provide one standard for work performance.

**PROS:**

- Allows the last two components not performing duty in uniform to option for the same military standard as the other components
- Total Force work environment.

**CONS:**

- None

### Legislative Language

SEC. 418.  Clothing allowance:  enlisted members

Section 418(b) of title 37, United States Code, is amended—

(a)  by striking "National Guard" and inserting "military"; and
(b)  by inserting "(dual status)" after "technicians"
(b)  by inserting "or section 10126 of title 10" after "title 32".

### Sectional Analysis

This change is required to implement a program whereby Military Technicians (dual status) wear the military uniform when performing duty.  It partners with a change requested to 10 USC 10216.  In and of itself it does not incur a cost nor make a mandatory obligation of funds.  If the authority were to be invoked it would only apply to 15 percent the Air Force and Army Reserve Components.  It does not apply to Non-Dual status technicians.

**Agency Subject Matter Expert:**  Lt Col Susan Lukas, 703-695-9441

**Legislative Initiative**
(Unified Legislation and Budgeting)

**TITLE:** Uniform allowance: officers

**SHORT DESCRIPTION:** Amend Title 37, USC 417(d)(1) to include Military Technicians (dual status) along with the National Guard technicians who are currently included.

|  | Army | Navy | Marine Corps | AF |
|---|---|---|---|---|
| **Approximate Full-Year Cost** | 0 | N/A | N/A | 0 |

**SUBMITTER:** Air Force Reserve          **OSD SPONSOR:**

**DISCUSSION:**

a. Renew: Maintain a diverse, agile, workforce that leverages synergy between active duty, air reserve and civilian components, and private industry to meet requirements and sustain capabilities.

b. This change is required to implement a program whereby Military Technicians (dual status) wear the military uniform when performing duty. It partners with a change requested to 10 USC 10216. In and of itself it does not incur a cost nor make a mandatory obligation of funds. If the authority were to be invoked it would only apply to 15 percent the Air Force and Army Reserve Components. It does not apply to Non-Dual status technicians.

**NUMBER OF PERSONNEL AFFECTED:**

|  | Army | Navy | Marine Corps | Air Force |
|---|---|---|---|---|
| **Number** | Unknown | N/A | N/A | 1,278 |

| COORDINATORS | ACTION OFFICERS | TELEPHONE | EMAIL |
|---|---|---|---|
| OSD | | | |
| JOINT STAFF | | | |
| ARMY | | | |
| NAVY | | | |
| MARINE CORPS | | | |
| AIR FORCE | Lt Col Susan Lukas | 695-9441 | |
| susan.lukas@pentagon.af.mil | | | |

**COST METHODOLOGY:**
No cost.

**BUSINESS CASE:** To increase the Total Force and provide one standard for work performance.

**PROS:**

- Allows the last two components not performing duty in uniform to option for the same military standard as the other components
- Total Force work environment.

**CONS:**

- None

### Legislative Language

SEC. 417.  Uniform allowance:  officers

Section 417(d)(1) of title 37, United States Code, is amended—

(a)  by striking "National Guard" and inserting "military"; and
(b)  by inserting "(dual status)" after "technician"
(b)  by inserting "or section 10126 of title 10" after "title 32".

### Sectional Analysis

This change is required to implement a program whereby Military Technicians (dual status) wear the military uniform when performing duty.  It partners with a change requested to 10 USC 10216.  In and of itself it does not incur a cost nor make a mandatory obligation of funds.  If the authority were to be invoked it would only apply to 15 percent the Air Force and Army Reserve Components.  It does not apply to Non-Dual status technicians.

**Agency Subject Matter Expert:** Lt Col Susan Lukas, 703-695-9441

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 8



GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
1600 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1600

GENERAL COUNSEL

FEB 0 5 2008

The Honorable Richard B. Cheney
President of the Senate
Washington, DC 20510

Dear Mr. President:

The Department of Defense requests that the Congress enact the enclosed National Defense Authorization Bill for Fiscal Year 2009.

The purpose of each proposal is stated in the accompanying section-by-section analysis.

In the coming weeks, the Department will propose a few additional legislative initiatives for inclusion in the same Bill.

The Office of Management and Budget advises that there is no objection, from the standpoint of the Administration's program, to the presenting of these legislative proposals for your consideration and the consideration of the Congress.

Sincerely,

William J. Haynes II

Enclosure:
As stated





GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
1600 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1600

FEB 0 5 2008

GENERAL COUNSEL

The Honorable Nancy Pelosi
Speaker of the House of Representatives
Washington, DC 20515

Dear Madam Speaker:

   The Department of Defense requests that the Congress enact the enclosed National Defense Authorization Bill for Fiscal Year 2009.

   The purpose of each proposal is stated in the accompanying section-by-section analysis.

   In the coming weeks, the Department will propose a few additional legislative initiatives for inclusion in the same Bill.

   The Office of Management and Budget advises that there is no objection, from the standpoint of the Administration's program, to the presenting of these legislative proposals for your consideration and the consideration of the Congress.

Sincerely,

William J. Haynes II

Enclosure:
As stated



# A BILL

To authorize appropriations for fiscal year 2009 for military activities of the Department of Defense, to prescribe military personnel strengths for fiscal year 2009, and for other purposes.

1    *Be it enacted by the Senate and House of Representatives of the United States of America*

2    *in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2009".

5    **SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

6    (a) DIVISIONS.—This Act is organized into two divisions as follows:

7    (1) Division A—Department of Defense Authorizations.

8    (2) Division B—Military Construction Authorizations.

9    (b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.
Sec. 105. Rapid Acquisition Fund.
Sec. 106. Joint Improvised Explosive Device Defeat Fund.
Sec. 107. Defense Production Act purchases.

Subtitle B—Air Force Programs

Sec. 111. Performance based logistics contracts for the F-35 Joint Strike Fighter.

TITLE II—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

Authorization of Appropriations

Sec. 201. Authorization of appropriations.

## TITLE III—OPERATION AND MAINTENANCE

### Subtitle A—Authorization of Appropriations

Sec. 301. Operation and maintenance funding.
Sec. 302. Working capital funds.
Sec. 303. Other Department of Defense programs.

### Subtitle B—Environmental Provisions

Sec. 311. Reimbursement of Environmental Protection Agency Wellfield Superfund Site, Moses Lake, Washington.

### Subtitle C—Workplace and Depot Issues

Sec. 321. Exception from prohibition on contractor performance of firefighting functions.
Sec. 322. Exception to prohibition on contracts for performance of security guard functions.
Sec. 323. Authority to consider depot level maintenance and repair using contractor furnished equipment or leased facilities as core logistics.

### Subtitle D—Other Matters

Sec. 331. Recovery of missing military property.

## TITLE IV—MILITARY PERSONNEL AUTHORIZATIONS

### Subtitle A—Active Forces

Sec. 401. End strengths for active forces.
Sec. 402. Increase in Marine Corps Reserve general officers in an active status.
Sec. 403. Exclusion of certain personnel from counting for active-duty end strengths.

### Subtitle B—Reserve Forces

Sec. 411. End strengths for Selected Reserve.
Sec. 412. End strengths for Reserves on active duty in support of the Reserves.
Sec. 413. End strengths for military technicians (dual status).
Sec. 414. Fiscal year 2009 limitation on number of non-dual status technicians.
Sec. 415. Maximum number of reserve personnel authorized to be on active duty for operational support.

### Subtitle C—Authorization of Appropriations

Sec. 421. Military personnel.
Sec. 422. Armed Forces Retirement Home.

## TITLE V—MILITARY PERSONNEL POLICY

### Subtitle A—Officer Personnel Policy

Sec. 501. Amendment of limited exclusion of joint duty requirements.
Sec. 502. Changes to promotion policy objectives for joint officers.
Sec. 503. Length of joint duty assignments.
Sec. 504. Streamlining language of joint duty requirements for promotion to general or flag officer.
Sec. 505. Technical changes to "joint specialty" terminology.
Sec. 506. Conforming changes to "joint specialty" terminology.

Sec. 507. Increased tenure for lieutenant generals.

Subtitle B—Reserve Component Management

Sec. 511. Extension of Retention on the Reserve active status list of military technicians (dual status) until age 60.
Sec. 512. Increase age limitation of reserve component chaplains and medical officers beyond age 64.
Sec. 513. Conforming amendments to increase the mandatory retirement age for Reserve officers.
Sec. 514. Authority to require the uniform by military technicians (dual status).
Sec. 515. National Guard officers in Federal and federally funded State status.
Sec. 516. Clarification of authority to consider for a vacancy promotion National Guard officers ordered to active duty during a contingency operation.

Subtitle C—Education and Training

Sec. 521. Awarding of Master of Arts in Strategic Security Studies.
Sec. 522. Tuition reimbursement and use of funds at the United States Air Force Institute of Technology.
Sec. 523. Expanded authority to award degrees.
Sec. 524. Authority to prescribe authorized strength for the United States Naval Academy.

Subtitle D—General Service Authorities

Sec. 531. Change in requirement for posthumous certification.
Sec. 532. Raise maximum reenlistment term.

Subtitle E—Other Matters

Sec. 541. Civil liability for noncompliance and enforcement of Servicemembers Civil Relief Act.

TITLE VI—COMPENSATION AND OTHER PERSONNEL BENEFITS

Subtitle A—Bonuses and Special and Incentive Pays

Sec. 601. One-year extension of certain bonus and special pays for reserve forces.
Sec. 602. One-year extension of certain bonus and special pay authorities for certain health care professionals.
Sec. 603. One-year extension of special pay and bonus authorities for nuclear officers.
Sec. 604. Direct accession bonus for psychology officers.
Sec. 605. Extending maximum length of nuclear officer incentive pay agreements for service.

Subtitle B—Travel and Transportation Allowances

Sec. 611. Travel and transportation allowances for certain family members to attend the burial ceremony or memorial service of members who die on duty.

Subtitle C—Retired Pay and Survivor Benefits

Sec. 621. Waiver of recoupment of overpayments of retired pay to spouse or former spouse as a result of retroactive disability determination.
Sec. 622. Survivor Benefit Plan: extension of period for election deemed to have been made.
Sec. 623. Survivor Benefit Plan: multiple beneficiaries.
Sec. 624. Survivor Benefit Plan: financial responsibility for Survivor Benefit Plan participation.
Sec. 625. Survivor Benefit Plan: presumptive proportionate share.
Sec. 626. Revocation of ten-year rule for direct payment of retired pay.
Sec. 627. Allowing member to submit application for direct payment.
Sec. 628. Disregard periods of confinement for dependent victims of abuse.
Sec. 629. Clarifying amendment regarding jurisdiction for purposes of allocation of retired pay under the Uniformed Services Former Spouse Protection Act.

3

1  **SEC. 514. AUTHORITY TO REQUIRE THE UNIFORM BY MILITARY**

2            **TECHNICIANS (DUAL STATUS).**

3        Section 10216(a) of title 10, United States Code is amended by adding at the end the

4  following new paragraph:

5        "(4) Under regulations prescribed by the Secretary concerned, the Secretary may

6        require a military technician (dual status), while performing duties as a military

7        technician (dual status), to wear the uniform appropriate for the member's grade and

8        component of the armed forces.".

9  **SEC. 515. NATIONAL GUARD OFFICERS IN FEDERAL AND FEDERALLY FUNDED**

10            **STATE STATUS.**

11        Section 325 of title 32, United States Code, is amended—

12        (1) in subsection (a)(2), by striking "in command of a National Guard unit";

13        (2) by redesignating subsection (b) as subsection (d); and

14        (3) by inserting after subsection (a) the following new subsections:

15        "(b) ADVANCE AUTHORIZATION AND CONSENT.—The President and Governor of the State

16  or Territory or Puerto Rico, or the commanding general of the District of Columbia National

17  Guard, as the case may be, respectively, may give the authorization and consent required by

18  subsection (a)(2), in advance, for the purpose of establishing the succession of command of a

19  unit.

20        "(c) NATIONAL GUARD DUTIES.—An officer who is not relieved from duty in the

21  National Guard while serving on active duty pursuant to subsection (a)(2) may perform any duty

22  authorized to be performed by the laws of his State or Territory, Puerto Rico, or the District of

23  Columbia, as the case may be, by the National Guard without regard to the limitations imposed

30

Attrition is expensive and losses, particularly among health care professionals, translate into a particularly expensive problem. The Department of Defense invests such significant resources in recruiting and retaining these critically-needed personnel that it can ill afford to lose them. There is no dispute that retaining health care professionals is considerably more effective than recruiting replacements. If these health care professionals wish to be retained beyond the normal mandatory retirement age, it would be more cost-effective to retain these individuals than to recruit and train new accessions.

**Cost Implications**:  As of September, 2007, there were ten medical officers and no chaplains in the Selected Reserve who are age 66. In other words, there are ten officers who could be retained for another year under this section. The Department of Defense estimates that the number of officers per component and the maximum annual total cost of this section would be as follows:

| Component | Number of Officers | Annual Cost |
|---|---|---|
| Army NG | 1 | $19,654 |
| Army Reserve | 5 | $98,270 |
| Air Force NG | 1 | $19,654 |
| Air Force Reserve | 1 | $19,654 |
| Navy Reserve | 2 | $39,308 |

The Department estimates that the total annual cost of this section would be $196,540. The military departments would fund any costs from this section within existing budget authority. Therefore, this section does not meet the threshold of a budgetary proposal.

**Section 513.**  Section 503 of the John Warner National Defense Authorization Act for Fiscal Year 2007 (Public Law 109-364) increased the mandatory retirement age for certain Reserve officers from 60 to 62 years of age, or from 62 to 64 years of age. Specifically, it amended sections 14508, 14509, 14510, and 14511 of title 10, United States Code, to allow for separation on the last day of the month in which the officer becomes 62 or 64 years of age, as applicable. However, section 503 did not include conforming amendments to sections 12647 and 14702 of title 10. This proposal would amend these provisions to conform to the other new statutory limitations regarding the mandatory retirement date for Reserve officers.

**Cost Implications:**  Since end strength limitations still apply, any additional costs associated with this section would be minimal.

**Section 514** would allow the Secretary of the military department concerned to require military technicians to wear the service uniform while performing their civilian duties.

Most military technicians (dual status) perform the same job for the Department of Defense, whether in civilian or military status. The requirement to wear the appropriate military uniform is already in place for Army and Air National Guard technicians, and it acts to reinforce and encourage the Total Force work environment. This section would provide the authority to the Secretary of the Army and the Secretary of the Air Force to have a consistent policy regarding the wearing of the uniform among all dual status military technicians. It does not

12

apply to non-dual status technicians.

**Section 515** would clarify the authority in section 325 of title 32, United States Code, to permit, with Presidential authorization and Gubernatorial consent, any National Guard officer -- not just an officer serving in command of a National Guard unit -- to retain his state commission in the National Guard while serving on active duty, so the officer thus possesses a dual status, federal and state. This would facilitate unity of effort in situations where title 10 and title 32 forces work together by allowing an officer who has been placed in a dual status to command the title 10 forces in his federal status (National Guard of the United States) and title 32 forces in his state status (National Guard).

This section also would allow the required Presidential authorization and Gubernatorial consent for a National Guard officer on active duty to continue to exercise his state commission to be obtained in advance for purposes of establishing command succession for mixed component (federal and state) units.

Finally, this section would clarify that an officer in a dual status retains full authority to perform National Guard functions authorized by State law without violating the provisions of the Posse Comitatus Act (18 U.S.C. 1385) if doing so in his state status, i.e., in command of, or working as a member of, a National Guard unit or team in state status.

**Section 516** would clarify the authority to consider for vacancy promotion National Guard officers who have been ordered to or are serving on active duty in support of a contingency operation and to promote such officers.

Currently, section 14317(e)(1)(B) of title 10, United States Code, provides that a reserve officer who has been ordered to or is serving on active duty in support of a contingency operation may, if eligible, be considered for promotion by a vacancy promotion board convened under section 14101(a) of title 10. Section 14101(a) of title 10 states that a "vacancy promotion board" is a board convened to recommend reserve officers of the Army and Air Force for promotion to fill a position vacancy under section 14315 of title 10. Section 14315 authorizes consideration for a vacancy promotion only in the case of an officer in the Army Reserve or Air Force Reserve. Thus, the authority in section 14317(e)(1)(B) to consider for vacancy promotion reserve officers order to active duty in support of a contingency operation does not apply to National Guard officers. This section will amend section 14317(e)(1)(B) to provide that a reserve officer who has been ordered to or is serving on active duty in support of a contingency operation may be considered for promotion not only by a vacancy promotion board under section 14101 but also "by examination for Federal recognition under title 32."

In addition to clarifying the authority to consider for vacancy promotion National Guard officers on active duty in support of contingency operations, the section would also clarify the authority to promote reserve officers who have been selected for a vacancy promotion and before being promoted are ordered to active duty to serve in support of a contingency operation. The change will enable officers, who are ordered to active duty in support of a contingency operation after being selected for promotion, to be promoted against vacancies other than those which existed in the unit with which they were ordered to active duty. This will prevent the officer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 9

# *ART Uniform*

- ■ **AFI IMC Published 7 Aug 07**
- ■ **AFIs 36-703, 36-801, & 36-2903 mandate uniform wear**
  - ■ Non-bargaining unit personnel wear immediately (30%)
  - ■ Bargaining unit personnel wear upon satisfaction of labor relations obligations (70%)
- ■ **Labor Relations Obligations**
- ■ **Impact and Implementation Negotiations (I&))**
  - ■ The policy is non-negotiable
  - ■ Unions have the right to negotiate over procedures
- ■ **Labor Contracts**
  - ■ Contracts permitting voluntary uniform wear "trump" AFIs until expiration
    - ■ Peterson (1/08), Seymour Johnson (9/08), Grissom (4/09)

*One Air Force, Same Fight… An Unrivaled Wingman*

# Impact & Implementation Negotiations

- ■ I&I negotiable proposals may include:
  - ■ Additional uniform allowances (up to $400)
  - ■ Changing facilities/lockers
  - ■ Duty time for haircuts/sewing patches
- ■ I&I non-negotiable proposals may include:
  - ■ Civilian identifiers on uniform, i.e., "civilian"
  - ■ Voluntary wear proposals
- ■ CPFs and unions exchange proposals in an effort to reach agreement
  - ■ Proposals in writing, face-to-face, or both
  - ■ Failure to submit proposals permits implementation

*One Air Force, Same Fight… An Unrivaled Wingman*

# *Impact & Implementation Negotiations*

- **Implementation will vary by location; subject to local agreement**
  - Could take weeks, months or longer
  - Terms of the agreements will vary

- **Impasse**
  - Either party may declare "impasse" if no agreement can be reached
  - Assistance available from:
    - Federal Mediation and Conciliation Service (FMCS)
    - Federal Service Impasses Panel (FSIP)
  - AFRC and MAJCOM coordination expected

3



# *Updates*

- **Agreement or implementation at seven locations a/o 13 August**
  - **Portland, Pope, Niagara, ARPC, Hanscom ESC, Keesler, Homestead**

- **Negotiations ongoing at remaining locations (45)**

- **Noteworthy issues:**
  - **March – union refused to submit proposals, ULP**
  - **Barksdale – union declared impasse after first exchange of proposals**
  - **Online Petition**
  - **2nd disciplinary action for non-compliance**
  - **1st resignation attributed to wear of uniform**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, *ET AL.*,   )
                                  )
            *Plaintiffs,*          )
                                  )
        v.                        )        Civil Action No. 1:08cv692 (EGS)
                                  )
SECRETARY OF THE AIR FORCE,       )
                                  )
            *Defendant.*           )        Judge Sullivan

# PLAINTIFFS' EXHIBIT 10

**IN ARBITRATION BEFORE MICHAEL D. GORDON, NEUTRAL**

**AFGE LOCAL 2361**

**and**                                                    **Military Uniform Grievance**
                                                           **FMCS No. 08-51344**

**WHITEMAN AFB**

================================================================

### ARBITRATOR'S DECISION AND AWARD

This group or class grievance arises under a 2007-2011 collective bargaining contract ("Agreement") between Local 2361 of the American Federation of Government Employees ("Union") and Whiteman AFB ("Employer") covering certain employees at Whiteman Air Force Base, Missouri ("Base").

A hearing was held March 26, 2008, at the Base. Richard L. Roberts represented the Union. Gordon B. Finley, Jr. and Robert G. Fuemmeler appeared for the Employer. The parties received full opportunity to examine and cross-examine witnesses, to introduce relevant exhibits and to argue. The record closed with receipt of written briefs on May 3, 2008.

## ISSUE

The parties were unable to agree on a statement of disputed issues. The Union states the issues are:

1. Interpretation of Agreement Article 3, Article 7 §7 and Article 28 §4, does Article 3 §2 or Article 3 §3 apply to negotiation of the Agency's proposed enforcement of AFI 36-703, 36-801 and 36-2903.

2. Can the Employer implement the proposed AFI changes without affecting or contradicting certain Agreement Articles?

The Employer defines the issues as:

1. Whether the Unions October 16, 2007, grievance is untimely under Article 33 §7; and, if so, is it not arbitrable: and, if not,

2. Whether 442d Fighter Wing management at Whiteman AFB may immediately implement Air Force regulatory changes that require Air Reserve Technicians to wear the military uniform when on duty in civilian status; or

3. Does the Agreement cover the wear of military uniforms by ART employees and thus preclude implementation of these Air Force regulatory changes during the life of this Agreement?

After review of the entire record, the Arbitrator designates the issues as follows:

1. Is the grievance untimely; and, if so, non-arbitrable; and, if not,

2. Does the Employer violate the Agreement by requiring ART employees to wear military uniforms while in civilian status performing civilian duties; and, if so, what is the appropriate remedy?

SELECTED PORTIONS OF THE AGREEMENT

**ARTICLE 3**

<u>**LEGAL AUTHORITY**</u>

Section 1:  This agreement is governed by existing Federal laws, Government-wide rules or regulations, and Department of Defense or Department of the Air Force rules and regulations.

Section 2:  In the event of new or amended governing directives that affect or contradict certain Articles of this Agreement, the Union and Management may agree to negotiate implementation of the directives, which could result in a new amended article.

Section 3:  It is agreed by the Parties that when changes are made to governing directives above the installation level that establishes new personnel policies, practices or procedures not currently contained in this agreement, a new article will be appropriately negotiated to update the agreement. The Employer shall provide the Union written electronic notification of all proposed governing directives or other type of proposals that the Agency intends to implement, which could affect Bargaining Unit Employees. If the Employer proposes new changes to existing governing directives and the proposed directive does not state the intended changes, Bargaining Unit obligations must be met on the entire directive unless there is evidence that obligations have been previously met. Negotiations will commence no later than 30 days after receipt of the changed directive by the Parties. Negotiations shall occur prior to implementation, unless higher authority directs implementation prior to meeting Bargaining Unit obligations. If higher authority directs earlier implementation, the decision could be overturned as a result of negotiations or a decision of the Authority. The new amendments resulting from these negotiations will not be put into effect prior to approval of DoD CPMS. The same conditions under which the basic agreement is reviewed and approved will govern review and approval of new articles or supplements.

\* \* \*

**ARTICLE 6**

<u>**RIGHTS AND OBLIGATIONS OF THE EMPLOYER**</u>

Section 1:  Nothing in this Agreement shall affect the authority of the Employer,

    1.    To determine the mission, budget, organization, number of Employees, and internal security practices of the Base/Tenant Units:

    2.    In accordance with applicable laws,

        1.    To hire, assign, direct layoff, and retain Employees, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such Employees;

        2.    To assign work, to make determinations with respect to contracting out, and to determine the personnel by which base operations shall be conducted;

. . .

**Section 2:**  Nothing in this article shall preclude the Agency and Union from negotiating:

    (a)  At the election of the agency, on the numbers, types, and grades of Employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

    (b)  The Employer agrees if requested, to negotiate with the Union, the appropriate arrangements in relation to Managements rights (U. S. Code Title 5 Section 7106 (b) (3) which may adversely affect Bargaining Unit Employees. In addition the Employer agrees to negotiate matters covered by Section 7106 (b) (2) which affects the procedures which Management will follow in exercising its statutory authority under Section 7106 (a).

## ARTICLE 7
### RIGHT OF THE EMPLOYEES

. . .

**Section 7:**  An Employee is accountable only for the performance of official duties and compliance with the standards of conduct for Federal Employees. Within this context, the Employer affirms the right of an Employee to conduct his or her private life as he or she deems fit. Employees shall have the right to engage in outside employment of their own choosing; however, they may be required by governing directives to report to the employer prior to engaging in such activities.

. . .

## ARTICLE 28
### SAFETY AND ENVIRONMENTAL HEALTH

. . .

**Section 4:**  Protective Safety Footwear shall be provided to all Employees working in areas, taskings, and operations, which are identified by the Employer as requiring protective footwear. If Employees are identified as mandated use of protective footwear, the Employer shall notify the Union to meet Bargaining Unit obligations.

a.  If Employees feel they need protective footwear based on their own assessment of the hazards associated with their occupation, they shall request the Personal Protective Equipment (PPE) through their Supervisor. Employee preference for use of protective footwear does not obligate or make it mandatory for others within the work center.

b.  Safety toe footwear shall he purchased through a distributor mutually acceptable to Organizational Commanders or designee and the Union. Employees may select from the distributors available shoes which meet ANSI Z 41 standards. The Employee selection on the installation may be made on duty time; if selection off the installation occurs, duty time will not exceed two hours in length. The Employer's cost shall not exceed $ 125.00. Any additional cost will be at the Employee's expense. The Employee may be required to pay applicable taxes on the amount above the Employer's cost. Protective footwear shall be replaced if it is deemed no longer serviceable.

c.  Employees with special footwear needs will be accommodated when they provide acceptable medical documentation.

d.  When work areas or occupations require the use of uncommon special protective footwear such as electrical hazard, non-conductive soles, chemical hazard etc., the Employer shall forego the price limitation in order to provide the specialized personal protective equipment.

. . .

### ARTICLE 33
### NEGOTIATED GRIEVANCE PROCEDURE

. . .

Section 6:  The time limits in this Article may be extended by mutual agreement. . . . Failure on the part of the responding party to act within prescribed time limits shall allow the grieving party to proceed to the next applicable step of the grievance procedure.

Section 7:  All grievances must be initiated within 30 days after the occurrence of the action grieved, or the date the grieving party became aware of the action or decision.

. . .

Section 11:  Union or Employer Initiated Grievances:

1.  Any grievance which concerns the claimed misinterpretation, inequitable application, violation of the provisions of this Agreement, or the alleged violation by either party of any other applicable law, rule, regulation or directive not covered in Section 7 or 8 shall be filed at the option of the Parties.

2.  Grievances will be presented in writing to the Employer by the Union or to the Union by the Employer. Representatives of the Parties will meet as soon as possible. . . . If the grievance is not settled by this method, a written decision to the grievance will be given within five workdays of the meeting.

3.  If the grieving party is dissatisfied with the written decision, they may proceed to arbitration in accordance with Article 34. . . .

Section 12:  New issues may not be raised by either Party after the initial meeting at the third step of a formal grievance or group grievance, or after the final decision, prior to arbitration, in a Union or Employer Initiated Grievance.  The new issues will be considered only if related to the original grievance and if otherwise arbitrable.

### ARTICLE 42
### DURATION OF AGREEMENT

Section 1:  This Agreement will have a duration of four years from the date of execution and becomes effective upon approval by DoD CPMS as appropriate, or 30 days after execution if neither approved nor disapproved. whichever occurs earlier. If the Union is not notified of disapproval in writing within the 30 day period. the Agreement is automatically approved on the 31st day. The date of execution will be the date of signature by the 509th Bomb Wing Command er or designee and the President of AFGE, Local 2361 or designee. Upon renewal, extension, or renegotiation, this Agreement must be brought into conformance with applicable laws, and Government-wide regulations.

Section 2:    Either Party may give written notice to the other, not more than 105 or less than 60 calendar days prior to the terminal date, of its intent to reopen this Agreement. If neither Party gives notice during this period, then the Parties mutually agree to extend the Agreement for four additional years, subject to requirements of this article. The Parties will meet within 21 calendar days of notification to commence ground rule negotiations. Contract negotiations will begin within 21 calendar days after ground rules are mutually adopted. Upon request, either party will receive an additional extension of time, which shall not exceed 15 calendar days.

Section 3:    The Articles contained in this Agreement constitute the entire Agreement, and there shall be no side agreements or understandings, written or implied, other than those embodied in the Agreement. The Parties have had full opportunity to raise any and all issues during negotiations, and this Agreement represents the sum total of the terms and conditions which the Parties agree to abide by for its duration.

Section 4:    This Agreement will supersede agency and government-wide regulations until the Agreement is changed through proper negotiations. The Agreement will remain in effect until either a renegotiated agreement is adopted or it is determined that the Union is no longer entitled to exclusive recognition under applicable laws.

Section 5:    This Article may not he amended during the course of the Agreement.

## FACTS

The Union has represented Base employees for forty years or more.  Its bargaining unit includes Air Reserve Technicians ("ARTs") who primarily train reserve support personnel.  They are dual status employees under 10 U.S.C. 10216.  They are full time civilian DoD civil service employees during the work week.  They share many, if not all, attributes of federal employees while in civilian status.  They never have been required to wear military uniform while in civilian status at the Base.

ARTs also are members in the Selected Reserve and serve as military reservists in an Air Force Reserve Command one weekend each month, at least 14 training days each year and if and when their unit is mobilized.  They hold military rank and wear uniforms during military reserve duty.

Since at least August 1999, Air Force Instruction ("AFI") 36-703 provided:

> Section C -- Dress and Appearance
> . . .
> 7.    Civilian Uniform Wear.  Military grooming and appearance standards do not apply to civilian employees.  However, employees standard uniforms, such as those prescribed in AFI 36-801, *Uniforms for Civilian Employees*, or medical or food service personnel furnished uniforms under Table of Allowances 016, may be expected to comply with grooming and appearance standards for employees in similar occupations employed by other Federal, state, or municipal governments. Air Reserve Technicians will adhere to the requirements as those in AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, when wearing the military uniform in civilian status.

The Agreement is for four years.  It became effective May 10, 2007.  Article 7 §7 appeared for the first time. Negotiations for the Agreement did not include any specific reference directly related to ARTs dress standards.

On August 21, 2007, the Union received an August 20 memo from Human Relations Specialist Robert G. Fuemmeler about an Interim Message Change ("IMC") regarding changes to AFI 36-703, 36-801 and 36-2903, in part, dealing with ARTs uniform

requirements while in civilian status.[1]    The memo said acceptance would be assumed if no response was made by September 7.    It attached an August 20 memo from the AFB Commander which stated that pursuant to an August 7 AFI it was mandatory for all ARTs to wear a military uniform while working in civilian status.    In part, the memo read:

> Effective immediately, all ART's not represented by a bargaining unit must comply with AFI requirements and wear the military uniform while in civilian status.    Labor relations obligations will be satisfied with our union partners prior to implementing the AFI requirements for Art's represented by a bargaining unit.    Until local bargaining obligations are satisfied, ART's represented by a bargaining unit remain encouraged to wear the military uniform on a voluntary basis.

On August 30, the Union replied that (1) it demanded bargaining to the full extent of the law; (2) the IMC contravened Article 7 §7 and other unspecified Agreement sections; and, therefore, (3) under Article 3 §2, the Union was not obliged to agree to changes in negotiations.    Citing Article 3 §3, it requested maintenance of the *status quo* until "all phases of collective bargaining are complete, including third-party proceeding." On September 7, the Union repeated its August 30 position and, expressly asked for the Employer's

---

[1]    Civilian employees wearing uniforms may have to follow military customs and courtesies inapplicable to non-uniformed civilian employees. The current dispute centers on the obligation to wear a uniform.    It does not directly address any resulting disagreements if uniforms can be required.

written response to the Union's position that, without Union concurrence at negotiations, implementing the IMC would violate the Agreement and Federal Labor Management Act ("FLRA"). The Union stated it would seek appropriate third party review if the Employer disagreed.

On September 17, the Employer responded. It disputed the Agreement covered the matter and asserted that ARTs wearing military uniforms was a management choice about "methods and means of performing work" under 5 U.S.C. 7106 (b)(1). It asked to negotiate about implementation and impact per Article 3 §3 but not the substance of its claimed permissive right.

On October 16, the Union filed this grievance under Article 33 §11. It basically repeated and refined its earlier correspondence, specifically rejected application of Article 3 §3 in favor of Article 3 §2 and expressly referenced AFI 36-703 and Articles 7 §7 and 28 plus 5 U.S.C. 7116(a)(7).

The parties were unable to resolve their differences in the grievance procedure or meetings about appropriate negotiation ground rules. This arbitration followed. Until now, no actual changes in bargaining unit ART uniform/dress requirements have been implemented or enforced.

## UNION POSITION

The grievance is arbitrable and meritorious. The Employer should be ordered not to enforce the new IMC uniform requirement unless and until the Union agrees. The Arbitrator should retain jurisdiction to eliminate any subsequent related problems.

The grievance is timely. The Union did not receive notice of the disputed AFI until August 21. On August 30 and September 17, it (1) asked the Employer if it agreed that changes had to be agreed upon in negotiations before being implemented and (2) stated it intended to seek third party review if the Employer did not concur.

There is no obligation to grieve a proposal. A grievance could not exist before the Employer answered the question. There was no "decision" under Article 33 §7 starting the 30 day countdown until the Employer's September 18 response. Additionally, the Employer did not raise a timeliness issue until the arbitration hearing.

Substantively, the proposed AFI changes conflict with Agreement Article 3 §2 or §3 and constitute an unfair labor practice under 5 U.S.C. 7116(a)(7). Article 3 §2 prevents the

-10-

Employer from requiring negotiation of a new amended article and allows the Union to decide whether a new or amended negotiated article results.

Article 3 §1 says the Agreement is governed by "existing" AFI's on May 10, 2007.  Article 3 §2 applies to this dispute. It provides that directives affecting or contradicting the Agreement's provisions "may" be negotiated and "could" result in a "new, amended" directive.  The disputed ICM here proposed amendments to Articles 7 §7 and 28 §4.  Any change can occur only at the Union's option.  The Union can negotiate, but if no mutual resolution is reached, the Agreement remains unchanged.

Employer reliance on Article 3 §3 is misplaced since it applies to directives that do not change or contradict an existing agreement.  The ICM does not deal with new subjects outside the existing Agreement.

Article 28 §4 is not just a "procedure", but even if it is, a new article creates a different way to acquire safety footwear.  Also, contrary to Article 3 §3's provision about the "entire directive", the Employer did not submit the entire AFI 36-2903 to the Union for negotiation.

Article 7 §7's first sentence stands alone. It gives employees more than a right to seek outside employment. It creates an overarching right that makes employees only accountable as federal employees in their duties and conduct.

When the Agreement became effective on May 10, 2007, AFI §36-703 was in effect and said "military grooming and appearance standards do not apply to civilian employees." The Employer's directive contradicts this contractual right.

Article 28's bargaining history and language supports the Union's reading. If, as the Employer claims, it is a procedure to attain protective footwear, it shows that Article 3 §2 applies rather than Article 3 §3. But, it is more than procedural. Article 28 §4(a)(1) allows all unit employees to decide if they need protective footwear; §4(b) and (c) create individual rights to use civilian or, sometimes, "special footwear" and time and defined reimbursements for off-duty selection from civilian distributors. The Employer's position contradicts or negates these contractual understandings.

Article 42 §3 makes the Agreement the sole contract for its four year term. It says the Agreement supercedes any subsequent AFI changes. Any changes in uniform requirements

should have been negotiated before the Agreement was signed some three months earlier.

### EMPLOYER POSITION

The grievance should be denied.  It is untimely and, therefore, not arbitrable.  Substantively, it lacks merit because the Agreement does not cover or otherwise preclude the wearing of military uniforms by ARTs while in civilian status. The parties should be returned to Article 4 §4 negotiations.

The grievance is untimely and non-arbitrable under Article 33 §7's thirty day filing requirement.  Time began to run when the Union received notice of regulatory changes and the intent to implement them on August 20.  It was not a proposal.  The Union received no new information on September 17.  Article 33 §4 is inapplicable since, as an inherent part of the grievance's subject matter jurisdiction, timeliness can not be a "new issue".  Either party can raise it at any point.

The Agreement does not cover or otherwise address this dispute. It was not contemplated when the Agreement originally was negotiated.  Federal courts and the FLRA hold that the matter is a permissive subject that can be bargained only at management's option.  Otherwise, wearing military uniforms is part of the technology and methods and means of performing

-13-

work reserved to management by FLRA §7106(b)(1).

Union reliance on Articles 3, 42, 7, and 28 are misplaced. Articles 42 and 3 should be read in conjunction.

Article 42 is a limited zipper clause. In relevant part, Article 42 §1 creates a four year contract; §3 incorporates all terms and conditions into the Agreement without any side agreements (this does not prohibit bargaining or foreclose future negotiated changes); §4 says subsequent government or Agency regulations must be negotiated and incorporated into the Agreement to become effective. Article 42 does not prevent amendments, it prescribes and maintains the status quo only until and unless amendments are negotiated.

Article 3 §1 incorporates all current Federal law, government wide rules and DoD and Air Force rules and regulations when the Agreement became effective. Thus, those preexisting matters became part of the Agreement.

Article 3 §2 deals with matters "covered by" the Agreement. The parties may negotiate new or amended provisions changing existing provisions, but bargaining is permissive, not mandatory. But, contrary to the Union, Article 3 §2 is inapposite since the Agreement's words and bargaining history

do not mention or contemplate ARTs wearing military uniforms.

Article 3 §3 applies to this dispute because it concerns directives above the installation level that establish new personnel policies, practices or procedures.  The parties agreed to appropriately negotiate updates.  Any negotiations are necessary only for stated changes in AFI 36-2903 (those listed in the IMC), not the entire publication, since the remaining parts were previously negotiated.

Also contrary to Union claims, the dress changes are not a burdensome, monumental cultural change.  The Union is long familiar with AFI 36-2903 because ARTs have dual status that makes them experienced Air Force reservists who regularly comply with it.  Unit employees already possess, maintain and wear uniforms.

Article 7 §7 is new to this Agreement. It deals primarily with off duty conduct or employment.  It does not incorporate AFI 36-703 as a "standard of conduct."  The Agreement does not cite or otherwise reference AFT 36-703. Article 7's bargaining history shows no mention of the AFI or ART wearing uniforms.

Article 28 §4 dates from 1999-2000 and covers only the purchase and wearing of protective footwear.  It goes beyond

ART to any employee required to wear safety footwear.
Negotiations and resulting language did not contemplate ART
wearing military uniforms in civilian status.  The Agreement
does not mention "civilian shoes" or "civilian footwear" or
even "shoes."  It is a procedural matter that lets the Union
help select footwear vendors and limits Employer costs to
$125. Article 28 §4 still can be applied in selecting footwear
from outside vendors compatible with both military dress and
safety standards.

DECISION

The Employer has the burden to prove non-arbitrability;
the Union is obliged to prove its claimed substantive contract
violation.  For the following reasons, it is found and
concluded that the dispute is arbitrable and meritorious.

<u>Arbitrability</u>

Procedural, like substantive, promises must be enforced
when clear and unmistakable. Still, absent specific language
to the contrary, time limitations are not strictly
jurisdictional.  They are in the nature of statutes of
limitations, subject to tolling or waiver for compelling

equitable reasons.[2]    On this record, the grievance is not untimely; and, if it exceeded the Agreement's 30 day filing limit, it remains arbitrable.

Primarily, when the Union received the August 21 correspondence, no activity had yet occurred or was squarely scheduled, action that might result was inchoate and, most importantly, the nature of applicable "labor relations obligations" and/or "local bargaining obligations" were undefined and uncertain.[3]

As it developed, the core of this dispute -- whether the changes already were covered by the Agreement -- was unstated until the Employer announced it would negotiate only about the implementation and impact of what it regarded as Article 3 §3

---

[2] See, Elkouri and Elkouri, *How Arbitration Works,* Ruben, Editor, 6th Ed., BNA, 2003, pp. 217-227, especially Chapter 5.7.A. iii and Footnote 104; and Nathan and Green, "Challenges to Arbitrability," Bornstein, Gosline, Greenbaum, *Labor and Employment Arbitration*, 2nd Ed., Matthew Bender, 2008, § 8.03.
   Employer reliance on *Edwards AFB and SPORT Air Traffic Controllers*, 108 LRP 5009 (Richmond, 2008), is misplaced. *Edwards* acknowledged the arbitral conflict about timeliness issues. It involved materially different contractual language with a narrower grievance definition and express language regarding the scope of the contract. The decision turned on a lack of subject matter jurisdiction, not an alleged untimely grievance filing. Allowing procedural or substantive arbitrability to be asserted tardily at arbitration does not mean the claim is valid. The delay in asserting the defense then becomes a factor in determining its applicability in the particular circumstances.

[3] Even when a future change is fully explained, time limits often do not begin until it takes effect. See, Elkouri and Elkouri, *supra*, p. 224.

-17-

"new policies, practices and procedures not currently contained in" the Agreement.

This grievance would not exist had both parties shared the Union's view that the Agreement already embraced the subject and, therefore, could not be modified without its consent. The Union learned something crucial to this dispute on September 17: the Employer fundamentally disagreed with its Article 3 reading that the contract applied to mandatory military uniforms for civilian ARTs. Therefore, time limits did not begin prior to September 17.

Indeed, Article 33 §7 speaks of the "occurrence of the action grieved" and the date of awareness of the "actions or decisions." ARTs have not yet been required to wear a uniform while in civilian status. The timing and mechanics of the future transition still are unresolved. Arguably, no occurrence, action and/or final decision happened even by October 16.[4] Moreover, there is no indication in language or evidence about which date prevails if the occurrence, action and/or final decision take place at different times.

---

[4]  Elkouri and Elkouri, *supra*, p. 224.

Assuming the clock began ticking on August 21, a combination of factors militate against non-arbitrability and in favor of the presumption of arbitrability. Beside those already referenced, the Agreement contains no express default or forfeiture language. The Employer did not claim untimeliness before the hearing despite potential Article 33 §12 prohibitions. The Union responded to the August 21 correspondence quickly and clearly stated its position. Neither party suffered prejudice from the date of the formal grievance. Given its silence about procedural deficiencies, the Employer's grievance answers and participation in negotiations before and after the grievance suggest a waiver of any timeliness defense. Considering this record as a whole, foreclosing analysis on the merits requires an unacceptable hyper-technical reading of the Agreement that applies inferences and consequences unsupported by its language or the circumstances.

<u>Merits</u>

As previously mentioned, stripped to its essentials, this dispute turns on whether Article 3 §2 or Article 3 §3 applies. Article 3 §2 describes permissive bargaining that "may" occur

about new or amended directives that "affect or contradict" existing Agreement provisions.  Negotiations must be voluntary and then result in mutual commitment. Otherwise, given Article 42, the Agreement's original provisions remain intact.

Article 3 §3 deals with certain new policies, practices or procedures "not currently contained" in the Agreement. Negotiations are mandatory ("a new article will be appropriately negotiated").  If impasse results, the parties are left to whatever non-contractual rights, if any, apply.

The contractual issue is similar to, but someways different from, statutory legal standards under the FLRA's "covered by" doctrine.  In Article 3 the parties agreed to their mid-term negotiation and contract modification obligations that, had the Agreement been silent, would be governed by *U.S. Department of Health and Human Services*, 47 FLRA 1004 (1993), and its progeny.[5]

_____

[5] When a contract is silent, management may require uniforms for dual status employees under its FLRA §7106(b)(1) mid-term authority to determine methods and means of performing work. When the contract speaks to a subject, the contract prevails.

The Authority uses a two-step "covered by" analysis. First is whether the subject matter "is expressly addressed" by the contract. An "exact congruence" is unnecessary if a reasonable reading shows the contract embodies the disputed matter.  Second, if not expressly addressed, a topic is covered if "inseparably bound up with a subject expressly covered by the contract."  See, *NTEU and FLRA*, 452 F.3d 793 (D.C. Cir, 2006); *Department of Navy, Marine Corps Logistics Base, Barstow, California*, 48 FLRA No. 10 (1993).

Therefore, the ultimate question is whether the Agreement covers or otherwise resolves uniform requirements for ARTs either in its specific provisions or by inferences derived from the Agreement as a whole, its negotiation history and/or other relevant circumstances. The answer is the Agreement's language, specifically or read as a whole, does both.

Article 3 §1 results in application of Article 3 §2. Because the Agreement is governed by DoD and Air Force rules and regulations existing on its effective date, the 1999 version of AFI 36-703 ("military grooming and appearance standards do not apply to civilian employees") are incorporated into it.  Often described as a "maintenance of standards", "maintenance of benefits" or "maintenance of conditions" clause, the provision assists both parties by freezing the status quo about defined subjects to eliminate mid-term contract disputes about initially unobjectionable, mutually acceptable conditions.[6]

The August 7 AFI was not an Article 3 §3 "new" subject "not currently contained" in the Agreement.   It directly contradicted the existing AFI that Article 3 §1 absorbed into the Agreement.

---

[6]  Generally, see Hill and Sinicropi, *Management Rights*, BNA, 1986, pp. 61-62, 399; Elkouri and Elkouri, supra, p. 622; and Jaffee, "Past Practice, Maintenance of Benefits and Zipper Clauses, Bornstein, Gosline, Greenbaum, supra, §2.21.

It is immaterial that uniforms were not specifically discussed during 2007 negotiations. There was no need to mention them since both parties were content to keep existing grooming and appearance rules, and a myriad of other subjects, fixed and stable until the Agreement expired.

This reading is consistent with Article 42 §3's zipper clause since Article 3 §1 "embodies" Air Force rules and regulations into the Agreement. Indeed, Article 42 supports continuation of unspecified rules existing on May 10, 2007. Article 42 §1's last sentence, providing conformance to applicable laws and regulations when the Agreement is renewed, extended or renegotiated, reflects the Agreement might deviate from changes occurring during its term. Article 42 §4 says the Agreement trumps "agency and government-wide regulations" unless changed by "proper negotiation."

If Articles 3 and 42's express language does not establish a specific intent to incorporate 1999 grooming/ appearance standards into the Agreement, other provisions, plus relevant circumstances, indicate the Agreement subsumed their inclusion. Accordingly, while uniforms may improve

consistent appearance, cohesion and other long-term military goals, they also can generate lower short-term morale and predicate consequential military behavior on a civilian work force. More importantly, the record contains no demonstrable evidence about the practical positive effects, if any, on ARTs' civilian work duties or the Air Force's mission. Likewise, there is no evidence of a material change in circumstances, any emergency or other compelling exigencies necessitating uniforms for civilian employees at times they had not previously worn them.

Additionally, at least one and possibly two provisions underscore that the parties contemplated that uniforms were not required. The Union's Article 7 §7 reading is more attractive than the Employer's. The first sentence has a broader reach than non-work time and/or outside employment. If it did not, the first sentence and the first three words in the second sentence would be unnecessary and meaningless. Also, "in this context" suggest the subject that follows is a subset of a broader concept that precedes it.

Much more compelling is Article 28. It allows employees to decide if protective footwear is needed and, if they do, provides up to two hours duty time, possibly off Base, and up to $125 reimbursement for purchase from approved outside vendors. It also says employees pay "applicable taxes." None of these stipulations make any sense unless the parties assumed employees wear civilian attire rather than government issue uniforms.

## AWARD

1.  The grievance is arbitrable;

2.  The Employer violates the Agreement by unilaterally requiring ARTs employees to wear military uniforms while in civilian status performing civilian duties.

3.  The Employer shall apply the 1999 version of AFI 36-703. It shall not apply the uniform requirements for ARTs in civilian status described in the August 7 AFI/August 20 IMC for the life of the Agreement unless and until the Union agrees to modify the Agreement to permit those requirements or similar changes.

4.  The Arbitrator shall retain jurisdiction for sixty days from the date of this Decision and Award, or for such longer time mutually agreeable to the parties, for the sole and exclusive purpose of resolving questions, if any, about the remedy described above. Jurisdiction shall continue until the remedial question is resolved if either party invokes the Arbitrator's retained jurisdiction during such sixty day or extended period. Unless the parties agree otherwise, any retention of jurisdiction applies only to the meaning of the above remedy and not to new or different disputes.

June 2, 2008
_____
Date

MICHAEL D. GORDON, ARBITRATOR

-24-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, *ET AL.*, )
                                )
                  *Plaintiffs,* )
                                )
          v.                    )          Civil Action No. 1:08cv692 (EGS)
                                )
SECRETARY OF THE AIR FORCE,     )
                                )
                  *Defendant.*  )          Judge Sullivan

# PLAINTIFFS' EXHIBIT 11



# FLRA BULLETIN

### FEDERAL LABOR RELATIONS AUTHORITY · WASHINGTON, DC · 20424

www.flra.gov

FOR IMMEDIATE RELEASE
March 3, 2008

### *Unfair Labor Practice Case Processing in the Absence of a General Counsel - Questions and Answers - -*

Question: Will the FLRA's regional offices continue to accept unfair labor practice charges during the time the FLRA does not have a General Counsel?

Answer: Yes, the FLRA's regional offices will continue to accept unfair labor practice charges during the time the FLRA lacks a General Counsel.

When an unfair labor practice charge is filed, the appropriate regional office will continue the regular practice of conducting an investigation to determine whether a complaint should be issued, or whether the charge should be dismissed because it lacks merit.

Question: If an investigation confirms that a charge has merit, will an unfair labor practice complaint be issued?

Answer: Not immediately. Unfair labor practice complaints may only be issued when the FLRA has a General Counsel. Similarly, settlement activities by the Office of the General Counsel, which follow a determination to issue a complaint, must also await the appointment of a new General Counsel. It remains the policy of the Office of the General Counsel to encourage parties to meet and resolve unfair labor practice disputes prior to and even after the filing of unfair labor practice charges. The parties to such disputes are always free to resolve their disputes on their own or with the assistance of a third party.

Question: If a Regional Director determines that a charge lacks merit and will be dismissed, can that determination be appealed?

Answer: Yes, such determinations can be appealed. Any appeal from a determination by a Regional Director to dismiss a charge must continue to be filed according the procedures and within the time limits provided in the FLRA's regulations. However, resolution of such appeals must await the appointment of a new General Counsel.

Question: If an unfair labor practice complaint has already been issued, will the Office of the General Counsel continue to prosecute that complaint in proceedings before the FLRA's Administrative Law Judges or otherwise?

Answer: Yes, in cases where the determination has been made to issue an unfair labor practice complaint, the Office of the General Counsel will prosecute that complaint consistent with the procedures set forth in the FLRA's regulations. This includes litigating the complaint before an FLRA Administrative Law Judge and the Authority. Such activities could also include engaging in settlement efforts as described in the FLRA's regulations. Parties involved in litigation related to a previously issued complaint must continue to follow FLRA regulations with respect to the filing of answers, motions, exceptions, and other pleadings or related matters.

Question: Who should be contacted with other questions about unfair labor practice case processing during the time the FLRA lacks a General Counsel?

Answer: Other questions concerning unfair labor practice case processing procedures should be directed to an appropriate regional office. Contact information for the FLRA's regional offices can be found at the following link http://www.flra.gov/gc/regions/map.html.

###

**Visit the FLRA Web Site at: www.flra.gov**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 12



# FLRA BULLETIN

### FEDERAL LABOR RELATIONS AUTHORITY · WASHINGTON, DC · 20424

www.flra.gov

FOR IMMEDIATE RELEASE
July 17, 2008

### Authority Case Processing
### During the Time the Authority Has One Member
### -- Questions and Answers --

**Question**: What is the current status of the Authority?

**Answer**: On July 14, 2008, Chairman Dale Cabaniss resigned as Chairman of the FLRA. Chairman Cabaniss had served nearly 11 years as a Member and, since 2001, the Chairman of the Authority. The Chairman's departure leaves the Authority with one Member, Member Carol Waller Pope.

**Question**: Has the Authority ever had only one Member before?

**Answer**: Yes. The Authority had only one Member between November 1988 and September 1989. During this time, the Authority's only Member was Chairman Jean McKee. The Authority gained a second Member in September 1989 with the appointment of Member Pamela Talkin.

**Question**: Does the Authority's current status, with only one Member, affect the ability of parties to file cases with the Authority?

**Answer**: No. The provisions in the Statute and the Authority's regulations concerning the filing of arbitration, negotiability, representation, and unfair labor practice cases with the Authority are not affected by the current composition of the Authority. The Authority's Case Intake and Publication section will continue to accept such filings. For questions on filing procedures, parties can contact CIP directly at **202-218-7740**. All documents filed or required to be filed under the Authority's regulations should be filed

with Case Intake and Publication, Federal Labor Relations Authority, Docket Room, Suite 201, 1400 K Street, NW, Washington, DC 20424-0001.

**Question**: Does the Authority's current status, with only one Member, affect the time limits that apply to the filing of cases and related documents with the Authority?

**Answer**: No. All time limits in the Statute and the Authority's regulations applicable to the filing of documents with the Authority continue to apply. This includes time limits for filing exceptions to arbitrator's awards, petitions for review of negotiability issues, applications for review of decisions by FLRA Regional Directors in representation cases, and exceptions to Administrative Law Judge decisions in unfair labor practice cases. Other time limits, relating to matters such as making filings that are responsive to initial filings in such cases, as well as motions for reconsideration of Authority decisions, also continue in effect.

**Question**: How does the Authority's current status, with only one Member, affect the Authority's ability to issue decisions?

**Answer**: With only one Member, the Authority lacks a quorum to exercise its power to adjudicate cases under the Statute. Therefore, during the period that the Authority has only one Member, it will not be issuing final decisions in cases currently pending, or which will be filed, with the Authority. However, the Authority's Case Intake and Publication section will continue to exercise its delegated power to procedurally review and, where appropriate, dismiss cases filed with the Authority that do not satisfy case filing requirements under the Statute and the Authority's regulations.

**Question**: When will the Authority begin issuing decisions again?

**Answer**: The Authority will begin issuing decisions adjudicating cases under the Statute when one or more additional Members "are appointed by the President by and with the advice and consent of the Senate." 5 U.S.C. § 7104(b).

**Question**: Who should be contacted concerning further questions relating to Authority case processing during the period when the Authority has one Member?

**Answer**: Further questions concerning filing cases with the Authority, and related matters, should be directed to the Authority's Case Intake and Publication section,

**202-218-7740** . CIP's address is: Case Intake and Publication, Federal Labor Relations Authority, Docket Room, Suite 201, 1400 K Street, NW, Washington, DC 20424-0001.

###

**Visit the FLRA Web Site at: www.flra.gov**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, *ET AL.*,   )
                                  )
            *Plaintiffs,*          )
                                  )
      v.                          )        Civil Action No. 1:08cv692 (EGS)
                                  )
SECRETARY OF THE AIR FORCE,       )
                                  )
            *Defendant.*           )        Judge Sullivan

# PLAINTIFFS' EXHIBIT 13

# NEGOTIATED AGREEMENT



# BETWEEN

**AFGE LOCAL 1364    &    NAS JRB, FT WORTH TEXAS**

## ARTICLE XXIII

### AIR RESERVE TECHNICIANS

SECTION 1:  Management has the right to encourage the wearing of the military uniform; however, it is understood and agreed that all Air Reserve Technicians (ARTs) shall have the right to exercise their individual option as to whether they wear the military uniform while in a civilian status.  The Employer agrees that there shall be no intimidation, coercion or harassment against employees who exercise their right to wear civilian clothes while in civilian status (by definition, civilian status means civil service status.)

SECTION 2:  The Employer and the Union agree to recognize the civilian grade of the employee for utilization of appropriate government facilities when working in civil service status.

SECTION 3:  Military requirements such as saluting, hair length, etc., will not apply while in a civilian status and attire.

SECTION 4:  The civilian grade will be the only grade shown on civilian travel orders.

## ARTICLE XXIV

*Both parties mutually agree to the changes made to Section 12 of Article XXIV on this 7th day of December 2006*

### OVERTIME

SECTION 1:  The Union agrees that the administration of any overtime work, as it pertains to the nature of the work, the need for special skills, the priority of production or support effort, and the number of employees, is solely the function of the Employer.

SECTION 2:  Authorized time spent in excess of eight (8) working hours a day or forty (40) working hours a week shall be considered overtime work.  Fifteen minutes is the minimum period of overtime that can be authorized.

SECTION 3:  Overtime assignment will be distributed and rotated equitably among employees with the same title, series, grade and assignment within the same work section in accordance with their particular skills.

  a.  Overtime will be accomplished by volunteers in the appropriate skills required, as far as practicable.

  b.  Supervisors shall not assign overtime work to employees as a reward or penalty.  Any complaint or disagreement on the distribution of overtime shall be processed under the negotiated grievance procedure.

SECTION 4:  Overtime shall not be compulsory except in an emergency or when official requirements must be met.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 14



bor-Management Agreement

March Field

and

American Federation
Of Government Employees
Local 3854

Article 37

## AIR RESERVE TECHNICIANS

SECTION 1: The Union acknowledges the complexity of the ART program, and does not wish to interfere in any way with the military regulations or policies that govern ART's when they are in military status. However, the Union does feel inclined to distinguish between the two entities.

SECTION 2: The Employer recognizes the Union's right to I&I bargaining, and will consult with the Union before implementing or changing policies, Base or higher headquarters, which impact working conditions, personnel practices or conditions of employment. The Union has the right to request meetings as appropriate to discuss issues of mutual concern.

SECTION 3: ART's in civilian status will be governed by all existing civilian directives, regulations and this collective bargaining agreement. The Employer will ensure that civilian and military personnel actions are kept distinctly separate, and the processing of these actions are done IAW applicable regulations.

SECTION 4:

a. The wear of the military uniform is encouraged by ART's during exercises, operational readiness inspections and ongoing contingency operations, however is not mandatory when performing duty in civil service status as an air reserve technician except when mandated by the employee's position description.

b. Wear of the uniform while performing duty in civil service status is at the option of the individual except when mandated by the employee's position description.

c. ART's must wear appropriate military flight clothing while participating in military flights as crew members/crew chiefs. They will, when in civilian status, be authorized to wear an aircrew style name patch with their name and aircrew/maintenance specialty badge on them.

d. While wearing the military uniform in civilian status, ART's will maintain the personal grooming and weight standards outlined in Air Force Instructions.

SECTION 5: The Employer agrees that while in civilian status, proper civilian titles will be used. Use of a military identity in the performance of their normal duties is at the option of the employee. ART's in civilian status may sign forms and documents using their choice of military or civilian rank, unless stipulated by Air Force Instruction, laws, or rules.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 15



**DEPARTMENT OF THE AIR FORCE**
305TH AIR MOBILITY WING (AMC)

20 March 2008

MEMORANDUM FOR AFGE Local 1778

FROM:    MSS/DPCE/S

SUBJECT: Response to Informal Grievance – GA-3055

1. We are in receipt of a grievance filed by Mr.            on 13 February 2008 and received in our office on 21 February 2008. Mr l          alleged that after leaving the dining facility he was approached by CMSgt '          and was informed that he couldn't be on the cell phone while in uniform. Mr l          recommended resolution is for management to be briefed on the Labor Management Agreement, not to harass civilians in uniform and an apology.

2. On 13 March 2008, I met with AFGE Local's President            Executive Vice President l        and l          from the Civilian Personnel Flight. During this meeting we discussed the 19 November 2007 implementation of the requirement for ARTs to wear military uniform while in civilian status. I pointed out that the uniform requirement is vested in Air Force Instructions 36-703, 36-801 and 36-2903. In accordance with AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, Table 6.1, rule 14, an Air Reserve Technician must wear the military uniform when performing duty in civil service as an Air Reserve Technician. Note 1 of Table 6.1 specifically states, "Members will conform to the same standards of appearance, military customs, practices, and conduct in uniform prescribed for active duty members." Paragraphs 1.3.2 and 1.3.2.2.of AFI 36-2903 state: *"Members will not walk in uniform while using cell phones, radios, hands-free headsets unless required in the performance of official duties using a government issued device."*

3. Mr l        grievance claimed that Article 35, Section 6 of the Labor Management Agreement was violated. However, Article 35, Section 6 states "Personal Cell Phones: Personal cell phones may be used on the job as long as their use does not interfere with official duties, the calls are of reasonable duration and frequency and whenever possible, the calls are made during the employees personal time such as rest or lunch periods. If carried when working on or around aircraft, they should be secured so as not to cause a FOD hazard. **Cell phones may not be carried if appropriate regulations/TOs prohibit their use..."** Therefore, Air Reserve Technicians wearing the military uniform are precluded from such devices unless required in the performance of official duties using a government issued device, as described in AFI 36-2903.

4. Therefore, this grievance is denied.

Human Resource Specialist



RECEIVED
20 Mar 08

By
Fax

**AMC-GLOBAL REACH FOR AMERICA**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, *ET AL.*, )
                                )
            *Plaintiffs,*        )
                                )
        v.                      )        Civil Action No. 1:08cv692 (EGS)
                                )
SECRETARY OF THE AIR FORCE,     )
                                )
            *Defendant.*         )        Judge Sullivan

# PLAINTIFFS' EXHIBIT 16

# CRS Report for Congress

Received through the CRS Web

# Military Technicians: The Issue of Mandatory Retirement for Non-Dual-Status Technicians

March 28, 2000

Lawrence Kapp
Analyst in National Defense
Foreign Affairs, Defense, and Trade Division

**ABSTRACT**

This report describes the mandatory retirement provisions for certain "non-dual-status" military technicians contained in the National Defense Authorization Act for Fiscal Year 2000 (P.L. 106-65), discusses the stated rationale behind the policy, and quantifies the impact it will likely have on individual technicians. The report also discusses objections to the mandatory retirement provisions and analyzes proposals to repeal or modify this policy. Appendices to this report contain detailed histories of the military technician program, the "dual status" requirement, and congressional efforts to curtail the number of non-dual-status technicians within the technician workforce. This report will be updated as needed.

# Military Technicians: The Issue of Mandatory Retirement for Non-Dual-Status Technicians

## Summary

Military technicians are federal civilian employees who provide support primarily to wartime deployable reserve units. Unlike regular civilian employees, military technicians are generally required to maintain membership in the Selected Reserve as a condition of their employment. These technicians are referred to as "dual-status" technicians, reflecting their status as both federal civilian employees and military reservists. The intent of this requirement is to guarantee that when a reserve unit is mobilized, the military technicians who support that unit will be mobilized as well. Some military technicians, however, are not members of the Selected Reserve. These technicians – referred to as "non-dual-status" technicians – cannot be ordered to deploy with their unit when it is mobilized.

The number of non-dual-status technicians, especially within the Army Reserve, has troubled Congress for many years. Concerned that the large proportion of non-deployable technicians within the technician workforce was undermining the readiness of reserve units, Congress passed legislation in 1983 – and in every subsequent year up through 1995 – aimed at reducing or eliminating the number non-dual-status technicians. These past efforts, however, did not produce the results Congress had hoped for. The mandatory retirement provisions of the National Defense Authorization Act for FY2000 are the latest attempt by Congress to ensure that the technician workforce is virtually all "dual status."

The mandatory retirement provisions do *not* affect technicians in the National Guard; they only apply to technicians in the Army Reserve and the Air Force Reserve who do not hold dual status now or who lose dual status at some time in the future. (There are no military technicians in the Naval Reserve, Marine Corps Reserve, or Coast Guard Reserve). Under current legislation, Army and Air Force Reserve technicians who do not hold dual status and who are eligible for an "unreduced annuity" will be required to retire; if they do not hold dual status but are not yet eligible for an "unreduced annuity," they *may* be allowed to continue working until they become eligible for one, at which time they will be required to retire. (An annuity, or pension, is a key component of the retirement benefits of federal civilian employees. An "unreduced annuity" is an annuity that is not subject to reduction by reason or age or years of service. It is important to point out that the annuity referred to here is the one which technicians earn as federal civilian employees, *not* the military retired pay which they may be entitled as a result of their simultaneous service in the Selected Reserve).

Critics of the mandatory retirement provisions claim that this policy is unfair because some technicians will suffer financially by having to retire earlier than planned. These critics also argue that it will undermine military readiness by forcing experienced technicians out of their jobs. They believe that the policy should be repealed, or at least modified in order to minimize the negative financial impact on technicians. However, supporters of the provisions argue that the policy is fair to technicians as it allows them to continue working until they are eligible for a normal pension. They also argue that it enhances the military readiness of reserve units by ensuring that technicians can deploy with the units they support.

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

What is a Military Technician? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Origin and Evolution of the Military Technician Program . . . . . . . . . . . . . . . . . 3

Congress and the Dual Status Requirement: Past Legislative Provisions . . . . . . . 4

Congress and the Dual Status Requirement:  Legislative Provisions in the
      National Defense Authorization Act for FY2000, Including the
      Mandatory Retirement Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Section 522:  Its Impact on Various Groups of Military Technicians in the
      Army Reserve and the Air Force Reserve . . . . . . . . . . . . . . . . . . . . . . . . 7
      Army and Air Force Reserve Technicians Hired on or Before
            February 10, 1996, Who Held Dual-status on October 5, 1999 . . . . . . 7
      Army and Air Force Reserve Technicians Hired on or Before
            February 10, 1996, Who Did Not Hold Dual-status on
            October 5, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      Army and Air Force Reserve Technicians Hired after February 10, 1996,
            Who Held Dual-status on October 5, 1999 . . . . . . . . . . . . . . . . . . . 10
      Army and Air Force Reserve Technicians Hired after February 10, 1996,
            Who Did Not Hold Dual-status on October 5, 1999 . . . . . . . . . . . . 10

Impact of the Mandatory Retirement Provisions on Individual Technicians . . . 10

Arguments in Opposition to the Mandatory Retirement Provisions . . . . . . . . . . 11

Arguments in Support of the Mandatory Retirement Provisions . . . . . . . . . . . . 13

Other Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The Ongoing Debate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Appendix A
      Origin and Evolution of the Military Technician Program and the
            Dual Status Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

"Dual Status" Provisions in the National Guard's Technician Program . . . . . . . 19

"Dual Status" Provisions in the Air Force Reserve's Technician Program . . . . . 20

"Dual Status" Provisions in the Army Reserve's Technician Program . . . . . . . . 21

Appendix B
      Congress and the Dual Status Requirement: Past Legislative Provisions . . 23

**List of Tables**

Table 1. Effect of P.L. 106-65, Section 522, on Military Technicians in the
Army Reserve and Air Force Reserve . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# Military Technicians: The Issue of Mandatory Retirement for Non-Dual-Status Technicians

## Introduction

The National Defense Authorization Act for Fiscal Year 2000[1] contains policy changes affecting many U.S. military technicians, most notably a provision which mandates the retirement of certain retirement-eligible technicians. Under this legislation, Army and Air Force Reserve technicians who do not hold dual status and who are eligible for an "unreduced annuity" will be required to retire; if they do not hold dual status but are not yet eligible for an "unreduced annuity," they *may* be allowed, at the discretion of their respective service, to continue working until they become eligible for one, at which time they will be required to retire. Although Congress has settled the question for now, advocates for some military technicians argue that the policy should be repealed or modified.

This report will describe the duties of military technicians and the history of military technician programs in the National Guard, Army Reserve, and Air Force Reserve. It will outline the importance of the "dual status" requirement in these three distinct technician programs, explain the interest of Congress in this requirement, and recount the legislative attempts to strengthen its application. Finally, this report will discuss the stated rationale for the recently enacted mandatory retirement provision, linking it to Congress's past efforts to strengthen the dual status requirement, and assess the impact of this provision on military technicians.

## What is a Military Technician?

The reserve component[2] (RC) of the United States armed forces employs a small core group of full time employees to administer RC units, train RC personnel, and maintain RC equipment. These employees are known as Full-Time Support (FTS) personnel. There are four distinct types of FTS personnel: civilian employees, active duty military personnel, Active Guard and Reserve (AGR) personnel, and military technicians.[3] Military technicians are federal civilian employees, hired under statutes

---

[1] P. L. 106-65; October 5, 1999.

[2] The reserve component of the United States military includes the Army Reserve, Navy Reserve, Air Force Reserve, Marine Corps Reserve, Coast Guard Reserve, Army National Guard, and the Air National Guard.

[3] Military technicians have also been referred to as "reserve technicians," "civilian technicians," "dual status technicians," "technicians" and "caretakers and clerks" in the past.

(continued...)

contained in titles 5 and 32, U.S. Code, who provide support primarily to wartime deployable units of the Selected Reserve.[4] Unlike regular civilian employees, however, military technicians are generally required to maintain membership in the Selected Reserve as a condition of their employment. They may also be required to fulfill their reserve obligation (i.e., drilling one weekend a month and attending two weeks of annual training) in the same unit they work for in their civilian capacity.[5] The principal intent of this policy is to guarantee that when a reserve unit is mobilized, the technicians who support it will be mobilized as well. This ensures that the expertise and skills of the technician workforce remain available to the unit when it needs them most.

Military technicians who hold membership in the Selected Reserve are referred to as "dual status technicians" because of their status as both civilian employees and reservists. However, for a variety of reasons which will be discussed later, not all military technicians belong to the Selected Reserve. These technicians are referred to as "non-dual-status technicians."[6] Precisely because they are not members of the Selected Reserve, non-dual-status technicians *cannot* be ordered to deploy with their unit when it is mobilized.[7] Thus, the supported unit is largely deprived of the technician's expertise and skills during its deployment.

---

[3] (...continued)
The term used in the most recent federal legislation has been "military technicians" and is the terminology generally used throughout this paper. The term "technicians," however, is sometimes used as an abbreviation. It should be considered synonymous with the term "military technicians" unless stated otherwise.

[4] The Selected Reserve, a sub-element of the Ready Reserve, contains those units and individuals most essential to wartime missions. Members of the Selected Reserve generally perform, at a minimum, one weekend of training each month, and two weeks of training each year, for which they receive pay and benefits.

[5] A "unit membership requirement" for certain military technicians was enacted November 18, 1997, as part of P. L. 105-85 and is codified in Title 10, U.S. Code, section 10216 (d). Similar unit membership requirements have existed for many years within the administrative agreements which govern the military technician programs in the Army Reserve and the Air Force Reserve. In the case of the Army Reserve, the annual Department of Defense Appropriations Acts from FY1984 through FY1996 also contained language barring funds to certain technicians who did not hold reserve membership in the same unit which they worked for in their civilian capacity. See footnote 63 for a full listing of these provisions.

[6] They are also sometimes referred to as "status quo" technicians.

[7] Non-dual-status technicians may *volunteer* to deploy with their units, as some did during the Gulf War, but they are under no obligation to do so.

CRS-3

# Origin and Evolution of the
# Military Technician Program

As a federal program, the military technician program is over 80 years old and its history is fairly complex. The following section provides a brief overview of the program's origin and evolution. A more detailed account is contained in Appendix A of this report.

Military technicians are descended from the personnel described in Section 90 of the National Defense Act of 1916.[8] This act authorized the use of federal funds "for the compensation of competent help" to take care of the "material, animals, and equipment" in National Guard units. Subsequent legislation renamed the "competent help" as "caretakers and clerks." Until 1968, these "caretakers and clerks" were state employees, governed by state laws, but paid with federal funds. In 1968, however, Congress passed the National Guard Technicians Act,[9] which converted all "caretakers and clerks" from state employees to federal employees and renamed them "technicians."

The Air Force Reserve and the Army Reserve established technician programs similar to the National Guard's in 1957 and 1960, respectively.[10] However, unlike the National Guard program, which was established by federal law, the Reserve programs were established administratively, under the broader statutory umbrella of the federal civil service. As such, the Reserve technician programs differed substantially from the National Guard program. Furthermore, because the Reserve technician programs operated under the authority of federal civil service laws, the Air Force Reserve and the Army Reserve needed the approval of the Civil Service Commission (now the Office of Personnel Management) before they could establish their technician programs. To win this approval, the Air Force Reserve and the Army Reserve each had to negotiate an agreement with the Civil Service Commission concerning employment conditions for the technicians. These agreements were negotiated separately and, as a result, the Air Force Reserve technician program differed substantially from the Army Reserve technician program.

One of the key differences among these three military technician programs – National Guard, Air Force Reserve, and Army Reserve – lies in the degree to which they required their technicians to maintain "dual status." A strict "dual status" provision would require military technicians to maintain membership in the Selected Reserve as a condition of their employment, usually in the same unit they work for in their civilian capacity. A less strict provision might make exceptions in certain cases, or merely encourage "dual status" while not requiring it.

---

[8] Statutes at Large, June 3, 1916, chapter 134, section 90.

[9] P. L. 90-486; 82 Stat. 755; August 13, 1968.

[10] The Naval Reserve, Marine Corps Reserve, or the Coast Guard Reserve have never had a military technician program.

Of the three military technician programs, the Army Reserve had the weakest dual status requirement.[11] The effect of this weaker "dual status" requirement was to create a technician program in the Army Reserve with a relatively high number of non-dual-status technicians. This eventually attracted the attention of Congress, which was concerned that the Army Reserve's readiness was being degraded by the presence of so many technicians who could not be required to deploy with their units in the case of mobilization.

# Congress and the Dual Status Requirement: Past Legislative Provisions

From 1983 to 1995, Congress repeatedly included provisions in defense appropriations bills aimed at reducing the numbers of non-dual-status technicians within the Army Reserve's military technician program. Yet, in spite of these efforts, the composition of the Army Reserve's technician workforce did not change appreciably. (For a detailed history of these legislative efforts and their impact see Appendix B). As a result, beginning in 1995, Congress began to take a broader and more aggressive approach towards managing the military technician workforce.

In 1995, Congress included a provision in the National Defense Authorization Act for Fiscal Year 1996 which established a strict dual-status requirement for all newly hired technicians, whether in the Army Reserve, the Air Force Reserve, or the National Guard.[12] Two years later, the National Defense Authorization Act for Fiscal Year 1998 contained several provisions related to military technicians and the "dual status" requirement. Specifically, it placed a limit on the number of non-dual-status technicians that could be employed in each of the technician programs and required the Secretary of Defense to submit a report to Congress outlining "a plan for ensuring that, on and after September 30, 2007, all military technician positions are held only by military technicians (dual status)."[13] The clear implication of this latter provision was that Congress was interested in phasing out the employment of all non-dual-status technicians and wanted advice from the Department of Defense on how to accomplish this objective.

The Department of Defense submitted a report to Congress in 1999 which contained a plan to ensure that only dual-status technicians held military technician positions by the end of FY2007; however, the report raised a number of concerns about the fairness and feasibility of doing so. With respect to fairness, the report predicted that meeting the 2007 deadline would require DoD to involuntarily separate 2,655 non-dual-status technicians, many of whom would not be eligible for civil

---

[11] For a comparison of dual-status requirements of the three programs, see Appendix A.

[12] P. L. 104-106, section 513(c); 110 Stat. 306; February 10, 1996.

[13] P. L. 105-85, section 523; 111 Stat. 1737; November 18, 1997. The caps on the number of non-dual-status technicians which could be employed by the other Reserve organizations were as follows: 1,500 non-dual-status technicians in the Army Reserve; 2,400 in the Army National Guard; 450 in the Air National Guard; and zero in the Air Force Reserve by the end of fiscal year 1998.

service retirement when separated.[14]  Forced reductions of this sort, the DoD report argued, were unfair to the individual technicians:

> ...non-dual status military technicians were hired and are managed according to various Reserve component policies. Non-dual status military technicians had a reasonable expectation that their positions carried career potential.  The Department feels a moral obligation to recognize previous commitments and reasonable individual career expectations and to avoid forced reductions to the extent practicable.[15]

Another significant point raised in the DoD report dealt with the limited need for non-dual-status technicians in the National Guard.  National Guard units usually operate under the authority of the Governor of the state or territory in which they are located.  Each state or territory maintains a headquarters to oversee its units and military technicians are frequently employed in these headquarters.  If these technicians hold dual-status, then they could potentially be mobilized by the federal government in times of national emergency and deployed with the unit they maintain membership in.  This, DoD contended, could cripple the ability of the state headquarters to carry out its own important mission.  "The National Guard," the report concluded, "cannot operate without a workforce that includes some employees who do not have to mobilize with the units they support."  From this perspective, the National Guard has a bona fide need for at least some non-dual-status technicians.[16]

## Congress and the Dual Status Requirement:  Legislative Provisions in the National Defense Authorization Act for FY2000, Including the Mandatory Retirement Provisions

As a result of the concerns raised by the Department of Defense, Congress substantially modified the idea of simply filling all military technician positions with dual-status technicians by 2007.   The National Defense Authorization Act for FY2000 contains a new initiative which attempts to reconcile the desire of Congress to have an all dual-status technician workforce with the issues of fairness and necessity raised by the Department of Defense.  With regards to the issue of necessity

---

[14] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999, pages 7 and 8.  Numbers are derived from the estimated Reductions in Force (RIFs) required by September 30, 2007, without benefit of additional retirement incentives.

[15] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999, page 3.

[16] A similar argument has been made by some military technicians with respect to the Army Reserve.  A small proportion of Army Reserve military technicians are assigned to non-deploying headquarters units where they perform functions similar to those performed by a National Guard state headquarters. (At present, 558 military technicians, or 9% of the Army Reserve's technician workforce, fit this description). Thus, they argue, if the National Guard has a bona fide need for some non-dual-status technicians in its headquarters units, so too does the Army Reserve.

raised by the National Guard, the congressional response was fairly straightforward: the act authorized the National Guard to employ up to 1,950 non-dual-status technicians on and after October 1, 2001.[17]

Reconciling Congress's desire to have a dual-status technician workforce with the desire to treat non-dual-status technicians fairly, however, was a more complicated issue and the relevant legislation was therefore more complex. The issue is addressed in Section 522 of the National Defense Authorization Act for FY2000, first by categorizing military technicians – in the Army and Air Force Reserves only[18] – in two separate ways. First, it categorized technicians based on the date they were hired: "on or before" or "after" February 10, 1996, the date of enactment of the National Defense Authorization Act for FY1996. This distinguishes between those technicians who were hired when there was an ambiguous dual-status requirement, and those who were hired after a firm dual-status requirement had been codified into law. Second, it categorized them based on whether or not they held dual-status on October 5, 1999, the date on which the National Defense Authorization Act for FY2000 was enacted into law. This provision was principally administrative: it facilitated distinguishing those technicians who would be affected immediately and those who might be affected in the future. These two dividing lines produce four distinct categories of Army and Air Force Reserve military technicians: (1) those who were hired on or before February 10, 1996, and who held dual-status on October 5, 1999; (2) those who were hired on or before February 10, 1996 and who did not hold dual-status on October 5, 1999; (3) those who were hired after February 10, 1996, and who held dual-status on October 5, 1999; and (4) those who were hired after February 10, 1996, and who did not hold dual-status on October 5, 1999. The legislative provisions contained in Section 522 and a description of how they impact each of these four groups are discussed below. (These provisions and their impact are summarized in Table1).

---

[17] P. L. 106-65, section 523; October 5, 1999. This figure represents about four% of the total number of technicians currently authorized for the National Guard.

[18] The National Guard was not included in this part of the Act because, as mentioned, Congress recognized that the Guard had a legitimate need to employ a small number of non-dual-status technicians. Applying the mandatory retirement/prompt separation provisions contained in this part of the Act to non-dual-status technicians in the National Guard would run counter to Congress's intent of allowing the Guard to employ this type of technician as a permanent part of its technician workforce.

# Section 522: Its Impact on Various Groups of Military Technicians in the Army Reserve and the Air Force Reserve

## Army and Air Force Reserve Technicians Hired on or Before February 10, 1996, Who Held Dual-status on October 5, 1999

Provided they maintain their dual-status, these technicians will not be affected by the changes contained in the National Defense Authorization Act for FY2000; however, should they lose their dual-status[19] at some point after October 5, 1999, they will be substantially affected. Those who lose their dual-status and are eligible for an "unreduced annuity"[20] will be required to retire within 30 days of losing dual-status. (It is important to point out that the annuity, or pension, referred to here is the annuity earned by technicians *as members of the civil service*. It does not refer to the military retired pay which some technicians become eligible for as long-time members of the Selected Reserve).[21] Those who lose their dual-status but are *not* eligible for an unreduced annuity will have several options. They will have the opportunity to "(i) reapply for, and if qualified, be appointed to, a position as a military technician (dual-status); or (ii) apply for a civil service position that is not a technician position."[22] Alternatively, these technicians can continue their employment with the Army or Air

---

[19] A technician could lose his or her dual status (i.e. membership in the Selected Reserve) in several ways, including the following: failure to meet military physical standards, failure to be selected for promotion to the next higher military rank within the prescribed period of time, or through disciplinary actions which lead to the technicians discharge from the reserves or ineligibility for re-enlistment. In the first two cases, the technician would generally be considered to have lost dual-status involuntarily, while in the latter case the technician would be considered to have lost dual-status voluntarily.

[20] "For purposes of this section, a technician shall be considered to be eligible for an unreduced annuity if the technician is eligible for an annuity under section 8336, 8412, or 8414 of title 5 that is not subject to a reduction by reason of the age or years of service of the technician." P. L. 106-65, section 522(a); October 5, 1999. Title 10, U.S. Code, Section 10218(c). Section 8336 of title 5 deals with immediate retirement under the Civil Service Retirement System; Section 8412 of title 5 deals with immediate retirement under the Federal Employees' Retirement System; Section 8414 of title 5 deals with early retirement under the Federal Employees' Retirement System. The practical implications of this definition of unreduced annuity on individual technicians are discussed later in the report.

[21] As members of the civil service, technicians can earn an entitlement to an annuity either under the Civil Service Retirement System (CSRS) or under the Federal Employee Retirement System (FERS). Generally, a federal employee must have 30 years of qualifying *civil service* and be 55 years of age in order to be entitled to an unreduced annuity, although this is not always the case. (See footnote 30 for more information on this topic). Technicians may also be eligible for military retired pay. To qualify for military retired pay, they normally must have 20 years of qualifying *military service*, the last eight of which must in the reserves, and be at least 60 years of age. Since the end of the Cold War, however, these requirements have been temporarily lowered to facilitate reserve force reductions.

[22] P. L. 106-65, section 522(a); October 5, 1999. Title 10, U.S. Code, Section 10218 (a)(3)(A).

Force Reserves as non-dual-status technicians; however, they will have several conditions attached to their employment. First, they will *not* be permitted to apply for voluntary personnel actions[23] after October 5, 2000. Second, they will be required to retire within 30 days of becoming eligible for an unreduced annuity.

## Army and Air Force Reserve Technicians Hired on or Before February 10, 1996, Who Did Not Hold Dual-status on October 5, 1999

If they are eligible for an unreduced annuity, these technicians will be required to retire no later than April 5, 2000. If they are *not* eligible for an unreduced annuity, they will have the opportunity to "(i) reapply for, and if qualified, be appointed to, a position as a military technician (dual-status); or (ii) apply for a civil service position that is not a technician position."[24] Alternatively, these technicians can continue their employment with the Army or Air Force Reserves as non-dual-status technicians; however, they will have several conditions attached to their employment. First, they will *not* be permitted to apply for voluntary personnel actions after October 5, 2000. Second, they will be required to retire within 30 days of becoming eligible for an unreduced annuity.

---

[23] "In this section, the term 'voluntary personnel action,' with respect to a non-dual status technician, means any of the following: (1) The hiring, entry, appointment, reassignment, promotion, or transfer of the technician into a position for which the Secretary concerned has established a requirement that the person occupying the position be a military technician (dual status). (2) Promotion to a higher grade if the technician is in a position for which the Secretary concerned has established a requirement that the person occupying the position be a military technician (dual status)." P. L. 106-65, section 522 (a); October 5, 1999. Title 10, U.S. Code, Section 10218(d).

[24] P. L. 106-65, section 522(a); October 5, 1999. Title 10, U.S. Code, Section 10218 (b)(2)(A).

## Table 1. Effect of P.L. 106-65, Section 522, on Military Technicians in the Army Reserve and Air Force Reserve

| Hired on or before February 10, 1996? | Yes | Yes | Yes | No | No |
|---|---|---|---|---|---|
| Held Dual Status on October 5, 1999? | No | Yes, and maintains it in the future | Yes, but loses it in the future | No | Yes, and mainta in the future |
| Affected by P.L. 106-65, section 522? | Yes | No | Yes | Yes | No |
| Effect on Technician | If eligible for an unreduced annuity, the technician will be retired no later than April 5, 2000.<br><br>If not eligible for unreduced annuity, technician has three options:<br><br>(1)regain reserve membership and reapply for position;<br>(2)apply for a non-technician position in the civil service;<br>(3)continue in their job as a non-dual-status technician. However, the technician will then be:<br><br>(a)ineligible for voluntary personnel actions after October 5, 2000, and:<br>(b)will be retired within 30 days of becoming eligible for an unreduced annuity. | None | If eligible for an unreduced annuity when dual status is lost, the technician will be retired within 30 days.<br><br>If not eligible for unreduced annuity when dual status is lost, technician has three options:<br><br>(1)regain reserve membership and reapply for position.<br>(2)apply for a non-technician position in the civil service.<br>(3)continue in their job as a non-dual-status technician. However, the technician will then be:<br><br>(a)ineligible for voluntary personnel actions after October 5, 2000, and;<br>(b)will be retired within 30 days of becoming eligible for an unreduced annuity. | If eligible for an unreduced annuity, the technician will be retired no later than April 5, 2000.<br><br>If not eligible for unreduced annuity, technician has three options:<br><br>(1)regain reserve membership and reapply for position;<br>(2)apply for a non-technician position in the civil service.<br>(3)continue in their job as a non-dual-status technician. However, the technician will then be:<br><br>(a)ineligible for voluntary personnel actions after October 5, 2000, and;<br>(b)will be separated from employment within one year of losing dual-status. | None |

CRS-10

## Army and Air Force Reserve Technicians Hired after February 10, 1996, Who Held Dual-status on October 5, 1999

Provided they maintain their dual-status, these technicians will not be affected by the changes contained in the National Defense Authorization Act for FY2000; however, should they lose their dual-status at some point after October 5, 1999, they will be substantially affected.  If they lose their dual-status and are eligible for an unreduced annuity, they will be required to retire from their positions within 30 days of losing dual-status.  Those who lose their dual-status but are *not* eligible for an unreduced annuity will have several options.  They will have the opportunity to "(i) reapply for, and if qualified, be appointed to, a position as a military technician (dual-status); or (ii) apply for a civil service position that is not a technician position."[25] Alternatively, these technicians can continue their employment with the Army or Air Force Reserves as non-dual-status technicians; however, they will *not* be permitted to apply for any voluntary personnel actions after October 5, 2000, and they will be separated from their employment not later than one year after the date on which dual status was lost.

## Army and Air Force Reserve Technicians Hired after February 10, 1996, Who Did Not Hold Dual-status on October 5, 1999

If they are eligible for an unreduced annuity, these technicians will be required to retire no later than April 5, 2000.  If they are *not* eligible for an unreduced annuity, they will have the opportunity to "(i) reapply for, and if qualified, be appointed to, a position as a military technician (dual-status); or (ii) apply for a civil service position that is not a technician position."[26] Alternatively, these technicians can continue their employment with the Army or Air Force Reserves as non-dual-status technicians; however, they will *not* be permitted to apply for any voluntary personnel actions after October 5, 2000, and they will be separated from their employment not later than one year after the date on which dual status was lost.

# Impact of the Mandatory Retirement Provisions on Individual Technicians

The mandatory retirement provisions mentioned above will cause an estimated 308 technicians, almost all of whom are employed by the Army Reserve, to be retired no later than April 5, 2000.[27]   These are technicians who were hired on or before

---

[25] P. L. 106-65, section 522(a); October 5, 1999.  Title 10, U.S. Code, Section 10218 (a)(3)(A)

[26] P. L. 106-65, section 522(a); October 5, 1999.  Title 10, U.S. Code, Section 10218 (b)(2)(A).

[27] Source: Colonel Richard Krimmer, Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs.  According to Colonel Krimmer, these figures are the best available at the present time, but they may fluctuate in the future.  The interpretation
(continued...)

February 10, 1996, did not hold dual-status on October 5, 1999, and *were eligible* for an unreduced civil service annuity on the latter date. By the end of fiscal year 2005, it is estimated that an additional 779 technicians will be similarly forced to retire, with a further 358 retired by the end of fiscal year 2016. These are technicians who were hired on or before February 10, 1996, did not hold dual-status on October 5, 1999, but *were ineligible* for an unreduced annuity on the latter date. Pursuant to the law they will be retired within six months of becoming eligible for an unreduced annuity. This projection, however, does not account for technicians who were hired on or before February 10, 1996, and held dual status on October 5, 1999, but who lose their dual status at some future date. According to the law, these technicians will also be required to retire when they become eligible for an unreduced annuity.

As mentioned above, those Army and Air Force Reserve technicians hired after February 10, 1996, will not be allowed to stay in their positions until retirement if they lose their dual-status. However, the legislation does allow them to stay in their positions for up to one year after losing dual-status. Thus, under this legislation, there likely will be a small number of non-dual-status technicians who are permitted to continue working during this one year transition period on an ongoing basis. Consequently, the legislation permanently authorizes up to 175 non-dual-status technicians in both the Army and Air Force Reserves after October 1, 2007, in order to accommodate these technicians.

# Arguments in Opposition to the Mandatory Retirement Provisions

The mandatory retirement provision has been criticized by some, especially by those non-dual-status technicians who will soon be forced into retirement. Their principal criticism is that the legislation is unfair to them, as it forces them to retire and receive a pension check when they would prefer to continue working and receive a full paycheck. The difference between a civil service retirement payment and a regular paycheck is substantial, although it will vary from individual to individual, depending on each individual's total years of service. For example, assume a non-dual-status technician plans to retire at age 60 after 35 years of service. At that time, the technician would be eligible for an annuity equal to 66.25% of his or her "high-3" average pay.[28] If, on the other hand, that same technician is required to retire at age 55 after 30 years of service, the difference between pay and pension will be greater. This technician will immediately be eligible to receive a civil service pension check, but it will equal 56.25% of his or her "high-3" average pay. Thus, assuming the

---

[27] (...continued)
of precisely who is eligible for an "unreduced annuity" will be a key factor in determining precisely how many technicians will be affected. (See footnote 30 for more information on this issue). Tom Hawley, Professional Staff Member, House Armed Services Committee, cites a figure of 387 technicians who will be retired by April 5, 2000.

[28] The accrual rates for each year of service under CSRS are 1.5% for the first five years, 1.75% for the second five years, and 2.0% for all subsequent years. This factor is then applied to the average of the employees highest three years of pay to determine the annuity.

individual does not find alternate employment, between the age of 55 and 60, the technician's gross income will be reduced by 43.75% (full paycheck minus pension check), and after age 60 the technician's gross income will be 15% lower than anticipated (an annuity of 56.25% of pay is worth 15% less than an annuity of 66.25%).[29]  Thus, assuming that they had a desire to continue working, the technicians who are retired under this provision could experience a significant reduction in income from the federal government.  These retired technicians are free to seek employment in the private sector, and the combination of their private sector earnings with their civil service pension could result in their earning a higher income than before.  However, as these technicians will all be at least 55 years of age at the time they retire, opponents of the mandatory retirement provisions argue that they may have a difficult time securing employment in the private sector.[30]

To remedy this situation, some propose repealing the mandatory retirement provisions altogether, allowing non-dual-status technicians to continue working indefinitely as long as they can fulfill the civilian functions of their job.  Others propose modifying the mandatory retirement provision so that it will not apply until

---

[29] Note, however, that the difference in net income will not be as great as the difference in gross income.  A technician who is covered by CSRS has 7% of gross pay deducted from each paycheck in order to fund his or her pension.  That deduction is not taken out of pension payments.

[30] Most of the technicians who will be immediately affected by the mandatory retirement provisions were hired prior to January 1, 1984 and most of them are covered by the Civil Service Retirement System (CSRS). Thus, the example cited here is based on the parameters of CSRS.  The age used here, 55 years, reflects the normal minimum retirement age of federal employees under CSRS and the normal years of service, 30, needed to receive an unreduced annuity (Title 5, U.S. Code, section 8336 (a)).  However, if involuntarily separated, federal employees covered by CSRS become eligible for an unreduced annuity at age 55 with 20 years of service or age 62 with five years of service (Title 5, U.S. Code, section 8336 (d); Title 5, U.S. Code, section 8336 (f); Title 5, U.S. Code, section 8339 (h)).  Thus, under this retirement authority some technicians could be forced to retire at age 55 with 20 years of service, with an annuity worth 36.25% of their "high-3" pay.  There has been some disagreement over whether Congress intended this involuntary separation retirement authority to apply to non-dual-status technicians.  However, Ted Newland from the Retirement Policy Division of the Office of Personnel Management recently stated that he "met with staff of the House Armed Service and Government Reform committees, and provided technical assistance in drafting the bill.  Not only are the above criteria [the retirement age/years of service combinations] consistent with the plain wording of the statute, they are consistent with the intentions expressed in those discussions."  While most of the technicians who will be immediately affected by the mandatory retirement provisions are covered by CSRS, a small number are covered by the Federal Employees Retirement System (FERS) rules for retirement, due to retirement system conversions or as a result of federal civil service credit for past military service.  Under FERS, employees are eligible for an unreduced annuity at age 50 with 20 years of service, at age 62 with five years of service, or at any age with 25 years of service. (Title 5, U.S. Code, section 8414 (b)).  The accrual rates under FERS are 1% per year of service.  The resultant factor is then applied to the employees "high-3" pay to determine the value of the annuity.

CRS-13

the technician reaches age 60, the age at which many of these technicians will be eligible to receive their military retirement check for their years of reserve duty.[31]

Opponents of the mandatory retirement provisions reject the notion that non-dual-status technicians undermine the readiness of reserve units. They argue that such a relationship has never been conclusively demonstrated.[32] On the contrary, they argue that military technicians, whether dual-status or not, contribute substantially to the readiness of reserve units. From this perspective, requiring some of the most experienced technicians to retire will hurt the readiness of reserve units rather than enhancing it.

## Arguments in Support of the Mandatory Retirement Provisions

Supporters of the mandatory retirement provisions reject the notion that mandatory retirement will undermine readiness; in fact, their principal argument is that it will enhance the readiness of the reserve units, especially those within the Army Reserve (which has the highest proportion of non-dual status technicians). Non-dual-status technicians, they argue, may do excellent work in their civilian capacity, but they cannot fulfill all the duties of their jobs unless they can be mobilized and deployed with their units. This inability to deploy creates a situation where some of the key, full-time personnel of a unit (the non-dual-status technicians) will remain at their home-station while the less experienced, part-time personnel (traditional reservists) deploy to the theater of operations. This, they argue, deprives the unit of key personnel precisely when they are needed most and thereby degrades the efficiency and effectiveness of the unit. The way to remedy it is to replace non-dual-status technicians with dual-status technicians, who will be able to deploy with their units in the event of a mobilization.

While conceding that non-dual-status technicians might not like the mandatory retirement provisions, supporters of the provisions argue that the provisions are fair. Recognizing that there was no clear dual status policy prior to February 10, 1996, the provisions allow the Department of Defense to continue employing technicians who were hired before that date until they are eligible for an unreduced civil service pension, regardless of whether or not they hold dual-status. Allowing these technicians to continue working until eligible for an unreduced pension, it is argued, is a fair way to reconcile the legitimate needs of the military with the legitimate career expectations of the technicians; and in any case, it is a solution that is far preferable

---

[31] As pointed out in footnote 21, technicians can qualify for two distinct types of retirement pay: a civil service pension and military retired pay. Note, however, that technicians do not automatically qualify for military retired pay. To be eligible, a technician must have completed at least twenty qualifying years of military service, either on active duty or as a member of the Selected Reserve. Precisely because non-dual-status technicians lost their membership in the Selected Reserve at some point in their career, there is good reason to believe that some of them are not eligible for military retired pay.

[32] John Esposito, President, Local 1900, American Federation of Government Employees.

to the reductions-in-force that would have occurred under the original plan to eliminate all non-dual-status technicians by 2007.

# Other Considerations

The debate over the mandatory retirement provisions has generally been framed within the context of whether or not they strike an appropriate balance between military readiness and fairness to technicians. Supporters of the provisions say that they do strike the proper balance. Opponents say that they do not. However, another perspective deserves mention; namely, some may question whether the mandatory retirement provisions are unduly generous to technicians and, as a result, undermine the readiness of reserve units. If one accepts the argument that employment of non-dual-status technicians in the technician workforce works to the detriment of the readiness of reserve units, then there are aspects of the mandatory retirement provisions which may be troubling from a military readiness perspective.

Specifically, the existing provisions allow for the continued employment of any military technicians in the Army and Air Force Reserve who have lost their dual-status, or who lose it in the future, provided they were hired on or before February 10, 1996. At present, 72% of all Army Reserve technicians and 99% of all Air Force Reserve technicians were hired on or before February 10, 1996.[33] Thus, a large number of technicians are potentially eligible to continue employment in their positions as non-dual-status technicians. While there are substantial drawbacks associated with this position status – such as ineligibility for promotion or transfer – they may be tolerable, especially for technicians who are happy in the position they currently occupy, who have already reached the top of their promotion ladder, or who are less employable in the private sector. In light of this, it is conceivable that a significant number of technicians will choose to drop their reserve membership, or will fail to maintain the standards necessary to maintain reserve membership, with the understanding that they will be "protected" from separation until they are eligible for retirement. Such a phenomenon could be particularly acute in the Air Force Reserve, which has historically imposed a fairly strict dual-status requirement on its technicians and which might see that policy undercut by a provision which appears to guarantee a full career to all technicians hired before February 10, 1996, whether they hold dual-status or not.[34]

---

[33] Source: Colonel Richard Krimmer, Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs.

[34] A rise in the proportion of non-dual-status technicians within the Air Force Reserve would be particularly troubling from the perspective of readiness given that the Air Force Reserve routinely uses its technicians to fill critical positions like air commander, base commander, pilot, and navigator. According to Colonel Richard Krimmer (Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs), the Air Force is unlikely to use the authority granted by Congress to keep non-dual-status technicians in their positions until eligible for retirement. Rather, it will almost certainly continue to enforce its dual-status requirement and separate those technicians who lose their reserve membership. This could trigger complaints of unfairness, however.

CRS-15

When considering this possibility, it is important to note that the legislation does not *require* the Department of Defense to allow non-dual-status technicians to continue in their technician positions until they qualify for retirement; the legislation only *permits* this to happen, by allowing DoD to employ these technicians until 30 days after they become retirement-eligible. However, given that the legislation was written in response to concerns raised by DoD about fairness to the career expectations of technicians, it seems likely that the Department will use this continuation authority liberally. To do otherwise would allow certain non-dual-status technicians to continue on until retirement, while forcing others out without that benefit. This would inevitably reopen the whole issue of "fairness" that DoD was so concerned about in its 1999 report to Congress.[35]

# The Ongoing Debate

Although Congress established a clear policy in 1999 when it enacted the mandatory retirement provisions for non-dual-status technicians in the Army and Air Force Reserve, some technicians and their advocates are currently lobbying to have that policy repealed or modified. A repeal of the mandatory retirement provisions would return the situation to the *status quo ante*: Non-dual-status technicians hired before February 10, 1996 (when the dual-status requirement was fixed in law) would be allowed to continue their careers in the same manner as dual status technicians, retiring only when they chose to do so. Under such a policy, non-dual-status technicians would be phased out of the technician workforce much more slowly than they will be under the current mandatory retirement provisions.

Another proposal currently being advanced by some is to modify the mandatory retirement provisions so that non-dual-status technicians will not be forced to retire before the age of 60. If enacted, such a change would allow the affected technicians to continue working for up to five years longer, extending the period in which they earn a full paycheck and increasing the size of their retirement annuity. Additionally, at age 60, many technicians become eligible for the military retired pay they have earned as members of the Selected Reserve. Thus, under this proposal, the difference in income between regular pay and retirement pay would be decreased for most affected technicians. However, if such a policy change were enacted, non-dual-status technicians would be phased out of the technician workforce more slowly than they will be under the current mandatory retirement provisions (but more quickly than they would be if the mandatory retirement provisions were repealed).

This latter proposal appears to be gaining support in Congress. On March 2, 2000, the chairman and ranking member of the Military Personnel subcommittee of the House Armed Service Committee sent a letter to the Secretary of Defense stating that "we have become aware of the need to revise certain portions of section 10218 [of Title 10 U.S.C.] to permit the mandatory separation to take place at age 60, instead of age 55. We are working to make this change part of the National Defense Authorization Act for Fiscal Year 2001." The letter also indicated that the authors

---

[35] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999.

CRS-16

supported a proposal advanced by the Army to temporarily rehire those technicians who will be separated on April 5, 2000, pending congressional consideration of the revised retirement age in the National Defense Authorization Act for FY2001.

# Appendix A
# Origin and Evolution of the Military Technician Program and the Dual Status Requirement

Military technicians are descended from the personnel described in Section 90 of the National Defense Act of 1916.[36]  This act, which dramatically reshaped the relationship between the state militias and the federal Army, authorized the use of federal funds "for the compensation of competent help"to take care of the "material, animals, and equipment" in those organized militia units known as the National Guard.[37]  In subsequent legislation, the phrase "competent help"was replaced with "caretakers and clerks."

From the program's inception in 1916, the personnel employed under this legislative authority remained state employees, although they were paid with federal funds.  However, this changed in 1968 when Congress passed the National Guard Technicians Act.[38]  This act converted all of the National Guard's "caretakers and clerks" from state employees paid with federal funds to federal employees subject to a certain measure of state control and administration.   It also renamed them "technicians."

For many years, the military technician program existed only within the National Guard.  However, in the late 1950s, both the Air Force Reserve and the Army Reserve decided to establish their own military technician programs.[39]  Unlike the National Guard program, which was established by independent statutory provisions, the Reserve programs were established administratively, under the broader statutory umbrella of the federal civil service.  The Air Force Reserve formally established its technician program in 1957 by successfully negotiating an agreement with the Civil Service Commission (later the Office of Personnel Management).  The Army Reserve also wanted to establish a technician program in the late 1950s, but the Civil Service Commission decided to postpone approval for such a program until it had a chance to assess the Air Force Reserve's program. The Air Force Reserve's technician program was a novel modification of traditional civil service rules and the Civil Service Commission was reluctant to expand the program until its impact on federal employees (the technicians) could be assessed.

In 1960, the Civil Service Commission rendered a fairly negative assessment of the Air Force Reserve's technician program.  In the eyes of the Commission, the program was plagued by problems that resulted from its unique mix of civilian and

---

[36] Statutes at Large, June 13, 1916, chapter 134, section 90.

[37] According to the National Defense Act of 1916 the militia of the United States was composed of all able-bodied  male citizens between the ages of 18 and 45.  The militia was then subdivided into three groups: the Unorganized Militia, the Naval Militia, and the National Guard.  Statutes at Large, June 13, 1916, chapter 134, sections 57.

[38] P. L. 90-486; 82 Stat. 755; August 13, 1968.

[39] There has never been a military technician program within the Naval Reserve, Marine Corps Reserve, or the Coast Guard Reserve.

military functions. In a letter to the Assistant Secretary of Defense, the chairman of the Civil Service Commission stated:

> A perfectly trouble-free operation for the undertaking of the magnitude and novelty of the Air Reserve Technician [ART] program had not been anticipated. However, the difficulties that have been encountered have been sufficiently serious to cause misgivings about the wisdom of entering upon another similar program...There have been complaints about inappropriate imposition of military discipline on civilians in such matters as standing at attention, saluting, and wearing uniforms. Nonreservists have complained that their jobs have been abolished only to reappear with an ART incumbent. We have had allegations that civilians who joined the Air Reserve to qualify for a technician job were later refused the job but not released from the Reserves. The failure to indoctrinate appointing officials with the true nature of the program and their responsibilities to it is indicated when an officer informed one of our regional directors that he would disregard Civil Service rules and the Air Force agreement whenever it suited his purposes to do so.[40]

Despite these problems, the Civil Service Commission agreed to approve an Army Reserve technician program in 1960; however, the Commission insisted that the program be designed in such a way as to minimize or eliminate the type of problems associated with the Air Force Reserve program. The Memorandum of Understanding (MOU) reached between the Civil Service Commission and the Department of the Army was drafted with this goal in mind.[41] As such, the agreement which governed the Army Reserve's technician program at its inception differed substantially from that of the Air Force Reserve. Furthermore, in certain respects, the provisions of both Reserve technician programs differed from those of the National Guard. One of the key areas of difference among the three military technician programs – National Guard, Air Force Reserve, and Army Reserve – was in the stringency of the dual status requirement for the military technicians employed. The different "dual status" provisions in the National Guard, Air Force Reserve, and Army Reserve are outlined below.

---

[40] Letter from Roger W. Jones, Chairman of the Civil Service Commission, to Charles C. Finucane, Assistant Secretary of Defense, February 23, 1960.

[41] Memorandum of Understanding dated July 5, 1960.

# "Dual Status" Provisions in the National Guard's Technician Program

The National Guard's "dual status" provisions can be traced back to the National Defense Act of 1916. While providing the National Guard with federal funds to hire "competent help," the act also required that the "the men to be compensated, not to exceed five for each battery or troop, shall be duly enlisted therein."[42] However, exceptions to this general policy were made soon thereafter. In 1924, for example, Congress amended the National Defense Act of 1916 to authorize the use of civilian employees "whenever it shall be found impracticable to secure the necessary competent enlisted caretakers...."[43] Similarly broad exceptions were contained in later versions of the statute. Despite these broad exceptions, the National Guard managed the technician program in such a way that its technician workforce was almost exclusively dual status. In 1968, Congress estimated that 95% of National Guard technicians held dual status.[44] In that same year, Congress passed the National Guard Technicians Act[45] which converted National Guard technicians from state to federal employees. The act also stipulated that every technician working for the National Guard would simultaneously "be a member of the National Guard," except as specifically prescribed by the Secretary of the Army or Air Force.[46] (In 1997, the language allowing the service Secretaries to make exceptions to the dual status requirement was deleted).[47] As a result of this fairly strict dual status requirement, the National Guard's technician workforce has remained overwhelmingly dual status. Since 1968, dual status technicians have constituted about 90 to 95% of the total

---

[42] Statutes at Large, June 3, 1916, chapter 134, section 90. "Batteries," "Troops," and "Companies" are Army units generally commanded by a captain or first lieutenant and having anywhere from 60 to 180 soldiers, depending on the type of unit.

[43] Statutes at Large, June 6, 1924, P. L. 207, Chapter 275, section 5.

[44] "About 95% of the technicians are required to hold concurrent National Guard membership as a condition for their civilian employment." House Report No. 1823, Conference Report to Accompany S. 3865, the National Guard Technicians Act of 1968. U.S. Code Congressional and Administrative News, Legislative History for P. L. 90-486, 3319.

[45] P. L. 90-486; 82 Stat. 755; August 13, 1968.

[46] P. L. 90-486; 82 Stat. 755, Section 709 (b); August 13, 1968. Congress did, however, anticipate that the National Guard would have need for a small number of technicians who did not hold dual status in the 1968 National Guard Technicians Act. The report language accompanying the bill noted that, under the new law, "about 95% of the technicians would hold noncompetitive positions and would be required to be members of the Guard as a part of their civilian employment. About 5%, or 2,000, would be in a competitive federal status and would constitute principally female employees, clerk-typists, and security guards." House Report No. 1823, Conference Report to Accompany S. 3865, the National Guard Technicians Act of 1968. U.S. Code Congressional and Administrative News, Legislative History for P. L. 90-486, 3324.

[47] P. L. 105-85, section 522 (c); 111 Stat. 1735; November 18, 1997.

technician workforce in the National Guard.[48]  The Department of Defense recently reported that 95% of National Guard technicians held dual status at the end of fiscal year 1998. This figure represents the average of the figures for Army National Guard technicians (91% of whom hold dual status) and Air National Guard technicians (99% of whom hold dual-status).[49]

## "Dual Status" Provisions in the Air Force Reserve's Technician Program

The Memorandum of Agreement (MOA) reached by the Air Force Reserve and the Civil Service Commission in 1957 contained a fairly strict "dual status" requirement. It stipulated that "For all ART [Air Reserve Technician] positions there will be an established requirement that persons appointed to these positions must be eligible for and willing to accept active membership in the reserve unit in which they would be employed."[50]  It further stated that "Employees who develop physical disabilities or conditions which do not permit continued reserve membership may not continue indefinitely in the ART category."[51]  Subsequent versions of this agreement have included a similarly strong dual status requirement.[52]  Depending on the importance of the position they occupied, technicians who lost their dual status were either subject to separation from their technician position, or allowed to continue in their technician position only until they could be placed in a non-technician position of similar or higher grade.

As a result of this fairly strict "dual status" requirement, the Air Force Reserve's technician workforce has been almost entirely dual status. The Air Force Reserve has allowed some technicians to continue working in their civilian capacity if they lost their dual status through no fault of their own, yet the number of technicians treated in this way is quite small. In fiscal year 1998, only one percent of the technicians in the Air Force Reserve could be described as "non-dual-status."[53]

---

[48] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999, page 2.

[49] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999, page 2.

[50] John W. Macy, Jr., Executive Director, United States Civil Service Commission, Commission Letter No. 57-45, "The Air Reserve Technician Plan for Air Reserve Flying Centers Within The Continental Air Command," June 28, 1957, 4.

[51] John W. Macy, Jr., Commission Letter No. 57-45, June 28, 1957, 5.

[52] "Recruitment of Air Reserve Technicians Through Competitive Agreement (ART Agreement)," United States Office of Personnel Management, basic document approved 24 January 1979; republished with authorized changes 1 December 1987.

[53] In fiscal year 1998, there were 113 technicians in the Air Force Reserve who did not hold dual status, out of a total technician population of 9,263. The Air Force Reserve prefers to refer to these technicians as "status quo" rather than as "non-dual-status" in order to highlight the fact that all of its technicians were required to hold dual-status when hired; none was hired

(continued...)

# "Dual Status" Provisions in the Army Reserve's Technician Program

In contrast to the fairly strict "dual status" requirement contained in the agreement governing the Air Force Reserve's program, the 1960 Memorandum of Understanding (MOU) governing the Army Reserve's program had a more flexible provision. For example, while the Air Force Reserve program required technicians to be members of the Air Force Reserve when hired, this was not an absolute requirement in the Army Reserve program. According to the Army's MOU, certain circumstances – such as a tight labor market – might make the use of dual status technicians impractical. In such cases, "any available qualified civilians, including women, will be employed through usual civil service procedures."[54] Thus, "under this program, individuals who were eligible for membership in the Army Reserve were the primary recruitment source for military technicians. Individuals not eligible for Reserve membership constituted a secondary recruitment source when Reservists were not available."[55] Another difference between the Army and Air Force Reserve programs was the way in which the programs treated technicians who lost their military membership. Under the Air Force rules, technicians who lost their military status, for any reason, were normally separated from the program. Under the Army rules, technicians who lost their military status voluntarily could be separated from the program, although this was not mandated. More importantly, technicians who lost their military status involuntarily – for example, by sustaining an injury that precluded meeting the physical standards of the military – could *not* be separated from the program.[56]

In 1970, the Army Reserve re-negotiated its MOU with the Civil Service Commission and incorporated a somewhat stricter dual-status requirement.[57] The new agreement stated that "membership in an active Army Reserve Unit (or eligibility and willingness to join the Reserve) shall be a requirement to secure a permanent appointment to a position as a technician...." There were still some exceptions to this policy, but it was certainly a stronger "dual status" provision than had previously been the case. This provision, however, only applied to the technician at the time of initial appointment; it did not constitute an ongoing requirement to maintain military membership. Indeed, the MOU specifically states that "No technician who attains dual status and later loses his active reserve status for reasons outside his control will

---

[53] (...continued)
as a "non-dual-status" technician. Yet, the fact remains that these "status quo" technicians do not now hold dual status. Thus, they can accurately be referred to as "non-dual-status" technicians, as the term is used in this report.

[54] Memorandum of Understanding, dated July 5, 1960, paragraph 1.

[55] Military Technician Compensation Report: A Report Prepared for the House Appropriations Committee, Office of the Secretary of Defense (Reserve Affairs), May, 1991, 4.

[56] Memorandum of Understanding, dated July 5, 1960, paragraph 2. "The lack or involuntary loss of military status will not be a basis for removing present or future civilian employees."

[57] The effective date of the new Memorandum of Understanding was September 1, 1970.

CRS-22

be involuntarily reassigned or removed."[58]  The MOU also contained an explicit "grandfather" clause to protect those technicians who had been hired under the terms of the previous MOU and who did not hold dual-status.[59] Thus, while the 1970 MOU strengthened the "dual-status" provisions in the Army Reserve's technician program with respect to initial hiring for technician positions, it still left ample room for the continued employment of non-dual status technicians.

---

[58] Army Regulation 140-315, Employment and Utilization of U.S. Army Reserve Military Technicians, 5 July 1985, Appendix A, Memorandum of Understanding, paragraph 7.

[59] "No technician employed prior to 1 September 1970 who is not in a dual civilian military status on that date will be involuntarily reassigned or removed from his position for failure to comply with the dual status requirement." Army Regulation 140-315, Employment and Utilization of U.S. Army Reserve Military Technicians, 5 July 1985, Appendix A, Memorandum of Understanding, paragraph 7.

CRS-23

# Appendix B
# Congress and the Dual Status Requirement: Past Legislative Provisions

Over the past 16 years, Congress has repeatedly passed legislation concerning the dual status requirement for military technicians. Often, this legislation has been directed exclusively towards technicians in the Army Reserve, reflecting a special congressional concern with the manner in which the Army Reserve was managing its technician workforce. In recent years, however, Congress's approach to the issue has been more general in scope, although the Army Reserve's technician program has remained the principal concern.

When Congress passed the National Guard Technicians Act in 1968,[60] it contained a fairly strict dual status requirement for National Guard military technicians. However, this act did not apply to the Army Reserve or the Air Force Reserve. These two reserve branches had set their own dual status policies for many years and Congress took no action to change that in 1968. This changed, however, in 1983. Concerned about the growing proportion of non-dual-status technicians in the Army Reserve, Congress included a provision in the Department of Defense Appropriation Act for Fiscal Year 1984 which addressed the dual status requirement for Army Reserve technicians. The report which accompanied the bill in the House criticized the proportion of non-dual-status technicians – referred to as "status quo" technicians – within the Army Reserve in the following terms:

> The Department of the Army estimates that approximately 50% of the United States Army Reserve [technicians] are either status quo technicians or military technicians assigned to units other than the one in which they are employed as a civilian. The Committee believes this situation is detrimental to mobilization readiness and unit cohesiveness.[61]

To correct this, the final version of the defense appropriation bill included language which prohibited the expenditure of funds to pay for any Army Reserve technician "initially hired after the date of enactment of the act...unless such individual is also a military member of the Army Reserve troop program unit that he or she is employed to support."[62] Virtually identical language was included in every subsequent DoD

---

[60] P. L. 90-486, 82 Stat. 755; August 13, 1968.

[61] House Report Number 98-427. Report to Accompany H.R. 4185, Department of Defense Appropriation Bill, 1984, 37. The ratio of technicians who were "status quo" versus those who were misassigned was not indicated in the House Report, but the General Accounting Office ascertained four years earlier that 26% of the dual-status technicians in the Army Reserve were assigned to military positions in units other than the one in which they are employed and an additional 20% of technicians were "status quo," or non-dual-status, technicians. H. L. Krieger, Director, General Accounting Office, Letter to Harold Brown, February 26, 1979.

[62] P. L. 98-212, section 783; December 8, 1983. Note, however, that there was an exception to the unit membership requirement for those technicians "employed by the Army Reserve in
(continued...)

CRS-24

Appropriations Act up to, and including, the DoD Appropriations Act for Fiscal Year 1995.[63]

On its face, this recurring provision would seem to preclude paying the salary of any technician whose initial date of hiring occurred after December 8, 1983 – the enactment date of the DoD Appropriations Act for FY1984 – and who did not hold or who failed to maintain "dual status." Indeed, the Army Reserve interpreted the appropriations language in just this way for many years. Nonetheless, due to lack of coordination within the Army Reserve's military technician program, this requirement was not always implemented; in some cases the employment contracts of technicians hired after December 8, 1983, did not include a clause specifying the technicians obligation to hold dual-status.[64]  More problematically, in 1995 the Army Reserve substantially modified its interpretation of the appropriations language. This revised interpretation was spelled out in a 1995 memorandum:

> We have reexamined the status of the involuntary removal policies as they affect dual status MT [military technician] personnel. We have concluded, based on the current legal interpretations, the rules of post Fiscal Year 1983 (FY1983) dual status alignments only apply to the initial FY of MT employment. Subsequent to the initial year of employment, the MT dual status requirement revert to the conditions in force for MT[s] hired between FY1970 and FY1983. Therefore, we conclude MTs, not in their initial FY of employment, may be involuntarily separated from their Selected Reserve troop program unit without concurrent loss of MT civilian employment.[65]

As a result of this interpretation, the impact of the appropriations language on the Army Reserve's technician workforce was minimized. Newly hired technicians were now only required to hold dual-status until the end of the fiscal year in which they were hired; at the end of that fiscal year they fell under the provisions of the 1970 MOU, which allowed technicians who lost their military membership involuntarily to

---

[62] (...continued)
areas other than Army Reserve troop program units." These technicians only needed to be "members of the Selected Reserve."

[63] P. L. 98-212, section 783; P. L. 98-473, section 8076; P. L. 99-190, section 8059; P. L. 99-591, section 9054; P. L. 100-202, section 8055; P. L. 100-463, section 8045; P. L. 101-165, section 9027; P. L. 101-511, section 8018; P. L. 102-172, section 8018; P. L. 102-396, section 9019; P. L. 103-139, section 8016; and P. L. 103-335, section 8015.

[64] Source: Colonel Richard Krimmer, Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs.

[65] "Memorandum for Commanders, Major U.S. Army Reserve Commands," from Colonel Thomas McCoy, Deputy Chief of Staff for Personnel, Headquarters, United States Army Reserve Command, 27 July 1995. The "current legal interpretations" referred to in the text apparently refers to a legal opinion issued by the Department of the Army's Judge Advocate General in February, 1995. A summary of this opinion was provided to the Congressional Research Service by the Office of the Judge Advocate General; however, that office declined to provide a copy of the opinion itself, citing attorney-client privilege. Thus, an analysis of its contents cannot be provided here.

about the fairness and feasibility of doing so. With respect to fairness, the report predicted that meeting the 2007 deadline would require DoD to involuntarily separate 2,655 non-dual-status technicians, many of whom would not be eligible for civil service retirement when separated.[73]   Forced reductions of this sort, the DoD report argued, were unfair to the individual technicians:

> ...non-dual status military technicians were hired and are managed according to various Reserve component policies. Non-dual status military technicians had a reasonable expectation that their positions carried career potential. The Department feels a moral obligation to recognize previous commitments and reasonable individual career expectations and to avoid forced reductions to the extent practicable.

Another significant point raised in the DoD report dealt with the limited need for non-dual-status technicians in the National Guard. National Guard units usually operate under the authority of the Governor of the state or territory they are located in. Each state or territory maintains a headquarters to oversee its units and military technicians frequently are employed in these headquarters. If these technicians are dual-status, then they could be mobilized by the federal government in times of national emergency and deployed with the unit they maintain membership in. This, DoD contended, could cripple the ability of the state headquarters to carry out its own important mission. "The National Guard," the report concluded, "cannot operate without a workforce that includes some employees who do not have to mobilize with the units they support." From this perspective, the National Guard has an ongoing need for at least some non-dual-status technicians.

---

[73] Department of Defense, Office of the Assistant Secretary of Defense for Reserve Affairs, "A Plan for Full Utilization of Military Technicians (Dual Status)," August 2, 1999, pages 7 and 8. Numbers are derived from the estimated Reductions in Force (RIFs) required by September 30, 2007, without benefit of additional retirement incentives.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 17

Army insults civilians by taking flag off uniform / QCTimes.com
Page 1 of 2
Case 1:08-cv-00692-EGS    Document 10-20    Filed 08/15/2008    Page 2 of 13

McLAUGHLIN MOTORS
866-538-1453
www.mcmotors.com

Home | News | Opinion | Sports | Entertainment | People | Classified | Homes | Cars | Jobs

Letters to the Editor    Editorials    Blogs    Barb Ickes    Bill Wundram    Melissa Coulter    Comments

Search                                    Advanced Search

You are not logged in.  Login  Register  Site Help

# Army insults civilians by taking flag off uniform

Story     Discussion

By Michael D. Petersen | Thursday, July 19, 2007 10:31 AM CDT |      ( 29) comments

Font Size:

I have served this country, first as a soldier then as a Department of Defense civilian for 29 years. This has always been something that I have been proud of until today.

I have endured the years away from family and friends, missing the birthdays of my children and holidays that most except those who serve take for granted.

I have moved my family all over the world to follow me in my job, asked them to give up their friends, their sweethearts and buddies.

I have worked for wages that were laughed at by friends and the contractors that I worked beside. I have lived in places where most people would not keep their dogs, and gone weeks without a shower or hot meal.

I have been shot at and missed, shot at and hit, never once regretting the career choice that I made so many years ago.

Don't get me wrong, it has been a great experience. I love working with the young soldiers, walking them through a complex task until you can almost see the light come on behind their eyes as they grasp the solution to the problem. Teaching them the proper way to maintain and repair their weapons systems then watching them go on to demonstrate those new skills to their squad members. Those same young soldiers are tomorrow's leaders and should be afforded the best training available.



Michael Petersen, photographed in Iraq earlier this week.

I am currently coming to the end of my fifth tour of duty in Iraq in support of U.S. Army soldiers in the War on Terror. We are mandated to wear military uniforms, the idea being that we will blend in with the soldiers we support and will be less likely to become targets. This is not optional — it is a condition of employment.

In a staff meeting today, we were told that DA and DOD Civilians are no longer authorized to wear the American flag on the right shoulder of their uniform. From here on out, only soldiers can wear the flag. I guess we are no longer considered American citizens, or of a high enough social order to be recognized as Americans.

To me and the thousands of other civilians who make it possible for the U.S. Army to wage a war, this is the worst insult that I could imagine. We are not allowed by the Army to display the symbol of our country while Iraqi interpreters in the employ of the U.S. Army can and do.

I don't know what is more disturbing about this — the fact that someone actually decided to do this or the fact that no one else in the chain of command had the moral courage to stop it. If the civilian workforce is so poorly thought of, get us the hell out of the uniforms.

What the Army leadership doesn't realize is that by insulting us, they are in fact insulting themselves as one day they too will be civilians. Fully 80 percent or more of the civilians working here in Iraq are former soldiers. The skills to do many of the jobs are unique and are only taught in the various military training schools.

I am so insulted by this that I have instructed my wife to have my son remove the American flag from our front yard until this is resolved.

Michael D. Petersen

Camp Anaconda, Iraq

Hometown: Davenport

Previous Story | Next Story

Share    Email    Print

## Weather

73°F
View Forecast

sponsored by:

Five Star
SALON & SPA

River Levels  |  Closings  |  Flight Information

# Buy It. Sell It.

▶ www.qctimes.com/classified

Quad-City Times

## E-Mail Updates

Breaking News Updates
Quick notification of big news, for your inbox or mobile phone. Delivered when news breaks (used sparingly).

Email:

[ Subscribe ]

» See more newsletters

More allegations of Child Labor Law infractions by Agriprocessors surfaced recently in Postville, Iowa. Do you think the current laws do enough to protect children in the workforce?

○ Yes
○ Maybe
○ No
○ I have no idea

## Marketplace

| Jobs | Homes | Ads | Cars | Outdoor Motors |

Health Care- CNA, CMA Need

Accounting Sr. Acctg Clerk-Payroll QCSA

Administrative Full Time Office Assistant.

Banking Manager of Mortgage/ Consumer

## ( 29) comments

Human Services Social Service Supervisory

View All

Search Jobs          [Go]

Rate this article                                    Thumbs Up          Thumbs Down

» **More Letters Stories**
- Iraq situation very different from Korea
- Thanks to Wundram for scholarship article
- Army insults civilians by taking flag off uniform
- Media needs to cover all the candidates
- Treat troops equally

**Free Time**
- Skybridge Webcam
- Sudoku
- More Games

**Highest Rated Articles from the last 7 Days**
- Diocesan bankruptcy bills: $2 million
- Last of the World War II Hero Street veterans dies
- Illinois wins Tug Fest
- Africans reach out with gifts and thanks
- Review: Smashing Pumpkins open 2008 U.S. tour at Adler

**2008 Diet Of The Year:**
Finally, A Diet That Really Works! Seen On CNN, NBC, CBS & Fox News.
www.Wu-YiSource.com

**8C News Articles**
Free Stories from 8c Experts Spy Photos, Videos, Breaking News.
www.InsideLine.com

**Cheap Airfare**
Compare multiple travel sites. Discount web fares made easy.
www.LowFares.com

Ads by Yahoo!

HAWKMANIA
HAWKMANIA
HAWKMANIA
HAWKMANIA

| **Sections** | **Services** | **Other Websites** | **Search** |
|---|---|---|---|
| Homepage | Advertise on Our Site | QC Business Journal | [Go] |
| News | Make us your Homepage | Bettendorf News | |
| Sports | Contact Us | QC On The River | |
| Features | About Us | Hawkmania: Iowa Hawkeyes | |
| Entertainment | Online Photo Store | NIE | A Lee Enterprises subsidiary |
| Obituaries | Subscriber services | QC Thrifty Nickel | Other Lee Websites |
| Classified | Events Calendar | QC Wheels | |
| Jobs | RSS | **Partners** | |
| Cars | | Plus 60 | |
| Homes | | Muscatine Journal | |
| | | Bix 7 | |

℗ Copyright 2008, The Quad-City Times. Davenport, IA | Terms of Service and Privacy Policy                    Back to top

Air Force
## Print News
Air Force news from around the world

# Reserve changes rules to require technicians to wear uniforms fulltime

8/21/2007 - **ROBINS AIR FORCE BASE, Ga.** -- When people visit an Air Force Reserve Command unit during the week in the coming months, they are likely to see more people in military uniforms.

The Air Force changed three of its instructions Aug. 7 to require all air reserve technicians to wear military uniforms rather than civilian clothes while working in civilian status. ARTs are full-time civilian employees who serve in the same job as Air Force reservists. They've been wearing uniforms when in military status.

ARTs in some locations are already wearing their uniforms all of the time at work. Others haven't started wearing their uniforms everyday because they have not been required to do so.

"We want our ARTs to be in uniform because we are integrating with the Regular Air Force and Air National Guard throughout the Air Force," said Lt. Gen. John A. Bradley, AFRC commander. "Total Force Integration is changing how we interact with the rest of the Air Force.

"Even before 9/11, the regular component depended on us to get the job done," he said. "That dependency is growing because we cannot afford to do business as usual. We need to consolidate our forces and capitalize on each other's strengths."

As example of progress, General Bradley cited reservists preparing to fly F-22s with the Regular Air Force in Alaska, reservists flying their own C-17s in California and reservists standing up and managing a C-130 unit in North Carolina with an active associate unit.

"We are able to take on new and challenging missions because of the skills and experience of our air reserve technicians," said Chief Master Sgt. Troy McIntosh, AFRC command chief master sergeant.

"Some technicians have told me they feel this uniform change is calling their military dedication or patriotism into question," said the chief. "That is not at all the case. Our technicians have proved themselves in the past and, I'm confident, they will continue to do so in the future."

General Bradley said the Air Force Reserve is entering a new era, which is vastly different than 1958, the year the air reserve technician program was created.

"I believe wearing uniforms is an important step to being a full partner and an Unrivaled Wingman in today's Air Force," said General Bradley.

The Air Force Reserve has about 1,335 ART officers and 8,400 ART enlisted people.

Case 1:08-cv-00692-EGS     Document 10-20     Filed 08/15/2008     Page 5 of 13



# STARS AND STRIPES.

**Thursday, July 10, 2008**

# Marine uniforms off-limits for civilians

**By <u>Jeff Schogol</u>, Stars and Stripes**
Mideast edition, Friday, February 8, 2008

ARLINGTON, Va. — Civilians who deploy to the U.S. Central Command theater of operations with Marines are no longer allowed to wear the Marine Corps' camouflage combat uniform, a recent message from the commandant said.

Those civilians already in theater and scheduled to return before June 30 can continue to wear the combat uniform for the remainder of their deployments, the Jan. 30 message said. Civilians in theater who are scheduled to return after June 30 can keep their boots but must exchange the rest of their uniforms for Defense Department-issue equivalent uniforms.

Similarly, civilians yet to deploy who have already been issued a combat uniform must exchange their uniforms for such an equivalent, the message said.

In recent years, Stripes readers have written numerous letters to the editor on the issue, with several servicemembers complaining they often see civilians wearing military uniforms improperly.

The Corps' move was prompted by feedback Commandant Gen. James Conway got from Marines both stateside and overseas, said spokesman Lt. Col. T.V. Johnson. They were concerned that people who weren't Marines were allowed to wear the Corps

uniform, especially when those civilians were not being held to the same standards as the Marines.

"There was nothing in place to police that," Johnson said on Wednesday. "You might have an individual wearing part of a uniform; whereas a Marine can't put on the cammie trousers and go out wearing his tennis shoes."

Marines make sure they wear their uniform the correct way, he said.

""We're taught from Day 1: You put this on, you take a lot of pride in it," Johnson said.

The message notes civilians still wearing the uniforms will be subject to "strict enforcement" of the wear regulations and "those individuals in violation of these policies will lose their authority to wear the uniforms immediately."

Last year, the Corps eliminated exceptions that allowed Marines to wear their combat uniforms off post.

Meanwhile, civilians who deploy downrange with the Army are issued Desert Camouflage Uniforms, which are procured by the Defense Logistics Agency, instead of the Army Combat Uniform, said Army spokesman Lt. Col. Lee Packnett.

Civilians can wear the Army uniform if they buy it themselves, Packnett said in an e-mail Thursday. Those who do so are held to the same uniform standards as the military.

"As with any military unit, it is the responsibility of the chain of command to discipline (make on the spot corrections) anyone for not wearing their uniform properly," Packnett said.

Case 1:08-cv-00692-EGS    Document 10-20    Filed 08/15/2008    Page 7 of 13

© 2007 Stars and Stripes. All Rights Reserved.

 

# ARTs sue Wynne over uniform policy

By Seamus O'Connor - Staff writer
Posted : Monday Apr 28, 2008 6:08:29 EDT

A conglomeration of union chapters representing Air Reserve technicians has filed a civil suit against Air Force Secretary Michael W. Wynne, attempting to overturn the decision requiring ARTs to wear military uniforms while in civilian capacity.

READ THE COMPLAINT
Lt. Gen. John Bradley, chief of the Air Force Reserve, implemented the change Aug. 7 to the dismay of many of the service's roughly 10,000 ARTs.

The new policy took effect immediately but was fought by many of the 6,600 unionized ARTs. An online petition collected over 2,700 signatures.

At the time, Bradley dismissed objections to the new policy, which he said was an idea of his to improve Total Force interoperability.

"This is not a negotiation about whether we're going to do it. The decision is made. We're going to do it," he told Air Force Times.

The ARTs fighting the policy worried that wearing their uniforms in their civilian capacity would put them under the jurisdiction of the Uniform Code of Military Justice, and that it could create chain-of-command issues, as ARTs may hold higher military rank than civilian rank.

On an emotional level, many ARTs took umbrage to the tone of an April 18 memo introducing the change. The memo suggested that putting ARTs in uniform full\time would ensure "good order and discipline," especially among the maintenance workers.

The lawsuit challenges that the policy change was "arbitrary and capricious" and opposed by U.S. statute.

Neither Wynne, nor officials at Air Force Reserve Command nor counsel for the plaintiffs could be reached immediately for comment.

**PREVIOUS STORIES**
Reserve techs object to wearing uniform

Reserve chief: Tech uniform rule is a done deal





| Home | Subscribe | Customer Service | Contact Us | Advertise | About Us | Help |

SUBSCRIBE TODAY
- Agency
- Management
- HR Management
- Pay & Benefits
- Information Tech.
- Procurement News
- Federal Traveler
- Career Information
- Commentary
- Weekly Poll
- Ask the Experts
- Bookstore

**Defense News Media Group**
- DishMediaGroup.com
- DefenseNews.com
- C4ISRJournal.com
- ArmedForcesJournal.com
- TSSOnline.com

**Military Times Media Group**
- MilitaryCity.com
- ArmyTimes.com
- NavyTimes.com
- AirForceTimes.com
- MarineCorpsTimes.com

August 11th, 2008

### Air Reserve technicians sue over order requiring uniforms

By SEAMUS O'CONNOR
Nov 00, 2008

When Air Force Reserve chief Lt. Gen. John Bradley decided last August to require Air Reserve technicians to wear military uniforms while on civilian status, he said it was "not a negotiation."

Now the matter is in litigation.

The American Federation of Government Employees filed a civil suit April 22 on behalf of the roughly 6,600 unionized ARTs, naming Air Force Secretary Michael Wynne as the plaintiff. The suit, filed in U.S. District Court for the District of Columbia, charges that the changes to the Air Force Instruction governing Air Reserve technician (ART) uniform policy were "arbitrary and capricious."

The changes also violate the U.S. statute that created ARTs and defines them as civilians who also have military status, the suit says. Air Reserve technicians are dual-status employees who hold the same job as both full-time Defense Department civilian workers and Air Force reservists who work in a reserve unit. ARTs are often former traditional reservists, and many work in aircraft maintenance fields.



**DoD**
Divot Tool with
3 ball Markers
Price: $15.00
Order yours
Today!



DEFENSENEWS
MEDIAGROUP



WALDEN UNIVERSITY
A higher degree. A higher purpose.
▶ CLICK HERE FOR INFO



"There is a certain magic to having to wear a military uniform, and you can't require a civilian to wear a military uniform," said Eugene Fidell, AFGE's lead attorney in the case. "What this is, is a change in the basic terms and conditions of the ART program. And it's one that Congress hasn't authorized the Air Force to do."

Despite the dual status of the 8,555 enlisted reserve techs, their military and civilian jobs are the same. Techs not represented by the union are already wearing uniforms on the job.

A similar system is employed for technicians in the Air National Guard. But in the Guard, legislation specifically requires them to wear their uniforms at work, regardless of whether they are on civilian or military duty.

Speaking in September to *Air Force Times*, a sister publication of *Federal Times*, Bradley said he wanted Congress to sign off on the changes even though, in his view, congressional approval was not necessary.

According to Fidell, the fact that the Air Force wants Congress' OK is "a sure sign" that the Air Force doesn't have authority to make the changes.

Wynne's office and officials at Air Force Reserve Command declined to comment on the matter.

The uniform debate is an emotional flashpoint for many ARTs. In news releases, Bradley said the move would improve integrated operations among ARTs, traditional reservists and active-duty airmen. But a memo sent April 18, 2007, from Air Force Reserve Command headquarters to AFGE President John Gage cited the need to ensure "good order and military discipline," which offended many ARTs.

Several ARTs interviewed were also upset at having to alter their day-to-day habits to meet military standards for those appearing in uniform. Beards, weeks between haircuts, walking while using a cell phone — those are all off-limits now for ARTs on civilian duty, but they receive no active-duty benefits in return.

The ARTs are still able to get free replacements for their uniform jackets and pants when they wear out, but must pay for their own T-shirts and socks.

The command's 1,357 officer reserve technicians traditionally wear their uniforms full time, and get annual payments of $150 for uniform expenses.

Enlisted ARTs have been promised a one-time payment of $150 for their whole careers. Not all units have delivered that payment, and it won't last long, said some ARTs, especially if it is supposed to cover the haircuts they must now get twice as often. In day-to-day practice, the uniform issue also complicates matters of discipline.

An ART said that supervisors at Keesler Air Force Base, Miss., now have a hard time telling who's who during missions: Is a person in uniform a traditional reservist, a mobilized ART, or a civilian who deserves overtime pay? The ART spoke on the condition of anonymity due to the pending litigation.

✉ Email this story to a friend



Use of this site signifies your agreement to the Terms of Service

in San Francisco, found that approximately one-third of
large U.S. companies offer formal time-off policies in
support of employee volunteer involvement. More than
40 percent of small companies offer a similar benefit, he
said, again citing the study.

*For more information on H.R. 5922, go to http://
thomas.loc.gov/cgi-bin/bdquery/z?d110:h.r.05922:.*

## Civilian Employment

### AFGE Files Lawsuit Challenging Directive That Air Reserve Technicians Wear Uniforms

The American Federation of Government Employees April 24 filed a complaint in the U.S. District Court for the District of Columbia asserting that a recent directive mandating that Air Force Reserve technicians wear uniforms while working in their civilian capacities violates federal law (*American Fed'n of Gov't Employees v. Secretary of the Air Force*, D.D.C., No. 1:08-cv-00692, *complaint filed 4/24/08*).

"A civilian employee cannot be required to wear a military uniform," Eugene Fidell of Feldsman, Tucker, Leifer, Fidell in Washington, an attorney on the case, said in an April 24 statement released by AFGE. "Requiring ARTs to wear military dress while serving in their civilian capacity improperly upsets settled expectations and confuses military and civilian status."

AFGE Assistant General Counsel Gony Goldberg told BNA April 28 that the uniform requirement also imposes on ARTs the burden of maintaining their uniforms more frequently, which can be costly and difficult.

There is "no obvious benefit to their actual work product," Goldberg said, and the uniform requirement is creating a huge change in ARTs' work life without "real data" that it will benefit government operations.

**Federal Civilian Employees.** According to the complaint, ARTs are one type of military technicians, which in turn are full-time support personnel that work with the Air Force Reserve. As a condition of employment ARTs are required to maintain active Air Force Reserve membership, but they are federal civilian employees hired under 5 U.S.C. § 3101, the complaint explained.

ARTs receive regular pay for their civil service jobs, may qualify for a civil service pension, are subject to timekeeping requirements pursuant to federal regulations governing civilians, earn annual leave pursuant to those regulations, and are subject to civil service laws with regard to claims arising out of their civilian employment, such as Title VII of the 1964 Civil Rights Act.

However, ARTs are considered "dual status" and can be ordered to deploy with their reserve units if mobilized. They receive military pay for their weekend and summer active duty tours, and may qualify for military retirement pay.

Goldberg said, however, that ARTs mostly work as civilians and spend little time performing military duties, making the Aug. 6, 2007, change in Air Force regulations to require ARTs to wear uniforms while performing their civilian work problematic.

While ARTs perform the same work in their military and civilian capacities, they do not report to the same superiors, and in fact some civilian supervisors have

lower military ranks than they do, Goldberg said. A confusion of when ARTs are considered military as opposed to civilian could lead to civilian supervisors having to salute their civilian subordinates, she said.

In addition, "many of these employees have been employed as civilians for 10, 15, 20 years," and now are being told that their work has been insufficient because it was performed in civilian clothing, Goldberg said.

**Significance of Uniform.** According to Goldberg, the theory behind AFGE's lawsuit is that the ART was created by statute as a civilian position. While under 10 U.S.C. § 709(b)(4) dual status National Guard technicians can be required to wear their uniforms while in civilian status, 10 U.S.C. § 10216, which governs ARTs, says nothing about a similar requirement, the complaint noted.

It added that the Defense Department asked Congress in February to amend the statute to allow for a uniform requirement.

"Although uniforms are worn in many settings, including many civilian settings, military uniforms enjoy a unique place in American society, United States law, *e.g.*, 10 U.S.C. § 771, 18 U.S.C. § § 702-03, and international humanitarian law," the complaint added. The former statute prohibits unauthorized wearing of the uniform, and the latter two make doing so a federal crime.

Goldberg added that under the Geneva Conventions civilians wearing military uniforms can be treated as soldiers if captured by an enemy. "It's not just a piece of cloth that has no meaning," she said.

AFGE also is concerned about the collective bargaining implications of the mandate. "ART union members say the mandate is designed to give the administration wide latitude in deploying federal employees without honoring previously negotiated collective bargaining agreements," the union said in its April 24 statement.

Goldberg explained that various CBAs contain clauses regarding ART uniforms—most stating that uniforms are optional but not mandatory. While management at each base reacted differently to the locals' attempts at bargaining impact and implementation of the uniform requirement, the response was overwhelmingly negative, she said.

**Promotion of 'Seamless Integration.'** While declining to talk about the lawsuit, Col. Audrey Bahler of the Air Force Reserve Strategic Command told BNA April 28 that the uniform requirement is part of a years-long effort by the Air Force to create a "seamless integration" of the Air Force and the Reserves. Because employees in the Reserves work "side by side" with full-time members of the Air Force, total force integration will be easier if all workers are dressed alike, she said.

Bahler stressed that the uniform requirement has nothing to do with ARTs' work product, and that their contributions are appreciated and valued. Rather, she said, the Air Force has found that total force integration has led to cost-effectiveness and crews with a wide range of knowledge and experience. She added that the integration also has included members of the National Guard.

Goldberg said there had been no effect on technician performance. "Beyond the rhetoric they have no showing" of any benefit, she said of the Air Force.

BY LAURA D. FRANCIS



🖶 Print | ✉ Email                    ⬆ Reddit | 🔲 Digg

# House cuts ART uniform requirement from bill

By Seamus O'Connor - Staff writer
Posted : Monday Jun 9. 2008 11:54:40 EDT

A word to Air Reserve technicians: Don't box up those civvies just yet.

The Air Force Reserve Command's effort to require the dual-status technicians to wear military uniforms while on civilian status has taken a blow.

The House of Representatives has stricken language that would have codified the change from its version of the 2009 defense authorization bill, and it appears the Senate will do the same.

The proposed change in uniform policy was included in both versions of the bill under Section 514. It would have amended Title 10 of the United States Code to allow the Air Force secretary to enforce the new uniform policy.

In the version of the bill passed out of the House, Section 514 doesn't mention uniforms at all. Section 514 has been dropped entirely in the Senate Armed Services Committee's report of the defense bill, meaning the uniform policy would have to be added by amendment to be included.

A spokesman for the House Armed Services Committee would not identify which legislator or legislators had sought to remove the language.

However, nothing is certain until the House and Senate agree on a joint version of the bill. Legislators could re-enter the Air Force's recommended language in conference meetings.

"The legislative process ... is a long, extended one, and things get added later and deleted later, so it's really too early to comment," said Jim Miller, an AFRC spokesman.

The requirement to wear uniforms has been part of the Air Force Instruction governing dress and appearance since 2006.

Reserve Commander Gen. John Bradley told Air Force Times in 2007 that while he did not think congressional approval was necessary to make these airmen wear their uniforms, he wanted the new policy codified.

But seeking congressional approval at all is a sign that the Air Force does not have the power to create the new policy on its own, according to Eugene Fidell, a lawyer and expert in military law.

Fidell is currently representing the American Federation of Government Employees in a civil suit against Air Force Secretary Michael W. Wynne. The suit, filed on behalf of the roughly 6,600 unionized ARTs, alleges that the new uniform policy violates several laws.

"We're gratified at the approach Congress has taken so far on this," Fidell told Air Force Times.

Multiple ARTs posting in military-interest online forums reported that a decision on the lawsuit's status was expected by July 8.

ARTs nationwide have been lobbying their congressional representatives to deny the Air Force's request to codify the new policy.

Wearing the uniform as civilians requires the ARTs to comport themselves as airmen — including shaving, keeping a short haircut and limiting cell phone use — but does not entitle them to military benefits, such as eating in dining facilities.

🖶 Print | ✉ Email                    ⬆ Reddit | 🔲 Digg

# AMC civilians to test new uniforms in combat zones

*Jul 03, 2008*
*BY Melissa Bohan*

FORT BELVOIR, Va. -- The Army Materiel Command is expected to begin a one-year pilot program early next year to determine whether the Army should develop a standard issue uniform for deployed civilians.

In the pilot, deploying AMC civilians will wear a solid tan-colored version of the Army Combat Uniform with insignia that identifies them as civilians. The majority of currently deployed AMC civilians wear the Desert Combat Uniform, while a few wear office work attire or even the ACU when deployed with certain units. The new uniform would standardize the way AMC civilians dress and help commanders more easily identify them as Army civilians.

"AMC Commanding General Gen. [Benjamin S.] Griffin initiated this program after talking with Gen. Petraeus [commanding general, Multi-National Force-Iraq] and other leadership while traveling in theater. He was seeking a way for AMC to better identify our civilians with standard attire while deployed," said Clyde Cargill, chief of the Logistics Assistance Program/Contractors on the Battlefield branch of AMC's deputy chief of staff G-3/5 office.

AMC pulled together personnel from several of its staff sections including command counsel, command contracting, and the AMC command sergeant major, and the Program Executive Office Soldier to develop the proposed uniform.



The AMC civilian uniform prototype includes a solid tan-colored version of the Army Combat Uniform with places for the standard last nameplate and civilian-specific insignia. AMC civilians are expected to start wearing the uniform early next year. Photo by AMC

AMC decided to leverage the already existing ACU program as a way to quickly develop a standard uniform with features similar to the ACU which would provide its civilians with the same level of protection as Soldiers. The Natick Research, Development and Engineering Center, Natick, Mass., worked with PEO Soldier to create the prototype uniform using the raw materials from the ACU pattern and made it a solid tan color.

"After AMC developed a prototype uniform, Gen. Griffin took it to theater and showed it to the Army leadership and they agreed it would be the right thing to do," said Cargill.

During the pilot, deployed AMC civilians will be issued solid tan-color uniform trousers, uniform coats, a patrol cap and a sun hat. They would also get the extended extreme cold-weather clothing system Gen II parka and helmet cover without communications flap. Tan boots, tan t-shirts and rigger belts are already issued to deploying civilians.

"AMC will go through a formal evaluation process to see how the tan color holds up to stains, and see if the uniform demonstrates an orderly and disciplined appearance. To do this, AMC will talk with civilians wearing it and get opinions from AMC and non-AMC leadership in theater to ensure it is meeting the intent," said Marcia Enyart, a contractor supporting the AMC G-3/5.

The next step is to award the contract for the new uniforms, which will include enough for each AMC civilian to be issued four sets. Once stock levels are sufficient with a variety of sizes, which is expected early next year, the uniforms will be stored in a warehouse at the U.S. Army Corps of Engineers' Unit Deployment Center - known as the UDC - in Winchester, Va.

Uniforms will be issued to AMC civilians who attend their pre-deployment training at the UDC, while civilians who attend their training at the Continental United States Replacement Center at Fort Benning, Ga., will receive the uniform by mail during the seven-day training session.

"AMC will not retrofit the uniform to civilians already in theater - it will be given to civilians who are deploying at the time the command starts to issue them," said Enyart.

If the program is successful, uniforms could be issued as organizational clothing and individual equipment to all Army civilians who deploy.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, *ET AL.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv692 (EGS) |
| | ) | |
| SECRETARY OF THE AIR FORCE, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Sullivan |

State of Wisconsin   )
                   )  *ss.:*
County of Vilas      )

## DECLARATION OF PROFESSOR RICHARD H. KOHN

1. My name is Richard H. Kohn. I make this declaration in support of the cross-motion for summary judgment in the above-captioned case.

2. Since 1991 I have been a history professor at the University of North Carolina at Chapel Hill. From 1992 to 2006, I directed the Curriculum in Peace, War, and Defense, an interdisciplinary undergraduate major in national security affairs; from 1992 through 1999 I directed the Triangle Institute for Security Studies, an interdisciplinary and interuniversity consortium of faculty, graduate students, and citizens in central North Carolina interested in national and international security broadly defined. My current title is Professor of History and Adjunct Professor of Peace, War, and Defense.

3. I received my Bachelor of Arts, magna cum laude, from Harvard College in 1962. I received my Master of Science from the University of Wisconsin—Madison in 1964, and my Ph.D. from the same university in 1968. I served on the history faculty of

the City College of the City University of New York and Rutgers University—New Brunswick from 1968 to 1984, and as visiting or adjunct faculty at the Army and National War Colleges in 1980-81, 1985-90, and 2006-07.   For over nine years I was a member of the Senior Executive Service, serving as Chief of the Office of Air Force History and Chief Historian of the U.S. Air Force. A copy of my curriculum vitae is attached.

4. The focus of my scholarship during my career has been American military history generally, emphasizing national security and military policy, strategy, the American experience with war-making, and the connections between war, the military, and American society.  In recent years my concentration has been on current civil-military relations, particularly civilian control of the military.  My long term project is a study of presidential war leadership in American history from the 1790s to today, but I continue to research, lecture on, and publish in the area of contemporary civil-military relations.

5. I have read the Complaint and the Secretary's brief in support of his Motion to Dismiss or, in the Alternative, for Summary Judgment. Based on my many years of study of the military, including civil-military relations, I believe requiring civilian reservists to wear their military uniforms while not on military duty is not in keeping with American military tradition or practice, and will have negative consequences for the efficiency and the effectiveness of the Air Force Reserve.

6. Americans since colonial times have differentiated military and civilian status. It was understood that the military—whether regular soldiers and naval personnel or militia on active service—were subject to military command and a different legal system. Citizen soldiers in the militia were civilians *unless called into service* through formal pro-

tocols, as suggested in the U.S. Constitution (Article I, Section 8, paragraphs 15-16; Article II, Section 2, paragraph 1) and subsequently codified in law. Inheriting a distrust of standing armies from the English experience of the 17th century, Americans until the last two decades of the 20th century generally disliked and distrusted the regular military as wasteful, inefficient, oppressive, and a threat to liberty. Ambivalence about, and disrespect for, "the regulars" was typical of American political discourse until the last two decades of the 20th century. Complaints about the military legal system arose during the mobilizations for World Wars I and II, leading to calls for the reform of military law and resulting in enactment of the modern Uniform Code of Military Justice in 1950. Finally, it has long been the American tradition that military service is voluntary except in times of war or military emergency. Significant numbers of citizens were compelled to serve only during times of war or imminent (1940-1941) war, when their local communities were threatened (triggering a call-up of militia units before active militia service became voluntary in the late 19th century), or during the Cold War (until 1973) when the country maintained a large standing military force.

7. My study of military institutions and service, including personal observation, leads me to conclude that compelling the wearing of uniforms while in a civilian job could threaten efficiency and effectiveness. Wearing the uniform would tend to confuse status since civil service jobs and levels are unlikely always to conform to military rank. For example, a civilian technician might hold higher rank in the reserves than his or her supervisor. Furthermore, uniforms would alter relationships, at least psychologically. When given a task or instruction while wearing a uniform, would a technician in uniform not tend to interpret the direction as an order? Would questioning or discussing it consti-

tute disobedience in the military sense?  Would not directions and orders given and re-

ceived while in uniform trigger a "chain of command" mentality in both supervisors and

subordinates, suggesting at least implicitly that military obedience or compliance was ex-

pected and that its absence might jeopardize mission or life or limb, or trigger military

disciplinary procedures?  Last, civilians, some working under union contracts, enjoy legal

rights and mutually agreed-upon conditions of employment that personnel in military

status do not and cannot enjoy, including limitations on working hours, rights to file

grievances, arbitration of disputes, and litigation (as mentioned in the Secretary of the Air

Force's motion).  Would not the wearing of uniforms in the work place serve to limit or

undermine those rights or conditions of employment, at the very least subtly?  It is likely

that the confusion of status inherent in the wearing of uniforms, with all that the power of

military rank and the symbol of military service that uniforms represent, would breed not

only uncertainty, but possibly friction and resentment that could undermine the efficiency

and effectiveness of these organizations.  Subordinates could well feel disempowered and

reduced in status beyond the normal circumstances of their jobs; supervisors might feel

empowered beyond what would be the appropriate exercise of their authority in the civil-

ian workplace.  At heart, uniforms are functional for military service.  In modern times,

uniforms developed in Europe with the rise of standing armies for use on the battlefield

and its rear or support areas where rank, authority, discipline, and relationships were de-

signed to support a military organization's ability to accomplish its mission in combat

against an enemy.  As far as I am aware, the wearing of the uniform has been limited to

those on military duty with the exception of wear on ceremonial occasions by retired or

former members—and has been prohibited by law except to those entitled to wear the

appropriate uniform by dint of personal status precisely to avoid the confusion of status mentioned above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 11, 2008.

*Richard H. Kohn*

Richard H. Kohn

# CURRICULUM VITA

## RICHARD H. KOHN

Professor of History and Peace, War, and Defense, University of North Carolina at Chapel Hill
Address:  CB# 3195, 424 Hamilton Hall
      The University of North Carolina at Chapel Hill
      Chapel Hill, North Carolina  27599-3195
Telephone: (919) 962-9700 (office); Fax: (919) 962-2603
E-mail: rhkohn@unc.edu

## EDUCATION

A.B., Harvard University (Magna cum Laude, History), 1962
M.S., University of Wisconsin--Madison, History, 1964
Ph.D., University of Wisconsin--Madison, History, 1968

## EMPLOYMENT (INCLUDING VISITING AND PART-TIME APPOINTMENTS)

Assistant Professor of History, City College of the City University of New York, 1968-1971
Professor of History, Rutgers University--New Brunswick (Assistant Professor, 1971-1975; Associate
      Professor, 1975-1983; Professor, 1983-1984)
Harold Keith Johnson Visiting Professor of Military History, U.S. Army Military History Institute/Army
      War College, Carlisle Barracks, Pennsylvania, 1980-1981
Chief, Office of Air Force History and Chief Historian, United States Air Force (Senior Executive Service,
      Department of the Air Force), 1981-1991
Adjunct Professor, National War College, Washington, D.C., 1985-1990
Visiting Scholar in Strategic Studies, The Paul H. Nitze School of Advanced International Studies, Johns
      Hopkins University, 1991
Professor of History, University of North Carolina at Chapel Hill (Associate Professor, 1991-1993;
      Professor, 1993-present); Chair, Curriculum in Peace, War, and Defense, 1992-2006; Executive
      Secretary, Triangle Institute for Security Studies, 1992-2000; Fellow, Institute for the Arts and
      Humanities, 1995-present; Adjunct Professor of Peace, War, and Defense, 2006-present
Professor of Public Policy Studies, Terry Sanford Institute of Public Policy, Duke University, 1998-2000
Omar N. Bradley Professor of Strategic Leadership, US Army War College and Dickinson College,
      Carlisle, PA, 2006-2007

## GRANTS, AWARDS, HONORS

American Philosophical Society:  Penrose Fund Grant, 1970-1971
National Endowment for the Humanities:  Bicentennial Grant, 1970-1971
Rutgers University:  Research Council Grants, 1971-1977; Faculty Academic Study Program (sabbatical),
      1974
Organization of American Historians:  Binkley-Stephenson Award (best article, *Journal of American
      History)*, 1973
American Council of Learned Societies:  Fellowship, 1977-1978
Department of the Army:  Certificates of Appreciation for Patriotic Civilian Service, 1981, 1996
Bowling Green State University:  Eleazer Wood Memorial Military History Lecture, 1982

1

Department of the Air Force:  Senior Executive Service compensation step elevations, 1983, 1984, 1986; Senior Executive Service Outstanding Performance Awards, 1987, 1988, 1989; Organizational Excellence Award, 1990; Decoration for Exceptional Civilian Service, 1991
Air Force Historical Foundation:  President's Award, 1987
American Antiquarian Society:  elected to membership, 1992
University of North Carolina at Chapel Hill:  Dupont Course Development Grant, 1994; William  N. Reynolds  Research Leave, 1995-1996; Institute for the Arts and Humanities Faculty Fellowship, 1995-1996, Chapman Family Teaching Fellowship,2005; Order of the Grail-Valkyries, 2001; John L. Sanders Award for Distinguished Undergraduate Teaching and Service,  2003
Society for Military History:  Victory Gondos Memorial Service Award, 1996
Smith-Richardson Foundation Research Grants, 1997, 1998-2001
USAF Academy:  Harmon Memorial Lecturer in Military History, 1999
University of North Carolina at Pembroke:  Gibson Gray Lecture, 2001
Naval War College: Edward S. Miller History Prize (*Naval War College Review*, 2002 publishing year)
Society for Military History/George C. Marshall Foundation:  George C. Marshall Lecturer in Military History, 2004 (American Historical Association Annual Meeting, 2004)
University of South Dakota, Vermillion, SD:  Herbert S. Schell Lecture in American History, 2005
US Army War College, Carlisle, PA :  James J. Whalen Lecture, 2007
Paul H. Nitze School of Advanced International Studies, Johns Hopkins University, Washington, DC: Alvin H. Bernstein Lecture, 2007
University of North Carolina at Chapel Hill, Chapel Hill, NC:  E. Maynard Adams Lecture (2008, scheduled)

## PROFESSIONAL ACTIVITIES

American Historical Association (Local Arrangements Committee, 1968;  Council [elected], 1986-1989; Finance Committee, 1986-1989; Co-Chair, *Ad Hoc* Committee on the Future of the AHA, 1987-1988; Special Committee on AHA Publications, 1989-1990)
Columbia University Seminar in Early American History and Culture (Nominations Committee, 1973-1976; Steering Committee, 1977-1980)
Consultant, various historical film and video projects, 1972-present
Referee, adviser, and consultant for articles, book manuscripts, reference works, and grant applications for various journals, publishers, organizations, and funding agencies, 1972-present
Expert Witness, U.S. Indian Claims Commission, 1974
Inter-University Seminar on the Armed Forces and Society (Executive Council, 1977-1987)
Editorial Board, *Papers of William Livingston*, 1977-1987
Editorial Board, *Papers of George Washington*, 1977-present
*Ad Hoc* Committee on the Middlebrook Cantonment, Bridgewater Township, N.J., 1978-1981
Juror, Pulitzer Prize in History, 1978
Editor, *The American Military Experience*, reprint series of 43 titles in 56 volumes, Arno Press, 1979
Society for Military History (Program and Planning Committee, 1979-1985; Trustee [elected], 1981-1989,1995-1999; Parliamentarian, 1982-1989, Chair, Special Committee on Future of *Military Affairs*, 1986-1987; President [elected two terms], 1989-1993; ex officio, Society Council, 1993-1995; Long-Range Planning Committee, 1996-1998; Chair, Nominations Committee, 2000-2003)
US Army Training and Doctrine Command, Commander's Advisory Committee on Military History Education, 1981-1984
Board of Advisors, *Air University Quarterly/Airpower Journal/Aerospace Power Journal*, 1981-1991, 1996-2002

Ex officio member, Air Force Museum Foundation Board of Managers, 1981-1991

Advisor, Air Force Historical Foundation, 1981-1991

Secretary of the Air Force Committee on Museum Policy, 1982

Co-editor, *Project Warrior Series*, an open-ended collection of original and reprint volumes on military air power, Office of Air Force History, 1983-1991

Air University Blue Ribbon Committee on Faculty Development, 1984

University of Alabama Advisory Committee on Military History Graduate Program for Air University, 1985-1991

Board of Directors, World War II Studies Association, 1985-1988, 1991-1997, 2000-2003

National Air and Space Museum, Smithsonian Institution (Special Committee on Research Programs, 1986; Chair, Collections Management Advisory Committee, 1988-1992; Chair,    Advisory Committee on Research and Collections Management, 1992-1996)

USAF Scientific Advisory Board Summer Study on Air Base Operability, 1986-1987

Chair, Museum Advisory Committee, Air Force Sergeants Association, 1987-1991

Presidential Materials (Nixon Papers) Review Board, National Archives and Records Administration, 1988-1991

Advisory Board, Documentary History of the First Federal Congress, 1988-present

Harmon Memorial Lecture Committee, USAF Academy, 1989-1992

Board of Directors, National Coordinating Committee for the Promotion of History (now the National Coalition for History), 1989-2000 (Treasurer, 1996-1998; Chair, 1998-2000)

Organization of American Historians:  Public History Committee, 1989-1992 (Chair, 1991-1992); Chair, Executive Secretary Search Committee, 1992-1993

National Aeronautics and Space Administration History Advisory Committee, 1991-1994

Consultant, Center for National Security Studies, Los Alamos National Laboratory, 1991-1992

Editorial Board, *The D-Day Encyclopedia*, Simon & Schuster, 1992-1994

Executive Review Board, Gulf War Air Power Survey, Department of the Air Force, 1992-1993

Consultant, Office of Net Assessment, Department of Defense, Roundtable on the Air Force and the Revolution in Military Affairs, 1993

Ad Hoc Committee on Advocacy, National Council for Public History, 1993-1994

Board of Directors, Center on Law, Ethics and National Security, Duke University School of Law, 1993-2005

Editorial Advisory Board, "Papers of the War Department, 1784-1800," East Stroudsburg University, 1993-2005

Consultant, Shaw University Project on African-American World War II Medal of Honor Nominees, 1993-1994

Steering Committee, "Post-Cold War U.S. Civil-Military Relations in America," Center for Strategic & International Studies, 1993-1994

Adviser, *Oxford Companion to American Military History*, Oxford University Press, 1994-1999

Editorial Review Board, *Periodical*, Council on America's Military Past, 1994-1995

Adviser, *Oxford Companion to American History*, Oxford University Press, 1995-2000

Senior Advisory Council, "The U.S. Military in Post-Cold War American Society," John M. Olin   Institute for Strategic Studies, Harvard University, 1995-1997

External Advisory Committee, Air Force 2025 Study, Air University, USAF, 1995-1996

Board of Visitors, Air University, USAF, 1996-2001

Board of Advisors, Rutgers University Military Oral History Project, 1996-1999

Editorial Board, *American Diplomacy*, 1996-2006

Senior Fellow, Center for Strategic Education, Paul H. Nitze School of Advanced International Studies, Johns Hopkins University, 1997-present

Co-Principal Investigator, Project on the Gap between the Military and Society, Triangle Institute for
  Security Studies, 1998-2001
Member, National Security Study Group and consultant, US Commission on National Security/21st
  Century (The Hart-Rudman Commission), 1998-2001
Commissioner, First Flight Centennial Commission, State of North Carolina, 1999-2002
Consultant, "Price of Freedom" Exhibition, National Museum of American History, Smithsonian
  Institution, 2003-2004

## PUBLICATIONS

### Books,  Monographs, and other Volumes

*Eagle and Sword:  The Federalists and the Creation of the Military Establishment in America, 1783-1802*
  (New York:  The Free Press, 1975).  Paperback edition 1985.
*The United States and Treaties Between the State of New York and the Oneida and Stockbridge Indians,
  1795-1847* [Library of Indian Affairs, *Expert Testimony before the Indian Claims Commission*]
  (New York:  Clearwater Publishing Company, n.d.).
Editor, *Anglo-American Antimilitary Tracts, 1697-1830* (New York:  Arno Press, 1979).
Editor, *Military Laws of the United States, from the Civil War through the War Powers Act of 1973* (New
  York:  Arno Press, 1979)
Editor (with Joseph P. Harahan), *Air Superiority in World War II and Korea:  An Interview with Gen
  James Ferguson, Gen Robert M. Lee, Gen William Momyer, and Lt Gen Elwood R. Quesada*
  (Washington:  Office of Air Force History, 1983).
Editor (with Joseph P. Harahan), *Air Interdiction in World War II, Korea, and Vietnam:  An Interview
  with Gen Earl E. Partridge, Gen Jacob E. Smart, and Gen John W. Vogt* (Washington:  Office
  of Air Force History, 1986)
Editor (with Joseph P. Harahan), *Strategic Air Warfare:  An Interview with Gen Leon W. Johnson, Gen
  Curtis E. LeMay, Gen David Burchinal, and Gen Jack J. Catton* (Washington:  Office of Air
  Force History, 1988).
Editor, *The United States Military under the Constitution of the United States, 1789-1989*, (New York:
  New York University Press, 1991).  Paperback edition 1992.  Also published as No. 69 of the
  *Revue Internationale d'Histoire Militaire*, 1990.
With Elliott V. Converse, III, Daniel K. Gibran, John A. Cash, and Robert K. Griffith, *The Exclusion of
  Black Soldiers from the Medal of Honor in World War II: The Study Commissioned by the United
  States Army to Investigate Racial Bias in the Awarding of the Nation's Highest Military
  Decoration* (Jefferson, NC: McFarland Publishers, 1997).  Paperback edition, 2008.
Editor (with Peter D. Feaver), *Soldiers and Civilians: The Civil-Military Gap and American National
  Security* (Cambridge, MA: MIT Press, 2001).

### Articles and Essays (* indicates refereed journal)

*"The Inside History of the Newburgh Conspiracy:  America and the Coup d'Etat," *William and Mary
  Quarterly*, 3rd series, XXVIII (1970), 187-220.  Reprinted Peter S. Onuf, ed., *The New American
  Nation, 1775-1820*, v. 4 (New York and London:  Garland Publishing, Inc., 1991), 79-112; in
  abridged form, *Society*, XII (May/June 1975), 30-36; Peter Karsten, ed., *The Military in America
  From the Colonial Era to the Present* (New York:  The Free Press, 1980, 2nd ed. 1986), 45-56.
  See also rebuttal to Paul David Nelson, "Horatio Gates at Newburgh, 1783:  A Misunderstood

Role," *William and Mary Quarterly*, 3rd series, XXIX (1972), 151-158; rebuttal to C. Edward Skeen, "The Newburgh Conspiracy Reconsidered," ibid., XXXI (1974), 290-298.

"General Wilkinson's Vendetta with General Wayne:  Politics and Command in the American Army, 1791-1796"" *Filson Club History Quarterly*, XLV (1971), 361-372.  Reprinted Samuel Watson, ed. *Warfare in the USA, 1784-1861* (Aldershot: Ashgate Pubishing Co., 2005), 101-112.

With David Syrett, "The Dangers of an All-Volunteer Army," *Military Review*, LII (June 1972), 70-74. Reprinted *Women's Army Corps Journal*, IV (Jan-Mar 1973), 22-24.  See also reply to Lieutenant-Colonel Harry G. Summers, Jr., "Another View of an All-Volunteer Army," *Military Review*, LII (July 1972), 3.

*"The Washington Administration's Decision to Crush the Whiskey Rebellion," *Journal of American History*, LIX (1972), 567-584.

"The All-Volunteer Army:  Too High a Price?" *United States Naval Institute Proceedings*, C (March 1974), 35-42.

"Military History at the Crossroads," *Reviews in American History*, II (1974), 222-226.

"The Murder of the Militia System in the Aftermath of the American Revolution," James Kirby Martin, ed., *The Human Dimensions of Nation Making:  Essays on Colonial and Revolutionary America* (Madison:  State Historical Society of Wisconsin, 1976), 304-322.  Also published in Stanley J. Underdal, ed., *Military History of the American Revolution: The Proceedings of the 6th Military History Symposium, United States Air Force Academy* (Washington:  Office of Air Force History and United States Air Force Academy, 1976), 110-126; reprinted David Curtis Skaggs annd Robert S. Browning III, *In Defense of the Republic: Readings in American Military Histry* (Belmont, CA:  Wadsworth Publishing Company, 1991), 69-82.

"The Greatness of George Washington:  Lessons for Today," *Assembly*, XXXVI (March 1978), 6-7, 28-29.

"American Generals of the Revolution:  Subordination and Restraint," Don Higginbotham, ed., *Reconsiderations on the Revolutionary War:  Selected Essays* (Westport, Conn.:  Greenwood Press, 1978), 104-123, 188-200.

"The Creation of the American Military Establishment, 1783-1802," Peter Karsten, ed., *The Military in America From the Colonial Era to the Present* (New York:  The Free Press, 1980), 73-84.

*"The Social History of the American Soldier:  A Review and Prospectus for Research," *American Historical Review*, LXXXVI (1981), 553-567; see also a shortened version, in Garry D. Ryan and Timothy K. Nenninger, eds., *Soldiers and Civilians: The U.S. Army and the American People* (Washington: National Archives and Records Administration, 1987), 53-56.

With George M. Curtis, III, "The Government, the Historical Profession, and Historical Editing:  A Review," *Reviews in American History*, IX (1981), 146-155.

"Anthony Wayne," Roger J. Spiller, ed., *Dictionary of American Military Biography* (Westport, Conn.: Greenwood Press, 1984), III, 1166-1170.

Editor, "Judge Alexander Addison on the Origin and History of the Whiskey Rebellion," Steven Boyd, ed., *The Whiskey Rebellion:  Past and Present Perspectives* (Westport, Conn.:  Greenwood Press, 1985), 49-60.

"Technology and USAF Planning:  Commentary," Harry R. Borowski, ed., *Military Planning in the Twentieth Century:  Proceedings of the Eleventh Military History Symposium, 10-12 October 1984, United States Air Force Academy* (Washington:  Office of Air Force History, 1986), 236-243.

*Editor (with Joseph P. Harahan), "U.S. Strategic Air Power, 1948-1962:  Excerpts from an Interview with Generals Curtis E. LeMay, Leon W. Johnson, David A. Burchinal, and Jack J. Catton," *International Security*, XII (1988), 78-95.

"The Future of the Historical Profession," *Perspectives: American Historical Association Newsletter*, 27 (November, 1989), 6, 12, 13.

"The Constitution and National Security: The Intent of the Framers," Richard H. Kohn, ed., *The United States Military under the Constitution of the United States, 1789-1989* (New York: New York University Press, 1991), 61-94; published in an earlier version, "The Constitution and the U.S. Army: National Security and the Intent of the Framers," in [Rod Paschall, ed.] *The Constitution and the U.S. Army* (Carlisle Barracks, PA: U.S. Army War College and U.S. Army Military History Institute, n.d. [1988]), 15-24.

Editor, "The Scholarship on World War II: Its Present Condition and Future Possibilities," *The Journal of Military History*, LV (1991), 365-393.

"A Note on the Yamamoto Aerial Victory Credit Controversy," *Airpower History*, 34(1992), 42-    52.

"Commentary" on "Air Warfare and Humanity," in Horst Boog, ed., *The Conduct of the Air War in the Second World War: An International Comparison* (New York: Berg Publishers, 1992), 405-411.

With Anna K. Nelson, "The U.S. Must Declassify Its Cold-War Documents," *Chronicle of Higher Education*, XXXIX (Sept. 16, 1992), A56.

"History as Institutional Memory: The Experience of the United States Air Force," in David Charters, Marc Milner, and J. Brent Wilson, eds., *Military History and the Military Profession* (Westport, CT: Praeger, 1992), 159-168.

"Women in Combat, Homosexuals in Uniform: The Challenge of Military Leadership," *Parameters: US Army War College Quarterly*, 23(Spring 1993), 2-4; reprinted in Robert L. Taylor and William E. Rosenbach, eds., *Military Leadership: In Pursuit of Excellence* (Boulder, CO: Westview Press, 1996), 227-229; as "Homosexuals Can Enhance Military Effectiveness," in Tamara L. Roleff, ed., *Gay Rights [Current Controversies* Series] (San Diego, CA: Greenhaven Press, 1997), 118-120.

"Out of Control: The Crisis in Civil-Military Relations," *The National Interest*, No. 35 (Spring 1994), 3-17; see also "Upstarts in Uniform," *New York Times* Op-Ed, April 10, 1994, p. E19, reprinted in various regional newspapers, and "An Exchange on Civil-Military Relations" [Letters from Gen. Colin Powell, Secretary John Lehman, Lt. Gen. William Odom, and Professor Samuel Huntington with response by Richard H. Kohn], *The National Interest*, No. 36 (Summer 1994), 23-31.

"History and the Culture Wars: The Case of the Smithsonian Institution's *Enola Gay* Exhibit," *Journal of American History*, 82 (December 1995):1036-1063. Also published in edited form as "History at Risk: The Case of the *Enola Gay*," in Edward T. Linenthal and Tom Engelhardt, eds., *History Wars: the Enola Gay and other Battles for the American Past* (New York: Henry Holt, 1996), 140-170, 273-283.

Editor, "The Practice of History in the U.S. Government: The Department of Defense," *The Journal of Military History*, LXI (1997):121-147.

"The Forgotten Fundamentals of Civilian Control of the Military in Democratic Government," Working Paper Number 11, Project on U.S. Post Cold-War Civil-Military Relations (Cambridge: John M. Olin Institute for Strategic Studies, Harvard University, 1997); also published in earlier form as "Los Fundamentos Olivadados del Control Civil sombre lost Militares en Gobiernos Democráticos," in Kevin Casas Zamora, ed., *Relaciones Civico-Militaries Comparadas: Entendiendo los Mecanismos de Control Civil en Pequeñas Democracias (América Latina)* (San José, Costa Rica: Fundación Arias para la Paz yel Progreso Humano, 1997), 37-65; in edited form as "An Essay on Civilian Control of the Military," *American Diplomacy*, 2 (February 1997):unpaginated [internet journal].

"How Democracies Control the Military," *Journal of Democracy*, 8(October 1997):140-153;  reprinted *The Global Divergence of Democracies*, ed. Larry Diamond and Marc F. Plattner (Baltimore: Johns Hopkins University Press, 2001), 275-288..

6

With Andrew J. Bacevich, "Grand Army of the Republicans," *The New Republic* (December 8, 1997), 22-24.

"An Officer Corps for the Next Century," *Joint Forces Quarterly*, No. 18 (Spring 1998), 76-80.

"Civil-Military Relations: Civilian Control of the Military," in John Whiteclay Chambers II, editor, *The Oxford Companion to American Military History*, (New York: Oxford University Press, 1999), 122-125.

With Peter D. Feaver, "The Gap: Soldiers, Civilians, and Their Mutual Misunderstanding," *The National Interest*, No. 61 (Fall 2000), 29-37.

"The Political Trap for the Military," Raleigh, NC *News & Observer*, September 22, 2000, p. A19; orig. published *Washington Post*, September 19, 2000, p. A23 and reprinted in various newspapers nationally and internationally.

*Editor (with Peter D. Feaver), "Media and Education in the U.S. Civil-Military Gap," special issue, *Armed Forces & Society*, 27(Winter 2001):177-294.

*Editor, "The Early Retirement of General Ronald R. Fogleman, Chief of Staff, United States Air Force," *Aerospace Power Journal*, XV(Spring 2001):6-23.

With Peter D. Feaver, "Civilian control to the forefront," Raleigh, NC *News & Observer*, October 16, 2001, p. A11.

"A War Like No Other," Organization of American Historians *Newsletter*, November 2001, pp. 1, 4; *Headquarters Gazette*, Society for Military History Newsletter, 12(Fall 2001):1-3.

With Andrew J. Bacevich, "On This Front, Not the Way to Go," *Washington Post*, February 17, 2002, p. B4.

*"The Erosion of Civilian Control of the Military in the United States Today," *Naval War College* Review, 55(2002):8-59, published in earlier form as *The Erosion of Civilian Control of the Military in the United States Today [Harmon Memorial Lecture in Military History, No. 42]* (Colorado Springs: USAF Academy, 1999 [2002].

"Attacking Iraq: Weighing the Means and Ends," *Chronicle of Higher Education*, XLIX (September 20, 2002), B10-11.

"Using the Military at Home: Yesterday, Today, and Tomorrow," *Chicago Journal of International Law*, 4(2003):165-192.

"Letter to the Federal Judiciary: Courts must guard liberty in time of war," *St. Louis Post-Dispatch*, Apr. 18, 2004, p. B5.

With Anthony Oberschall, "The U.S. Road Ahead: Military Strategy," *St. Louis Post-Dispatch*, May 16, 2004, p. B1.

"Four More (War) Years: Can He Write a Better Script?" *Washington Post*, Jan. 16, 2005, p. B01.

"Democracy Has Its Own Timetable, Mr. Bush," *Washington Post*, July 3, 2005, p. B4.

"The Generals Who Said Too Much: Why they're wrong to attack Rumsfeld in public — even if he deserves it," Time.com, April 17, 2006,
http://www.time.com/time/nation/article/0,8599,1184335,00.html

"Hoping is not a Strategy; it's time to disengage," Raleigh *News & Observer*, January 14, 2007, p. 21A

With Richard B. Myers, "The Military's Place," in "Salute and Disobey?" *Foreign Affairs*, 86(Sept./Oct. 2007):147-149.

"Military History in Academe Today," *Headquarters Gazette*, Society for Military History Newsletter, 19(Winter 2007):2-4.

"Coming Soon: A Crisis in Civil-Military Relations," *World Affairs*, 170(Winter, 2008):69-80.

"Building Trust: Civil-Military Behaviors for Effective National Security," chapter 13, Suzanne Nielsen and Don Snider, eds., *American Civil-Military Relations: Realities and Challenges in the New Era* (Baltimore: Johns Hopkins University Press, in press).

"The Challenge of Military Professionalism in the 21st Century," (Washington: Philip Merrill Center for Strategic Studies, Paul H. Nitze School of Advanced International Studies, Johns Hopkins University, 2008). Accepted for publication, *World Affairs*.

"The Danger of Militarization in an Endless 'War' on Terrorism," accepted for publication, *Journal of Military History*.

Oral History Interviews (* indicates published)

Generals James Ferguson, Robert L. Lee, William Momyer, and Lieutenant General Elwood R. Quesada, Bolling Air Force Base, DC, 1982*

Generals Earle E. Partridge, Jacob E. Smart, and John W. Vogt, Jr., Bolling Air Force Base, DC, 1983*

Generals Curtis E. LeMay, Leon W. Johnson, David A. Burchinal, and Jack J. Catton, Bolling Air Force Base, DC, 1984*

With Diane Putney, Associate Justice of the Supreme Court Lewis F. Powell, Jr., Washington, DC, 1985*

With Maurice N. Marynow, General David C. Jones, Arlington, VA, 1985-1986

Generals Bernard Shreiver, Samuel C. Phillips, Robert T. Marsh, and James H. Doolittle, and Dr. Ivan H. Getting, Bolling Air Force Base, 1985*

Chief Master Sergeants of the Air Force Paul W. Airey, Donald L. Harlow, Thomas N. Barnes, and Robert D. Gaylor, Bolling Air Force Base, DC, 1986*

## TEACHING AND UNIVERSITY ACTIVITIES

Lecture Courses

U.S. History to 1865
Military History of the United States (one semester)
War and American Society to 1903
War and American Society since 1903
History of the Cold War (team taught)

Undergraduate Discussion Courses

American Studies: Varieties of Americans (team taught)
American Studies: Americans at War
U.S. History since 1865
Comparative Civil-Military Relations in Germany and the United States
The President of the United States as a War Leader
Abraham Lincoln as a War Leader
Harry S. Truman as a War Leader
The American Soldier
The American War for Independence
Air Power in the 20th Century
The United States in Vietnam
Introduction to National and International Security

Graduate Seminars and Colloquia

Problems and Directed Readings in American History to 1860 (team taught)
Historical Writing for Dissertation Students
Politics in the Early National Period
Indian-White Relations in America to 1800
Introduction to Military History (team taught)
American Military History
Civil-Military Relations in the United States
European Military History (team taught)
History of Military Strategy
History of American War-Making
History of Air Power
Military Leadership and Command
Introductory Seminar in Military History
Advanced Seminar in Military History
Civilian Control of the Military in the United States

<u>Committee Activities</u>

Departmental AAUP Representative, 1973-1974
College Committee on Scholastic Standing, 1973-1976, 1978-1980 (Chair, 1979-1980)
Departmental Advising Committee, 1974-1977
Departmental Chair, U.S. Political History Search Committee, 1975-1976
Departmental Teaching Effectiveness Committee, 1975-1977
University Ad Hoc Committee on Honorary Degree Program, 1976
College Athletic Committee, 1976-1977
College Faculty Representative, Panel Discussion for Parents of Incoming Freshmen, 1977, 1978
University Research Council Consultant, Social Sciences, 1979
University Research Council, 1979-1980
University Research Council Sabbatical Grant Committee, 1980
Ad Hoc Curriculum Committee, 1981
Chair, Faculty Advisory Committee, Curriculum in Peace, War, and Defense, 1991-2006
Curriculum Revision Committee, Curriculum in Peace, War, and Defense, 1991-1992
History Department Committee on Teaching, 1992-1995
Triangle Institute for Security Studies, Executive Committee, 1992-2006
Faculty Advisory Committee, Program in the Humanities and Human Values, 1996-2006; Chair, 2000-2005
College of Arts and Sciences, Ad Hoc Committee on Undergraduate Advising, 2000
Board of Advisors, Carolina for Kibera, 2002-2006
Faculty Advisory Committee, University Center for International Studies, 2002-2004
National Advisory Board, Academic Leadership Program, Institute for the Arts and Humanities, 2003-present
University Teaching Awards Committee, 2003-2004
Military History Search Committee, Duke University History Department, 2003-2004
Chair, National/International Security Search Committee, 2004-2005

<u>Administrative Responsibilities</u>

Administrator, Perspectives in Military History Lecture Series, US Army Military History, Institute, 1980-1981

Co-convener, Carolina Seminar on "The Future of U.S. National Security Policy," 1992-1994

Chair, Curriculum in Peace, War, and Defense, 1992-2006

Executive Secretary, Triangle Institute for Security Studies, 1992-1999

## WORKS IN PROGRESS

*Liberty with Security: Civilian Control of the Military in the United States Then and Today.* Essays on the subject from "The Inside History of the Newburgh Conspiracy: America and the *Coup d'Etat*" published in 1970 through "The Danger of Militarization in an Endless 'War on Terrorism,'" to be published in 2008.

*The President at War from George Washington to George W. Bush.* This book analyzes the challenges of successful war leadership by presidents of the United States over the course of American history.

*The Myth of the Sleeping Dinosaur, and other Essays on How the United States has Made and Experienced War, including The American Way of War.* This book of fourteen studies explores the American experience of war over four centuries from a cultural, political, social, economic, and diplomatic, as well as military perspective.

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *ET AL.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv692 (EGS) |
| SECRETARY OF THE AIR FORCE, | ) ) | |
| *Defendant.* | ) | Judge Sullivan |

# PLAINTIFFS' EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF           )
GOVERNMENT EMPLOYEES, *ET AL.*,  )
                                 )
          *Plaintiffs,*          )
                                 )
     v.                          )      Civil Action No. 1:08cv692 (EGS)
                                 )
SECRETARY OF THE AIR FORCE,      )
                                 )
          *Defendant.*           )      Judge Sullivan


State of Delaware    )
                     )   *ss.:*
County of Kent       )


DECLARATION OF DANIEL H. SACCO

1. My name is Daniel H. Sacco. I make this declaration in support of the plaintiffs' cross-motion for summary judgment in the above-captioned case.

2. I am a dual status Air Reserve Technician ("ART") at Dover Air Force Base ("AFB"), Delaware. I am a Chief Steward of Local 1709, AFGE.

3. I have read the Complaint and the brief being filed on behalf of the plaintiffs. The facts stated in them are true.

4. My civilian pay grade is WG-10, and my military rank is Technical Sergeant (E-6). I have been an ART since December 1989. I entered the ART program on the understanding that when not serving in my military capacity I would be treated as a civilian. My civilian position is materially different from my military position. As a WG-10 employee I have no supervisory function. My main duty as a civilian is as an aircraft mechanic, servicing the C-5 "Galaxy" heavy transport aircraft. In my military capacity, I do

supervise others, serving as a Crew Leader for a team of six traditional reservists, whom I train, supervise and evaluate. Service as an aircraft mechanic is not my primary function when in military status.

5. When working in my civilian capacity, I have always had the latitude to wear civilian clothes that are appropriate to the work assigned. My work outfit in that capacity could, at my election, consist of casual wear such as blue jeans, an informal shirt, and steel-toed safety footwear of my own selection. Those arrangements changed in 2007 when the Air Force unilaterally amended its regulations to require me and other Dover AFB ARTs to wear the regulation Air Force military uniform even when working in our civilian capacity.

6. I served on active duty in the United States Navy for four years. At the end of my enlistment I was ready to return to civilian life but I still wanted to serve my country as a reservist, even though I knew full well that this could subject me to a call-up in time of war or crisis. I have never had a problem with this. But the changes the Agency made last year to require me and other dual status ARTs to wear the military uniform even when working in civilian status are radical and outside the Air Force's authority. The changes impact ARTs in both of their capacities, significantly reducing personal auton-omy in our civilian capacity while not affording the many benefits that come from mili-tary status (including the protections of the Uniform Code of Military Justice). Wearing the military uniform when in civilian status is misleading all around. It implies that I, as a noncommissioned officer in my military capacity, can give military orders, when I in fact cannot. It imposes an obligation to render formal military courtesies to persons wearing the uniform of a higher military pay grade, when in fact I am not serving as a military

2

member. It prevents me from engaging in perfectly normal and acceptable civilian behavior such as using my cell phone while walking. It may seem a trivial example, but it demonstrates the pervasive effects of the change to mandatory wear of the military uniform. There is no reason ARTs in civilian status should be required to wear the military uniform when non-ART reservists (so-called "weekend warriors") who also work for the Air Force as civilians (or for any other civilian employer, for that matter) need not do so.

7. I have studied the reasons given by the Air Force for the 2007 change. None of them make any sense. Wearing the uniform adds nothing to my or any other ART's awareness of our part in National Defense or the fact that we work in a military environment. Our workplaces are military bases; the Air Force is all around us. There is no nexus between civilian-status ARTs' wear of the military uniform and either continuity or good order and discipline. To my knowledge, no continuity or good-order-and-discipline problems have arisen as a result of ARTs wearing civilian clothes when working in their civilian status. Most ARTs have been associated with the Armed Forces one way or another for many years. ARTs are typically older than non-ARTs with the same military pay grade. We no more need to wear the military uniform when doing our civilian jobs to be reminded of our part in the overall Air Force and its mission (or the need for continuity and good order and discipline) than does the Secretary's civil-service secretary, who I am certain is not required to and in fact does not wear a military uniform.

8. It is seriously misleading to suggest that ARTs "frequently convert from civilian to military status." They shift from one status to the other in the normal course of events, becoming military only when their reservist-capacity obligations arise for drills one weekend per month or annual 15-day training. This is perfectly normal, and has been

the case for decades. It is, if anything, even more misleading to suggest that ARTs "have been a significant part of the deployed force" (seemingly referring to overseas operations in Iraq and Afghanistan), without focusing on the particular capacity in which they have been deployed. Dual status ARTs are subject to deployment in either their military or civilian status. ARTs have gone on overseas missions, but this has been in their capacity as military reservists during periods in which they have been activated to active duty status, like any other reservist, rather than in their civilian capacity.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 15, 2008.

Daniel H. Sacco

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF                    )
GOVERNMENT EMPLOYEES, *ET AL.*,           )
                                          )
              *Plaintiffs,*               )
                                          )
        v.                                )          Civil Action No. 1:08cv692 (EGS)
                                          )
SECRETARY OF THE AIR FORCE,               )
                                          )
              *Defendant.*                )          Judge Sullivan


PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND
STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT

*Introduction*

This is an action for declaratory and injunctive relief brought by the American

Federation of Government Employees, AFL-CIO ("AFGE"), 14 of its locals that repre-

sent "dual status" Air Reserve Technicians ("ARTs"), and an individual member of a fif-

teenth AFGE local. The case seeks to invalidate as arbitrary and capricious, contrary to

law, and in excess of statutory authority certain rule changes the Air Force promulgated

in 2007 ("the 2007 amendments") that purport to compel the locals' members to wear

military uniforms even when serving in their civilian capacity. Pl. Exs. 3-5.

Over 2700 of the 6600 unionized ARTs have objected to the 2007 amendments.

*See* Seamus O'Connor, *ARTs Sue Wynne Over Uniform Policy,* Air Force Times, Apr. 28,

2008,

http://www.airforcetimes.com/news/2008/04/airforce_airreservetechnicians_lawsuit_042

408w/ (last visited Aug. 15, 2008), Pl. Ex. 17. A show of hands among those who are

affected is obviously not how lawsuits are decided. But neither is it something to be ignored when this many dedicated members of the federal workforce take the trouble to express themselves. Oftentimes laypersons have an acute sense of what is lawful and, as here, what is not. This is such a case.

A civilian cannot be required to wear a military uniform. Requiring ARTs to do so when serving in their civilian capacity not only improperly upsets settled expectations, but confuses military and civilian status in an era when having or not having the protections of the Geneva Conventions is all too real an issue as to which clarity is critical. As intensely proud as they are of their part-time military status as Air Force reservists and their contribution to the national defense in both their military and civilian statuses, imposing such a requirement on ARTs represents serious official overreaching, especially in the teeth of actual knowledge that Congress has not authorized the Air Force to impose such a requirement on them.

The Secretary has moved to dismiss or, in the alternative, for summary judgment. As we shall explain in this brief, his motion should be denied, and plaintiffs' cross-motion for summary judgment should be granted. There appear to be no genuine issues of material fact and plaintiffs are entitled to judgment as a matter of law.

### *Questions Presented*

DOES THE COMPLAINT STATE A CAUSE OF ACTION?

DOES THE COMPLAINT PRESENT A POLITICAL QUESTION SO AS TO PRECLUDE JUDICIAL REVIEW?

DO PLAINTIFFS HAVE ANOTHER ADEQUATE REMEDY SUCH AS TO PRECLUDE APA REVIEW?

IS THE CASE RIPE?

MAY THE SECRETARY REQUIRE ARTS TO WEAR MILITARY UNIFORMS EVEN WHEN IN CIVILIAN STATUS?

*Plaintiffs' Exhibits*

1. DoD Instruction 1205.18, *Full-Time Support (FTS) to the Reserve Components* (May 4, 2007)

2. AFI 36-108, *Air Reserve Technician (ART) Program* (July 26, 1994)

3. AFI 36-703, *Civilian Conduct and Responsibility* (Aug. 1, 1999, incorporating change 1, Aug. 6, 2007)

4. AFI 36-801, *Uniforms for Civilian Employees* (Apr. 29, 1994, incorporating change 1, Aug. 6, 2007)

5. AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel* (Aug. 2, 2006, incorporating change 1, Aug. 6, 2007)

6. Memorandum from Air Force Reserve Command to John Gage, Pres., AFGE (Apr. 18, 2007)

7. Legislative Initiative

8. Letters from William J. Haynes, II, General Counsel, DoD, with legislative proposal (Feb. 5, 2008)

9. Air Force Reserve Command, PowerPoint Presentation, *ART Uniform*

10. *AFGE Local 2361 and Whiteman AFB*, No. 08-51344 (Fed. Med. & Concil. Svc. June 2, 2008)

11. FLRA Bulletin, Unfair Labor Practice Case Processing in the Absence of a General Counsel (Mar. 3, 2008)

12. FLRA Bulletin, Authority Case Processing During the Time and Authority Has One Member (July 17, 2008)

13. Negotiated Agreement between AFGE Local 1364 and Naval Air Station Joint Reserve Base, Fort Worth, Texas, Art. XXIII

14. Labor-Management Agreement between March Field and AFGE Local 3854, Art. 37

15. Memorandum from 305th Air Mobility Wing, McGuire AFB, to AFGE Local 1778 (Mar. 20, 2008)

16. Congressional Research Service, Military Technicians: The Issue of Mandatory Retirement for Non-Dual-Status Technicians (Mar. 28, 2000)

17. News Articles

18. Declaration of Prof. Richard H. Kohn (July 11, 2008)

19. Declaration of Daniel H. Sacco (Aug. 15, 2008)

*Glossary*

AFB ...................................................................................................... Air Force Base

AFI .................................................................................................Air Force Instruction

AMC ...........................................................................................Army Materiel Command

APA..........................................................................................Administrative Procedure Act

ART..............................................................................................Air Reserve Technician

CBA ..........................................................................Collective Bargaining Agreement

DoD........................................................................................... Department of Defense

FLRA ........................................................................... Federal Labor Relations Authority

FSLMRS ........................................Federal Service Labor-Management Relations Statute

FTS...........................................................................................Full-Time Support

LMA...............................................................................Labor-Management Agreement

MT.....................................................................................Military Technician

RC ..................................................................................Reserve Component

UCMJ............................................................................Uniform Code of Military Justice

ULP.....................................................................................Unfair Labor Practice

*Governing Law*

The governing statute is 10 U.S.C. § 10216. It provides:

Sec. 10216. Military technicians (dual status)

(a) In General.—(1) For purposes of this section and any other provision of law, a military technician (dual status) is a Federal civilian employee who—

> (A) is employed under section 3101 of title 5 or section 709(b) of title 32;
>
> (B) is required as a condition of that employment to maintain membership in the Selected Reserve; and
>
> (C) is assigned to a civilian position as a technician in the organizing, administering, or training of the Selected Reserve or in the maintenance and repair of supplies or equipment issued to the Selected Reserve or the armed forces.

(2) Military technicians (dual status) shall be authorized and accounted for as a separate category of civilian employees.

(3) A military technician (dual status) who is employed under section 3101 of title 5 may perform the following additional duties to the extent that the performance of those duties does not interfere with the performance of the primary duties described in paragraph (1):

> (A) Supporting operations or missions assigned in whole or in part to the technician's unit.
>
> (B) Supporting operations or missions performed or to be performed by—
>
> (i) a unit composed of elements from more than one component of the technician's armed force; or
>
> (ii) a joint forces unit that includes—
>
> (I) one or more units of the technician's component; or
>
> (II) a member of the technician's component whose reserve component assignment is in a position in an element of the joint forces unit.
>
> (C) Instructing or training in the United States or the Commonwealth of Puerto Rico or possessions of the United States of—
>
> (i) active-duty members of the armed forces;
>
> (ii) members of foreign military forces (under the same authorities and restrictions applicable to active-duty members providing such instruction or training);
>
> (iii) Department of Defense contractor personnel; or
>
> (iv) Department of Defense civilian employees.

(b) Priority for management of military technicians (dual status).—

(1) As a basis for making the annual request to Congress pursuant to section 115(c) of this title for authorization of end strengths for military technicians (dual status) of the Army and Air Force reserve components,

the Secretary of Defense shall give priority to supporting authorizations for military technicians (dual status) in the following high-priority units and organizations:

    (A) Units of the Selected Reserve that are scheduled to deploy no later than 90 days after mobilization.

    (B) Units of the Selected Reserve that are or will deploy to relieve active duty peacetime operations tempo.

    (C) Those organizations with the primary mission of providing direct support surface and aviation maintenance for the reserve components of the Army and Air Force, to the extent that the military technicians (dual status) in such units would mobilize and deploy in a skill that is compatible with their civilian position skill.

  (2) For each fiscal year, the Secretary of Defense shall, for the high-priority units and organizations referred to in paragraph (1), seek to achieve a programmed manning level for military technicians (dual status) that is not less than 90 percent of the programmed manpower structure for those units and organizations for military technicians (dual status) for that fiscal year.

  (3) Military technician (dual status) authorizations and personnel shall be exempt from any requirement (imposed by law or otherwise) for reductions in Department of Defense civilian personnel and shall only be reduced as part of military force structure reductions.

  (c) Information required to be submitted with annual end strength authorization Request.—(1) The Secretary of Defense shall include as part of the budget justification documents submitted to Congress with the budget of the Department of Defense for any fiscal year the following information with respect to the end strengths for military technicians (dual status) requested in that budget pursuant to section 115(c) of this title, shown separately for each of the Army and Air Force reserve components:

    (A) The number of military technicians (dual status) in the high priority units and organizations specified in subsection (b)(1).

    (B) The number of technicians other than military technicians (dual status) in the high priority units and organizations specified in subsection (b)(1).

    (C) The number of military technicians (dual status) in other than high priority units and organizations specified in subsection (b)(1).

    (D) The number of technicians other than military technicians (dual status) in other than high priority units and organizations specified in subsection (b)(1).

  (2)(A) If the budget submitted to Congress for any fiscal year requests authorization for that fiscal year under section 115(c) of this title of a military technician (dual status) end strength for a reserve component of the Army or Air Force in a number that constitutes a reduction from the end strength minimum established by law for that reserve component for the fiscal year during which the budget is submitted, the Secretary of Defense

shall submit to the congressional defense committees with that budget a justification providing the basis for that requested reduction in technician end strength.

(B) Any justification submitted under subparagraph (A) shall clearly delineate the specific force structure reductions forming the basis for such requested technician reduction (and the numbers related to those reductions).

(d) Unit Membership Requirement.—(1) Unless specifically exempted by law, each individual who is hired as a military technician (dual status) after December 1, 1995, shall be required as a condition of that employment to maintain membership in—

       (A) the unit of the Selected Reserve by which the individual is employed as a military technician; or

       (B) a unit of the Selected Reserve that the individual is employed as a military technician to support.

(2) Paragraph (1) does not apply to a military technician (dual status) who is employed by the Army Reserve in an area other than Army Reserve troop program units.

(e) Dual status requirement.—(1) Funds appropriated for the Department of Defense may not (except as provided in paragraph (2)) be used for compensation as a military technician of any individual hired as a military technician (dual status) after February 10, 1996, who is no longer a member of the Selected Reserve.

(2) Except as otherwise provided by law, the Secretary concerned may pay compensation described in paragraph (1) to an individual described in that paragraph who is no longer a member of the Selected Reserve for a period up to 12 months following the individual's loss of membership in the Selected Reserve if the Secretary determines that such loss of membership was not due to the failure of that individual to meet military standards.

(f) Deferral of mandatory separation.—The Secretary of the Army shall implement personnel policies so as to allow a military technician (dual status) who continues to meet the requirements of this section for dual status to continue to serve beyond a mandatory removal date for officers, and any applicable maximum years of service limitation, until the military technician (dual status) reaches age 60 and attains eligibility for an unreduced annuity (as defined in section 10218(c) of this title).

Also at issue are several Air Force Instructions ("AFIs"), submitted as Pl. Exs. 3-5. In a nutshell, the 2007 amendments to those AFIs mandate for the first time wear of the Air Force military uniform by ARTs even when working in their civilian capacity.

*Statement of Facts*

AFGE, a labor organization affiliated with the AFL-CIO, represents approximately 600,000 federal government employees throughout numerous government departments and agencies. AFGE represents the interests of employees within its bargaining units by, *inter alia*, enforcing the legal rights of its bargaining unit employees, negotiating collective bargaining agreements ("CBAs," also known as labor-management agreements ("LMAs")), arbitrating grievances, filing unfair labor practices ("ULPs"), lobbying, and litigating employees' collective and individual rights in the federal courts and administrative agencies. The other plaintiffs are local labor unions chartered by AFGE and Mark Winstead, who is a member of the AFGE local at Andrews Air Force Base ("AFB"), Maryland. Plaintiff Winstead and the locals' other members are ARTs whose dual status employment is governed by § 10216.

Defendant is Secretary of the Air Force. As such, he is responsible for assigning, detailing, and prescribing the duties of members of the Air Force as well as civilian personnel of the Department of the Air Force. 10 U.S.C. § 8013(g).

The reserve component ("RC") of the United States armed forces—which includes, among other elements, the Air Force Reserve, 10 U.S.C. §§ 10101(6), 10110—employs a core group of full-time employees to administer RC units, train RC personnel, and maintain RC equipment. These employees are known as Full-Time Support ("FTS") personnel. Pl. Ex. 16, at 1.

The Air Force Reserve "consists of the members of the officers' section of the Air Force Reserve and of the enlisted section of the Air Force Reserve." 10 U.S.C. § 10110.

Military technicians ("MTs") are one category of FTS personnel. MTs who hold membership in the Selected Reserve are referred to as "dual status technicians" because of their status as both civilian employees and reservists. Pl. Ex. 16, at 3.

The Air Force Reserve's technician program was established in 1957 under the statutory umbrella of the civil service. *See generally American Federation of Gov't Employees v. Hoffman*, 543 F.2d 930 (D.C. Cir. 1976); Pl. Ex. 16, at 17. MTs such as ARTs are federal civilian employees who provide support primarily to wartime deployable reserve units. MTs shall not perform their civilian duties during their inactive duty or annual military reserve training unless their civilian and military duties are identical. Dep't of Defense ("DoD") Instruction 1205.18, ¶ 6.10.4 (May 4, 2007), Pl. Ex. 1.

ARTs are full-time civilian employees. AFI 36-108, *Air Reserve Technician (ART) Program* (26 July 1994), Attachment 1, Pl. Ex. 2. They are hired under 5 U.S.C. § 3101. As a condition of employment, however, with a limited exception, *see generally Jeffries v. Dep't of the Air Force*, 999 F.2d 529, 530 (Fed. Cir. 1993) (ARTs who lose active reserve status for reasons beyond their control are not immediately separated), they are required to maintain active membership in the Air Force Reserve unit in which the position they hold is authorized and be assigned militarily to the designated ART position. 10 U.S.C.§ 10216(d). Unlike non-dual-status MTs, ARTs can be ordered to deploy with their unit if it is mobilized. Pl. Ex. 16, at 2 & n.7.

In his or her military capacity, an ART may be a commissioned officer, a warrant officer, or an enlisted member. Def. Statement of Mat. Facts ¶ 14.

ARTs receive regular pay for their civil service jobs, plus military pay for their weekend and summer active duty tours. Because they are members of the civil service,

ARTs may qualify for a civil service pension. They may also qualify for military retired pay based on their active and reserve military service. They are subject to timekeeping requirements pursuant to federal regulations for civilian employees with respect to their civilian employment. ARTs receive annual leave pursuant to federal regulations for civilian employees with respect to their civilian employment. In their civilian capacity, ARTs are subject to civil service laws and regulations. Def. Statement of Mat. Facts ¶¶ 15-16.

The same concepts, rules, regulations, and policies apply to ART positions as to regular civil service positions. Pl. Ex. 2, at 1.

Most ARTs have been associated with the Armed Forces one way or another for many years. ARTs are typically older than non-ARTs with the same military pay grade. Sacco Decl. ¶ 7, Pl. Ex. 19. Wearing the military uniform adds nothing to any ART's awareness of his or her part in National Defense or the fact that they work in a military environment. Their workplaces are military bases; the Air Force is all around them. Sacco Decl. ¶ 7, Pl. Ex. 19.

ARTs shift from one status to the other in the normal course of events, becoming military only when their reservist-capacity obligations arise for drills one weekend a month or annual 15-day training. This is perfectly normal, and has been the case for decades. Sacco Decl. ¶ 8, Pl. Ex. 19. Dual status ARTs are subject to deployment in either their military or civilian status. ARTs have gone on overseas missions, but this has been in their capacity as military reservists during periods in which they have been activated to active duty status, like any other reservist, rather than in their civilian capacity. *Id.*

On August 6, 2007, the Secretary amended three AFIs to provide that ARTs must wear the military uniform while performing civilian duties. Pl. Exs. 3-5. The Air Force has

announced that the requirements imposed by the 2007 amendments are not negotiable within the context of collective bargaining between it and AFGE's locals. Def. Ex. J, at 6 (¶ d).

The National Guard Technicians Act provides that dual status National Guard technicians—an MT category that is distinct from ARTs—may be required to wear the military uniform even while in civilian status. 32 U.S.C. § 709(b)(4). Congress has never enacted comparable legislation for ARTs. On February 5, 2008, DoD asked Congress to amend § 10216(a) by adding a provision conferring on the Secretary and the Secretary of the Army the power to prescribe regulations to "require a military technician (dual status), while performing duties as a military technician (dual status), to wear the uniform appropriate for the member's grade and component of the armed forces." Pl. Ex. 8; *see also* Pl. Ex. 7. Congress has not enacted the requested amendment. It appears in neither version of the current (FY09) Defense authorization bill. *See* note 14 *infra*.

Although uniforms are worn in many settings, including many civilian settings, *military* uniforms enjoy a unique place in American society, United States law, *e.g.*, 10 U.S.C. § 771, 18 U.S.C. §§ 702-03, and international humanitarian law.

The Air Force has many other categories of *civilian* personnel who wear *civilian* uniforms. These include guards and police, firefighters, chauffeurs, motor vehicle operators, U.S. citizens in overseas areas, physical education instructors, water survival school personnel, aircraft maintenance employees, and motion picture projectionists. *See generally* AFI 36-801 *passim*, Pl. Ex. 4.

*Standard of Review*

The 2007 amendments constitute final agency rule making that is subject to judicial review under the standards prescribed in the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). These include whether an agency action is arbitrary and capricious, contrary to law, or in excess of statutory authority.

*Summary of Argument*

Contrary to the Secretary's claim, the merits question presented—whether the 2007 amendments are lawful—is not a political question and there is no basis for dismissal. There is no impediment to APA review because plaintiffs do not have another adequate remedy and the case is ripe now. On the merits, the 2007 amendments are invalid.

*Argument*

I

THE COMPLAINT STATES A CAUSE OF ACTION

The Secretary has moved to dismiss pursuant Fed. R. Civ. P. 12(b)(6). *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) sets forth the standard of review for such motions: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Complaint must be viewed in the light most favorable to plaintiffs and all of its material allegations must be accepted as true. *Warth v. Seldin,* 422 U.S. 490, 501 (1975*); e.g., Maljack Productions, Inc. v. Motion Picture Ass'n of America, Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995) (on motion to dismiss, "plaintiff's burden is relatively light." "We construe the complaint liberally in [plaintiff's] favor, taking all the

facts alleged as true, and giving [plaintiff] the benefit of all reasonable inferences from those facts"); *Kugel v. United States,* 947 F.2d 1504, 1505 (D.C. Cir. 1991). This is consistent with the well-established policy that "the plaintiff is to be given every opportunity to state a claim." *Hitt v. v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).

Plaintiffs have pleaded sufficient facts that, when viewed in the light most favorable to them, support their claim that the Secretary violated § 10216 when he issued the 2007 amendments requiring ARTs to don military uniform even when acting in their capacity as civilians. Section 10216 makes it perfectly clear that ARTs are civilian employees. It states in relevant part:

> (a) In general.—(1) For purposes of this section and any other provision of law, a military technician (dual status) is a Federal ***civilian employee*** who—
>
> (A) is employed under section 3101 of title 5 or section 709(b) of title 32;
>
> (B) is required as a condition of that employment to maintain membership in the Selected Reserve; and
>
> (C) is assigned to a ***civilian*** position as a technician in the organizing, administering, instructing, or training of the Selected Reserve or in the maintenance and repair of supplies or equipment issued to the Selected Reserve or the armed forces.
>
> (2) Military technicians (dual status) shall be authorized and accounted for as a separate category of ***civilian*** employees.

§ 10216 (emphasis added). Notwithstanding the statute's clear language that ARTs are civilian employees, the Secretary is nullifying the meaning of "civilian" by requiring them to wear military uniform while performing civilian duties.

Wearing a military uniform is contrary to the meaning of "civilian." "There is an old saying that 'clothes make the man.'" *Saks & Co. v. Continental Ins. Co*., 23 N.Y.2d 161, 163, 242 N.E.2d 833, 834, 295 N.Y.S.2d 668, 669 (1968). Civilian attire indicates a

civilian employee. In contrast, a military uniform connotes a member of the military. Wearing the military uniform has a distinct meaning; it is not merely the donning of a random garment. This is so inculcated into military society and ethic that it is unlawful for a civilian to wear military uniform. It should be evident, therefore, an employee cannot remain a civilian employee while wearing military garb. Because wearing a military uniform is antithetical to the meaning of "civilian," plaintiffs have stated a claim that the Secretary violated the plain language of § 10216 when implementing policy requiring civilian employees to wear military uniform. His motion to dismiss should be denied.

## II

### THE COMPLAINT DOES NOT RAISE A POLITICAL QUESTION

The Secretary's claim (at 4-6) that the complaint raises a political question is without merit. The case in no way calls upon the Court to inquire into, much less second-guess, matters such as the training, equipping, or utilization of military personnel, as in *Gilligan v. Morgan*, 413 U.S. 1 (1973), following the notorious incident at Kent State University. That case involved decision making with respect to *military* personnel.

This case, in sharp contrast, concerns *civilian* personnel: ARTs serving in their civilian capacity. Whether a civilian employee can lawfully be compelled to wear the uniform of a military member is hardly "a uniquely military matter," and in any event it is certainly not a matter on which the military may, in a democracy, have the last word, as defendant suggests. Quite plainly, moreover, the relief sought by plaintiffs is a far cry from the "continuing judicial surveillance" that the *Kent State* plaintiffs sought. *See* 413 U.S. at 6; *id.* at 14 (Blackmun & Powell, JJ., concurring). But for that, there would have been six votes to dismiss *Gilligan* as moot. *Id.* at 12, 14.

14

Even more obviously, the case does not involve one of those areas in which there are no "judicially discoverable and manageable standards" so as to render inappropriate any judicial involvement. *See generally Baker v. Carr*, 369 U.S. 186, 217 (1962). Whether a civilian employee may be required to wear a military uniform represents a straightforward question of statutory interpretation—easily within the normal adjudicative responsibilities of a federal district court.

III

APA REVIEW IS AVAILABLE BECAUSE PLAINTIFFS<br/>DO NOT HAVE AN ADEQUATE REMEDY AT LAW

A

The Secretary insists (at 7) that the decision for ARTs to wear the military uniform while in a civilian duty status is subject to FLRA review. Based on *Love v. Connor*, 525 F. Supp. 2d 155, 159 (D.D.C. 2007), he argues (at 7 n.12) that the FLRA is the "special" administrative agency entrusted in this form of administrative review and that the FLRA may provide an "adequate" remedy for their wrong. Both assertions are wrong.

The FLRA is not vested with original jurisdiction to adjudicate whether the Secretary has violated § 10216 when he issued internal regulations requiring ARTs to wear military uniform in their civilian capacity and therefore plaintiffs have no other adequate remedy at law. Congress intended the FLRA to be a "specialized expert" in the principles and goals set forth in the Federal Services Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. §§ 7101-35; *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 (1983). Therefore, the FLRA has jurisdiction only when it interprets its own enabling statute and whether the Secretary violated the FSLMRS. *Id.* However, the question before the Court is whether the Secretary violated the plain language of

§ 10216, not whether he violated the FSLMRS.  The FLRA is not charged by Congress with interpreting the meaning of the word "civilian" in § 10216. *Cf. Ass'n of Civilian Technicians v. FLRA*, 370 F.3d 1214, 1221 (D.C. Cir. 2004) (no deference owed to FLRA's interpretation of DoD Appropriations Act); *Div. of Military and Naval Affairs, State of New York v. FLRA*, 683 F.2d 45, 48 (2d Cir. 1982) (FLRA not entitled to deference in interpretation provision administered by GSA).  Accordingly, FLRA review is neither a "special" nor an "adequate" means of obtaining remedy for plaintiffs' claim.

To support his claim that the FLRA has jurisdiction to adjudicate this claim, the Secretary cites multiple ULP filings regarding whether he violated the FSLMRS when implementing the internal regulations requiring the wearing of military uniform. Similarly, he cites (at 15 n.17) multiple cases in which the FLRA has ruled on whether the National Guard violated the FSLMRS when guardsmen were required to wear military uniform.  His reliance on those cases is misplaced.

He also errs by misconstruing the issue at the heart of this case and therefore focusing on the wrong law.  Unlike the ULPs attached to the Secretary's motion, the issue here is not whether he violated existing collective bargaining agreements when promulgating the 2007 amendments; if it were, then the FLRA would have jurisdiction.  Nor is the issue whether he violated provisions regarding midterm bargaining in existing CBAs when promulgating those amendments; if it were, then the FLRA would have jurisdiction.  Nor is the issue whether he violated the FSLMRS when he failed to properly bargain the implementation and impact of the 2007 amendments before their effective date; if it were, then yet again the FLRA would have jurisdiction.  Rather, the issue is quite

simply whether he exceeded his § 10216 authority when he promulgated those amendments.

Similarly, the issue before the Court is not whether the Secretary violated the FSLMRS when he refused to include a LMA provision permitting civilian technicians to wear civilian attire. This is in contrast with the issue in *New York Council, Ass'n of Civilian Technicians v. FLRA*, 757 F.2d 502 (2d Cir. 1985). As a result, that case is, contrary to the Secretary's claim (at 9), most certainly not "almost identical to the one at hand." Rather, the issue in this case does not relate to labor relations whatsoever. Consequently the FLRA has neither special expertise, *see* cases cited at p. 16 *supra*, nor jurisdiction.

Plaintiffs have framed the issue, as is their privilege, and the issue they have framed does give rise to any administrative review. As the Supreme Court stated in *Bell v. Hood*, 327 U.S. 678, 681-82 (1946), the party who brings a suit is "master to decide what law he will rely upon, and . . . does determine whether he will bring a 'suit arising under' the . . . [Constitution or laws] of the United States by his declaration or bill" (citation omitted). As alleged in the Complaint, plaintiffs challenge whether a civilian may be required to wear a military uniform or whether requiring ARTs to do so when serving in their civilian capacity improperly upsets settled expectations in violation of law. All three counts relate to the APA and § 10216. As the case focuses on the APA and interpretation of the title 10 provision that regularized the existence of ARTs and does not reach the FSLMRS, the FLRA does not have jurisdiction and the matter is properly before this Court.

B

The Secretary argues (at 7-11) that plaintiffs are not entitled to review of the 2007 amendments because they have another adequate remedy at law. The point is not well-taken. While the APA confines what is commonly called "APA review" to those circumstances where there is no other adequate remedy at law, this is not such a case.

First, contrary to the Secretary's assertion (at 11) that "[t]he matter at hand is nothing more than a labor relations dispute between employees and their employer," the case in fact turns on the meaning of a particular Act of Congress—§ 10216—that is not part of the FSLMRS and as to which the FLRA can claim no expertise. Congress has indeed established a "comprehensive scheme" for resolving disputes between federal agencies and their civilian employees, and that scheme includes provision for judicial review. But the availability of the FLRA machinery and review in the courts of appeals is irrelevant here because the question presented falls outside the scope of the FLRA process. It would be perverse to close the door to APA review on the theory that these plaintiffs had a remedy under the State. They don't.

The court has jurisdiction to address plaintiffs' statutory ultra vires claim. See *KiSKA Construction Corp. v. WMATA*, 321 F.3d 1151, 1158 (D.C. Cir. 2003). "General federal question jurisdiction . . . gives the district courts the power to review agency action absent a preclusion of review statute." *Ass'n of National Advertisers v. FTC*, 617 F.2d 611, 619 (D.C. Cir. 1979). While federal question jurisdiction may be limited by other statutes that transfer review authority to an executive agency or another court, no such restriction precludes judicial review of plaintiffs' claim that the 2007 amendments exceeded the Secretary's authority. Even if there were a preclusion of review provision, it

18

would not operate to deprive the court of jurisdiction over that claim. *See Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (case law in this circuit is clear that judicial review is available when agency acts ultra vires.)  Thus, where as here, an agency official is alleged to have exceeded his statutory authority, "courts are normally available to reestablish the limits on his authority." *Id*. (citations omitted). "Any action taken by a federal agency must fall within the agency's appropriate province under its organic statute." *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156, 169 (D.C. Cir. 1988) (citations omitted).

Congress created the FLRA to carry out the purpose of the FSLMRS and oversee the government's civilian labor-management relations program. 5 U.S.C. § 7105; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 (1983). That power does not include authority to definitively construe any other federal law.  As the Court of Appeals found in *U.S. Department of Treasury v. FLRA*, 43 F.3d 682, 690 (D.C. Cir. 1995), "[t]o give any administrative tribunal such final authority to construe any or all statutes or treaties of the United States would be a staggering delegation, which surely would have provoked considerable congressional debate."

Beyond this, the Secretary's position is and always has been that requiring ARTs to wear the military uniform is outside the parameters of what is negotiable within the labor-management scheme established by Congress in the FSLMRS. According to him, this question—as opposed to peripheral issues that may flow from it, such as the availability of uniform allowances, *Ass'n of Civilian Technicians, Inc., Rhode Island Chapter*, 55 FLRA No. 70 (1999), or attaching emblems, *NFFE, Local 1669*, 55 FLRA No. 18 (1999)—involves a "method" or "means" of performing work and as such is

outside the duty to bargain. 5 U.S.C. § 7106(b)(1). The courts of appeals have upheld the FLRA's view that requiring federal personnel to wear a uniform is not a mandatory subject of bargaining. *American Federation of Government Employees, AFL-CIO, Local 2441 v. FLRA*, 864 F.2d 178, 186-86 (D.C. Cir. 1988) (collecting FLRA decisions); *New York Council, supra*; *American Federal of Government Employees, Local 3013, AFL-CIO v. FLRA*, 762 F.2d 183 (1st Cir. 1985) (per curiam). It is therefore clear that, in the eyes of the Secretary, the FLRA, and the courts of appeals, requiring military technicians to wear military uniforms even when in civilian status is not within the duty to bargain. It follows that plaintiffs have no FLRA remedy. The case is therefore properly framed as an APA action for conventional judicial review of agency action.[1]

C

But even if the law were unclear as to whether the Secretary's subordinates have a duty to bargain on the matter here at issue, plaintiffs would not still have an alternative remedy for the further (and simple) reason that there is neither an incumbent general counsel of the FLRA (who alone may file an ULP charge), *see* Def. Statement of

---

[1] The fact that the Secretary could *elect* to permit negotiation on wear of the uniform by ARTs, *see* Def. Ex. J, at 2 (¶ 9); *Ass'n of Civilian Technicians, Montana Air Chapter No. 29 v. FLRA*, 22 F.3d 1150 (D.C. Cir. 1994) (National Guard Bureau repudiation of CBA that permitted National Guard technicians to wear civilian attire), is of no moment from the standpoint of the availability of APA review: he has treated the service-wide 2007 amendments' effectiveness and validity as nonnegotiable. *E.g.,* Def. Ex. J, at 6 (¶ d); Pl. Ex. 9. Plainly it would be absurd to treat as an alternative adequate remedy at law (for purposes of the availability of normal APA review of agency action) a negotiation process that was not only entirely voluntary on the part of an employer-agency that had already stated its position in published regulations but further had explicitly announced that the matter was nonnegotiable. Lt. Gen. John A. Bradley, Chief of the Air Force Reserve, told *Air Force Times*, "This is not a negotiation about whether we're going to do it. The decision is made. We're going to do it." O'Connor, *ARTs Sue Wynne Over Uniform Policy, supra*, Pl. Ex. 17. He has given no indication whatever that the Air Force was or is ready, willing, and able to negotiate on the matter. The Secretary's position on this aspect of the case asks the Court to close its eyes to reality.

Material Facts at 6 n.3 (noting vacancy in position of general counsel); Def. Br. at 18 n.18 (same), nor a quorum on the FLRA itself. "With only one Member, the Authority lacks a quorum to exercise its power to adjudicate cases under the Statute. Therefore, during the period that the Authority has only one Member, it will not be issuing final decisions in cases currently pending, or which will be filed, with the Authority. . . . The Authority will begin issuing decisions adjudicating cases under the Statute when one more additional Members 'are appointed by the President by and with the advice and consent of the Senate.' 5 U.S.C. § 7104(b)." FLRA Bull., *Authority Case Processing During the Time the Authority Has One Member—Questions and Answers*, July 17, 2008, http://www.flra.gov/news/pr08-07.html (last visited Aug. 15, 2008), Pl. Ex. 12; *see also* FLRA Bull., *Unfair Labor Practice Case Processing in the Absence of the General Counsel—Questions and Answers*, Mar. 3, 2008, http://www.flra.gov/news/pr08-03.html (last visited Aug. 15, 2008) (ULP complaints may only be issued, settlements concluded, and appeals from regional director dismissals of complaints processed only after general counsel has taken office), Pl. Ex. 11.[2]

In summary: this is not an FLRA case and plaintiffs in any event have no FLRA remedy. The matter is therefore properly presented under the APA and Declaratory Judgment Act. The complaint states a cause of action and the case may not properly be dismissed.

---

[2] Even if there were an incumbent general counsel, he or she would be bound by the decisional law of the FLRA and would dismiss an ULP complaint. Such a dismissal would not be subject to judicial review. *Montana Air Chapter No. 29, Ass'n of Civilian Technicians*, 632 F. Supp. 643, 645 (D. Mont. 1986). Agency action that is both impossible (at present) and unreviewable is hardly an "effective remedy at law."

IV

THE CASE IS RIPE

Equally unmeritorious is the Secretary's suggestion that the case is not yet ripe. The Secretary's position is perfectly clear: he considers that he had authority to and properly did issue the 2007 amendments. Plaintiffs, on the other hand, dispute that. In some instances, battle has been deferred only because some of the locals have CBAs that expressly provide for wear of civilian clothing. Pl. Exs. 13 (Art. XXIII), 14 (Art. 37 § 4). In those cases, the Secretary has no alternative but to abide the expiration of the agreement. *See* Pl. Ex. 10. But even in those cases, his position is clear: as the agreements expire, the 2007 amendments will take effect (and be enforced) as to those locals, with no bargaining on the bottom line issue. In other instances, the Secretary has made it clear that the military uniform wear requirement is effective. According to an Air Force "PowerPoint" brief, the 2007 amendments have already led to disciplinary action and a resignation. Pl. Ex. 9. In the circumstances, there is a genuine case of controversy within the meaning of the Declaratory Judgment Act under which the action is in part filed.

The central purpose of the APA is to provide a *broad spectrum* of judicial review of agency action.  It provides for judicial review whenever agency action is "made reviewable by statute and [there is a] final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704**.**  The primary thrust of § 704 is to codify an exhaustion requirement.  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also Love v. Connor***,** 525 F.Supp.2d 155 (D.D.C. 2007).  However, judicial review of final agency action will not be cut off unless there is persuasive reason to believe that that was Congress's intent. *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) (abrogated on

other grounds); *Harper v. Levi*, 520 F.2d 53 (D.C. Cir. 1975).  Therefore, the "exception"

of exhaustion "should not be construed to defeat the central purpose of providing a broad

spectrum of judicial review of agency action."  *Bowen, supra,* at 903.

      The Department of the Air Force (which the Secretary heads) is an agency whose

actions are subject to judicial review. *E.g., Roelofs v. Secretary of Air Force,* 628 F.2d

594, 599 (D.C. Cir. 1980). The Air Force took final agency action when it promulgated

the 2007 amendments.

      The Court of Appeals has set forth the multiple factors that may be considered in

determining whether an agency action is final for the purpose of § 704:

> Is the agency's action "sufficiently direct and immediate" and does it have
> a "direct effect . . . on day-to-day business"? *Abbott Laboratories v. Gard-*
> *ner,* 387 U.S. 136, 152, 87 S. Ct. 1507, 1517, 18 L. Ed.2d 681 (1967). Has
> the agency "completed its decisionmaking process" and is "the result of
> that process [one that] will directly affect the parties"? *Franklin v. Massa-*
> *chusetts,* 505 U.S. 788, 797, 112 S. Ct. 2767, 2773, 120 L. Ed.2d 636
> (1992). Is the agency action "finally operative and decisive"? ATTOR-
> NEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCE-
> DURE ACT 103 (1947), quoted in *Darby v. Cisneros,* 509 U.S. 137, 148-
> 49 n.10, 113 S. Ct. 2539, 2546 n.10, 125 L. Ed.2d 113 (1993). Has the
> agency decisionmaker "arrived at a definitive position on the issue that in-
> flicts an actual, concrete injury"? *Williamson County Regional Planning*
> *Comm'n v. Hamilton Bank,* 473 U.S. 172, 193, 105 S. Ct. 3108, 3120, 87
> L. Ed.2d 126 (1985), quoted in *Darby,* 509 U.S. at 144, 113 S. Ct. at 2543.
> On the other hand, courts have defined a nonfinal agency order as one, for
> instance, that "does not itself adversely affect complainant but only affects
> his rights adversely on the contingency of future administrative action,"
> *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 130, 59 S. Ct. 754,
> 757, 83 L. Ed. 1147 (1939), cited in the ATTORNEY GENERAL'S
> MANUAL at 101-02, as a judicial construction of "final" that will carry
> over to § 704. . . .  No matter which of these formulations we apply, the
> result here is the same.

*DRG Funding Corp. v. Secretary of Housing and Urban Development*, 76 F.3d 1212,

1214 (D.C. Cir.), *rehearing denied*, 83 F.3d 1482 (1996); *see also Role Models America,*

*Inc. v. White*, 317 F.3d 327 (D.C. Cir. 2003) (to be final, agency action need not be last

administrative action contemplated by statutory scheme; rather, question is whether agency has imposed an obligation, denied a right, or fixed some legal relationship).

Here, on or about August 6, 2007, the Secretary amended three AFIs to impose a requirement that all ARTs wear the military uniform for their reserve pay grade even when performing duties in their civilian capacity. Complaint ¶ 24; Pl. Exs. 3-5.  This requirement had a direct effect on a material condition of employment of the ARTs' day-to-day business: instead of wearing civilian attire or civilian uniform, they are now required to alter their clothing to military uniform on a daily basis.  Another day-to-day business effect for ARTs is the requirement to engage in "military courtesy" due to the wearing of the military uniform.  Military courtesy dictates, among other behaviors, that they may no longer walk with their hands in their pockets, walk while talking on a cellular telephone, or eat or drink while walking.  AFI 36-2903 § 1.3.2, Pl. Ex. 5; *see, e.g.*, Pl. Ex. 15.

As these examples demonstrate, military courtesy alters ART work conditions on a day-to-day basis.   Although the Air Force gave notice of its intent to impose a military uniforms requirement on civilian-status-ARTs, Pl. Ex. 6, the amended AFIs were not issued as mere proposals or "talking points."[3]  Rather, they became effective on August 6, 2007, and are presently operative except in those instances where compliance is "covered by" (and precluded by) an existing CBA—and then only until the CBA

---

[3] The Secretary observes (at 4) that the AFIs were amended by means of an "interim message change." The label is of no moment; the new uniform requirement is final agency action. *See Carter/Mondale Presidential Committee, Inc. v. Federal Election Comm'n,* 711 F.2d 279, 288 & n.17 (D.C. Cir. 1983) (agency's characterization of finality is not decisive in determining whether a final agency action has occurred).

expires.[4]  The requirement has actual consequences: failure to follow the new military uniform requirement may result in discipline including but not limited to termination. Therefore, there can be no doubt that the 2007 amendments are final agency action.

The Secretary's action is not simply a rumor or threat; it takes the form of official amendments—on their face, immediately effective—to no fewer than three regulations. He has also, as previously noted, made it plain that he does not consider the bottom line issue to be negotiable. It is hard to imagine a riper controversy.

V

THE 2007 AMENDMENTS ARE INVALID

The 2007 amendments are invalid. Congress has not authorized the extraordinary action of requiring the ARTs, as *civilian* federal employees, to wear military uniforms at times when they are not performing duty in their capacity as military enlisted personnel or commissioned officers. The 2007 amendments violate § 20816, are in excess of the Secretary's authority and an abuse of discretion. Quite simply, *Bruton v. Schnipke*, 404 F. Supp. 1032 (E.D. Mich. 1975), was wrongly decided and should not be followed.

ARTs are both civilian employees and military personnel.[5] As such, they must

---

[4] For example, plaintiff AFGE 1364's CBA provides that Dallas-Fort Worth ARTs in civilian status will be in civilian attire. Pl. Ex. 13. A Federal Mediation and Conciliation Service arbitrator recently ruled that Whiteman AFB cannot give effect to the 2007 amendments over plaintiff Local 2361 until its current CBA expires in 2011. *AFGE Local 2361 and Whiteman AFB*, No. 08-51344 (Fed. Med. & Concil. Svc. June 2, 2008), Pl. Ex. 10. Local 2361's ARTs "never have been required to wear military uniform while in civilian status at the Base." *Id.* at 6. Arbitration awards are not binding on third parties, and *Local 2361* in any event only addresses the case where the CBA includes a clause that trumps intervening regulatory changes. *Id.* at 22.

[5] These are plainly distinct categories. For example, an ART is an "employee" for purposes of collective bargaining, *see* 5 U.S.C. § 7103(a)(2)(A), but the term "employee" expressly excludes "a member of the uniformed services." *Id.* § 7103(a)(2)(ii). The Air Force is a "uniformed service." 10 U.S.C. §§ 101(a)(4)-(5)(A).

keep two "hats" in their closets, one civilian and one military. But, as the Supreme Court observed in the case of the National Guard (whose members must keep three hats in their closets), "only one . . . is worn at any particular time." *Perpich v. Dep't of Defense*, 496 U.S. 334, 348 (1990). Just as "the Militia Clause is no longer applicable" when a National Guard member's state hat is replaced by the federal hat, *id*., so too, when an ART is "wearing" his or her civilian employee hat, the reservist hat remained in the closet. The Secretary ignored this basic proposition in promulgating the 2007 amendments.

While there are of course many civilian employments in which uniforms play a role—judges' robes, for example, or the numerous other civilian jobs for which the Air Force requires wear of a civilian uniform, *see* Pl. Ex. 4; p. 11 *supra*—military uniforms stand in a unique position. Under both domestic and international law, the military uniform enjoys a special, protected status. Wear of a true military uniform by individuals who are not on active military duty (other than in a theatrical production or other defined circumstances) without authority is forbidden, 10 U.S.C. §§ 771-72, and a criminal offense. 18 U.S.C. § 702.[6]

From an international law perspective, failing to wear a military uniform ("a fixed distinctive sign recognizable at a distance") can have implications for POW status under Article 4 of the Third Geneva Convention, even though, as one scholar has noted, "[t]here is . . . no general obligation for soldiers to wear uniform," and the practice of wearing military uniforms, though expected and commonly followed, "is not a prerequisite for the definition of armed forces." Toni Pfanner, *Military Uniforms and the*

---

[6] The Secretary of Defense's implementing regulations appear at 32 C.F.R. pt. 53 (2007).

*Law of War*, 86 INT'L REV. OF THE RED CROSS 93, 123 (2004).[7] "The uniform as an identification element of armies does not anymore only and primarily relate to the need to distinguish one army from the next as in the past, but has shifted largely to be the distinctive element in relation to the civilian population." *Id.* at 104.

Precisely what constitutes a uniform was not defined by the diplomatic conference that led to the Additional Protocols to the Geneva Conventions, *see* Claude Pilloud, Jean de Preux, Yves Sandoz, Bruno Zimmermann, Philippe Eberlin, Hans-Peter Gasser, Claude F. Wenger, Sylvie-S. Junod & Jean Pictet, COMMENTARY ON THE ADDITIONAL PROTOCOLS OF 8 JUNE 1977 TO THE GENEVA CONVENTIONS OF 12 AUGUST 1949 468 (Int'l Comm. of the Red Cross 1987) (¶ 1577); *see also* Pfanner, *supra*, at 104 ("none of the instruments of international humanitarian law give a definition of a military uniform"), and thorny legal issues may be generated when military personnel wear non-standard uniforms. *See generally* W. Hays Parks, *Special Forces' Wear of Non-Standard Uniforms*, 4 CHI. J. INT'L L. 493 (2003); Major William H. Ferrell, III, *No Shirt, No Shoes, No Status: Uniforms, Distinction, and Special Operations in International Armed Conflict*, 178 MIL. L. REV. 94 (2003). In short, military uniforms are not simply another

---

[7]  "It is within the competence of the armed forces to decide if and when their members are allowed to wear civilian clothes," Pfanner, *supra*, at 101, but this is a function of national legislation. *See id.* at 105 ("international humanitarian law . . . implicitly instructs the States Parties to specify [the constituent elements of a military uniform] in their national legislation and especially their military manuals"). "Not all members of the armed forces wear a uniform. Even the commander-in-chief of the armed forces, who is often the head of State, usually wears civilian clothes. Other members of the armed forces may be exempted from wearing uniform when not performing combat functions. They include in particular back-office and headquarters staff, sometimes working in militarily decisive posts." *Id.* (footnotes omitted). "In technologically highly sophisticated societies, some of those functions and personnel are 'outsourced' and no longer come within the remit of the armed forces (e.g. weapons development, but also logistical and technical services)." *Id.* at 101 n.22.

way of dressing.[8]

Legal implications abound. For example, as one Air Force scholar noted even before the 2007 amendments:

> . . . A good example of how the distinction between noncombatants and civilians can become blurred is the civilian air reserve technician program used by the U.S. Air Force. . . .  The ART must, in many circumstances, wear his military uniform even when reporting to work in civilian status. Any observer seeing uniformed ART personnel working on military aircraft would logically assume they are combatants, although they are actually civilians under the law of war who may not engage in combat until converted to active duty status.

Major J. Ricou Heaton, USAF, *Civilians at War: Reexamining the Status of Civilians Accompanying the Armed Forces*, 57 A.F.L. REV. 155, 173 n.118 (2005) (citing AFIs 36-108, 36-2903). When a civilian-capacity, uniform-wearing ART issued an order directing a senior airman to provide a urine sample, it was found to be improper because the officer was serving in his civilian capacity, uniform to the contrary notwithstanding. *United States v. Miller*, 66 M.J. 306, 307-08 (C.A.A.F. 2008) ("At the time he signed the letter directing Appellee to provide a urine specimen, Major Ryan was in civilian status and, therefore, not able to act as a commander. AFI 38-101 para. 2.1.2.1.1; Op. JAGAF 1993/19, 5 Civ. Law Ops. 233, 234 (Feb. 22, 1993).").

In another case, had the point not been waived by defense counsel, it would have been a serious issue that the accuser in a court-martial was serving in his civilian capacity at the time he preferred UCMJ charges against an Air Force enlisted man. *United States v. Thomas*, 38 M.J. 614, 620-21 (A.F.C.M.R. 1993) (citing *Thomas v. United States*, Misc. Dkt. No. 92-19 (A.F.C.M.R. Jan. 26, 1993), *pet. denied*, 37 M.J. 276 (C.M.A.

---

[8] "Uniforms are all about control not only of the social self but also of the inner self and its formation." Jennifer Craik, UNIFORMS EXPOSED: FROM CONFORMITY TO TRANSGRESSION 4 (2005).

1993)).[9]

An Air Force colonel who was interviewed about the 2007 amendments told the Bureau of National Affairs that "[b]ecause employees in the Reserves work 'side by side' with full-time members of the Air Force, total force integration will be easier if all workers are dressed alike." Laura D. Francis, *AFGE Files Lawsuit Challenging Directive That Air Reserve Technicians Wear Uniforms*, 46 GOV'T EMPL. RELNS. REP. (BNA) 518 (May 6, 2008) (quoting Col. Audrey Bahler, Air Force Reserve Command), Pl. Ex. 17. Cases such as those just cited suggest that compelling ARTs to wear military uniforms while in civilian status is a source of mischief, real and potential.

Practical implications abound as well. As Prof. Richard H. Kohn, one of the Nation's leading experts on civil-military relations, observes: "It is likely that the confusion of status inherent in the wearing of uniforms, with all that the power of military rank and the symbol of military service that uniforms represent, would breed not only uncertainty, but possibly friction and resentment that could undermine the efficiency and effectiveness of those organizations." Kohn Decl. ¶ 7, at 4, Pl. Ex. 18.

The danger of confusion is not a figment. "An ART said that supervisors at Keesler Air Force Base, Miss., now have a hard time telling who's who during missions: Is a person in uniform a traditional reservist, a mobilized ART, or a civilian who deserves overtime pay?" Seamus O'Connor, *Air Reserve Technicians Sue Over Order Requiring Uniforms*, Federal Times, May 2, 2008, http://www.federaltimes.com/index.php?S=3510113 (last visited Aug. 15, 2008), Pl. Ex.

---

[9] The Air Force Court wrote: "When called to active duty, or while performing inactive duty for training, [Thomas] was a member of the military. *The rest of the time he was a civilian employe*e." 38 M.J. at 620 (emphasis added).

17.

Persons in military uniform are expected to render and receive salutes when meeting those senior and junior to them in military rank. Such behaviors as smoking, using a cellular telephone while walking, Pl. Ex. 15, standing with poor posture, putting one's hands in one's pockets, or wearing garments that are unpressed or shoes with holes in the soles, may be problematic when in military uniform, but unobjectionable when otherwise attired. As one scholar has put it, "[t]he uniform, then, is a radical form of clothing that is employed to announce a particular type of identity that acts both as shorthand of the kind of behaviour exhibited by the wearer and expected by the observer. Uniforms convey specific structural relations (via types of uniforms and titles of wearers) that form the framework of interpersonal relations that are possible with the uniformed person." Craik, *supra* note 8, at 5 (citation omitted).

"Military uniforms are intended to demonstrate that their wearers belong to the armed forces of a State." Pfanner, *supra*, at 93. ARTs, however, are not, in their civilian capacity, "members" of the Air Force Reserve, under the statutory definition found in 10 U.S.C. § 10110. They are not subject to the Uniform Code of Military Justice ("UCMJ") when serving in their civilian capacity. UCMJ Article 2(a)(3), 10 U.S.C. § 802(a)(3), extends court-martial jurisdiction to reservists when they are "on inactive duty-training." But ARTs are not "on inactive-duty training" when serving in their civilian capacity. Unless an ART serving in his or her civilian capacity happens to fall within the UCMJ's ambit on some other basis, such as serving with or accompanying an armed force in the field in time of a declared war or a contingency operation, UCMJ Article 2(a)(10), 10

U.S.C. § 802(a)(10),[10] or on the basis of offenses committed while on active duty or inactive-duty training, UCMJ Article 2(d), 10 U.S.C. § 802(d), he or she would not be subject to military criminal jurisdiction. *See generally Reid v. Covert*, 354 U.S. 1 (1957); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955). "Inactive-duty training" is a defined term, and does not include duty performed in a civilian capacity. *See* 10 U.S.C. § 101(d)(7).

Instead of military justice as the guarantor of the faithful and proper performance of duty, ARTs are, when serving in their civilian capacity, subject to the same standards of conduct that govern the entire civil service. Unlike the UCMJ, for example, that requires no service-connection to justify prosecution in a military court, *Solorio v. United States*, 483 U.S. 435 (1987) (overruling *O'Callahan v. Parker*, 395 U.S. 258 (1969)), ARTs need be concerned, in their civilian capacity, only about sanctions imposed under the Civil Service Reform Act of 1978, 5 U.S.C. § 7513(a), for the purpose of promoting the efficiency of the service. In other words, military criminal law applies to many kinds

---

[10] The Army Materiel Command ("AMC") recently announced a pilot program to determine whether to develop a standard uniform for civilians who are deployed. *See* Melissa Bohan, *AMC civilians to test new uniforms in combat zones*, http://www.army.mil/-news/2008/07/03/10586-amc-civilians-to-test-new-uniformed-in-comnbat-zones.html (last visited Aug. 15, 2008), Pl. Ex. 17. Most deployed AMC civilians currently wear the desert combat uniform, while a few wear office work attire or the Army's combat uniform when deployed with certain units. The solid-tan uniform under consideration is military-style, but different in important respects from the combat uniform worn by GIs. Civilian-specific insignia, rather than normal Army insignia, are contemplated. Deployed Army and DoD civilians are not permitted to wear the American flag on their uniforms. *See* Michael D. Petersen, *Letter to the Editor*, Quad Cities Times, July 19, 2007, http://www.qctimes.com/articles/2007/07/19/opinion/letters/doc469ea2798ee52290051779.txt (last visited Aug. 15, 2008), Pl. Ex. 17. "Civilians who deploy to the U.S. Central Command theater of operations with Marines are no longer allowed to wear the Marine Corps' camouflage combat uniform. . . ." Jeff Schogol, *Marine Uniforms Off-Limits for Civilians*, Stars & Stripes (Mideast ed. Feb. 8, 2008), http://www.stripes.com/articleprint.asp?section=104&article=59736&archive=true (last visited Aug. 15, 2008), Pl. Ex. 17.

of misconduct that are not reached by the systems of sanctions applicable to civil servants. Assimilation of ARTs to military status even when not in military status utterly blurs this line.[11]

Despite the fact that many lines of work today involve the wear of uniforms of one sort or another, American society continues—unlike some others[12]—to reserve the military "look" to military personnel in the strict sense. It may be, as Paul Fussell has wrily noted, that "it is an implicit assumption in armies and navies and universities that the wearer of a uniform becomes the person associated with the values it represents, and thus increases in courage, obedience, loyalty, and intellect by the act of putting on the livery of the boss," Fussell, *supra* note 12, at 202—and no one would question the public

---

[11] The FLRA argued in a National Guard case that "because the traditional means of instilling esprit de corps and military discipline, such as drill, military courtesy and protocol, are not available for use with personnel who are employed technically in a civilian status, the wearing of the military uniform becomes indispensable as a constant reminder to technicians that they are members of an organization which is essentially military and subject to mobilization at a moment's notice." *Div. of Military and Naval Affairs, State of New York and New York Council, Ass'n of Civilian Technicians*, 8 FLRA 288, 294 (1984), *aff'd sub. nom. New York Council, supra.* The point is not well-taken. For one thing, it is difficult to take seriously the proposition that ARTs—who, after all, *work on military installations* in their civilian capacity—need to be reminded that they are members of an essentially military organization. If the only remaining rationale is the need to ensure that they keep ever in mind their exposure to mobilization, it is difficult to take that seriously as a reason for requiring the wear of military uniforms. If that were a valid reason, moreover, it would apply with even greater force to "weekend warriors," yet that part of the Air Force work force not only is not required to wear the uniform during the normal (non-drill) work-week, but is forbidden to do so. Finally, if wear of the uniform by ARTs in civilian status is so critical, how come it has been permitted under a variety of CBAs?

[12] "'Russia under its last czars,' writes the historian Marvin Lyons, 'has been compared to a vast military academy.' But one signal difference was the wearing of uniforms by people who were not soldiers but highly regarded civilians, like doctors, lawyers, teachers, and pupils at state schools. Karl Baedeker, the publisher of travel guides, visited St. Petersburg in 1914 and testified that 'nearly one-tenth of the male population . . . wear some kind of uniform, including not only the numerous military officers, but civil officials, and even students, schoolboys, and others.'" Paul Fussell, UNIFORMS: WHY WE ARE WHAT WE WEAR 16 (2002).

interest in fostering those traits—but there is no need to do so by requiring the wear of military uniforms by ARTs in their civilian capacity since they are all Air Force reservists anyway, albeit not full-time, and hence can already be expected to display them. It would be absurd to imagine that personal qualities such as courage, obedience, loyalty and intellect come and go in the case of the self-same individual depending on whether it is a drill weekend (and he or she wears the Air Force's military uniform) or a weekday (and he or she dresses in civilian clothes).

When the policy change that was effected by the 2007 amendments was proposed earlier last year, the Air Force attempted to explain why it was necessary. *See* Pl. Ex. 6. That explanation does not withstand scrutiny:

- *ARTs must have an active reserve status*. This proves nothing, since most active reservists have civilian jobs but are not required to wear military uniform to those jobs.

- *ARTs perform the same duties and report to the same supervisor regardless of which status they are in at any given time*. From this it does not follow that they must wear the military uniform when in civilian status.

- *ARTs operate in an inherently military environment*. The same is true of non-ART Air Force reservists who are employed by the Air Force, DoD or another branch of the armed forces.

- *ARTs are "a part of the military."* The same is true of every Air Force or DoD civilian employee, yet non-ARTs are not required to wear the military uniform when performing their job as civilians.

- *ARTs are embedded in the structure of our Reserve units*. From this it does not

follow that they must wear the military uniform when in civilian status.

- *ARTs are not "weekend warriors."* From this it does not follow that they must wear the military uniform when in civilian status. "Weekend warriors" are not required to wear their military uniforms when not performing military duty; it is a complete non sequitur to reason that personnel who are not "weekend warriors" may be required to wear the military uniform when performing duty as civilians.

- *ARTs frequently convert from civilian to military status and have been a significant part of the deployed force.* The former is obviously an entirely manageable phenomenon, since the Air Force must take account of it already in respect of such administrative matters as pay, leave, medical care, lodging, messing facilities, and the like. *See* Pl. Ex. 6, at 2 (first paragraph); *see also* Sacco Decl. ¶ 8, Pl. Ex. 19 (ARTs "shift from one status to the other in the normal course of events, becoming military only when their reservist-capacity obligations arise for drills one weekend per month or annual 15-day training"). The latter is not probative; the United States currently has more civilians than uniformed personnel in the wartime theater. In any event, "ARTs have gone on overseas missions, but this has been in their capacity as military reservists during periods in which they have been activated to active duty status, like any other reservist, rather than in their civilian capacity." Sacco Decl. ¶ 8, Pl. Ex. 19.

- *Requiring wear of the uniform keeps "clear and visible" the need for continuity and good order and discipline.* This assertion is a mere *ipse dixit*

34

with no evidentiary basis. Quite the contrary, there is no nexus between civilian-status ARTs' wear of the military uniform and either continuity or good order and discipline. No continuity or good-order-and-discipline problems have arisen as a result of ARTs wearing civilian clothes when in civilian status. Sacco Decl. ¶ 7, Pl. Ex. 19. Even if the claim of such a connection were supported by evidence, it would be of no moment because it still does lead to the conclusion that ARTs must wear the military uniform when in civilian status. *See also* note 11 *supra*; Sacco Decl. ¶ 7, Pl. Ex. 19. We are unable to make any sense of the officialese last sentence on page 1 of Pl. Ex. 6. As best we can tell, it *seems* to be yet another non sequitur.

- *There is precedent in the uniform requirement for National Guard technicians*. Congress has elected not to impose (or authorize the Secretary to impose) the same requirement on ARTs. *See* pp. 11 *supra* and 37-38 n.14 *infra*.

- *Air Force Reserve policy already authorizes ARTs to wear the military uniform at all times*. From this it in no way follows that the Secretary is authorized to *require* wear of the military uniform by ARTs when in civilian status.

- *The changes reinforce a DoD regulation that deems "the military nature of the technician program . . . paramount over all other considerations*. An agency cannot expand its own authority by regulation. *See also* Pl. Ex. 2, at 1.

The Secretary argues (at 13) that because ARTs are members of the Air Force Selected Reserve, they are perforce members of the Air Force and can wear the Air

Force's military uniform without violating 10 U.S.C. § 771. We do not disagree. He goes on, however, to argue that he can authorize members of "a designated organization" to wear the uniform, and by implication that the ARTs are such an "organization." Given Lord Tenterden's Rule, *see generally* 2A Norman J. Singer & J.D. Shambie Singer, STATUTES AND STATUTORY CONSTRUCTION § 47:17 (7th ed. 2007) (where general words follow specific words in statutory enumeration, general words construed to embrace only objects similar in nature to those enumerated by preceding specific words), this is not a fair reading of § 772(j) since the preceding subsection refers to the Boy Scouts of America, and ARTs are hardly in the same category as the scouts. Be that as it may, the Secretary's point entirely misconceives the issue. The question is not whether he can *authorize* ARTs to wear the Air Force's military uniform, but whether he can *require* them to wear it when they are working in their civilian capacity. In our submission, he has no more power to do so with respect to an ART than he has to require a Boy Scout to do so.

The Secretary also argues (at 14) that plaintiffs failed to explain how the 2007 amendments violate § 10216. This is untrue: the complaint set out very clearly what the violation consists of, and no more is required under the Federal Rules. The objections are perfectly clear: § 10216 provides that ARTs are civilian employees, albeit employees who must maintain reserve status. In a democratic society, civilians cannot be required to wear military uniforms, especially absent clear legislative directive. There is such a directive for National Guard Technicians;[13] there is none for ARTs. It's really that

---

[13] "Except as authorized in subsection (c), a person employed under subsection (a) must meet each of the following requirements: . . . (4) while performing duties as a military technician (dual status), wear the uniform appropriate for the member's grade and com-

simple. The 2007 amendments are as objectionable as it would be for the Secretary to require traditional reservists ("weekend warriors") to wear their military uniforms while at their civilian jobs, whether that job is as a Pentagon official, a Member of Congress, or an attorney in private practice.

The Secretary obviously has the power to make rules for the conduct of personnel of his department, 5 U.S.C. § 301, but that provision does not trump § 10216 by permitting him to treat his military and civilian workforces as fungible. Congress has provided that ARTs are civilian personnel, and when serving in that capacity they must be treated that way. Since § 10216 is the more specific provision, it clearly takes precedence over general (housekeeping) provisions such as § 301. 2B Norman J. Singer & J.D. Shambie Singer, STATUTES AND STATUTORY CONSTRUCTION, *supra*, § 51:5.

Similarly, 10 U.S.C. § 8013(g)(3) does not confer on the Secretary the power to transform ARTs into members of the basically different category of military personnel. And even more clearly, the overall Air Force Reserve rule making authority conferred by § 10202(a), on which he also relies (at 14), does not give him essentially legislative authority to disregard the civilian character of ARTs-when-performing-civilian-duties.

If there were any need to go beyond the language of the statute, and we do not believe there is, it suffices to consider the Secretary's own recognition—despite his denial—that he needs legislation in order to do what he has purported to do in the 2007 amendments. Yet despite an Administration request, Pl. Ex. 8; *see* http://www.dod.mil/dodgc/olc/legislpro.html (last visited Aug. 15, 2008) (with links to letters of transmittal, bill language and section-by-section analysis), Congress has not

---

ponent of the armed forces." 32 U.S.C. § 709(b)(4).

given him that authority,[14] even though it did give him and the Secretary of the Army such authority with respect to National Guard Technicians as long ago as 1996. *See* 32 U.S.C. § 709 (noted in Sec'y Br. at 15 n.16). If, as the Secretary insists (at 14), he already had the necessary authority, there would have been no occasion for him to seek legislation earlier this year.

"Every uniform . . . has a politics as well as a history." Fussell, *supra* note 12, at 58 (citing Prof. Cynthia Enloe, Clark Univ.). The politics of the 2007 amendments are not for this Court to decide, but the fact that the political branches have failed to take the very action with respect to which the Secretary has exercised self-help, is revealing. It may be, as DoD's Legislative Initiative package reveals, Army and Air Force Reserve technicians "represent[] the last 15 percent of the force not performing duty in uniform," Pl. Ex. 7, but that is no excuse for the Secretary to take the law into his own hands.

*Conclusion*

For the foregoing reasons, the Secretary's motion should be denied and plaintiffs' cross-motion should be granted. A judgment should issue—

(1) declaring the 2007 amendments invalid;

(2) ordering the Secretary to cease and desist all efforts to compel plaintiffs and their

---

[14] Section 514 of both the House and Senate versions of the proposed Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (H.R. 5658), would have given the Secretary power to insist that ARTs wear the military uniform even when in civilian status. "In the version of the bill passed out of the House, Section 514 doesn't mention uniforms at all. Section 514 has been dropped entirely in the Senate Armed Services Committee's report of the defense bill, meaning the uniform policy would have to be added by amendment to be included." Seamus O'Connor, *House Cuts ART Uniform Requirement from Bill*, Air Force Times, June 9, 2008, http://www.airforcetimes.com/news/2008/06/airforce_arts_jousebill_0606w/ (last visited Aug. 15, 2008), Pl. Ex. 17. The committee reports are H. Rep. No. 110-652, 110th Cong. (2008), and S. Rep. No. 110-335, 110th Cong. (2008).

"dual status" ART members to wear military uniforms when performing duty in

their civilian capacity; and

(3)  granting such other and further relief as may in the circumstances be just and

proper.

Respectfully submitted,

/s/ Mark D. Roth
MARK D. ROTH (235473)
General Counsel

/s/ Charles A. Hobbie
CHARLES A. HOBBIE (283499)
Deputy General Counsel
American Federation of Government
  Employees, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Tel      (202) 639-6434
Fax      (202) 639-6490

/s/ Eugene R. Fidell
EUGENE R. FIDELL (112003)
(*Lead Attorney*)
MATTHEW S. FREEDUS (475887)
FELDESMAN TUCKER LEIFER
  FIDELL LLP
2001 L Street, N.W., 2d Floor
Washington, D.C. 20036
Tel      (202) 466-8960
Fax      (202) 293-8103

*Attorneys for Plaintiffs*

August 15, 2008